No. 14-2275

---

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

---

SIERRA CLUB,

*Plaintiff-Appellant,*

*v.*

DTE ENERGY COMPANY, *et al.*

*Defendants-Appellees*.

---

On Appeal From the U.S. District Court for the Eastern District of Michigan, No. 10-cv-13101 (Hon. Bernard A. Friedman)

---

**BRIEF OF PLAINTIFF-APPELLANT SIERRA CLUB**

---

Shannon Fisk
Mary Whittle
Earthjustice
1617 John F. Kennedy Blvd.
Suite 1675
Philadelphia, PA 19103
(217) 717-4520
sfisk@earthjustice.org
mwhittle@earthjustice.org

*Counsel for Sierra Club*

DATED: December 23, 2014

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Sierra Club states that it is not a subsidiary or affiliate of a publicly owned corporation.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........ i
TABLE OF AUTHORITIES ........ iii
GLOSSARY OF TERMS ........ v
CLEAN AIR ACT CODIFICATION GUIDE ........ v

JURISDICTIONAL STATEMENT ........ 1
STATEMENT OF ISSUES ........ 1
STATEMENT OF THE CASE ........ 2
A. Procedural History ........ 2
B. Regulatory Background ........ 6
C. Factual Background ........ 7
STANDARD OF REVIEW ........ 9
SUMMARY OF ARGUMENT ........ 9
ARGUMENT ........ 11
A. DTE Violated the NSR Regulations Governing the Demand Growth Exclusion When It Excluded All Of Its Projected Emissions Increases From Its Applicability Analysis. ........ 11
B. A Post-Project Emissions Increase Is Not Required For A Preconstruction Enforcement Act Under the CAA. ........ 15
CONCLUSION ........ 17

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Auer v. Robbins*,
519 U.S. 452 (1997) .......... 9

*Nat'l Parks and Conservation Ass'n, Inc. v. Tenn. Valley Auth.*,
502 F.3d 1316 (11th Cir. 2007) .......... 16

*New York v. U.S. E.P.A.*,
413 F.3d 3 (D.C. Cir. 2005) .......... 7, 11, 12, 13

*Sierra Club v. Otter Tail Power Co.*,
615 F.3d 1008 (8th Cir. 2010) .......... 16

*Trs. of Resilient Floor Decorators Ins. Fund. v. A & M Installations, Inc.*,
395 F.3d 244 (6th Cir. 2005) .......... 9

*U.S. v. DTE Energy Co.*,
711 F.3d 643 (6th Cir. 2013) .......... 1, 2, 3, 4, 5, 6, 10, 11, 15, 17

*U.S. v. Midwest Generation, LLC*,
694 F. Supp. 2d 999 (N.D. Ill. 2010) .......... 16

## Statutes

28 U.S.C. § 1291 .......... 1

28 U.S.C. § 1331 .......... 1

## Regulations

40 C.F.R. § 52.21(a)(2)(iv)(a) .......... 15

40 C.F.R. § 52.21(a)(2)(iv)(b) .......... 16, 17

40 C.F.R. § 52.21(a)(2)(iv)(c) .......... 16

40 C.F.R. § 52.21(b)(2) .......... 15, 16

40 C.F.R. § 52.21(b)(23).....6, 8

40 C.F.R. § 52.21(b)(41).....6

40 C.F.R. § 52.21(b)(41)(ii)(a).....14

40 C.F.R. § 52.21(b)(41)(ii)(c).....7, 12

40 C.F.R. § 52.21(b)(48).....6

40 C.F.R. § 52.21(r)(1).....17

40 C.F.R. § 52.21(r)(6)(i)(c).....7, 12

67 Fed. Reg. 80,186 (Dec. 31, 2002).....7, 11, 12

FED. R. CIV. P. 56(a).....9

## GLOSSARY OF TERMS

| | |
|---|---|
| CAA | Clean Air Act |
| DTE | DTE Energy Co. and Detroit Edison Co. |
| EPA | U.S. Environmental Protection Agency |
| MDEQ | Michigan Department of Environmental Quality |
| $NO_x$ | Nitrogen Oxides |
| NSR | New Source Review |
| PSD | Prevention of Significant Deterioration |
| $SO_2$ | Sulfur Dioxide |

## CLEAN AIR ACT CODIFICATION GUIDE

| **Clean Air Act Section** | **Codified at:** |
|---|---|
| § 111 – Definitions | 42 U.S.C. § 7411 |
| § 113 – Federal Enforcement | 42 U.S.C. § 7413 |
| § 165 – Preconstruction Requirements (PSD Program) | 42 U.S.C. § 7475 |
| § 167 – Enforcement (PSD-specific) | 42 U.S.C. § 7477 |
| § 169 – Definitions (PSD-specific) | 42 U.S.C. § 7479 |
| § 304 – Citizen Suits | 42 U.S.C. § 7604 |

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiff-Appellant Sierra Club requests oral argument. The issues presented here are issues of national importance. Sierra Club submits that the Court would benefit from the full exploration of the issues that oral argument would provide.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 and entered final judgment on August 5, 2014. Sierra Club filed a timely notice of appeal on October 3, 2014, and this Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

Clean Air Act (CAA) regulations require a utility seeking to modify an electric generating unit to "make a preconstruction projection of whether and to what extent emissions from the source will increase following construction." *U.S. v. DTE Energy Co.*, 711 F.3d 643, 644 (6th Cir. 2013). The preconstruction projection "determines whether the project constitutes a 'major modification' and thus requires a permit" and installation of modern pollution controls under the CAA New Source Review (NSR) program. *Id.* at 644. This Court held that, given the importance of the preconstruction projection to the entire NSR program, such projection may be "subject to an enforcement action by [the Environmental Protection Agency (EPA)] to ensure that the projection is made pursuant to the requirements of the regulations." *Id.* at 652.

Did the District Court incorrectly grant summary judgment in favor of DTE Energy Co. and Detroit Edison Co. (collectively DTE), dismissing Sierra Club's claims that the preconstruction analysis for the $65 million overhaul of Unit 2 at the Monroe Power Plant failed to comply with the demand growth provisions of

the NSR regulations, where DTE simply assumed that the entirety of its projected annual post-construction emissions increases of 3,701 tons of nitrogen oxides ($NO_x$) and 4,096 tons of sulfur dioxide ($SO_2$) could be disregarded on the basis of demand growth and failed to conduct any analysis justifying its invocation of the demand growth exclusion?

Further, did the district court incorrectly hold that an enforcement action for failing to make a preconstruction projection according to the requirements in the NSR regulations is premature until post-project emissions increase over the baseline, where this Court already held that an enforcement proceeding may proceed without post-construction data and remanded the case to the district court specifically to allow the enforcement action regarding the preconstruction projection to proceed? *See id.* at 649, 652.

## STATEMENT OF THE CASE

### A. <u>Procedural History</u>

The United States originally brought this CAA enforcement case based on a $65 million construction project that DTE performed to overhaul the boiler at Unit 2 of the Monroe Power Plant. That project, which began in March 2010, took approximately three months to complete. Opinion and Order Granting Defendants' Motion for Summary Judgment, RE 160, Page ID # 6641. The United States alleged that this construction project constituted a "major modification" under the

CAA, thereby triggering the need for a preconstruction permit under the CAA'S Prevention of Significant Deterioration (PSD) and Nonattainment NSR programs. The United States further alleged that DTE's failure to obtain a permit violated the CAA. *See generally* Complaint, RE 1, Page ID # 13-15. Sierra Club subsequently intervened as a plaintiff, likewise asserting claims that focused on Unit 2 of the Monroe Power Plant. Motion to Intervene, RE 35; Order Granting Motion to Intervene, RE 64.

On August 23, 2011, the district court granted DTE's motion for summary judgment on the Monroe Unit 2 claims. Opinion and Order Granting Defendants' Motion for Summary Judgment, RE 160. The court held that DTE was not required to obtain a permit prior to its renovation of Unit 2 and that a "determination of whether the projects at issue constitute a major modification is premature." *Id.* at Page ID # 6643. The court concluded that the United States could "pursue NSR enforcement if and when post-construction monitoring shows a need to do so." *Id.*

This Court reversed the district court's opinion, holding that a utility seeking to modify an electric generating unit must "make a preconstruction projection of whether and to what extent emissions from the source will increase following construction," and that such projections may be "subject to an enforcement action by EPA to ensure that the projection is made pursuant to the requirements of the

regulations." *DTE Energy Co.*, 711 F.3d at 644, 652. This Court also rejected the district court's ruling that an enforcement proceeding is not permitted until there is post-construction data confirming a significant emissions increase. *Id.* at 649. This Court held that the CAA authorizes enforcement actions both: (1) to prevent the construction or modification of a major emitting facility that does not make projections according to the requirements in the NSR regulations, *id.* at 650, and (2) to stop post-construction emissions that turn out to be higher than preconstruction emissions, despite a preconstruction analysis that followed the requirements in the NSR regulations, *id.* at 651. This Court remanded the case so the district court could determine whether DTE had "adhered to EPA's regulations governing preconstruction emission projections prior to renovating [Unit 2]." Opinion and Order Granting Defendants' Motion for Summary Judgment, RE 196, Page ID # 7514.

While the case was on remand, both the United States and the Sierra Club moved for leave to file amended complaints. Motions for Leave to File First Amended Complaints, RE 184, 186. The district court granted these motions, allowing the United States and Sierra Club to add NSR claims related to several additional construction projects that occurred at DTE's coal-fired power plants. Order Granting Motions for Leave to File Amended Complaints, RE 202. The court disallowed the addition of only one of Sierra Club's claims regarding Unit 3

of the River Rouge Power Plant because the United States had not included that claim in its amended complaint. Order Granting in part Defendants' Motion for Reconsideration, RE 217.

Meanwhile, DTE filed a renewed motion for summary judgment, which the district court granted in an Opinion and Order issued on March 3, 2014. RE 196. In its Order, the district court concluded that the United States was taking DTE "to task over *the extent* to which they relied upon the demand growth exclusion to justify their projections," and in doing so was impermissibly "second-guessing 'the making of preconstruction emission projections.'" *Id.* at Page ID # 7515 (quoting *DTE Energy Co.*, 711 F.3d at 649). The district court held that the government had failed to establish that "defendants violated the regulations governing emission projections," and this CAA enforcement action was premature. *Id.* at Page ID # 7515-16. The district court held that even if DTE misapplied the demand growth exclusion in its preconstruction projection, EPA cannot maintain an enforcement action where the actual post-project emissions from Unit 2 have not increased. *Id.* at Page ID # 7515.

On April 2, 2014, Sierra Club filed a motion seeking a partial final judgment under Rule 54(b) to appeal the 2014 summary judgment decision. Sierra Club Motion for Judgment Pursuant to 54(b), RE 201. On June 30, the United States also filed a motion seeking a partial final judgment under Rule 54(b) to appeal that

decision. United States Motion for Judgment Pursuant to 54(b), RE 218. The district court granted those motions on August 5, 2014, and issued a stay of the remaining claims pending appeal. Order Granting Partial Final Judgment and Staying the Case Pending Appeal, RE 220. On October 3, 2014, the United States and Sierra Club noticed their appeals of the March 3, 2014 Summary Judgment Order. Notices of Appeal, RE 221, 222.

**B. Regulatory Background**

Under the NSR regulations, a utility's preconstruction projection involves three basic steps: (1) determine baseline actual emissions as defined in 40 C.F.R. § 52.21(b)(48); (2) determine projected actual emissions as defined in 40 C.F.R. § 52.21(b)(41); and (3) compare the two to determine whether a net emissions increase exceeding the significance thresholds set forth in 40 C.F.R. § 52.21(b)(23) is projected to occur. If the projected emissions increase exceeds the significance threshold, then the utility "must seek a permit from EPA or the relevant state agency and install expensive modern pollution-control technology." *DTE Energy Co.*, 711 F.3d at 647. If the significance threshold is not exceeded, then the utility will likely have to comply with various recordkeeping and reporting requirements so that the EPA, state environmental agency, and interested individuals can evaluate whether the pre-construction projection was accurate or whether an NSR-triggering post-project emissions increase occurs. *Id.*

The NSR regulations include a number of detailed requirements that must be followed in carrying out the pre-construction projection. Only one of those requirements is at issue here: the demand growth exclusion. The demand growth exclusion provides that a utility should subtract from its projected actual emissions any emissions that "could have [been] accommodated" during the baseline period and that are "unrelated to the particular project, including any increased utilization due to product demand growth." 40 C.F.R. § 52.21(b)(41)(ii)(c). Under the NSR regulations, DTE was required "before beginning actual construction of the project" to "document and maintain a record of . . . the amount of emissions excluded under paragraph (b)(41)(ii)(c) of this section and an explanation for why such amount was excluded." 40 C.F.R. § 52.21(r)(6)(i)(c). Such explanation must go beyond the mere claim that all emissions increases are due to demand growth because the NSR regulations do not create a "per se exclusion for demand growth." *New York v. U.S. E.P.A.*, 413 F.3d 3, 32 (D.C. Cir. 2005). Instead, "demand growth can only be excluded to the extent that the physical or operational change is not related to the emissions increase." 67 Fed. Reg. 80,186, 80,203 (Dec. 31, 2002).

## C. <u>**Factual Background**</u>

DTE cites the demand growth exclusion as its basis for concluding that the $65 million Monroe Unit 2 overhaul would not trigger NSR requirements. Ex. 4 to

DTE Brief in Support of Motion for Summary Judgment, Supplemental Declaration of Skiles W. Boyd, RE 166-5, Page ID # 6798 (¶5.e). In a planned outage notification sent to the Michigan Department of Environmental Quality (MDEQ) just before the overhaul project commenced, DTE projected that the Monroe Unit 2 $SO_2$ emissions would increase from a baseline amount of 30,115 tons per year to a post-project level of 33,816 tons in 2013, for a total increase of 3,701 tons. Ex. 3 to DTE Brief in Support of Motion for Summary Judgment, Letter from DTE Energy to MDEQ, RE 166-4, Page ID # 6793. The company further projected that NOx emissions would increase from a baseline amount of 10,398 tons to a post-project level of 14,494 tons, for a total increase of 4,096 tons. *Id.* Such increases far exceed the CAA's 40-ton threshold for triggering the NSR permitting provisions for those pollutants. 40 C.F.R. § 52.21(b)(23). DTE then excluded the amount of the projected $SO_2$ and $NO_x$ emissions from its analysis, thereby enabling the company to project zero change in emissions as a result of the $65 million overhaul. Ex. 3 to DTE Brief in Support of Motion for Summary Judgment, Letter from DTE Energy to MDEQ, RE 166-4, Page ID # 6793. In the notification, DTE simply quoted the regulatory provision setting forth the demand growth exclusion without presenting any explanation for why the projected emissions were purportedly the result of demand growth or any analysis showing

how those specific increases were purportedly the result of demand growth. *Id.* at Page ID # 6790.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*. *Trs. of Resilient Floor Decorators Ins. Fund. v. A & M Installations, Inc.*, 395 F.3d 244, 247-48 (6th Cir. 2005). Summary judgment is appropriate only if the movant shows there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When examining a regulation promulgated by an agency, the Court defers to the agency's interpretation unless it is "plainly erroneous or inconsistent with" the regulation. *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (citation omitted).

## SUMMARY OF ARGUMENT

The district court incorrectly granted summary judgment against Sierra Club's citizen enforcement action on the legally and factually flawed ground that Sierra Club was attempting to "second guess" DTE's demand growth exclusion claim. In fact, there was no DTE analysis to "second guess," as the company has never identified even a shred of evidence suggesting that its projection of a post-project emissions increase was due to demand growth. To the contrary, DTE's own contemporaneous filing with the Michigan Public Service Commission projected that energy demand on the DTE system would decline for each of the

next five years. Nor has DTE ever offered a genuine explanation for how the increased operating hours projected by its model could be unrelated to the project that was completed for the purpose of eliminating the largest source of breakdowns at the unit. By simply assuming, rather than justifying, a demand growth exclusion, DTE failed to comply with the preconstruction projection requirements. As this Court held, "if the projection is made in contravention of the regulations guiding how the projection is to be made, then the [NSR] system is not working" and an enforcement action may proceed. *DTE Energy Co.*, 711 F.3d at 649, 650. As such, the district court erred in granting DTE's motion for summary judgment.

The district court also incorrectly held that an enforcement suit for failure to comply with the regulations for NSR projections cannot be maintained where post-construction emissions data do not demonstrate an actual increase in emissions. As this Court already held, enforcement is proper where an operator fails to follow the NSR regulations governing preconstruction projections ***or*** where actual post-construction emissions are higher than preconstruction emissions, despite a preconstruction projection that followed the regulations but turned out to be incorrect. *DTE Energy Co.*, 711 F.3d at 651. Both are not required for an enforcement action to lie.

Accordingly, Plaintiff-Appellants respectfully request that this Court overturn the district court's dismissal of Sierra Club's NSR claims against DTE for

the $65 million overhaul of Unit 2 at the Monroe Power Plant and remand for further proceedings.

## ARGUMENT

### A. DTE Violated the NSR Regulations Governing the Demand Growth Exclusion When It Excluded All Of Its Projected Emissions Increases From Its Applicability Analysis.

DTE projected a significant increase in emissions after the Monroe Unit 2 boiler renovation but improperly excluded all of the 3,701 tons of $SO_2$ and 4,096 tons of $NO_x$ expected emissions increases from its applicability analysis, citing, without any of the support or analysis that is required by the NSR regulations, the demand growth exclusion. Ex. 3 to DTE Brief in Support of Motion for Summary Judgment, Letter from DTE Energy to MDEQ, RE 166-4, Page ID # 6790, 6793. As this Court held, "[DTE] has to make projections according to the requirements for such projections contained in the regulations. If the operator does not do so, and proceeds to construction, it is subject to an enforcement proceeding." *DTE Energy Co.*, 711 F.3d at 649. DTE's applicability analysis for the Monroe 2 overhaul was flawed in part because DTE zeroed out all of the unit's projected actual emissions increase contrary to regulatory procedure.

Under the rules, DTE may exclude a portion of the projected emissions increase only if the unit was capable of accommodating the emissions during the baseline period *and* the increased emissions are unrelated to the project. *See New*

*York*, 413 F.3d at 33 (*citing* 67 Fed. Reg. 80,186, 80,277 (Dec. 31, 2002) (codified at 40 C.F.R. § 52.21(b)(41)(ii)(c)). DTE's preconstruction projections and exclusions not only needed to be recorded, they had to be supported. *See* 40 C.F.R. § 52.21(r)(6)(i)(c) (requiring a source's description of its NSR applicability test to include, *inter alia*, the amount of emissions excluded under the demand response exclusion, and "an *explanation for why* such amount was excluded." (emphasis added)).[1] The requirement to support and explain the use of the demand growth exclusion to zero out projected emissions increases is critical to ensuring that the regulations do not improperly create a "per se exclusion for demand growth." *New York*, 413 F.3d at 33. DTE, however, did not make any showing to substantiate its claim that the thousands of tons of projected increased emissions after the Monroe 2 boiler overhaul could be excluded due to demand growth.

Merely invoking the demand growth exception is a far cry from substantiating it. This is especially true where DTE's own analyses make clear that it expected that the increases in emissions would occur as a result of the project, not because of demand growth. DTE's own economic analyses suggest

[1] Sierra Club is not challenging the sufficiency of DTE's Notice Letter to MDEQ. The district court already has held that the United States did not allege any insufficiency in the Notice Letter in it Notice of Violation and is barred from pursuing such a claim now. Opinion and Order Granting Defendants' Motion for Summary Judgment, RE 160, Page ID # 6645. Instead, Sierra Club contends that DTE did not comply with the source obligation to document and maintain a record of the applicability test it used to determine that the project was not a major modification, including its justification for the demand growth exclusion.

that the company expected the overhaul to lead to increased generation at Monroe Unit 2 that would inherently mean increased emissions. U.S. Motion for Preliminary Injunction, Decl. of Myron Adams, RE 8-21, Page ID # 456; U.S. Reply in Support of Motion for Preliminary Injunction, Decl. of Matthew Kahal, RE 58-13, Page ID # 2166-67 and Decl. of Robert Koppe, RE 58-10, Page ID # 2111. In the twenty-five years preceding the overhaul, DTE operated Monroe Unit 2 every hour the unit was available. *See* Ex. C to U.S. Opposition to DTE's Motion for Summary Judgment (Filed Under Seal), DTE's Responses to Plaintiff's First Set of Requests for Admission, RE 181-4, Page ID # 7105 (No. 36). DTE's rationale for the Monroe Unit 2 overhaul was to enable the unit to operate more hours by decreasing forced outages and increasing availability. If "the increase [in emissions] is related to the changes made to the unit, then the emissions increases resulting from the increased operation must be attributed to the modification [of the] project, and cannot be subtracted from the projection of post-change actual emissions." *New York*, 413 F.3d at 33. In other words, emissions can be excluded only if they are projected to occur even without the project. DTE's analysis does not support the exclusion here.

Moreover, DTE's contemporaneous projection submitted to the Michigan Public Service Commission – based on the same modeling that DTE used for the projection at issue here – runs counter to DTE's demand growth claim. In that

filing, DTE projected lower annual system energy demand in each of the five years after the overhaul than in each of the five years before the overhaul. U.S. Motion for Preliminary Injunction, Decl. of Bruce Biewald, RE 8-19, Page ID # 372 and Decl. of Matthew Kahal, RE 8-22, Page ID # 464-466. DTE used the same modeling to assert two different projections about demand growth to two different state agencies. The NSR rules require a utility to consider all relevant information including “the company’s filings with the State or Federal regulatory authorities,” when determining the projected actual emissions before beginning actual construction. 40 C.F.R. § 52.21(b)(41)(ii)(a). DTE’s claim of demand growth for Monroe Unit 2 at the same time that the company projected declining demand in its overall system underscores the need for regulatory compliance with the requirement to explain and document how DTE’s projected increased utilization of Monroe Unit 2 is unrelated to the boiler overhaul.

But DTE has not provided any such explanation or documentation to justify its inconsistent positions regarding future demand; there is nothing for EPA or Sierra Club to “second-guess.” As a result, DTE violated the NSR provisions of the CAA for constructing the $65 million overhaul of Monroe Unit 2 without a permit, and the district court erroneously granted summary judgment against Sierra Club’s citizen enforcement action.

## B. A Post-Project Emissions Increase Is Not Required For A Preconstruction Enforcement Act Under the CAA.

In spite of this Court's previous ruling that post-construction data is not necessary to bring an action for an improper preconstruction projection, *DTE Energy*, 711 F.3d at 650, the district court ruled that, where actual post-construction emissions are below the baseline, "the government is unable to show that the renovations to Unit 2 constituted a major modification." Opinion and Order Granting Defendants' Motion for Summary Judgment, RE 196, Page ID # 7516. The court held that until post-construction emissions demonstrate a significant increase that is traceable to construction, "any EPA enforcement action related to the Unit 2 renovations would be premature." *Id.* Contrary to the district court's determination, EPA's rules and this Court's previous decision prohibit a utility from using its actual post-project emissions to evade NSR preconstruction permitting requirements.

In its summary judgment motion, DTE relied on a snippet of language in 40 C.F.R. § 52.21(a)(2)(iv)(a), stating that a "project is not a major modification if it does not cause a significant emissions increase," as purportedly foreclosing any finding of an NSR violation in the absence of a post-project increase in actual emissions. But the cited regulation clarifies that "major modification" is defined at paragraph (b)(2), which defines the term as "any physical change in or change in the method of operation . . . that ***would result in***: a significant emissions increase . .

. .” *Id.* at § 52.21(b)(2). Further, the regulations state that “[t]he procedure for calculating (before beginning actual construction) whether a significant emissions increase . . . will occur depends on the type of emissions units being modified, according to paragraphs (a)(2)(iv)*(c)* through *(f)* of this section.” *Id.* at § 52.21(a)(2)(iv)(b). For projects that only involve existing emissions units, like the Monroe 2 project at issue here, the regulations set forth the actual-to-projected-actual applicability test:

> A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the projected actual emissions (as defined in paragraph (b)(41) of this section) and the baseline actual emissions (as defined in paragraphs (b)(48)(i) and (ii) of this section), for each emissions unit, equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

*Id.* at § 52.21(a)(2)(iv)(c). Accordingly, whether a construction project would result in a significant emissions increase triggering NSR is a determination that is based on a preconstruction analysis – not post-construction data.

Furthermore, courts have held that violations of the preconstruction permitting requirements occur at the time of construction. *See, e.g., Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1014 (8th Cir. 2010); *Nat’l Parks and Conservation Ass’n, Inc. v. Tenn. Valley Auth.*, 502 F.3d 1316, 1322-23 (11th Cir. 2007); *U.S. v. Midwest Generation, LLC*, 694 F. Supp. 2d 999, 1008 (N.D. Ill. 2010). The regulations state that “any owner or operator of a source or

modification subject to this section who commences construction . . . without applying for and receiving approval hereunder, shall be subject to an appropriate enforcement action." 40 C.F.R. § 52.21(r)(1). If a violation of preconstruction permitting requirements occurs at the time of construction, then post-project data cannot nullify the violation.

In addition to the preconstruction projection requirements, the regulations also provide that NSR is triggered by a qualifying post-project emissions increase even if the utility had not projected such an increase. This Court recognized that when it stated: "If a company's projections are later proven incorrect, EPA can bring an enforcement action." *DTE Energy Co.*, 711 F.3d at 651 (*citing* 40 C.F.R. § 52.21(a)(2)(iv)(b)). This regulatory provision thus supplements – not replaces – the preconstruction projection requirement. Contrary to DTE's arguments, nothing in the regulatory language excuses a utility's failure to comply with the preconstruction rules on the ground that a post-project emissions increase has yet to occur.

## CONCLUSION

EPA regulations and applicable case law clearly establish that the demand growth exclusion does not provide utilities with a free pass to simply write off any projected post-project emissions increase. Instead, only emissions increases demonstrated to be due to demand growth or otherwise unrelated to the project can

be excluded and, thus, not counted for NSR purposes. DTE failed to provide any demonstration that the thousands of tons of emissions the company excluded from its preconstruction projection meet this test. The district court's ruling that Sierra Club improperly "second-guessed" DTE's demand growth analysis is wrong as both a matter of law and fact because one cannot second guess an analysis that does not exist.

Further, Sierra Club's enforcement action for DTE's failure to comply with the rules governing preconstruction projections is not precluded by post-construction data that does not show an actual emissions increase. The duty to comply with the preconstruction projection rules for determining NSR applicability is separately enforceable under EPA regulations and does not require post-project data.

For these reasons, Sierra Club respectfully requests that this Court overturn the district court's ruling and remand the case for further proceedings.

Date: December 23, 2014 Respectfully submitted,

/s/ Shannon Fisk
Shannon Fisk
Mary Whittle
Earthjustice
1617 John F. Kennedy Blvd.
Suite 1675
Philadelphia, PA 19103
(217) 717-4520
sfisk@earthjustice.org
mwhittle@earthjustice.org

## CERTIFICATION OF COMPLIANCE WITH TYPE VOLUME LIMITATION

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,172 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because I prepared it in a proportionally-spaced typeface using the Microsoft Word 2010 word processing program in 14-point Times New Roman type.

/s/ Shannon Fisk
Shannon Fisk
Earthjustice
1617 John F. Kennedy Blvd.
Suite 1675
Philadelphia, PA 19103
(217) 717-4520
sfisk@earthjustice.org

## CERTIFICATE OF SERVICE

I certify that I served a copy of the foregoing brief upon the following counsel using the Sixth Circuit's electronic case filing system:

F. William Brownell
Mark Bierbower
Makram Jaber
Hunton & Williams LLP
2200 Pennsylvania Ave, NW
Washington, D.C. 20037

Harry M. Johnson, III
George P. Sibley, III
Hunton & Williams LLP
951 E. Byrd Street
Richmond, VA 23219

Brent A. Rosser
101 South Tyron Street
Charlotte, NC 28280

***Attorneys for Defendant-Appellees DTE Energy Company & Detroit Edison***

Thomas A. Benson
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611

***Attorney for the Plaintiff-Appellant United States of America***

/s/ Shannon Fisk
Shannon Fisk
Earthjustice
1617 John F. Kennedy Blvd.
Suite 1675
Philadelphia, PA 19103
(217) 717-4520
sfisk@earthjustice.org

## RELEVANT DISTRICT COURT DOCUMENTS

| | |
|---|---|
| RE 1 | Complaint, Page ID # 13-15 |
| RE 8-19 | U.S. Motion for Preliminary Injunction, Decl. of Bruce Biewald, Page ID # 372. |
| RE 8-21 | U.S. Motion for Preliminary Injunction, Decl. of Myron Adams, Page ID # 456. |
| RE 8-22 | U.S. Motion for Preliminary Injunction, Decl. of Matthew Kahal, Page ID # 464-466. |
| RE 35 | Motion to Intervene |
| RE 58-10 | U.S. Reply in Support of Motion for Preliminary Injunction, Dec. of Robert Koppe, Page ID # 2111. |
| RE 58-13 | U.S. Reply in Support of Motion for Preliminary Injunction, Decl. of Matthew Kahal, Page ID # 2166-67. |
| RE 64 | Order Granting Motion to Intervene |
| RE 160 | Opinion and Order Granting Defendants' Motion for Summary Judgment, Page ID # 6641, 6643, 6645. |
| RE 166-4 | Ex. 3 to DTE Brief in Support of Motion for Summary Judgment, Letter from DTE Energy to MDEQ, Page ID # 6790, 6793. |
| RE 166-5 | Ex. 4 to DTE Brief in Support of Motion for Summary Judgment, Supplemental Declaration of Skiles W. Boyd, Page ID # 6798. |
| RE 181-4 | Ex. C to U.S. Opposition to DTE's Motion for Summary Judgment (Filed Under Seal), DTE's Responses to Plaintiff's First Set of Requests for Admission, Page ID # 7105. |
| RE 184 | United States Motion for Leave to File First Amended Complaint |
| RE 186 | Sierra Club Motion for Leave to File First Amended Complaint |

| | |
|---|---|
| RE 196 | Opinion and Order Granting Defendants' Motion for Summary Judgment, Page ID # 7514-16. |
| RE 201 | Sierra Club Motion for Judgment Pursuant to 54(b) |
| RE 202 | Order Granting Motions for Leave to File Amended Complaints |
| RE 217 | Order Granting in part Defendants' Motion for Reconsideration |
| RE 218 | United States Motion for Judgment Pursuant to 54(b) |
| RE 220 | Order Granting Partial Final Judgment and Staying the Case Pending Appeal |
| RE 221 | United States Notice of Appeal |
| RE 222 | Sierra Club Notice of Appeal |

# STATUTORY AND REGULATORY ADDENDUM



| Provision | CFR Page |
|---|---|
| 40 CFR § 52.21 (a)(2) | 14 |
| 40 CFR § 52.21(b)(2) | 16 |
| 40 CFR § 52.21 (b)(23) | 21 |
| 40 CFR § 52.21 (b)(41) | 23 |
| 40 CFR § 52.21 (b)(48) | 24 |
| 40 CFR § 52.21 (r)(1) | 38 |
| 40 CFR § 52.21 (r)(6) | 38 |

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO





**§ 52.18 Abbreviations.**

Abbreviations used in this part shall be those set forth in part 60 of this chapter.

[38 FR 12698, May 14, 1973]

**§ 52.20 Attainment dates for national standards.**

Each subpart contains a section which specifies the latest dates by which national standards are to be attained in each region in the State. An attainment date which only refers to a month and a year (such as July 1975) shall be construed to mean the last day of the month in question. However, the specification of attainment dates for national standards does not relieve any State from the provisions of subpart N of this chapter which require all sources and categories of sources to comply with applicable requirements of the plan—

(a) As expeditiously as practicable where the requirement is part of a control strategy designed to attain a primary standard, and

(b) Within a reasonable time where the requirement is part of a control strategy designed to attain a secondary standard.

[37 FR 19808, Sept. 22, 1972, as amended at 39 FR 34535, Sept. 26, 1974; 51 FR 40676, Nov. 7, 1986]

**§ 52.21 Prevention of significant deterioration of air quality.**

(a)(1) *Plan disapproval.* The provisions of this section are applicable to any State implementation plan which has been disapproved with respect to prevention of significant deterioration of air quality in any portion of any State where the existing air quality is better than the national ambient air quality standards. Specific disapprovals are listed where applicable, in subparts B through DDD of this part. The provisions of this section have been incorporated by reference into the applicable implementation plans for various States, as provided in subparts B through DDD of this part. Where this section is so incorporated, the provisions shall also be applicable to all lands owned by the Federal Government and Indian Reservations located in such State. No disapproval with respect to a State's failure to prevent significant deterioration of air quality shall invalidate or otherwise affect the obligations of States, emission sources, or other persons with respect to all portions of plans approved or promulgated under this part.

(2) *Applicability procedures.* (i) The requirements of this section apply to the construction of any new major stationary source (as defined in paragraph (b)(1) of this section) or any project at an existing major stationary source in an area designated as attainment or unclassifiable under sections 107(d)(1)(A)(ii) or (iii) of the Act.

(ii) The requirements of paragraphs (j) through (r) of this section apply to the construction of any new major stationary source or the major modification of any existing major stationary source, except as this section otherwise provides.

(iii) No new major stationary source or major modification to which the requirements of paragraphs (j) through (r)(5) of this section apply shall begin actual construction without a permit that states that the major stationary source or major modification will meet those requirements. The Administrator has authority to issue any such permit.

(iv) The requirements of the program will be applied in accordance with the principles set out in paragraphs (a)(2)(iv)(*a*) through (*f*) of this section.

(*a*) Except as otherwise provided in paragraphs (a)(2)(v) and (vi) of this section, and consistent with the definition of major modification contained in paragraph (b)(2) of this section, a project is a major modification for a regulated NSR pollutant if it causes two types of emissions increases—a significant emissions increase (as defined in paragraph (b)(40) of this section), and a significant net emissions increase (as defined in paragraphs (b)(3) and (b)(23) of this section). The project is not a major modification if it does not cause a significant emissions increase. If the project causes a significant emissions increase, then the project is a major modification only if it also results in a significant net emissions increase.

(*b*) The procedure for calculating (before beginning actual construction)

whether a significant emissions increase (i.e., the first step of the process) will occur depends upon the type of emissions units being modified, according to paragraphs (a)(2)(iv)(*c*) through (*f*) of this section. The procedure for calculating (before beginning actual construction) whether a significant net emissions increase will occur at the major stationary source (i.e., the second step of the process) is contained in the definition in paragraph (b)(3) of this section. Regardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase.

(*c*) *Actual-to-projected-actual applicability test for projects that only involve existing emissions units.* A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the projected actual emissions (as defined in paragraph (b)(41) of this section) and the baseline actual emissions (as defined in paragraphs (b)(48)(i) and (ii) of this section), for each existing emissions unit, equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(*d*) *Actual-to-potential test for projects that only involve construction of a new emissions unit(s).* A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the potential to emit (as defined in paragraph (b)(4) of this section) from each new emissions unit following completion of the project and the baseline actual emissions (as defined in paragraph (b)(48)(iii) of this section) of these units before the project equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(*e*) [Reserved]

(*f*) *Hybrid test for projects that involve multiple types of emissions units.* A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the emissions increases for each emissions unit, using the method specified in paragraphs (a)(2)(iv)(*c*) through (*d*) of this section as applicable with respect to each emissions unit, for each type of emissions unit equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(v) For any major stationary source for a PAL for a regulated NSR pollutant, the major stationary source shall comply with the requirements under paragraph (aa) of this section.

(b) *Definitions.* For the purposes of this section:

(1)(i) *Major stationary source* means:

(*a*) Any of the following stationary sources of air pollutants which emits, or has the potential to emit, 100 tons per year or more of any regulated NSR pollutant: Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input, coal cleaning plants (with thermal dryers), kraft pulp mills, portland cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants (with thermal dryers), primary copper smelters, municipal incinerators capable of charging more than 250 tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production plants, chemical process plants (which does not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140), fossil-fuel boilers (or combinations thereof) totaling more than 250 million British thermal units per hour heat input, petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels, taconite ore processing plants, glass fiber processing plants, and charcoal production plants;

(*b*) Notwithstanding the stationary source size specified in paragraph (b)(1)(i) of this section, any stationary source which emits, or has the potential to emit, 250 tons per year or more of a regulated NSR pollutant; or

(*c*) Any physical change that would occur at a stationary source not otherwise qualifying under paragraph (b)(1) of this section, as a major stationary

source, if the changes would constitute a major stationary source by itself.

(ii) A major source that is major for volatile organic compounds or $NO_X$ shall be considered major for ozone.

(iii) The fugitive emissions of a stationary source shall not be included in determining for any of the purposes of this section whether it is a major stationary source, unless the source belongs to one of the following categories of stationary sources:

(*a*) Coal cleaning plants (with thermal dryers);

(*b*) Kraft pulp mills;

(*c*) Portland cement plants;

(*d*) Primary zinc smelters;

(*e*) Iron and steel mills;

(*f*) Primary aluminum ore reduction plants;

(*g*) Primary copper smelters;

(*h*) Municipal incinerators capable of charging more than 250 tons of refuse per day;

(*i*) Hydrofluoric, sulfuric, or nitric acid plants;

(*j*) Petroleum refineries;

(*k*) Lime plants;

(*l*) Phosphate rock processing plants;

(*m*) Coke oven batteries;

(*n*) Sulfur recovery plants;

(*o*) Carbon black plants (furnace process);

(*p*) Primary lead smelters;

(*q*) Fuel conversion plants;

(*r*) Sintering plants;

(*s*) Secondary metal production plants;

(*t*) Chemical process plants—The term chemical processing plant shall not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140;

(*u*) Fossil-fuel boilers (or combination thereof) totaling more than 250 million British thermal units per hour heat input;

(*v*) Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels;

(*w*) Taconite ore processing plants;

(*x*) Glass fiber processing plants;

(*y*) Charcoal production plants;

(*z*) Fossil fuel-fired steam electric plants of more that 250 million British thermal units per hour heat input, and

(*aa*) Any other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the Act.

(2)(i) *Major modification* means any physical change in or change in the method of operation of a major stationary source that would result in: a significant emissions increase (as defined in paragraph (b)(40) of this section) of a regulated NSR pollutant (as defined in paragraph (b)(50) of this section); and a significant net emissions increase of that pollutant from the major stationary source.

(ii) Any significant emissions increase (as defined at paragraph (b)(40) of this section) from any emissions units or net emissions increase (as defined in paragraph (b)(3) of this section) at a major stationary source that is significant for volatile organic compounds or $NO_X$ shall be considered significant for ozone.

(iii) A physical change or change in the method of operation shall not include:

(*a*) Routine maintenance, repair and replacement. Routine maintenance, repair and replacement shall include, but not be limited to, any activity(s) that meets the requirements of the equipment replacement provisions contained in paragraph (cc) of this section;

NOTE TO PARAGRAPH (b)(2)(iii)(*a*): By court order on December 24, 2003, the second sentence of this paragraph (b)(2)(iii)(a) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the FEDERAL REGISTER advising the public of the termination of the stay.

(*b*) Use of an alternative fuel or raw material by reason of an order under sections 2 (a) and (b) of the Energy Supply and Environmental Coordination Act of 1974 (or any superseding legislation) or by reason of a natural gas curtailment plant pursuant to the Federal Power Act;

(*c*) Use of an alternative fuel by reason of an order or rule under section 125 of the Act;

(*d*) Use of an alternative fuel at a steam generating unit to the extent that the fuel is generated from municipal solid waste;

(*e*) Use of an alternative fuel or raw material by a stationary source which:

modification itself. Secondary emissions include emissions from any offsite support facility which would not be constructed or increase its emissions except as a result of the construction or operation of the major stationary source or major modification. Secondary emissions do not include any emissions which come directly from a mobile source, such as emissions from the tailpipe of a motor vehicle, from a train, or from a vessel.

(i) Emissions from ships or trains coming to or from the new or modified stationary source; and

(ii) Emissions from any offsite support facility which would not otherwise be constructed or increase its emissions as a result of the construction or operation of the major stationary source or major modification.

(19) *Innovative control technology* means any system of air pollution control that has not been adequately demonstrated in practice, but would have a substantial likelihood of achieving greater continuous emissions reduction than any control system in current practice or of achieving at least comparable reductions at lower cost in terms of energy, economics, or nonair quality environmental impacts.

(20) *Fugitive emissions* means those emissions which could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening.

(21)(i) *Actual emissions* means the actual rate of emissions of a regulated NSR pollutant from an emissions unit, as determined in accordance with paragraphs (b)(21)(ii) through (iv) of this section, except that this definition shall not apply for calculating whether a significant emissions increase has occurred, or for establishing a PAL under paragraph (aa) of this section. Instead, paragraphs (b)(41) and (b)(48) of this section shall apply for those purposes.

(ii) In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a consecutive 24-month period which precedes the particular date and which is representative of normal source operation. The Administrator shall allow the use of a different time period upon a determination that it is more representative of normal source operation. Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.

(iii) The Administrator may presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit.

(iv) For any emissions unit that has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.

(22) *Complete* means, in reference to an application for a permit, that the application contains all of the information necessary for processing the application.

(23)(i) Significant means, in reference to a net emissions increase or the potential of a source to emit any of the following pollutants, a rate of emissions that would equal or exceed any of the following rates:

POLLUTANT AND EMISSIONS RATE

Carbon monoxide: 100 tons per year (tpy)
Nitrogen oxides: 40 tpy
Sulfur dioxide: 40 tpy
Particulate matter: 25 tpy of particulate matter emissions
$PM_{10}$: 15 tpy
$PM_{2.5}$: 10 tpy of direct $PM_{2.5}$ emissions; 40 tpy of sulfur dioxide emissions; 40 tpy of nitrogen oxide emissions unless demonstrated not to be a $PM_{2.5}$ precursor under paragraph (b)(50) of this section
Ozone: 40 tpy of volatile organic compounds or nitrogen oxides
Lead: 0.6 tpy
Fluorides: 3 tpy
Sulfuric acid mist: 7 tpy
Hydrogen sulfide ($H_2S$): 10 tpy
Total reduced sulfur (including $H_2S$): 10 tpy
Reduced sulfur compounds (including $H_2S$): 10 tpy
Municipal waste combustor organics (measured as total tetra-through octa-chlorinated dibenzo-p-dioxins and dibenzofurans): $3.2 \times 10^{M6}$ megagrams per year ($3.5 \times 10^{M6}$ tons per year)
Municipal waste combustor metals (measured as particulate matter): 14 megagrams per year (15 tons per year)
Municipal waste combustor acid gases (measured as sulfur dioxide and hydrogen chloride): 36 megagrams per year (40 tons per year)

Municipal solid waste landfills emissions (measured as nonmethane organic compounds): 45 megagrams per year (50 tons per year)

(ii) *Significant* means, in reference to a net emissions increase or the potential of a source to emit a regulated NSR pollutant that paragraph (b)(23)(i) of this section, does not list, any emissions rate.

(iii) Notwithstanding paragraph (b)(23)(i) of this section, *significant* means any emissions rate or any net emissions increase associated with a major stationary source or major modification, which would construct within 10 kilometers of a Class I area, and have an impact on such area equal to or greater than 1 μg/m$^3$, (24-hour average).

(24) *Federal Land Manager* means, with respect to any lands in the United States, the Secretary of the department with authority over such lands.

(25) *High terrain* means any area having an elevation 900 feet or more above the base of the stack of a source.

(26) *Low terrain* means any area other than high terrain.

(27) *Indian Reservation* means any federally recognized reservation established by Treaty, Agreement, executive order, or act of Congress.

(28) *Indian Governing Body* means the governing body of any tribe, band, or group of Indians subject to the jurisdiction of the United States and recognized by the United States as possessing power of self government.

(29) *Adverse impact on visibility* means visibility impairment which interferes with the management, protection, preservation or enjoyment of the visitor's visual experience of the Federal Class I area. This determination must be made on a case-by-case basis taking into account the geographic extent, intensity, duration, frequency and time of visibility impairment, and how these factors correlate with (1) times of visitor use of the Federal Class I area, and (2) the frequency and timing of natural conditions that reduce visibility.

(30) *Volatile organic compounds (VOC)* is as defined in § 51.100(s) of this chapter.

(31) *Electric utility steam generating unit* means any steam electric generating unit that is constructed for the purpose of supplying more than one-third of its potential electric output capacity and more than 25 MW electrical output to any utility power distribution system for sale. Any steam supplied to a steam distribution system for the purpose of providing steam to a steam-electric generator that would produce electrical energy for sale is also considered in determining the electrical energy output capacity of the affected facility.

(32) [Reserved]

(33) *Replacement unit* means an emissions unit for which all the criteria listed in paragraphs (b)(33)(i) through (iv) of this section are met. No creditable emission reductions shall be generated from shutting down the existing emissions unit that is replaced.

(i) The emissions unit is a reconstructed unit within the meaning of § 60.15(b)(1) of this chapter, or the emissions unit completely takes the place of an existing emissions unit.

(ii) The emissions unit is identical to or functionally equivalent to the replaced emissions unit.

(iii) The replacement does not alter the basic design parameters (as discussed in paragraph (cc)(2) of this section) of the process unit.

(iv) The replaced emissions unit is permanently removed from the major stationary source, otherwise permanently disabled, or permanently barred from operation by a permit that is enforceable as a practical matter. If the replaced emissions unit is brought back into operation, it shall constitute a new emissions unit.

(34) *Clean coal technology* means any technology, including technologies applied at the precombustion, combustion, or post combustion stage, at a new or existing facility which will achieve significant reductions in air emissions of sulfur dioxide or oxides of nitrogen associated with the utilization of coal in the generation of electricity, or process steam which was not in widespread use as of November 15, 1990.

(35) *Clean coal technology demonstration project* means a project using funds appropriated under the heading ''Department of Energy-Clean Coal Technology'', up to a total amount of

$2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations for the Environmental Protection Agency. The Federal contribution for a qualifying project shall be at least 20 percent of the total cost of the demonstration project.

(36) *Temporary clean coal technology demonstration project* means a clean coal technology demonstration project that is operated for a period of 5 years or less, and which complies with the State implementation plans for the State in which the project is located and other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

(37) (i) *Repowering* means replacement of an existing coal-fired boiler with one of the following clean coal technologies: atmospheric or pressurized fluidized bed combustion, integrated gasification combined cycle, magnetohydrodynamics, direct and indirect coal-fired turbines, integrated gasification fuel cells, or as determined by the Administrator, in consultation with the Secretary of Energy, a derivative of one or more of these technologies, and any other technology capable of controlling multiple combustion emissions simultaneously with improved boiler or generation efficiency and with significantly greater waste reduction relative to the performance of technology in widespread commercial use as of November 15, 1990.

(ii) Repowering shall also include any oil and/or gas-fired unit which has been awarded clean coal technology demonstration funding as of January 1, 1991, by the Department of Energy.

(iii) The Administrator shall give expedited consideration to permit applications for any source that satisfies the requirements of this subsection and is granted an extension under section 409 of the Clean Air Act.

(38) *Reactivation of a very clean coal-fired electric utility steam generating unit* means any physical change or change in the method of operation associated with the commencement of commercial operations by a coal-fired utility unit after a period of discontinued operation where the unit:

(i) Has not been in operation for the two-year period prior to the enactment of the Clean Air Act Amendments of 1990, and the emissions from such unit continue to be carried in the permitting authority's emissions inventory at the time of enactment;

(ii) Was equipped prior to shut-down with a continuous system of emissions control that achieves a removal efficiency for sulfur dioxide of no less than 85 percent and a removal efficiency for particulates of no less than 98 percent;

(iii) Is equipped with low-$NO_X$ burners prior to the time of commencement of operations following reactivation; and

(iv) Is otherwise in compliance with the requirements of the Clean Air Act.

(39) *Pollution prevention* means any activity that through process changes, product reformulation or redesign, or substitution of less polluting raw materials, eliminates or reduces the release of air pollutants (including fugitive emissions) and other pollutants to the environment prior to recycling, treatment, or disposal; it does not mean recycling (other than certain "in-process recycling" practices), energy recovery, treatment, or disposal.

(40) *Significant emissions increase* means, for a regulated NSR pollutant, an increase in emissions that is significant (as defined in paragraph (b)(23) of this section) for that pollutant.

(41)(i) *Projected actual emissions* means the maximum annual rate, in tons per year, at which an existing emissions unit is projected to emit a regulated NSR pollutant in any one of the 5 years (12-month period) following the date the unit resumes regular operation after the project, or in any one of the 10 years following that date, if the project involves increasing the emissions unit's design capacity or its potential to emit that regulated NSR pollutant and full utilization of the unit would result in a significant emissions increase or a significant net emissions increase at the major stationary source.

(ii) In determining the projected actual emissions under paragraph (b)(41)(i) of this section (before beginning actual construction), the owner or operator of the major stationary source:

(*a*) Shall consider all relevant information, including but not limited to, historical operational data, the company's own representations, the company's expected business activity and the company's highest projections of business activity, the company's filings with the State or Federal regulatory authorities, and compliance plans under the approved State Implementation Plan; and

(*b*) Shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions; and

(*c*) Shall exclude, in calculating any increase in emissions that results from he particular project, that portion of the unit's emissions following the project that an existing unit could have accommodated during the consecutive 24-month period used to establish the baseline actual emissions under paragraph (b)(48) of this section and that are also unrelated to the particular project, including any increased utilization due to product demand growth; or

(*d*) In lieu of using the method set out in paragraphs (a)(41)(ii)(*a*) through (*c*) of this section, may elect to use the emissions unit's potential to emit, in tons per year, as defined under paragraph (b)(4) of this section.

(42) [Reserved]

(43) *Prevention of Significant Deterioration (PSD) program* means the EPA-implemented major source preconstruction permit programs under this section or a major source preconstruction permit program that has been approved by the Administrator and incorporated into the State Implementation Plan pursuant to § 51.166 of this chapter to implement the requirements of that section. Any permit issued under such a program is a major NSR permit.

(44) *Continuous emissions monitoring system (CEMS)* means all of the equipment that may be required to meet the data acquisition and availability requirements of this section, to sample, condition (if applicable), analyze, and provide a record of emissions on a continuous basis.

(45) *Predictive emissions monitoring system (PEMS)* means all of the equipment necessary to monitor process and control device operational parameters (for example, control device secondary voltages and electric currents) and other information (for example, gas flow rate, $O_2$ or $CO_2$ concentrations), and calculate and record the mass emissions rate (for example, lb/hr) on a continuous basis.

(46) *Continuous parameter monitoring system (CPMS)* means all of the equipment necessary to meet the data acquisition and availability requirements of this section, to monitor process and control device operational parameters (for example, control device secondary voltages and electric currents) and other information (for example, gas flow rate, $O_2$ or $CO_2$ concentrations), and to record average operational parameter value(s) on a continuous basis.

(47) *Continuous emissions rate monitoring system (CERMS)* means the total equipment required for the determination and recording of the pollutant mass emissions rate (in terms of mass per unit of time).

(48) *Baseline actual emissions* means the rate of emissions, in tons per year, of a regulated NSR pollutant, as determined in accordance with paragraphs (b)(48)(i) through (iv) of this section.

(i) For any existing electric utility steam generating unit, baseline actual emissions means the average rate, in tons per year, at which the unit actually emitted the pollutant during any consecutive 24-month period selected by the owner or operator within the 5-year period immediately preceding when the owner or operator begins actual construction of the project. The Administrator shall allow the use of a different time period upon a determination that it is more representative of normal source operation.

(*a*) The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(*b*) The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above any emission limitation that was legally enforceable during the consecutive 24-month period.

(*c*) For a regulated NSR pollutant, when a project involves multiple emissions units, only one consecutive 24-

month period must be used to determine the baseline actual emissions for the emissions units being changed. A different consecutive 24-month period can be used For each regulated NSR pollutant.

(*d*) The average rate shall not be based on any consecutive 24-month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by paragraph (b)(48)(i)(*b*) of this section.

(ii) For an existing emissions unit (other than an electric utility steam generating unit), baseline actual emissions means the average rate, in tons per year, at which the emissions unit actually emitted the pollutant during any consecutive 24-month period selected by the owner or operator within the 10-year period immediately preceding either the date the owner or operator begins actual construction of the project, or the date a complete permit application is received by the Administrator for a permit required under this section or by the reviewing authority for a permit required by a plan, whichever is earlier, except that the 10-year period shall not include any period earlier than November 15, 1990.

(*a*) The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(*b*) The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above an emission limitation that was legally enforceable during the consecutive 24-month period.

(*c*) The average rate shall be adjusted downward to exclude any emissions that would have exceeded an emission limitation with which the major stationary source must currently comply, had such major stationary source been required to comply with such limitations during the consecutive 24-month period. However, if an emission limitation is part of a maximum achievable control technology standard that the Administrator proposed or promulgated under part 63 of this chapter, the baseline actual emissions need only be adjusted if the State has taken credit for such emissions reductions in an attainment demonstration or maintenance plan consistent with the requirements of § 51.165(a)(3)(ii)(G) of this chapter.

(*d*) For a regulated NSR pollutant, when a project involves multiple emissions units, only one consecutive 24-month period must be used to determine the baseline actual emissions for all the emissions units being changed. A different consecutive 24-month period can be used For each regulated NSR pollutant.

(*e*) The average rate shall not be based on any consecutive 24-month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by paragraphs (b)(48)(ii)(*b*) and (*c*) of this section.

(iii) For a new emissions unit, the baseline actual emissions for purposes of determining the emissions increase that will result from the initial construction and operation of such unit shall equal zero; and thereafter, for all other purposes, shall equal the unit's potential to emit.

(iv) For a PAL for a stationary source, the baseline actual emissions shall be calculated for existing electric utility steam generating units in accordance with the procedures contained in paragraph (b)(48)(i) of this section, for other existing emissions units in accordance with the procedures contained in paragraph (b)(48)(ii) of this section, and for a new emissions unit in accordance with the procedures contained in paragraph (b)(48)(iii) of this section.

(49) *Subject to regulation* means, for any air pollutant, that the pollutant is subject to either a provision in the Clean Air Act, or a nationally-applicable regulation codified by the Administrator in subchapter C of this chapter, that requires actual control of the quantity of emissions of that pollutant, and that such a control requirement has taken effect and is operative to control, limit or restrict the quantity of emissions of that pollutant released from the regulated activity. Except that:

(i) *Greenhouse gases (GHGs),* the air pollutant defined in § 86.1818–12(a) of this chapter as the aggregate group of

That the applicable requirements of this section are otherwise met.

(7) *Variance by the Governor with the President's concurrence.* In any case where the Governor recommends a variance in which the Federal Land Manager does not concur, the recommendations of the Governor and the Federal Land Manager shall be transmitted to the President. The President may approve the Governor's recommendation if he finds that the variance is in the national interest. If the variance is approved, the Administrator shall issue a permit pursuant to the requirements of paragraph (q)(7) of this section: *Provided,* That the applicable requirements of this section are otherwise met.

(8) *Emission limitations for Presidential or gubernatorial variance.* In the case of a permit issued pursuant to paragraph (q) (5) or (6) of this section the source or modification shall comply with such emission limitations as may be necessary to assure that emissions of sulfur dioxide from the source or modification would not (during any day on which the otherwise applicable maximum allowable increases are exceeded) cause or contribute to concentrations which would exceed the following maximum allowable increases over the baseline concentration and to assure that such emissions would not cause or contribute to concentrations which exceed the otherwise applicable maximum allowable increases for periods of exposure of 24 hours or less for more than 18 days, not necessarily consecutive, during any annual period:

MAXIMUM ALLOWABLE INCREASE

[Micrograms per cubic meter]

| Period of exposure | Terrain areas | |
|---|---|---|
| | Low | High |
| 24-hr maximum | 36 | 62 |
| 3-hr maximum | 130 | 221 |

(q) *Public participation.* The Administrator shall follow the applicable procedures of 40 CFR part 124 in processing applications under this section. The Administrator shall follow the procedures at 40 CFR 52.21(r) as in effect on June 19, 1979, to the extent that the procedures of 40 CFR part 124 do not apply.

(r) *Source obligation.* (1) Any owner or operator who constructs or operates a source or modification not in accordance with the application submitted pursuant to this section or with the terms of any approval to construct, or any owner or operator of a source or modification subject to this section who commences construction after the effective date of these regulations without applying for and receiving approval hereunder, shall be subject to appropriate enforcement action.

(2) Approval to construct shall become invalid if construction is not commenced within 18 months after receipt of such approval, if construction is discontinued for a period of 18 months or more, or if construction is not completed within a reasonable time. The Administrator may extend the 18-month period upon a satisfactory showing that an extension is justified. This provision does not apply to the time period between construction of the approved phases of a phased construction project; each phase must commence construction within 18 months of the projected and approved commencement date.

(3) Approval to construct shall not relieve any owner or operator of the responsibility to comply fully with applicable provisions of the State implementation plan and any other requirements under local, State, or Federal law.

(4) At such time that a particular source or modification becomes a major stationary source or major modification solely by virtue of a relaxation in any enforceable limitation which was established after August 7, 1980, on the capacity of the source or modification otherwise to emit a pollutant, such as a restriction on hours of operation, then the requirements or paragraphs (j) through (s) of this section shall apply to the source or modification as though construction had not yet commenced on the source or modification.

(5) [Reserved]

(6) Except as otherwise provided in paragraph (r)(6)(vi)(*b*) of this section, the provisions of this paragraph (r)(6) apply with respect to any regulated NSR pollutant emitted from projects at existing emissions units at a major

stationary source (other than projects at a source with a PAL) in circumstances where there is a reasonable possibility, within the meaning of paragraph (r)(6)(vi) of this section, that a project that is not a part of a major modification may result in a significant emissions increase of such pollutant, and the owner or operator elects to use the method specified in paragraphs (b)(41)(ii)(*a*) through (*c*) of this section for calculating projected actual emissions.

(i) Before beginning actual construction of the project, the owner or operator shall document and maintain a record of the following information:

(*a*) A description of the project;

(*b*) Identification of the emissions unit(s) whose emissions of a regulated NSR pollutant could be affected by the project; and

(*c*) A description of the applicability test used to determine that the project is not a major modification for any regulated NSR pollutant, including the baseline actual emissions, the projected actual emissions, the amount of emissions excluded under paragraph (b)(41)(ii)(*c*) of this section and an explanation for why such amount was excluded, and any netting calculations, if applicable.

(ii) If the emissions unit is an existing electric utility steam generating unit, before beginning actual construction, the owner or operator shall provide a copy of the information set out in paragraph (r)(6)(i) of this section to the Administrator. Nothing in this paragraph (r)(6)(ii) shall be construed to require the owner or operator of such a unit to obtain any determination from the Administrator before beginning actual construction.

(iii) The owner or operator shall monitor the emissions of any regulated NSR pollutant that could increase as a result of the project and that is emitted by any emissions unit identified in paragraph (r)(6)(i)(*b*) of this section; and calculate and maintain a record of the annual emissions, in tons per year on a calendar year basis, for a period of 5 years following resumption of regular operations after the change, or for a period of 10 years following resumption of regular operations after the change if the project increases the design capacity or potential to emit that regulated NSR pollutant at such emissions unit.

(iv) If the unit is an existing electric utility steam generating unit, the owner or operator shall submit a report to the Administrator within 60 days after the end of each year during which records must be generated under paragraph (r)(6)(iii) of this section setting out the unit's annual emissions during the calendar year that preceded submission of the report.

(v) If the unit is an existing unit other than an electric utility steam generating unit, the owner or operator shall submit a report to the Administrator if the annual emissions, in tons per year, from the project identified in paragraph (r)(6)(i) of this section, exceed the baseline actual emissions (as documented and maintained pursuant to paragraph (r)(6)(i)(*c*) of this section), by a significant amount (as defined in paragraph (b)(23) of this section) for that regulated NSR pollutant, and if such emissions differ from the preconstruction projection as documented and maintained pursuant to paragraph (r)(6)(i)(*c*) of this section. Such report shall be submitted to the Administrator within 60 days after the end of such year. The report shall contain the following:

(*a*) The name, address and telephone number of the major stationary source;

(*b*) The annual emissions as calculated pursuant to paragraph (r)(6)(iii) of this section; and

(*c*) Any other information that the owner or operator wishes to include in the report (e.g., an explanation as to why the emissions differ from the preconstruction projection).

(vi) A ''reasonable possibility'' under paragraph (r)(6) of this section occurs when the owner or operator calculates the project to result in either:

(*a*) A projected actual emissions increase of at least 50 percent of the amount that is a ''significant emissions increase,'' as defined under paragraph (b)(40) of this section (without reference to the amount that is a significant net emissions increase), for the regulated NSR pollutant; or

(*b*) A projected actual emissions increase that, added to the amount of emissions excluded under paragraph

(b)(41)(ii)(*c*) of this section, sums to at least 50 percent of the amount that is a ''significant emissions increase,'' as defined under paragraph (b)(40) of this section (without reference to the amount that is a significant net emissions increase), for the regulated NSR pollutant. For a project for which a reasonable possibility occurs only within the meaning of paragraph (r)(6)(vi)(*b*) of this section, and not also within the meaning of paragraph (r)(6)(vi)(*a*) of this section, then provisions (r)(6)(ii) through (v) do not apply to the project.

(7) The owner or operator of the source shall make the information required to be documented and maintained pursuant to paragraph (r)(6) of this section available for review upon a request for inspection by the Administrator or the general public pursuant to the requirements contained in § 70.4(b)(3)(viii) of this chapter.

(s) *Environmental impact statements.* Whenever any proposed source or modification is subject to action by a Federal Agency which might necessitate preparation of an environmental impact statement pursuant to the National Environmental Policy Act (42 U.S.C. 4321), review by the Administrator conducted pursuant to this section shall be coordinated with the broad environmental reviews under that Act and under section 309 of the Clean Air Act to the maximum extent feasible and reasonable.

(t) *Disputed permits or redesignations.* If any State affected by the redesignation of an area by an Indian Governing Body, or any Indian Governing Body of a tribe affected by the redesignation of an area by a State, disagrees with such redesignation, or if a permit is proposed to be issued for any major stationary source or major modification proposed for construction in any State which the Governor of an affected State or Indian Governing Body of an affected tribe determines will cause or contribute to a cumulative change in air quality in excess of that allowed in this part within the affected State or Indian Reservation, the Governor or Indian Governing Body may request the Administrator to enter into negotiations with the parties involved to resolve such dispute. If requested by any State or Indian Governing Body involved, the Administrator shall make a recommendation to resolve the dispute and protect the air quality related values of the lands involved. If the parties involved do not reach agreement, the Administrator shall resolve the dispute and his determination, or the results of agreements reached through other means, shall become part of the applicable State implementation plan and shall be enforceable as part of such plan. In resolving such disputes relating to area redesignation, the Administrator shall consider the extent to which the lands involved are of sufficient size to allow effective air quality management or have air quality related values of such an area.

(u) *Delegation of authority.* (1) The Administrator shall have the authority to delegate his responsibility for conducting source review pursuant to this section, in accordance with paragraphs (v) (2) and (3) of this section.

(2) Where the Administrator delegates the responsibility for conducting source review under this section to any agency other than a Regional Office of the Environmental Protection Agency, the following provisions shall apply:

(i) Where the delegate agency is not an air pollution control agency, it shall consult with the appropriate State and local air pollution control agency prior to making any determination under this section. Similarly, where the delegate agency does not have continuing responsibility for managing land use, it shall consult with the appropriate State and local agency primarily responsible for managing land use prior to making any determination under this section.

(ii) The delegate agency shall send a copy of any public comment notice required under paragraph (r) of this section to the Administrator through the appropriate Regional Office.

(3) The Administrator's authority for reviewing a source or modification located on an Indian Reservation shall not be redelegated other than to a Regional Office of the Environmental Protection Agency, except where the State has assumed jurisdiction over such land under other laws. Where the State has assumed such jurisdiction,