Nos. 14-2274 and 14-2275

## UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

and

SIERRA CLUB,

*Intervenor-Plaintiff-Appellant,*

v.

DTE ENERGY COMPANY and DETROIT EDISON COMPANY,

*Defendants-Appellees.*

**On Appeal from the U.S. District Court for the Eastern District of Michigan, No. 10-13101 (Hon. Bernard A. Friedman)**

## BRIEF OF DEFENDANTS-APPELLEES
## DTE ENERGY COMPANY AND DETROIT EDISON COMPANY

Harry M. Johnson, III
George P. Sibley, III
**HUNTON & WILLIAMS LLP**
951 E. Byrd Street
Richmond, VA  23219
(804) 788-8200

Michael J. Solo
**DTE ENERGY COMPANY**
One Energy Plaza
Detroit, MI  48226
(313) 235-9512

*Counsel for DTE Energy Company
and Detroit Edison Company*

F. William Brownell
Mark B. Bierbower
Makram B. Jaber
**HUNTON & WILLIAMS LLP**
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
(202) 955-1500

Brent A. Rosser
**HUNTON & WILLIAMS LLP**
101 South Tryon Street, Suite 3500
Charlotte, NC 28280
(704) 378-4707

DATED: February 27, 2015

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 14-2274          Case Name: USA v. DTE Energy Company, et al.

Name of counsel: F. William Brownell

Pursuant to 6th Cir. R. 26.1, DTE Energy Company

*Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
     identity of the parent corporation or affiliate and the relationship between it and the named
     party:

No

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
     in the outcome?  If yes, list the identity of such corporation and the nature of the financial
     interest:

No

CERTIFICATE OF SERVICE

I certify that on _____ February 27, 2015 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ F. William Brownell

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number:  14-2274              Case Name:  USA v. DTE Energy Company, et al.

Name of counsel:  F. William Brownell

Pursuant to 6th Cir. R. 26.1,  DTE Electric Company
                                                        *Name of Party*

makes the following disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> Parent Corporation/Affiliate Name:  DTE Energy Company
> Relationship with Named Party:  Parent

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No

---

CERTIFICATE OF SERVICE

I certify that on _____ February 27, 2015 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/  F. William Brownell

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 14-2275          Case Name: USA, et al. v. DTE Energy Co., et al.

Name of counsel: F. William Brownell

Pursuant to 6th Cir. R. 26.1, DTE Energy Company

*Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No

CERTIFICATE OF SERVICE

I certify that on _____ February 27, 2015 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ F. William Brownell

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 14-2275          Case Name: USA, et al. v. DTE Energy Co., et al.

Name of counsel: F. William Brownell

Pursuant to 6th Cir. R. 26.1, DTE Electric Company
                              *Name of Party*
makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> Parent Corporation/Affiliate Name:  DTE Energy Company
> Relationship with Names Party:  Parent

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No

---

CERTIFICATE OF SERVICE

I certify that on _____ February 27, 2015 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ F. William Brownell

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ........................................................i

TABLE OF CONTENTS ............................................................................. v

TABLE OF AUTHORITIES ...................................................................... viii

GLOSSARY OF TERMS ............................................................................xv

CLEAN AIR ACT CODIFICATION GUIDE ........................................................xvi

STATEMENT IN SUPPORT OF ORAL ARGUMENT .................................... xvii

STATEMENT OF THE ISSUE ....................................................................1

PRELIMINARY STATEMENT ....................................................................2

STATEMENT OF THE CASE ......................................................................8

   I.    Statutory and Regulatory Background: The CAA and the
       Role of NSR ...................................................................................8

   II.   The Regulatory History of NSR ................................................13

       A.   Earlier Rules Contained Frustrating Ambiguities That
            Led to an "Abysmal Breakdown in the Administrative
            Process." ..............................................................................15

       B.   EPA's First Round of Reforms in 1992 ............................18

       C.   The 2002 NSR Reform Rules: A Common Sense
            Approach to NSR Applicability and Enforcement ...........................20

            1.   The 2002 NSR Reform Rules Enhance and Clarify
                 a Source's Pre- and Post-Construction Obligations .................21

                 a.   "Baseline Actual Emissions" .............................................22

                 b.   "Projected Actual Emissions" ............................................24

                 c.   Comparison of "Baseline Actual Emissions"
                    and "Projected Actual Emissions" ....................................26

2.   The 2002 NSR Reform Rules Measure the Validity of the Source's Preconstruction Projection Through Post-construction Emissions Data............................28

STATEMENT OF FACTS ................................................................30

I.   DTE's 2010 Maintenance Projects at Monroe Unit 2 ......................30

II.   Procedural History.............................................................35

A.   The Government's Notice of Violation and Subsequent Enforcement Action ...................................................35

B.   The District Court Grants DTE's Original Motion for Summary Judgment. .................................................37

C.   This Court's 2013 Decision .............................................38

1.   This Court Endorsed Key Premises of The District Court's 2011 Decision. ..............................38

2.   This Court Carves Out a Narrow Category of Claims to Ensure That the System Works. ...............40

3.   The District Court Concludes That DTE Complied with the Regulations' Specific Instructions. ...............42

STANDARD OF REVIEW .............................................................43

SUMMARY OF ARGUMENT .........................................................44

ARGUMENT ..............................................................................46

I.   EPA Seeks to Second-Guess DTE's Preconstruction Projection, Which This Court Already Has Concluded Is Improper. ...................................................................46

A.   Post-Project Data Dictate Whether a Project Was a Modification...................................................46

B.   Decisions Interpreting Pre-2002 Versions of the NSR Rules Are Inapposite........................................51

C.   The Government Seeks to Prove, Through Second-
Guessing, That DTE Violated the Regulations. ...............................54

1.   DTE Considered All Relevant Information. ............................54

2.   DTE Properly Applied the Demand Growth
Exclusion. ................................................................................55

3.   DTE Complied With the Notice and
Recordkeeping Requirements, and the Government
and Sierra Club Have Waived Any Further
Argument to the Contrary. .......................................................61

II.   The Government's Litigation Position Is Not Entitled to
Deference. ................................................................................................66

III.   EPA Has Not Alleged a Violation of Projection Regulations .................70

CONCLUSION ...................................................................................................73

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

RELEVANT DISTRICT COURT DOCUMENTS

STATUTORY AND REGULATORY ADDENDUM

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Auer v. Robbins*, 519 U.S. 452 (1997) ........................................................66

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) .......................66

*Christensen v. Harris Cnty.*, 529 U.S. 576 (2000) ...........................58, 66

*Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012).......................69

*Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007) .............................12, 15, 16

*In re Tenn. Valley Auth.*, 9 E.A.D. 357, 2000 WL 1358648 (EAB Sept. 15, 2000) .........................................................52, 68

*Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, 480 F.3d 410 (6th Cir. 2007) .........................................................9

*Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, 618 F. Supp. 2d 815 (E.D. Tenn. 2009).........................................................67

*Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, No. 3:01-CV-71, 2010 WL 1291335 (E.D. Tenn. Mar. 31, 2010)......................................30

*Panhandle E. Pipe Line Co. v. FERC*, 613 F.2d 1120 (D.C. Cir. 1979)................70

*Pennsylvania Dep't of Envtl. Prot. v. Allegheny Energy, Inc.*, No. 05-885, 2008 WL 4960100 (W.D. Pa. Sept. 2, 2008) ........................................67

*Pennsylvania Dep't of Envtl. Prot. v. Allegheny Energy, Inc.*, No. 05-885, 2014 WL 494574 (W.D. Pa. Feb. 6, 2014) ........................................30

*Rouse v. DaimlerChrysler Corp.*, 300 F.3d 711 (6th Cir. 2002)............................63

*Service v. Dulles*, 354 U.S. 363 (1957).......................................................70

*Sierra Club v. Ruckelshaus*, 344 F. Supp. 253 (D.D.C.), *aff'd per curiam* 4 Env't Rep. Cas. (BNA) 1815 (D.C. Cir. 1972)................8

*Sierra Club v. Tenn. Valley Auth.*, No. CV-02-2279-VEH, slip op.
(N.D. Ala. July 5, 2006) .......................................................................67

*Tenn. Valley Auth. v. Whitman*, 336 F.3d 1236 (11th Cir. 2003)..........17, 52, 53, 68

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994) .......................................66

*Trs. of Resilient Floor Decorators Ins. Fund v. A & M Installations,
Inc.*, 395 F.3d 244 (6th Cir. 2005)...................................................43

*United States v. Ala. Power Co.*, 372 F. Supp. 2d 1283 (N.D. Ala.
2005)........................................................................................16, 67

*United States v. Ala. Power Co.*, 681 F. Supp. 2d 1292 (N.D. Ala.
2008)................................................................................................15

*United States v. Ala. Power Co.*, 730 F.3d 1278 (11th Cir. 2013) ........................18

*United States v. AM Gen. Corp.*, 808 F. Supp. 1353 (N.D. Ind. 1992)..................71

*United States v. Cinergy Corp.*, 384 F. Supp. 2d 1272 (S.D. Ind.
2005), *aff'd*, 458 F.3d 705 (7th Cir. 2006)...............................51, 53

*United States v. Cinergy Corp.*, 458 F.3d 705 (7th Cir. 2006)...................15, 16, 51

*United States v. Cinergy Corp.*, 623 F.3d 455 (7th Cir. 2010)........................18, 52

*United States v. DTE Energy Co.*, 711 F.3d 643 (6th Cir. 2013)...................*passim*

*United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619 (M.D.N.C.
2003), *aff'd on other grounds*, 411 F.3d 539 (4th Cir. 2005),
*vacated in Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561
(2007)...............................................................................................15

*United States v. Duke Energy Corp.*, No. 1:00-CV-1262, 2010 WL
3023517 (M.D.N.C. July 28, 2010)........................................51, 53

*United States v. E. Ky. Power Coop., Inc.*, 498 F. Supp. 2d 976 (E.D.
Ky. 2007) ......................................................................................67

ix

*United States v. EME Homer City Generation, L.P.*, 727 F.3d 274 (3d Cir. 2013)........................................................................................16

*United States v. LTV Steel Co.*, 116 F. Supp. 2d 624 (W.D. Pa. 2000)..................71

*United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829 (S.D. Ohio 2003).......................................................................................17, 51, 52, 53

*United States v. Okla. Gas & Elec. Co.*, No. CIV-13-690-D, 2015 WL 224911 (W.D. Okla. Jan. 15, 2015).........................................................52, 72

*United States v. Pan Am. Grain Mfg. Co.*, 29 F. Supp. 2d 53 (D.P.R. 1998).......................................................................................71

*United States v. S. Ind. Gas & Elec. Co.*, No. IP99-1692-C-M/F, 2002 WL 1629817 (S.D. Ind. July 18, 2002)...................................................51, 53

## FEDERAL STATUTES

Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*

CAA § 109, 42 U.S.C. § 7409 ........................................................................8

CAA § 110, 42 U.S.C. § 7410 ....................................................................8, 12

CAA § 111(a)(4), 42 U.S.C. § 7411(a)(4).......................................11, 14, 53

CAA § 113(b), 42 U.S.C. § 7413(b)..........................................................71, 72

CAA § 160, 42 U.S.C. § 7470 ........................................................................9

CAA § 160(5), 42 U.S.C. § 7470(5)...............................................................11

CAA § 163, 42 U.S.C. § 7473 ......................................................................11

CAA § 169(4), 42 U.S.C. § 7479(4).............................................................11

CAA §§ 169A-169B, 42 U.S.C. §§ 7491-7492............................................12

CAA § 171, 42 U.S.C. § 7501 .......................................................................9

CAA §§ 401-416, 42 U.S.C. §§ 7651-7651*o* ................................................12

## LEGISLATIVE MATERIALS

Clean Air Amendments of 1970, Pub. L. No. 91-604, 84 Stat. 1676
   (Dec. 31, 1970) ...........................................................................8

Clean Air Act Amendments of 1977, Pub. L. No. 95-95, 91 Stat. 685
   (Aug. 7, 1977).............................................................................8

Clean Air Act Amendments of 1990, Pub. L. No. 101-549, 104 Stat.
   2399 (Nov. 15, 1990)...................................................................8

H.R. REP. NO. 95-294 at 185 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1077,
   1264 ...........................................................................................11

## FEDERAL REGULATIONS AND RULES

40 C.F.R. § 19.4 ...........................................................................72

40 C.F.R. § 51.166 .......................................................................10

40 C.F.R. § 52.21 .........................................................................10

40 C.F.R. § 52.21(a)(2)(iii)............................................................26

40 C.F.R. § 52.21(a)(2)(iv) ...........................................................13

40 C.F.R. § 52.21(a)(2)(iv)(*a*) ............................. 11, 14, 29, 45, 54, 66

40 C.F.R. § 52.21(a)(2)(iv)(*b*) ............................. 11, 14, 26, 29, 54, 68

40 C.F.R. § 52.21(a)(2)(iv)(*c*)........................................................22

40 C.F.R. § 52.21(b)(2).................................................................11

40 C.F.R. § 52.21(b)(2)(iii)(*a*) .....................................................30

40 C.F.R. § 52.21(b)(20)..............................................................23

40 C.F.R. § 52.21(b)(23) ........................................................................26

40 C.F.R. § 52.21(b)(33)(ii) (1992) .......................................................19

40 C.F.R. § 52.21(b)(41) ..................................................................22, 61

40 C.F.R. § 52.21(b)(41)(i) ....................................................................24

40 C.F.R. § 52.21(b)(41)(ii) .......................................................70, 71, 72

40 C.F.R. § 52.21(b)(41)(ii)(*a*) .............................................................24

40 C.F.R. § 52.21(b)(41)(ii)(*b*) .............................................................25

40 C.F.R. § 52.21(b)(41)(ii)(*c*) .............................................................25

40 C.F.R. § 52.21(b)(48)(i) ................................................................22, 23

40 C.F.R. § 52.21(b)(48)(i)(a) .................................................................23

40 C.F.R. § 52.21(b)(48)(i)(b) .................................................................23

40 C.F.R. § 52.21(b)(48)(i)(c) .................................................................23

40 C.F.R. § 52.21(b)(48)(i)(d) .................................................................24

40 C.F.R. § 52.21(r)(6) ......................................................................13, 14

40 C.F.R. § 52.21(r)(6)(i) ...................................................................7, 28

40 C.F.R. § 52.21(r)(6)(i)(*a*) ...............................................................27

40 C.F.R. § 52.21(r)(6)(i)(*b*) ...............................................................27

40 C.F.R. § 52.21(r)(6)(i)(*c*) ....................................................27, 62, 63

40 C.F.R. § 52.21(r)(6)(ii) ..................................... 27, 28, 50, 62, 63, 69

40 C.F.R. § 52.21(r)(6)(iii) .....................................................................28

40 C.F.R. § 52.21(r)(6)(iv)........................................................................28

40 C.F.R. § 52.21(r)(6)(vi)(*a*)..................................................26, 27, 34

40 C.F.R. § 52.21(r)(6)(vi)(*b*)........................................................26, 34

FED. R. CIV. P. 56(a)..............................................................................43

## STATE REGULATIONS

MICH. ADMIN. CODE R. 336.2818(3)(a) ................................................34

## FEDERAL REGISTER

39 Fed. Reg. 42,510 (Dec. 5, 1974).........................................................9

57 Fed. Reg. 32,314 (July 21, 1992)..............................18, 19, 20, 50, 58

61 Fed. Reg. 38,250 (July 23, 1996)......................................................58

63 Fed. Reg. 39,857 (July 24, 1998)......................................................59

67 Fed. Reg. 80,186 (Dec. 31, 2002)..........................20, 21, 26, 59, 68

70 Fed. Reg. 61,081 (Oct. 20, 2005)......................................................12

72 Fed. Reg. 72,607 (Dec. 21, 2007)..............................................60, 61

## MISCELLANEOUS

Brief for Respondent EPA, *New York v. EPA*, No. 02-1387, 2004 WL
    5846388 (D.C. Cir. Oct. 26, 2004)................................................12

Complaint, *United States v. Okla. Gas & Elec. Co.*, No. 13-cv-690-D
    (W.D. Okla. filed July 8, 2013), ECF No. 1..................................72

EPA, *New Source Review:  Report to the President* (June 2002),
    *available at*
    http://www.epa/gov/nsr/documents/nsr_report_to_president.pdf................60

EPA, EPA-454/R-12-001, *Our Nation's Air:  Status and Trends
    Through 2010* (Feb. 2012), *available at*
    http://www.epa.gov/airtrends/2011/report/fullreport.pdf.............................13

EPA, *Supplemental Analysis of the Environmental Impact of the 2002
    Final NSR Improvement Rules* (Nov. 21, 2002), *available at*
    http://www.epa.gov/nsr/documents/nsr-analysis.pdf...................................60

EPA, *Technical Support Document for the Prevention of Significant
    Deterioration and Nonattainment Area New Source Review
    Regulations* (Nov. 2002), *available at*
    http://www.epa.gov/NSR/actions.html#2002 ........................................20, 21

EPA, EPA-456/R-03-005, *Technical Support Document for the
    Prevention of Significant Deterioration (PSD) and
    Nonattainment Area New Source Review (NSR):
    Reconsideration* (Oct. 2003), *available at*
    http://www.epa.gov/NSR/documents/petitionresponses10-30-
    03.pdf...............................................................................................12

EPA, *The Green Book Nonattainment Areas for Criteria Pollutants*
    (as of Jan. 30, 2015), *available at* http://www.epa.gov/
    airquality/greenbk.................................................................................9

Order Denying Plaintiff's Motion for Reconsideration, *United States
    v. Duke Energy Corp.*, No. 1:00-cv-01262 (M.D.N.C. Feb. 23,
    2004), ECF No. 294..............................................................................17

Special Verdict Form, Verdict Form [1 of 2], and Verdict Form [2 of
    2], *United States v. Cinergy Corp.*, No. 99-1693 (S.D. Ind. May
    22, 2008, May 22, 2008, and May 19, 2009), ECF Nos. 1338,
    1339, and 1742 ....................................................................................52

Transcript of Oral Argument, *United States v. DTE Energy Co.*, 711
    F.3d 643 (6th Cir. 2013) (No. 11-2328)......................................5, 48, 49, 57

## GLOSSARY OF TERMS

| | |
|---|---|
| 2002 NSR Reform Rules | EPA, Prevention of Significant Deterioration (PSD) and Nonattainment New Source Review (NSR): Baseline Emissions Determination, Actual-to-Future-Actual Methodology, Plantwide Applicability Limitations, Clean Units, Pollution Control Projects, Final Rule, 67 Fed. Reg. 80,186 (Dec. 31, 2002) |
| CAA | Clean Air Act |
| CEMS | Continuous Emissions Monitoring System |
| EPA | U.S. Environmental Protection Agency |
| FGD | Flue Gas Desulfurization |
| MDEQ | Michigan Department of Environmental Quality |
| NAAQS | National Ambient Air Quality Standards |
| NNSR | Nonattainment New Source Review Program |
| NOV | Notice of Violation |
| $NO_x$ | Nitrogen Oxide |
| NSR | New Source Review |
| NSR programs | Prevention of Significant Deterioration Program and Nonattainment New Source Review Program |
| $PM_{2.5}$ | Fine Particulate Matter |
| PSCR | Power Supply Cost Recovery |
| PSD | Prevention of Significant Deterioration |
| SCR | Selective Catalytic Reduction |
| SIPs | State Implementation Plans |
| $SO_2$ | Sulfur Dioxide |
| SSM | Startup, Shutdown and Malfunction |

xv

## CLEAN AIR ACT CODIFICATION GUIDE

| **Clean Air Act Section** | **Codified at:** |
|:---:|:---:|
| § 109 | 42 U.S.C. § 7409 |
| § 110 | 42 U.S.C. § 7410 |
| § 111 | 42 U.S.C. § 7411 |
| § 113 | 42 U.S.C. § 7413 |
| § 114 | 42 U.S.C. § 7414 |
| § 160 | 42 U.S.C. § 7470 |
| § 163 | 42 U.S.C. § 7473 |
| § 169 | 42 U.S.C. § 7479 |
| § 169A | 42 U.S.C. § 7491 |
| § 169B | 42 U.S.C. § 7492 |
| § 171 | 42 U.S.C. § 7501 |
| §§ 401-416 | 42 U.S.C. §§ 7651-7651*o* |

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Defendants-Appellees DTE Energy Company and Detroit Edison Company (collectively, "DTE") request oral argument.  The issue presented here is of national importance.  DTE submits that the Court would benefit from the full exploration of the issue that oral argument would provide.

## STATEMENT OF THE ISSUE

In its March 28, 2013, decision, this Court rejected the Government's contention that it can enforce the Clean Air Act's New Source Review (NSR) program by second-guessing an operator's preconstruction projection of whether a maintenance project is expected to cause a significant increase in emissions and thus trigger the obligation to obtain a permit.  But the Court remanded the case to allow the district court to consider a limited question—whether DTE complied with the objective requirements governing preconstruction projections under the 2002 NSR Reform Rules.

Did the district court correctly conclude that DTE was entitled to judgment as a matter of law where the undisputed facts establish that DTE complied with the objective requirements of EPA's regulations governing preconstruction projections and the Government has never contended otherwise?

## PRELIMINARY STATEMENT

In its 2013 decision in this enforcement action under the Clean Air Act's (CAA) New Source Review (NSR) program, this Court emphasized that EPA's 2002 NSR Reform Rules create a "project-and-report" system for determining whether a construction project is a "major modification" that triggers NSR permitting obligations. *United States v. DTE Energy Co.*, 711 F.3d 643, 644 (6th Cir. 2013). As this Court explained, the rules require operators to project whether a construction project is expected to cause an increase in emissions and then report actual emissions thereafter. "[P]rior approval" of the projection from EPA is not required, but if the project actually causes a significant increase in emissions, the operator will be subject to enforcement. *Id.* at 650-51.

Endorsing the premises of the district court's 2011 summary judgment decision, this Court emphasized that the rules forbid EPA from "enforc[ing]" NSR by second-guessing the operator's projection, because that would create, in effect, a prior approval system. *Id.* at 649. "If operators had to defend every projection to the agency's satisfaction, companies would hesitate to make any changes, including those that may improve air quality." *Id.* The 2002 NSR Reform Rules thus "take a middle road by trusting operators to make projections but giving them specific instructions to follow." *Id.* Accordingly, where the source has projected no increase in emissions due to the project, post-project data will dictate whether a

2

modification has occurred.  As this Court concluded, "[a] project-and-report scheme is entirely compatible with the statute's intent, which … is 'to prevent increases in air pollution.'"  *Id.* at 651.  "If [the] company's projections are later proven incorrect, EPA can bring an enforcement action" alleging a major modification.  *Id.*  And the source can manage its actual post-project emissions to ensure that they do not increase.  *Id.* ("Such actions further the goal of the statute.").  As the Government "conceded at oral argument, the statute and regulations allow sources to replace parts indefinitely without losing their grandfathered status so long as none of those changes cause an emissions increase."  *Id.*

But the Court concluded that the district court's decision may have gone too far in one limited respect—it seemed to preclude *any* challenge to the operator's preconstruction projection "before there is post-construction data to prove or disprove it."  *Id.* at 644.  In other words, the Court believed that the district court's decision, if applied to its broadest extent, would preclude not only impermissible second-guessing, but also more basic actions to ensure that the operator complied with the "specific instructions" governing preconstruction projections.  *Id.* at 649, 650.  For example, "EPA must be able to prevent construction if an operator … uses an improper baseline period or uses the wrong number to determine whether a projected emissions increase is significant."  *Id.* at 650 (explaining further that "if

3

[the operator] had misread the rules and used 400 [tons per year] instead of 40 [tons per year as the significance threshold] … the agency could then make them do the projection right." (internal quotation marks omitted)).  In other words, "[the Government] is not categorically prevented from challenging even blatant violations of its [projection] regulations. . . ." *Id*. at 644.  So the Court reversed and remanded for the district court to address a straightforward question:  Before commencing construction on the 2010 projects at its Monroe power plant Unit 2, did DTE "at a basic level … make a projection in compliance with how the projections are to be made," i.e., as specified in "the requirements for such projections contained in the regulations." *Id.* at 649; *see also id.* at 652 ("[I]s [the projection] made pursuant to the requirements of the regulations"?).

On remand, the district court concluded that DTE had done so.   The district court correctly observed that the Government does not "contend that [DTE] violated any of the agency's regulations when [it] computed the preconstruction emissions projections from Unit 2."  Summ. J. Op. & Order II at 3, RE 196, Page ID # 7515.  Instead, the Government "takes [DTE] … to task over *the extent* to which they relied upon … demand growth" to explain that no emission increase would be caused by the proposed projects.  *Id.*  The Government could not point to any objective requirement—any "specific instructions"—of the regulations that DTE purportedly violated, but rather simply disagreed with DTE's engineers'

4

conclusion that the projected emissions increase was due to factors, like demand growth, that were unrelated to the projects. This, held the district court, was impermissible "second-guessing." *Id.* And "the fact that … the actual post-project emissions from Unit 2 never increased" rendered the Government's experts' alternative-reality projections inherently unreliable. *Id.* at 3-4, Page ID # 7515-16. Were DTE to go back and do the projection the way the Government would have done it, the result would be "verifiably inaccurate." *Id.* at 4, Page ID # 7516. The district court thus granted DTE's motion for summary judgment. The Government again appealed.

The Government in its Opening Brief ignores the vast majority of this Court's March 2013 decision. Obstinately pushing its experts' "now verifiably inaccurate" projections, the Government contends that, had DTE conducted a "reasonable" projection—i.e., the one concocted after the fact by EPA's litigation experts using methodologies that are not contained in the regulations—DTE would have projected a similarly inaccurate increase in emissions caused by the projects. This is *precisely* the type of enforcement action the Government described at oral argument that led Judge Rogers to observe: "That sounds like getting a permit to not get a permit. It sounds like you have to get approval from EPA as to your calculations before you can proceed without a permit." Oral Arg. at 50:39, Nov. 27, 2012.

5

The Government attempts to fit this enforcement action within this Court's mandate—i.e., to determine whether, at a basic level, DTE complied with the "specific instructions" in the regulations governing projections, *DTE*, 711 F.3d at 649—by arguing that DTE violated these projection regulations in three respects. First, the Government contends DTE failed to consider "all relevant information." *See* Opening Br. for Pl.-Appellant U.S. (Gov't Br.) at 39, ECF No. 21 (Case No. 14-2274). But the Government concedes, as it must, that DTE *did* consider all relevant information. *Id.* at 36-37. Its real beef is that DTE placed different weight on certain factors than would the Government's hired experts. That is second-guessing.

Second, the Government takes issue with DTE's reliance on the so-called "demand growth exclusion" to explain that no emissions increase would be caused by the projects. But again, the Government can point to no specific instruction that DTE failed to follow or any requirement to perform this part of the projection the way its litigation experts would. It merely offers its experts' judgments in lieu of DTE's. That, too, is second-guessing.

And finally, the Government claims that DTE failed to "demonstrate" that it appropriately applied the demand growth exclusion. But the Government does not—it cannot—point to any "instructions" in the rules that require a source to "demonstrate" to EPA's satisfaction the correctness of its engineering judgment,

6

nor does it specify how an operator would even do so.  Indeed, to read into the

rules a requirement to make such a demonstration to EPA's satisfaction would

create precisely the "prior approval" system that this Court unequivocally rejected.

*DTE*, 711 F.3d at 650.  And while the rules require the operator to "document and

maintain a record of" certain information regarding its projection and, in some

circumstances, to provide notice of its projection, 40 C.F.R. § 52.21(r)(6)(i), the

district court ruled in 2011 that DTE complied with those regulations.  Summ. J.

Op. & Order I at 10, RE 160, Page ID # 6643.  The Government did not challenge

that ruling in its first appeal and cannot do so now.

Most fundamentally, the Government seeks through this enforcement action

to do much more than verify that DTE followed the "specific instructions" for

performing projections, such as whether DTE "use[d] an improper baseline period

or use[d] the wrong number to determine whether a projected emissions increase is

significant."  *DTE*, 711 F.3d at 650.  A violation of those regulations would

require, at most, that DTE go back and "do the projection right."  *Id.*  But the

Government seeks to establish that the projects were actual major modifications

based on what its experts say DTE *should have* projected, even though emissions

following the project never increased and, in fact, substantially decreased.  That is

just the type of second-guessing that would transform the 2002 NSR Reform Rules

from a "project-and-report" system into a "prior approval" system."  *Id.*

In short, the Government's view of NSR enforcement remains at odds with the regulations and cannot be reconciled with this Court's previous decision. The undisputed material facts demonstrate that DTE complied with the specific instructions governing projections. That EPA's experts would reach a different conclusion based on different judgments is immaterial. The district court's decision should be affirmed.

## STATEMENT OF THE CASE

### I.    Statutory and Regulatory Background: The CAA and the Role of NSR

Congress enacted the primary provisions of Title I of the CAA in 1970 and adopted major amendments in 1977 and 1990. Pub. L. No. 91-604, 84 Stat. 1676 (Dec. 31, 1970); Pub. L. No. 95-95, 91 Stat. 685 (Aug. 7, 1977); Pub. L. No. 101-549, 104 Stat. 2399 (Nov. 15, 1990). Congress in 1970 directed EPA to develop National Ambient Air Quality Standards (NAAQS) to protect public health with an adequate margin of safety. 42 U.S.C. § 7409. The States, in turn, were to develop State implementation plans (SIPs) setting source-by-source emissions limits to meet the NAAQS. *Id.* § 7410. In 1972, a court ordered EPA to require the revision of SIPs to prevent "significant deterioration" of air quality in areas meeting the NAAQS. *Sierra Club v. Ruckelshaus*, 344 F. Supp. 253 (D.D.C.), *aff'd per curiam* 4 Env't Rep. Cas. (BNA) 1815 (D.C. Cir. 1972). In response, EPA

8

issued regulations in 1974 establishing minimum requirements for SIPs to prevent

significant deterioration of air quality. *See* 39 Fed. Reg. 42,510 (Dec. 5, 1974).

In 1977, Congress amended the CAA to codify the regulatory prevention of

significant deterioration (PSD) preconstruction permit program promulgated in

1974 for areas with air quality that meets the NAAQS, and created a companion

Nonattainment NSR program (NNSR) for areas with air quality worse than the

NAAQS (collectively, the "NSR programs"). These programs apply on a

pollutant-by-pollutant basis depending on whether the source is located in a

NAAQS attainment area (PSD) or a NAAQS nonattainment area (NNSR) for that

pollutant. *See* 42 U.S.C. §§ 7470 *et seq.* (PSD program requirements); *id.* § 7501

*et seq.* (NNSR program requirements); *see also, e.g., Nat'l Parks Conservation*

*Ass'n v. Tenn. Valley Auth.*, 480 F.3d 410, 412 n.1 (6th Cir. 2007) (describing the

PSD and NNSR programs). Both programs technically apply here, because

Monroe County, Michigan, where the Monroe power plant is located, was

designated as in attainment for sulfur dioxide ($SO_2$) and nitrogen oxides ($NO_x$) but

not so for fine particulate matter ($PM_{2.5}$) at the time of the projects.[1] But as

relevant here, the programs are indistinguishable as they relate to NSR

---

[1] Monroe County has since been re-designated as in attainment for $PM_{2.5}$. EPA, *The Green Book Nonattainment Areas for Criteria Pollutants* (as of Jan. 30, 2015), *available at* http://www.epa.gov/airquality/greenbk.

applicability, so like the Government, we will refer only to the PSD program regulations.

EPA defines the minimum requirements for these programs, which States then implement through SIPs.  The EPA regulations defining the requirements for the PSD program are found in 40 C.F.R. §§ 51.166 and 52.21.[2]  As explained below, these requirements were substantially revised by the 2002 NSR Reform Rules. Michigan revised its SIP in 2006 to incorporate the 2002 revisions to the new PSD rules.

The CAA regulates new and existing major stationary sources differently. In general, *new* sources—i.e., sources that are constructed or that undergo "major modifications" after the effective date of the applicable NSR provisions—must undergo preconstruction review and permitting, and as part of this process may be required to install additional emission controls.  Congress chose to impose these obligations on new sources because it determined that new sources could incorporate more cost-effectively and efficiently those types of emissions controls

---

[2] Section 51.166 technically provides the minimum requirements that SIPs must contain, while section 52.21 sets forth the provisions that apply if an approvable SIP has not been submitted.  The substantive provisions relevant here are identical in both sections, so for ease of reference, we refer only to section 52.21.

into their designs as they were being built than could existing sources. *See, e.g.*, H.R. REP. NO. 95-294 at 185 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1077, 1264.

In defining whether a project at an existing source constitutes a "major modification" that triggers NSR permitting, both the CAA and EPA's NSR rules focus on emissions increases that add to existing pollution above "baseline" levels. *See* 42 U.S.C. §§ 7470(5), 7473, 7479(4). The CAA defines "modification" as "any physical change in, or change in the method of operation of, a stationary source which *increases the amount* of any air pollutant emitted by such source … ." 42 U.S.C. § 7411(a)(4) (emphasis added). And EPA's rules make clear that a physical change must cause a significant increase in emissions to qualify as a "major modification." *See* 40 C.F.R. § 52.21(a)(2)(iv)(*a*), (*b*); *id.* § 52.21(b)(2).

As this Court has recognized, NSR is not a mechanism to force the retirement of older units or to otherwise mandate emission reductions. *DTE*, 711 F.3d at 651.[3] Rather, as EPA itself has explained repeatedly, "[the] [NSR] program's *limited object is to limit significant emissions increases* from new and

---

[3] *See also DTE*, 711 F.3d at 651 (explaining that DTE's practice, and commitment in this case, to further ensure the Monroe Unit 2 projects would not trigger NSR by managing post-project emissions to less than baseline levels "further[s] the goal of the statute"). For these reasons, EPA's claim that DTE's projects allegedly cause harm is completely off the mark. The harm under PSD must be defined by the goals of the statute. If a project does not in fact cause a significant emissions increase, it cannot cause any harm under PSD.

modified sources."  EPA, EPA-456/R-03-005, *Technical Support Document for the Prevention of Significant Deterioration (PSD) and Nonattainment Area New Source Review (NSR):  Reconsideration* at 105 (Oct. 30, 2003) (emphasis added), *available at* http://www.epa.gov/NSR/documents/petitionresponses10-30-03.pdf. *See also* 70 Fed. Reg. 61,081, 61,088 (Oct. 20, 2005) ("[T]he primary purpose of the major NSR program is *not to reduce emissions*, but to balance the need for environmental protection and economic growth …." (emphasis added)). Accordingly, the NSR rules are designed to ensure "that *only* changes causing a *real* increase in pollution are subject to NSR."  Br. for Resp. EPA at 76, *New York v. EPA*, No. 02-1387, 2004 WL 5846388, at *76 (D.C. Cir. Oct. 26, 2004) (emphases added); *see also Envtl. Def. v. Duke Energy Corp*., 549 U.S. 561, 578 (2007) ("What these provisions are getting at is a measure of *actual* operations averaged over time …." (emphasis added)).

Other CAA programs and mechanisms—such as SIPs specifically designed to meet or exceed federal air quality standards, 42 U.S.C. § 7410; visibility protection programs, *id.* §§ 7491-7492; and the Title IV Acid Rain program, *id.* §§ 7651-7651*o*—are the CAA vehicles for achieving emissions *reductions*.  These CAA programs have worked well to substantially improve air quality and reduce

emissions from the utility sector specifically over the last three decades.[4]  *See, e.g.,*

EPA, EPA-454/R-12-001, *Our Nation's Air: Status and Trends Through 2010* at 1-

2 (Feb. 2012), *available at*

http://www.epa.gov/airtrends/2011/report/fullreport.pdf.

## II.    The Regulatory History of NSR

Today, EPA's NSR rules are relatively straightforward.  Those rules, as

revised in 2002 to clarify NSR applicability, articulate principles that govern the

application of PSD program requirements and clearly specify sources' pre- and

post-construction obligations.  *See* 40 C.F.R. § 52.21(a)(2)(iv) & (r)(6).  In those

---

[4] DTE's experience is illustrative. Over the years, DTE has substantially decreased its emissions, including emissions of $SO_2$ and $NO_x$, and is currently decreasing them at an accelerated pace.  Decl. of Skiles W. Boyd (Boyd Decl.) ¶ 6 (Nov. 3, 2010), RE 166-3, Page ID # 6734.  At the Monroe plant in particular, DTE by 2011 had reduced annual $SO_2$ emissions by about 69% since the early 1990s and annual $NO_x$ emissions by about 79% since the mid-1990s.  *Id.* ¶ 7, Page ID # 6734.  More recently, DTE embarked on a $2 billion program to install advanced $SO_2$ and $NO_x$ controls at the Monroe power plant.  In 2005-2006, DTE installed second generation low-$NO_x$ burners on Monroe Units 1-4 (first generation low-$NO_x$ burners were installed in the mid-1990s). *Id.* ¶ 8, Page ID # 6736.  After several years of construction, it started operating Selective Catalytic Reduction (SCR) systems for further $NO_x$ control on Monroe Units 1 and 4 in 2003, and on Unit 3 in 2007; and Flue Gas Desulfurization (FGD) systems for further $SO_2$ control on Units 3 and 4 in 2009.  *Id.*  These are the types of control equipment the Government is asking be installed at Monroe Unit 2 in this lawsuit.  In 2010, however, even as EPA had filed this lawsuit, DTE obtained a PSD permit from the Michigan Department of Environmental Quality (MDEQ) to install SCR and FGD on Monroe Unit 2.  These controls have now been constructed, and became operational in 2014.  In short, DTE's $2 billion pollution control plan is now complete, making the Monroe plant one of the cleanest and most efficient coal-fired power plants in the country.

rules, EPA states in the clearest possible terms: "a project is a major modification for a regulated NSR pollutant if it causes … a significant emissions increase … . The project is not a modification if it does not cause a significant emissions increase." *Id.* § 52.21(a)(2)(iv)(*a*). And in the very next provision, where EPA describes the procedure for preconstruction projections, EPA states: "Regardless of *any such* preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase." *Id.* § 52.21(a)(2)(iv)(*b*) (emphasis added).

These provisions are centrally important here. While consistent with the pre-2002 regulations, they clarify (i) that pre-approval of preconstruction projections is not required and that the validity of those projections will be measured by actual post-project data; and (ii) that only projects that cause a significant increase in emissions can be deemed major modifications. Coupled with new post-construction recordkeeping and reporting requirements triggered by those construction projects that have a "reasonable possibility" of causing a significant increase in emissions, *id.* § 52.21(r)(6), these provisions confirm the focus of EPA's NSR program on its statutory role as a program designed to evaluate and limit projects that "increase[] the amount" of an emitted air pollutant. 42 U.S.C. § 7411(a)(4). *See DTE*, 711 F.3d at 651 (rejecting EPA's contention that DTE's purposeful management of post-project emissions to less than baseline

14

levels to avoid NSR is improper, and finding instead such actions further the goals of the statute).

But the rules were not always so clear. The 2002 NSR Reform Rules did not arise in a vacuum. They instead addressed ambiguities in earlier versions of the rules that spawned a dysfunctional enforcement regime.

### A. Earlier Rules Contained Frustrating Ambiguities That Led to an "Abysmal Breakdown in the Administrative Process."

As explained above, NSR is triggered when an existing major source undertakes a "major modification." Although simple in concept, the definition of "major modification" proved difficult to apply.[5] As currently construed by the courts, EPA's original NSR rules promulgated in 1980 contemplated a preconstruction judgment of whether a "change" is "projected" to cause a "significant net increase" in emissions over baseline levels. *See, e.g., United States v. Cinergy Corp.*, 458 F.3d 705, 709 (7th Cir. 2006). But these rules provided no guidance at all on how to project emissions and imposed no pre- or post-

---

[5] For a thorough description of the regulatory history of NSR and the varying EPA interpretations of the NSR rules leading up to the "NSR enforcement initiative," which EPA launched against the utility industry in 1999, *see United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 634-37 (M.D.N.C. 2003) (describing regulatory history of the routine maintenance, repair, and replacement provision), 641-42, 644-46 (describing regulatory history of the emissions increase provisions), *aff'd on other grounds*, 411 F.3d 539 (4th Cir. 2005), *vacated in Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007); *see also United States v. Ala. Power Co.*, 681 F. Supp. 2d 1292, 1296-99 (N.D. Ala. 2008).

construction recordkeeping requirements.  *See, e.g., id.* ("[W]hat is required … is … merely a reasonable estimate of the amount of additional emissions that the change will cause."); *see also Duke Energy*, 549 U.S. at 577 (explaining "the 1980 PSD regulations may be no seamless narrative" but "[w]hat these provisions are getting at is a measure of actual operations averaged over time").[6]

These ambiguities gave rise to wildly inconsistent interpretations by EPA's enforcement arm in a series of cases comprising the Government's "NSR enforcement initiative."[7]  One court specifically called out the Government for its "zigs and zags represented by its contradictory … statements and rules" and its failure to speak "with one voice, or a consistent voice, or even a clear voice" with respect to the NSR program.  *United States v. Ala. Power Co.*, 372 F. Supp. 2d 1283, 1306 (N.D. Ala. 2005) (rejecting Government argument for deference to its interpretation of the NSR rules).  That same court characterized EPA's enforcement initiative as a "sport, which is not exactly what one would expect to find in a national regulatory enforcement program."  *Id*. at n.44; *see also Duke*

---

[6] That "the 1980 PSD regulations may be no seamless narrative," as the Court put it, is an understatement, considering the 1980 rules do not even have a provision defining post-project emissions.

[7] That initiative is "the largest, most contentious industry-wide enforcement initiative in EPA history to retroactively target violations of the [NSR] program." *United States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 281 (3d Cir. 2013) (internal quotation marks omitted).

*Energy, supra*, Order Den. Pl.'s Mot. for Recons. at 3, *United States v. Duke Energy Corp.*, No. 1:00-cv-01262 (M.D.N.C. Feb. 23, 2004), ECF No. 294 (noting EPA's propensity to "sp[eak] out of both sides of its mouth" on the issue of NSR applicability). When EPA in 1999 attempted to apply its new NSR positions to TVA in an administrative proceeding before EPA's Environmental Appeals Board, the Eleventh Circuit rejected that effort as a "patent violation of the Due Process Clause" that "lacked the virtues of most agency adjudications." *Tenn. Valley Auth. v. Whitman*, 336 F.3d 1236, 1245-46, 1258-59 (11th Cir. 2003); *see id.* at 1261 (Barkett, J., specially concurring) ("[C]onstitutional due process cannot be provided on an ad hoc basis under the direction and control of the entity whose decision is being challenged."). The court declared EPA's order to TVA "legally inconsequential" and directed that "TVA is free to ignore [it]." *Id.* at 1239-40.

By 2002, the NSR enforcement initiative had become "an abysmal breakdown in the administrative process." *See United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 832 (S.D. Ohio 2003). Rather than focusing on *actual* emissions resulting from the projects in question, the Government used the ambiguities in the 1980 rule to adopt a strategy of hiring a team of "experts" to develop after-the-fact projections to second-guess what emissions the utility *should have projected* to occur as a result of the projects. These "experts" used an enforcement-driven emissions methodology that always predicts an increase in

17

emissions from common maintenance activity. *See United States v. Cinergy Corp.*, 623 F.3d 455, 458-61 (7th Cir. 2010) (holding that the method proffered by EPA's experts was unreliable under *Daubert*). Although a divided panel of the Eleventh Circuit subsequently allowed the methodology under *Daubert* in another case, *see United States v. Ala. Power Co.*, 730 F.3d 1278, 1284-88 (11th Cir. 2013), no actual liability has yet been adjudicated in that case on remand, more than one-and-a-half years after the Eleventh Circuit's decision (and over 15 years after the case was filed).

### B.    EPA's First Round of Reforms in 1992

EPA began fixing the rules in 1992, when EPA revised the 1980 rules to specify for electric utilities an emission projection technique, called "the 'representative actual annual emissions' methodology." *See* 57 Fed. Reg. 32,314, 32,325 (July 21, 1992). In general, this methodology allowed for utilities to project future emissions based on anticipated operations and, after excluding emission increases that are unrelated to the project, to compare those emissions to a baseline period to determine whether an increase was projected to occur as a result of the project. EPA also promulgated provisions for "post-construction" PSD monitoring for sources opting to use this emission projection approach. *Id.* at 32,325. During the rulemaking for these changes, some commenters expressed concern that "utilities could deliberately underestimate future operations (and thus

emissions) for the purpose of avoiding review or that even where a forthright estimate is made, the forecast may prove inaccurate." *Id.* EPA explained that this concern was misplaced, because the post-construction monitoring would "guard against the possibility that significant increases in actual emissions attributable to the change may occur under this methodology." *Id.* EPA explained further that "NSR applies only where the emissions increase is caused by the change," and "[i]f … the reviewing authority determines [based on post-project data] that the … emissions have in fact increased significantly over baseline … as a result of the change, the source would become subject to NSR requirements *at that time*." *Id.* (emphasis added).

The 1992 rules also provided explicit guidance on the "causation" test for determining whether a "change" results in an emissions increase. In projecting future emissions, one must:

> Exclude, in calculating any increase in emissions that results from the particular physical change … at an electric utility steam generating unit, that portion of the unit's emissions following the change that [1] could have been accommodated during the representative baseline period and [2] is attributable to an increase in projected capacity utilization at the unit that is unrelated to the particular change … .

40 C.F.R. § 52.21(b)(33)(ii)(1992). In the preamble, EPA explained that for the first prong of the causation analysis (i.e., the "capable of accommodating" prong), a "but for" causation standard applied. 57 Fed. Reg. at 32,326. For the second

prong (i.e., "unrelated to the change"), the causation standard is whether the "change" was the "predominant cause" of the increase. *Id.* at 32,327.

### C. The 2002 NSR Reform Rules: A Common Sense Approach to NSR Applicability and Enforcement

In 2002, EPA acknowledged that more changes to the rules were necessary. So in December 2002—based on more than 130,000 written comments and multiple public meetings involving more than 100 groups—EPA amended both the 1980 rules and the 1992 rules. *See* 67 Fed. Reg. 80,186 (Dec. 31, 2002). The new rules built on the reforms begun in 1992. They established a more detailed "projected emissions" applicability test based on the 1992 rules for electric utilities that would apply to all categories of sources, and they affirmed the 1992 rules' "causation" requirements. The 2002 NSR Reform Rules also beefed up post-construction emissions monitoring and reporting requirements for projects as to which there is a "reasonable possibility" of a significant emissions increase caused by the project, even though the source operator's preconstruction projection does not predict that the project will cause a significant emissions increase. These changes, EPA explained, "better ensure[ ] that a project will not be considered a major modification where there will not be a significant emissions increase resulting from the modification project at the source." EPA, *Technical Support Document for the Prevention of Significant Deterioration and Nonattainment Area*

20

*New Source Review Regulations* at I-5-23 (Nov. 2002), *available at*

http://www.epa/gov/NSR/actions.html#2002.

> **1.    The 2002 NSR Reform Rules Enhance and Clarify a Source's Pre- and Post-Construction Obligations.**

The 2002 NSR Reform Rules provide a common sense method that clarifies

and codifies how emissions should be projected before a project is commenced and

how that projection will be judged after the project is completed.  As with previous

iterations of EPA's NSR regulations, the 2002 NSR Reform Rules[8] require

operators to predict, before commencing construction, whether a construction

project will cause a significant increase in emissions (as defined numerically in the

regulations, *see infra* at 25) and thus trigger CAA permitting requirements.  *Id.* at

4-7.  For projects like those at issue here that only involve existing emissions units,

the rules require the operator to project its future emissions and compare those

projected emissions to baseline actual emissions:

> [a] significant emissions increase of a regulated NSR
> pollutant is projected to occur if the sum of the difference
> between the *projected actual emissions* … and the
> *baseline actual emissions* … for each existing emissions
> unit, equals or exceeds the significant amount for that
> pollutant (as defined in paragraph (b)(23) of this section).

---

[8] *See* 67 Fed. Reg. 80,186 (Dec. 31, 2002).

21

40 C.F.R. § 52.21(a)(2)(iv)(*c*) (emphases added).  If projected actual emissions[9] in any one of the five years after the project exceed baseline actual emissions by greater than the significance threshold for any regulated pollutant, the operator must get a permit.  And even if the calculation does not show a significant increase, the operator nonetheless may be required to comply with certain recordkeeping and reporting requirements.

These rules implement the requirement to project whether an "emission increase" will be caused by a construction project through three basic steps:  (a) determine "baseline actual emissions"; (b) determine "projected actual emissions" (after accounting for causation); and (c) compare the two.  *DTE*, 711 F.3d at 647.

### a.    "Baseline Actual Emissions"

"Baseline actual emissions" is defined as "the average rate, in tons per year, at which the unit actually emitted the pollutant during any consecutive 24-month period selected by the owner or operator within the 5-year period immediately preceding when the owner or operator begins actual construction of the project." 40 C.F.R. § 52.21(b)(48)(i).  The regulations specifically require the operator to do four things when determining baseline actual emissions.

---

[9] As discussed more fully below, the term "projected actual emissions" under the regulations incorporates causation by excluding emissions increases unrelated to the project at issue.  *See infra* at 25-26 (discussing 40 C.F.R. § 52.21(b)(41)).

1.  The operator must pick the 24-month baseline period.  That consecutive 24-month period must occur within the five years immediately preceding actual construction of the project, unless the operator requests the use of another period that is deemed "more representative."  *Id.*  And the operator can select a different consecutive 24-month period for each regulated pollutant.  *Id.* § 52.21(b)(48)(i)(c). The operator then calculates the average annual rate based on that 24-month period.  *Id.* § 52.21(b)(48)(i).  (The math is easy—simply divide the total emissions for that period by two.)

2.  The operator must include both fugitive emissions, to the extent quantifiable, and emissions associated with startup, shutdown and malfunction (SSM) in calculating the average emissions rate.  *Id.* § 52.21(b)(48)(i)(a). "Fugitive emissions" are "those emissions which could not reasonably pass through a stack, chimney, vent or other functionally equivalent opening."  *Id.* § 52.21(b)(20).  SSM emissions are the (sometimes, for some pollutants) higher rates of emission that occur during startup, shutdown and malfunction.

3.  The operator must adjust baseline emissions downward to subtract non-compliant emissions.  *Id.* § 52.21(b)(48)(i)(b).  These are emissions "that occurred while the source was operating above any emission limitation that was legally enforceable during the consecutive 24-month period."  *Id.*

23

4. The regulations instruct the operator to make sure there is adequate data for the 24-month period selected: "The average rate shall not be based on any consecutive 24-month period for which there is inadequate information for determining annual emissions, in tons per year ...." *Id.* § 52.21(b)(48)(i)(d).

### b.     "Projected Actual Emissions"

"Projected actual emissions" is defined as the "maximum annual rate, in tons per year, at which an existing emissions unit is projected to emit" a regulated PSD pollutant "in any one of the 5 years (12-month period) following the date the unit resumes regular operation after the project. . . ." *Id*. § 52.21(b)(41)(i). The regulations direct operators to do four things in making this projection.

1. The operator must project emissions for the 5 years following the project and identify the "maximum annual rate ... at which [the unit] is projected to emit a regulated NSR pollutant in any one of the 5 years (12-month period) following the date the unit resumes regular operation after the project. . . ." *Id.*; *DTE*, 711 F.3d at 647.

2. "[T]he owner or operator ... [s]hall consider all relevant information," including the "company's own representations," its "expected business activity," and its "filings with the State or Federal regulatory authorities." 40 C.F.R. § 52.21(b)(41)(ii)(*a*). But critically, the rules do not provide an exhaustive list of

24

relevant factors or tell the operator what weight to apply to any one of them.  That is left to the operator's technical and engineering judgment.

3.  As with its calculation of baseline actual emissions, the operator must include SSM emissions and fugitive emissions (to the extent quantifiable).  *Id.* § 52.21(b)(41)(ii)(*b*).

4.  The regulations then dictate that the owner/operator "[*s*]*hall exclude*, in calculating any increase in emissions that results from the particular project, that portion of the unit's emissions following the project" that the unit "could have accommodated during the consecutive 24-month period used to establish the baseline actual emissions … and that are also unrelated to the particular project, including any increased utilization due to product demand growth." *Id*. § 52.21(b)(41)(ii)(*c*) (emphasis added).  The rules provide no "specific instructions" for the operator to follow in determining whether any projected increase in emissions is "unrelated" to the project and "could have been accommodated" in the baseline period.  This, too, is left to the operator's technical and engineering judgment.

This step in the process for projecting future emissions is sometimes called the "demand growth exclusion," because the regulations specifically identify emission increases attributable to demand growth as an example of a factor unrelated to the project that could have caused an increase.  But it would be more

accurate to call this the "causation" requirement.  A project is a major modification only if it *causes* a significant increase in emissions.  40 C.F.R. § 52.21(a)(2)(iv)(*b*). Absent causation, the fact that emissions may be projected to increase after the projects is irrelevant.  *See* 67 Fed. Reg. at 80,203 ("Both the statute and … regulations indicate that there should be a causal link between the proposed change and any post-change increase in emissions.").

### c.    Comparison of "Baseline Actual Emissions" and "Projected Actual Emissions"

After the operator has calculated baseline actual emissions and projected actual emissions, it must compare the two numbers and determine whether a "significant" increase in emissions is projected to occur.  A table in the regulations provides numeric thresholds for what constitutes "significant" for each regulated pollutant.  *Id.* § 52.21(b)(23).  If the projects are projected to cause a significant net emissions increase, the operator must get a permit.  *See* 40 C.F.R. § 52.21(a)(2)(iii).

Even if the comparison shows no significant increase is expected to be caused by the project, the regulations recognize that there still may be a "reasonable possibility" that emissions could increase.  *Id* § 52.21(r)(6)(vi)(*a*), (*b*). The "reasonable possibility" of an increase does not make a project a major modification.  Rather, it merely requires the operator to comply with one of two sets of notification requirements.  As to projects for which the operator projects an

26

emissions increase of at least 50 percent of the "significant" level defined in the regulations, *without* accounting for causation, "[b]efore beginning actual construction …, the owner or operator shall document and maintain a record" that (i) "descri[bes] . . . the project," (ii) "[i]dentifi[es] . . . the emissions unit(s) whose emissions of a regulated NSR pollutant could be affected by the project," and (iii) contains the "projected actual emissions, the amount of emissions excluded under paragraph (b)(41)(ii)(*c*) … and an explanation for why such amount was excluded." *Id*. § 52.21(r)(6)(i)(*a*)-(*c*). The regulations do not in any way specify, provide any guidance, or even give examples of how this "explanation" should be made.

Additional obligations apply to projects for which, despite the operator's projection that the projects will not cause a significant increase in emissions, the operator's projection shows an increase of greater than 50% of the significant amount *even after* excluding emissions increases that are unrelated to the projects. Under § 52.21(r)(6)(vi)(*a*), "before beginning actual construction, the owner or operator" must also provide its preconstruction analysis to the permitting authority. *Id.* § 52.21(r)(6)(ii). The source, however, is not "require[d] … to obtain any determination from the Administrator before beginning actual construction." *Id.*; *see also DTE*, 711 F.3d at 649 (explaining that the regulations do not require approval of projections). Rather, once pre-project analysis and recordkeeping

27

requirements are met (i.e., once notification is sent to the permitting authority or records are maintained, as applicable under the rules), the 2002 NSR Reform Rules provide that construction may begin in full compliance with the CAA.  40 C.F.R. §52.21(r)(6)(i), (ii) ("Before beginning actual construction of the project, the owner or operator shall document and maintain a record of the following information," and in some cases "provide a copy of th[at] information" to the permitting authority.).  After construction is complete, the operator must calculate and maintain a record of emissions in tons per year of any NSR-regulated pollutant and (for electric generating units) report those emissions to the relevant regulatory authority annually.  *Id.* § 52.21(r)(6)(iii)-(iv).

> ### 2. The 2002 NSR Reform Rules Measure the Validity of the Source's Preconstruction Projection Through Post-construction Emissions Data.

The 2002 NSR Reform Rules make clear that the Government may not second-guess the operator's technical and engineering judgment in making a projection that emissions will not increase due to a project.  As noted above, the regulations state that the operator is not "require[d] … to obtain any determination from the Administrator before beginning actual construction."  *Id.* § 52.21(r)(6)(ii).  The regulations then make clear that the validity of that pre-project projection that there will be no increase in emissions due to a project will be judged by actual post-project emissions data.  Consistent with the statute, which

28

defines "modification" as a change that "increases the amount" of an emitted air pollutant, the revised rules state unequivocally that "a project is a major modification for a regulated NSR pollutant if it *causes* … a significant emissions increase … and a significant net emissions increase." *Id.* § 52.21(a)(2)(iv)(*a*) (emphasis added).  And in the very next sentence, the rules make clear that a project "is *not* a major modification *if it does not cause a significant emissions increase*." *Id.* (emphases added).  So in the absence of evidence showing an actual increase in emissions caused by the project, a source operator cannot be held liable for constructing a major modification without a permit.

The rules further reinforce the primacy of post-construction real emissions data in judging whether a major modification has occurred by clarifying that such data either confirm or trump preconstruction projections.  After describing how an operator should project post-project emissions, the regulations make clear that, "[r]egardless of *any such* preconstruction projections, a major modification" depends on whether "the project *causes a significant emissions increase* …." *Id.* § 52.21(a)(2)(iv)(*b*) (emphases added).  This provision applies expansively to "any such" projection, whether it is the actual projection performed by the operator or a projection intended to "second-guess" the operator's projection after the fact.  The district court held as much in its original summary judgment decision, Summ. J. Op. & Order I at 5-6, RE 160, Page ID # 6638-39, and this Court agreed.  *DTE,*

29

711 F.3d at 649 ("[T]he district court's premises are largely correct."); *id.* at 651 ("A project-and-report scheme is entirely compatible with the statute's intent."); *id.* at 650 ("[It] is entirely consistent with the statute and regulations" for a source "to keep its post-construction emissions down in order to avoid the significant increases that would require a permit.").

## STATEMENT OF FACTS

### I.    DTE's 2010 Maintenance Projects at Monroe Unit 2

From March to June 2010, DTE removed Monroe Unit 2 from service to perform a number of routine maintenance projects, including the replacement of three boiler tube components—the economizer, the pendant reheater, and a portion of the waterwall.[10]  Boyd Decl. ¶ 17, RE 166-3, Page ID # 6745.

Before commencing construction, DTE followed the NSR regulations' specific instructions for determining whether the projects would trigger CAA

---

[10] These types of boiler tube component replacements are common in the utility industry, due to the harsh conditions that exist in the combustion chamber of such boilers.  Every utility in the country must do them to maintain the efficiency, reliability, and safety of the nation's electric generating system.  *See* Decl. of Jerry L. Golden, RE 46-10.  For this reason, DTE contends that these projects are routine maintenance, repair, and replacement that cannot trigger the NSR program.  40 C.F.R. § 52.21(b)(2)(iii)(*a*); *see, e.g., Pa. Dep't of Envtl. Prot. v. Allegheny Energy, Inc.*, No. 05-885, 2014 WL 494574, *30-31 (W.D. Pa. Feb. 6, 2014) (finding similar boiler tube component replacements "routine"); *Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, No. 3:01-CV-71, 2010 WL 1291335, *27-34 (E.D. Tenn. Mar. 31, 2010) (same).  This is an independent reason why these projects did not trigger NSR that is not at issue in this appeal.

permitting requirements.  With respect to calculating baseline actual emissions, *see supra* at 23-24 (listing the four specific instructions for determining baseline emissions), DTE first selected consecutive 24-month periods within the five years immediately preceding construction for each pollutant:  (a) October 2006 through September 2008 for $NO_x$; (b) July 2006 through June 2008 for $SO_2$; and (c) January 2008 through December 2009 for particulate matter.  Letter from Kelly L. Guertin, DTE Energy, to William Presson, MDEQ (2010 DTE Notification Letter) at 3 (Mar. 12, 2010), RE 166-4, Page ID # 6791, Supplemental Decl. of Skiles W. Boyd (Supp. Boyd Decl.) ¶ 4.a, RE 166-5, Page ID # 6796.  DTE then tabulated total emissions for these periods, including any emissions associated with startup, shutdown or malfunction.  Supp. Boyd Decl. ¶¶ 4.a, 4.c, RE 166-5, Page ID # 6796-97.  Fugitive emissions were not included because they were not quantifiable. *Id.* ¶ 4.d, Page ID # 6797.  DTE did not need to adjust any of these emissions downward, because none of the emissions exceeded any enforceable limitation, *id.* ¶ 4.e, Page ID # 6797, and the data for each of these periods was recorded by the continuous emissions monitoring system (CEMS) for Monroe Unit 2 and thus was more than adequate, *id.* ¶ 4.b, Page ID # 6796.

DTE also followed the regulations' four specific instructions with respect to projected actual emissions.  *See supra* at 24-25.  DTE relied on the projections it made in the company's 2010 Power Supply Cost Recovery (PSCR) filing

submitted in September 2009 to the Michigan Public Service Commission.  *Id.* ¶ 5, Page ID # 6797-98.  These annual PSCR submissions are intended to reflect the company's best estimate, considering all relevant information regarding the future operation of its units, including the demand for its power generation units and its cost to deliver power to its customers.  Tr. of Gordon P. Usitalo 30(b)(6) Dep. at 76-79 (June 9, 2011), RE 166-6, Page ID # 6802-03.  To make this submission, DTE used a sophisticated "production cost model" called PROMOD to simulate the dispatch of each of its power plants, including Monroe Unit 2, five years into the future.  Supp. Boyd Decl. ¶ 5, RE 166-5, Page ID # 6797.  The inputs for this PROMOD model are exhaustive, including among other things the estimated demand profile, estimated coal prices, estimated natural gas prices, the cost of emission "allowance[s]" that must be purchased to comply with other CAA regulations, planned outages at various units, and estimates of random outages.  *Id.* ¶ 5.b, Page ID # 6797-98.  This analysis indicated that Monroe Unit 2 would experience its highest utilization during calendar year 2013, *id.* ¶ 5.a, Page ID # 6797, and that emissions during that year (before accounting for causation) would be higher than baseline actual emissions.  *See* Boyd Decl. ¶ 17, RE 166-3, Page ID # 6745.  Emissions for other years during this five-year period were projected to be below baseline.  *Id.*

As required by the regulations, the company accounted for SSM emissions in the projection. Specifically, DTE calculated average emission rates for use in the projection based on total emissions and other data reported in CEMS before the projects, including the baseline periods, which would include the impacts of start-up, shutdown and malfunction on average emission rates. Supp. Boyd Decl. ¶ 5.c, RE 166-5, Page ID # 6798. "Fugitive" emissions were not included because the company concluded they were not quantifiable and, in any event, would be no greater than fugitive emissions during the baseline period. *Id.* ¶ 5.d, Page ID # 6798.

The company then excluded emissions caused by independent factors that the unit was capable of accommodating during the baseline period. Based on the company's technical and engineering judgment and its understanding of the inputs used as part of its PSCR submission for 2010, DTE concluded that the calculated increase in emissions over baseline actual emissions would be attributable to factors other than the projects, in particular the company's evaluation of the electricity markets in mid-2009 showing that there would be substantial demand for power from all of the units in DTE's portfolio. *Id.* ¶ 5.e, Page ID # 6798. Finally, the company concluded that the emissions it sought to exclude could have been accommodated during the baseline period, because the unit had greater

availability during the baseline period than the highest expected utilization of the unit after the project. *Id.*

Consistent with the company's practice for almost a decade, DTE then submitted a planned outage notification to MDEQ on March 12, 2010, before commencing work on the projects. *See* 2010 DTE Notification Letter, RE 166-4. That notice (i) addressed each of the information requirements of the Michigan NSR rules, *see* Mich. Admin. Code R. 336.2818(3)(a); (ii) explained why the repairs were projects within the NSR "routine maintenance, repair, and replacement" provision that would not trigger NSR; and (iii) explained why, in any event, the projects would not result in any "significant emissions increase." *Id.*[11]

---

[11] The 2010 projects on Monroe Unit 2 triggered the "reasonable possibility" record-keeping and reporting requirements of 40 C.F.R. § 52.21(r)(6)(vi)(*b*) because, before accounting for causation, DTE's projection showed an increase in emissions of more than 50% of the significance threshold. But after accounting for causation by excluding factors unrelated to the project, the projects were not projected to cause any increase in emissions and therefore were not subject to the more stringent reporting requirements applicable to projects that trigger "reasonable possibility" reporting under § 52.21(r)(6)(vi)(*a*). *See* Boyd Decl. ¶ 15, RE 166-3, Page ID # 6743. Nonetheless, consistent with company practice, DTE treated the projects as if they did trigger the additional reporting requirements and submitted a notice of these projects and its emissions projection analysis to its permitting authority, MDEQ. The district court ruled in its first Summary Judgment Opinion and Order that DTE's notice was timely and consistent with the regulatory requirements. RE 160, Page ID # 6643 (p. 10). On appeal, the Government abandoned its challenge to the timeliness or content of DTE's notice, but still suggested vaguely that DTE's filing of the notice shortly before the projects started was somehow improper. This Court also flatly rejected that suggestion. *DTE*, 711 F.3d at 649 (The district court "uph[eld] both the timeliness

MDEQ did not question DTE's analysis, either then or since.  Boyd Decl. ¶ 17, RE 166-3, Page ID # 6745.  The projects started on March 13, 2010, and concluded on June 20, 2010.  *Id.* ¶ 18, Page ID # 6746.

In the nearly five years since the 2010 projects were completed, Monroe Unit 2 has never exceeded pre-project emissions on an annualized basis.  Supp. Boyd Decl. ¶ 7, RE 166-5, Page ID # 6799.  In fact, the unit's actual emissions have been substantially less than baseline emissions for each of 2011, 2012 and 2013.  *Id.*  And since the completion of the major air pollution control retrofit project at Monroe Unit 2 in 2014, emissions have decreased further still.

## II.    Procedural History

### A.    The Government's Notice of Violation and Subsequent Enforcement Action

In June 2010, the Government issued DTE a "Notice and Finding of Violation" (NOV) that accused DTE of violating the NSR regulations.  NOV at ¶¶ 25-26 (June 4, 2010), RE 166-2, Page ID # 6727.  The Government did *not* allege that DTE failed to follow the specific instructions of the projection regulations for determining NSR applicability.  Rather, the Government alleged that routine boiler tube replacement projects that DTE commenced at Monroe Unit 2 in March 2010 were "major modifications," *id.*, based on its contention that DTE should have

and sufficiency of the information reported in the notice.  These determinations of adequate reporting are not challenged on appeal.").

predicted that its projects would cause a significant increase in emissions.  In response to an information request, DTE provided the Government with additional information explaining its projections, including that "[i]f current information were used [in PROMOD], it is unlikely that we would have even projected increased demand (and emissions) for this unit."  2010 DTE Letter in Response to § 114 Request at 4 (June 1, 2010), RE 166-3, Page ID # 6779 (Boyd Decl. Ex. 3).[12] Ultimately, the Government was unwilling to accept DTE's projections, so the Government filed this lawsuit in August 2010, shortly after Monroe Unit 2 resumed operations and before annual data were available to show whether Monroe Unit 2 had emitted any regulated pollutant at greater-than-baseline levels, much less whether the projects had *caused* emissions to increase.  In its Complaint, the Government asserted two essentially identical claims—that DTE violated the

---

[12] In a follow-up letter dated June 23, 2010, DTE reiterated and further explained:

> The attached chart further illustrates and confirms the conclusion of the Company's notification to [MDEQ] prior to the project, i.e., that there will be no significant increase in emissions due to the project. The chart provides the results of Detroit Edison's 2009 PROMOD runs in comparison to the 2005-2007 baseline period, and confirms that emissions and utilization projections are the product of independent factors such as demand and fuel prices, not tube replacements.

June 23, 2010 DTE Response to NOV at 3, RE 166-3, Page ID # 6784 (Boyd Decl. Ex. 4).

PSD (Count One) and NNSR (Count Two) programs by constructing a major

modification at Monroe Unit 2 without a permit.

### B.    The District Court Grants DTE's Original Motion for Summary Judgment.

DTE moved for summary judgment, because the Government had no

evidence showing that emissions at Monroe Unit 2 increased after the 2010

projects.  The Government's case instead was built on exactly the type of second-

guessing that the 2002 NSR Reform Rules do not tolerate.  Specifically, the

Government intended to prove its case by showing, through expert testimony, that

DTE *should have projected* that the projects *would cause* an increase in emissions,

regardless of DTE's projection that no increase would result from the project and

regardless of whether actual post-project emissions ever increased above baseline

levels (and, indeed, regardless of whether emissions actually decreased, as they did

since Monroe Unit 2 returned to operation after the projects, over four years ago).

The district court agreed with DTE that the 2002 NSR Reform Rules do not

allow the type of second-guessing that was the cornerstone of the Government's

liability proof.  *See* Summ. J. Op. & Order I, RE 160.  The district court found that

DTE had complied with the rules' preconstruction source obligations governing

notice requirements, "upholding both the timeliness and sufficiency of the

information reported in the notice," *DTE,* 711 F.3d at 649, and also found that

actual post-project emissions data did not show an actual significant increase in

37

emissions.  Summ. J. Op. & Order I at 8-9, RE 160, Page ID # 6641-42.

According to the court, any contention that the 2010 projects were, in fact, major

modifications was therefore premature.  *Id.* at 10, Page ID #6643.  The district

court also rejected the Government's belated claim that DTE's preconstruction

notice to MDEQ was deficient, both because the notice met all of the regulatory

requirements and because the Government failed to allege in its NOV that DTE's

notice was deficient.  *Id.* at 12, Page ID # 6645.

The Government appealed.

**C.     This Court's 2013 Decision**

**1.     This Court Endorsed Key Premises of The District
Court's 2011 Decision.**

On appeal, the Government pursued the same enforcement theory it had

pursued unsuccessfully in the district court.  The Government argued that it should

be able to prove that a major modification has occurred by second-guessing the

operator's projection:  "[The Government] can … enforce PSD requirements by

demonstrating that the operator *should have* projected that emissions would

increase."  Br. for the United States as Appellant (2012 U.S. Br.) at 29 (Feb. 17,

2012), ECF No. 38 (Case No. 11-2328) (emphasis in original); *see also* Reply Br.

for the United States as Appellant at 5 (June 8, 2012), ECF No. 60 (Case No. 11-

2328) (claiming that "the statute itself, the … regulation, case law, and decades of

NSR practice … all … make clear that EPA can enforce NSR based on the

pollution an operator should have expected to result from construction," and regardless of whether emissions actually increase after construction).   The Government contended that it need not adduce evidence of an actual increase in emissions after the project to meet its burden.  2012 U.S. Br. at 31.  It would suffice, argued the Government, to show that a "projection[]" made after the fact in the context of an enforcement case would have shown an increase.  *Id.*

This Court issued its decision on March 28, 2013.  In that decision, the Court did not question the basic premises of the district court's summary judgment decision or disagree with the district court's conclusion that there can be no modification where there is no actual emissions increase due to the project.  "[T]he district court's premises are largely correct," the Court observed.  *DTE*, 711 F.3d at 649.  The 2002 NSR Reform Rules "do[] not contemplate approval of the projection prior to construction."  *Id.*  The regulations, therefore, "allow operators to undertake projects without having EPA second-guess their projections."  *Id.* at 644.  Were EPA allowed to "second-guess the making of the projections, then a project-and-report scheme would be transformed into a prior approval scheme."  *Id.* at 649.  Thus, the Court observed, "submitting [the] ... projection one day before construction began … is fully consistent with a project-and-report scheme."  *Id.* at 650.  And "keep[ing] ... post-construction emissions down in order to avoid

the significant increases that would require a permit … is entirely consistent with the statute and regulations." *Id.*

The Court also agreed with the district court on the role of post-project data—they dictate whether or not a modification has occurred, where the operator has projected no increase in emissions due to the project: "If [the] company's projections are later proven incorrect, EPA can bring an enforcement action" alleging a major modification. *Id.* at 651. This reflects the nature of the statutory and regulatory modification program: "As EPA conceded at oral argument, the statute and regulations allow sources to replace parts indefinitely without losing their grandfathered status so long as none of those changes cause an emissions increase." *Id.*

> ## 2.    This Court Carves Out a Narrow Category of Claims to Ensure That the System Works.

But the Court also concluded that the district court's legal holding might have been stated too broadly in one limited respect. The Court explained, "This appeal raises a single question: can EPA challenge th[e] [operator's] projection before there is post-construction data to prove or disprove it?" *Id.* at 644. The Court answered this question in the affirmative: even though an operator's projections are not subject to second-guessing by EPA, "[t]he operator has to make projections according to the requirements for such projections contained in the regulations. If the operator does not do so, and proceeds to construction, it is

subject to an enforcement proceeding." *Id.* at 649. Stated differently, "[i]f there is no projection, or the projection is made in contravention of the regulations guiding how the projection is to be made, then the system is not working." *Id.* "[A]t a *basic level* the operator has to make a projection in compliance with how the projections are to be made." *Id.* (emphasis added).

The category of enforcement actions contemplated by the Court's decision is narrow. EPA is authorized to bring an enforcement action if it believes the operator has not conducted a projection at all or if the operator has not complied with the "requirements for such projections contained in the regulations." *Id.* at 649. As the Court explained, "EPA must be able to prevent construction if an operator … uses an improper baseline period or uses the wrong number to determine whether a projected emissions increase is significant." *Id.* at 650. Notably, these examples of "specific instructions" that can be subject to enforcement are straightforward, explicit, easily-determined, numeric requirements that do not involve the exercise of technical and engineering judgment by the operator. The Court admonished that the Government cannot second-guess those judgments. For example, EPA cannot substitute its judgment for that of the operator as to the likely demand for the unit in the projected years or with respect to the weight given to each of the relevant factors the operator must consider in making a projection. The object of such an action, rather, is to ensure

"at a basic level" that "the operator has … [made] a projection in compliance with how the projections are to be made." *Id.* at 649. Critically, "this does not mean that the agency gets *in effect* to require prior approval of the projections." *Id.* (emphasis added). And, as this Court recognized, the consequence of doing the projection incorrectly may merely be for "'the agency … [to] make [the operator] do the projection right.'" *Id.* at 650.

### 3.    The District Court Concludes That DTE Complied with the Regulations' Specific Instructions.

On remand, DTE promptly moved for summary judgment, because the undisputed facts established that DTE had complied with the objective requirements of the regulations. DTE used the correct baseline period, and DTE relied on its PROMOD production model, which the Government itself describes as "a 'sophisticated' computer model …. [b]ased on 'exhaustive' input data." Gov't Br. at 13. And after excluding emissions that DTE concluded were unrelated to the project, DTE determined that there would be no significant increase in emissions caused by the project in any of the five years following the project. This undisputed evidence showed that, "at a basic level," DTE had made "a projection in compliance with how the projections are to be made." *DTE*, 711 F.3d at 649.

The district court agreed. The Government, the court explained, does not "contend that [DTE] violated any of the agency's regulations when [it] computed

42

the preconstruction emission projections from Unit 2." Summ. J. Op. & Order II at

3, RE 196, Page ID # 7515. Instead, the Government challenged DTE's judgment

in applying the "demand growth exclusion"—the Government would have applied

the exclusion differently. *Id.* This, held the district court, was impermissible

"second-guessing." *Id.* Indeed, the district court observed that based on post-

project data, the Government's "own preconstruction emission projections are now

verifiably *inaccurate*." *Id.* at 4, Page 7516. Thus, not only was the Government

seeking to second-guess DTE's projection, it was doing so on the basis of its own

demonstrably incorrect projection. Nonetheless, the district court noted that this

"does not permanently bar EPA from commencing an enforcement action against

defendants" if in the future it could show that the project had in fact caused a

significant emissions increase. *Id.*

This appeal followed.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo.

*Trs. of Resilient Floor Decorators Ins. Fund v. A & M Installations, Inc.*, 395 F.3d

244, 247-48 (6th Cir. 2005). Summary judgment is appropriate where the movant

shows there is "no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

43

## SUMMARY OF ARGUMENT

1.      The Government's objective in this latest chapter of its action against

the Monroe Unit 2 repair and replacement projects remains unchanged from its

original objective.  It seeks to second-guess DTE's projection—specifically DTE's

application of the causation requirement—to prove that DTE "'should have

expected'" that the 2010 projects at Monroe Unit 2 would cause significant

emissions increases, *see* Gov't Br. at 29, notwithstanding that emissions at Monroe

Unit 2 have verifiably decreased after the projects.  This Court squarely rejected

this approach to enforcement in its 2013 opinion, while allowing for limited

actions to ensure "at a basic level" that DTE complied with the "specific

instructions" governing preconstruction projections.

The Government tries to fit this claim within this Court's 2013 mandate by

purporting to identify three ways in which DTE violated the "specific instructions"

in the regulations: (1) by failing to consider all "relevant information," *id.* at 26;

(2) by improperly applying the so-called "demand growth exclusion," *id.* at 36-37;

and (3) by failing to adequately "explain" or "document" its application of the

"demand growth exclusion," *id.* at  32-33.  The Government is wrong on each of

these points.  DTE considered "all relevant information," as the Government itself

concedes, but the Government would place different weight on certain factors than

did DTE.  That is second-guessing.  So too is the Government's argument that

44

DTE failed to apply the demand growth exclusion properly.  It can point to no "specific instruction" that DTE failed to follow; it just would have evaluated causation differently.  And nothing in the rules requires DTE to "demonstrate" to EPA's satisfaction the validity of its projection.  To require otherwise would be to mandate the very "prior approval" system this Court unequivocally rejected.  The rules instead required DTE to "project-and-report," and both the district court and this Court have held that DTE satisfied those requirements.

2.    The Government's request for deference is similarly misplaced. Deference to an agency's interpretation of its regulations is not appropriate where the rules are unambiguous, and the 2002 NSR Reform Rules state unambiguously that a project "is not a major modification if it does not cause a significant emissions increase."  40 C.F.R. § 52.21(a)(2)(iv)(*a*).  And this Court already has concluded that the rules preclude enforcement by "second-guess[ing]."  *DTE*, 711 F.3d at 649.  Moreover, the statements to which the Government seeks deference are either irrelevant to the issues presented here or relate to earlier versions of the NSR rules, not the 2002 rules at issue here.

3.    The Government's enforcement theory is also fatally flawed due to the Government's failure to allege any violation of the projection regulations in its NOV.  Contrary to the Government's suggestions, the NOV relates *solely* to the allegation that DTE undertook a "major modification" at Monroe Unit 2, which is

very different from any claim based on a "specific" alleged violation of the

projection regulations, the consequence of which merely would be to require DTE

to redo the projection.

## ARGUMENT

I.     **EPA Seeks to Second-Guess DTE's Preconstruction Projection, Which This Court Already Has Concluded Is Improper.**

A.     **Post-Project Data Dictate Whether a Project Was a Modification.**

The central premise of the Government's argument on appeal is a

mischaracterization of this Court's 2013 opinion.  Specifically, the Government

asserts that the Court diminished the salience of post-project emissions data in

determining whether a project is a major modification, when the operator's

preconstruction projection shows no significant increase caused by the projects.

Gov't Br. at 50 (stating that this Court "rejected" the argument that "only post-

project data can trigger major modification status").   According to the

Government, "[t]he fact that emissions have (so far) gone down in the years after

the overhaul does not shed any light on whether DTE followed the regulations in

predicting emissions before the project."  Pl. U.S. Opp'n to DTE's Mot. for Summ.

J. Based on Compliance with Pre-Construction Projection Requirements at 11

(Aug. 2, 2013), RE 178 (filed under seal).  The Government goes on to suggest this

Court held that, if the Government can establish that an operator "should have

46

expected" an emissions increase, that alternative projection "determine[s] whether a project is a major modification" and thus requires a permit.  Gov't Br. at 29, 48.

This is a blatant mischaracterization of the Court's decision.  In describing the "project-and-report" system created by the regulations, this Court explained that it is the "owners and operators" of major sources who must do a projection, and it is "*[t]hat* projection" that determines whether a preconstruction permit is needed.  *DTE*, 711 F.3d at 644 (emphasis added).  The Court then went on to emphasize that the validity of *that* preconstruction projection showing no increase in emissions caused by the project would be measured by *actual* post-project emissions:

> If a company's projections are later proven incorrect, EPA can bring an enforcement action.  ...  If post-construction emissions are higher than preconstruction emissions, and the increase does not fall under the demand growth exclusion, the operator faces large fines and will have to undertake another project at the source to install modern pollution-control technology.

*Id.* at 651.  Nowhere in this Court's opinion did it endorse the Government's position that it can enforce by second-guessing—by showing that the operator *should have projected* a significant increase caused by the project.[13]

---

[13] Had this Court accepted the Government's theory, it would not have explicitly held that an operator may "keep its post-construction emissions down *in order to avoid* the significant increases *that would require a permit*."  *DTE*, 711 F.3d at 650 (emphases added).  Nor would it have observed that DTE's practice of

In fact, the Court specifically rejected the Government's position, both at oral argument and in its opinion. The exchange at oral argument is revealing:

> **JUDGE ROGERS**: [You] would have to say there's some Regulation which [DTE] interpreted incorrectly in making these projections. Is that correct?

> **MR. BENSON**: Well, I think what the district court would find is that one side or the other's projection was inaccurate based on the facts. It is really a factual question, and then there is a legal question.

> **JUDGE ROGERS**: Alright. That puzzles me entirely.

> *        *        *

> **MR. BENSON**: [I]f there is a projection that complies with the regulations, there may be two different projections that both sort of *on a superficial level* meet the requirements of the regulations. But they would rely on different facts that would be found by the district court. … And that is the type of analysis that EPA and the company is going to do and in a court below *the court would have to decide whose analysis makes sense*.

> **JUDGE ROGERS**: Well here's the problem I have with that. *That sounds like getting a permit to not get a permit. It sounds like you have to get approval from EPA as to your calculations before you can proceed without a permit.*

Oral Arg. at 50:39, Nov. 27, 2012 (emphases added).

Thus, consistent with the 2002 rules, the majority unsurprisingly rejected the Government's argument that, even though the company's projection (including

---

"purposely manag[ing] the cost of electricity from Monroe Unit #2 to keep its emissions from increasing … further[s] the goal of the statute." *Id.* at 651.

necessarily its application of the demand growth exclusion) complies with the regulations at "superficial level," the Government nevertheless should be allowed to have its own hired experts second-guess it in court.  Rather, this Court made clear that the rules do not tolerate such second-guessing:

> [I]f the agency can second-guess the making of the projections, then a project-and-report scheme would be transformed into a prior approval scheme. … [A]t a basic level the operator has to make a projection in compliance with how the projections are to be made.  But this does not mean that the agency gets *in effect* to require prior approval of the projections.

*DTE*, 711 F.3d at 649 (emphasis added).

The Court also properly recognized that the Government was attempting to use NSR "enforcement" for a purpose at odds with the statutory objective of NSR. At oral argument, Judge Rogers observed in questioning EPA's counsel:  "The only way you can really use a lever to force them to get a permit which would put them to a lower level than they now have is to second-guess their projection in a way that projects it *higher than what even turns out to be reality*."  Oral Arg. at 46:20, Nov. 27, 2012 (emphasis added).  That is not the purpose of NSR.  The Court thus specifically observed that the definitions of "major modification" in the regulations are:

> incompatible with EPA's argument that [NSR] is a program designed to force every source to eventually adopt modern emissions control technology.  … As EPA conceded at oral argument, the statute and regulations

49

> allow sources to replace parts indefinitely without losing
> their grandfathered status so long as none of those
> changes cause an emissions increase.

*DTE*, 711 F.3d at 650-51.

For this reason, the Government's extended discussion of the "preconstruction" nature of NSR, *see* Gov't Br. at 42-54, is a non sequitur. DTE does not contend—and the district court did not hold—that NSR applicability can be "erased" by post-project emissions data. If the operator projects that a project will cause an increase, it must get a permit. *DTE*, 711 F.3d at 647. But where the operator does not project an increase due to the proposed project, the operator is not "require[d] … to obtain any determination from the Administrator before beginning actual construction." 40 C.F.R. § 52.21(r)(6)(ii). There is no "major modification" for which a permit must be obtained, so there is nothing to "erase." The validity of the operator's projection will be judged by whether the project causes an actual increase in emissions. If there is such an increase, the operator must obtain a permit "at that time." *See* 57 Fed. Reg. at 32,325. If the project does not cause an actual increase in emissions, the operator's projection is now "verifiably" correct. No "major modification" has occurred, and no permit was required. This may even incent the operator to purposely keep emissions below baseline levels, but as this Court has held, that's the point of NSR. *DTE*, 711 F.3d at 650-51.

50

**B.      Decisions Interpreting Pre-2002 Versions of the NSR Rules Are Inapposite.**

The Government tries to bolster its misreading of this Court's 2013 opinion by arguing, as it did in its first appeal, that "courts have endorsed EPA's authority to bring claims based on what the source 'expected, or should have expected … at the time of the projects." Gov't Br. at 11. "Every court to address the issue has reached the same conclusion," says the Government. *Id.* at 2. But the Government fails to acknowledge the cases it cites involved projects governed by the *pre*-2002 versions of the rules—almost exclusively the 1980 rules. *See Ohio Edison*, 276 F. Supp. 2d at 864, 869 (applying 1980 rules with respect to Activities 2, 4-8, 10-11 and 1992 rules with respect to Activities 1, 3 and 9); *United States v. Cinergy Corp.*, 384 F. Supp. 2d 1272, 1277 (S.D. Ind. 2005), *aff'd*, 458 F.3d 705 (7th Cir. 2006) (explaining that it was applying 1980 rules); *United States v. Duke Energy Corp.*, No. 1:00-CV-1262, 2010 WL 3023517, at *2 (M.D.N.C. July 28, 2010) (same)*; United States v. S. Ind. Gas & Elec. Co.*, No. IP99-1692 C-M/F, 2002 WL 1629817 (S.D. Ind. July 18, 2002) (*SIGECO*) (same).[14]  Each of these cases

---

[14] The Government suggests that the Seventh Circuit in *Cinergy* found the differences between the 2002 rules and earlier versions to be insignificant. 2012 U.S. Br. at 30 n.8 (citing *Cinergy*, 458 F.3d at 708). The issue the Seventh Circuit considered was whether net emissions increase should be judged based on hourly emissions rate or total annual emissions measured in tons per year. *Cinergy*, 458 F.3d at 708. On that issue, the court correctly observed that there is no difference

51

involved enforcement-by-second-guessing,[15] which has been rejected in each case brought under the 2002 NSR Reform Rules.  *See DTE*, 711 F.3d at 649; *United States v. Okla. Gas & Elec. Co.*, No. CIV-13-690-D, 2015 WL 224911, *8-9 (W.D. Okla. Jan. 15, 2015).  Unsurprisingly, neither of these cases cited, much less relied on, any of the cases cited in the Government's brief.

Moreover, each of the decisions cited by the Government relies (either directly or indirectly) on the order of EPA's Environmental Appeals Board in *In re Tennessee Valley Authority*, 9 E.A.D. 357, 2000 WL 1358648 (EAB Sept. 15, 2000), *vacated by*, *Tenn. Valley Auth. v. Whitman*, 336 F.3d 1236 (11th Cir.

---

between the 1992 and 2002 rules.  The *Cinergy* Court did not address the question presented here.

[15] The litigation track record in these cases shows that the Government seeks to go well beyond a determination of whether, at a basic level, the operator complied with the regulations' specific instructions.  In most of these cases, factfinders have evaluated competing projections and ultimately ruled in favor of the operators.  Only one court uncritically applied the Government's projection to find liability for particular projects.  *See Ohio Edison*, 276 F. Supp. 2d at 869.  By contrast, two juries rejected it for the majority of projects at issue in *Cinergy*, and the Seventh Circuit reversed one of these jury verdicts (the other partial verdict was saved from reversal by settlement) because the court found that method unreliable under *Daubert*.  *See* Special Verdict Form, Verdict Form [1 of 2], and Verdict Form [2 of 2], *United States v. Cinergy Corp.*, No. 99-1693 (S.D. Ind. May 22, 2008, May 22, 2008, and May 19, 2009), ECF Nos. 1338, 1339, and 1742; *United States v. Cinergy Corp.*, 623 F.3d 455, 458-61 (7th Cir. 2010).  This mix of results illustrates the "abysmal breakdown in the administrative process" that led to the 2002 NSR Reform Rules, and it shows that, its disclaimers to the contrary notwithstanding, *see* Gov't Br. at 51, the Government in this case envisions a trial where the factfinder will decide which of two projections is "better."

2003)—the same administrative decision that the Eleventh Circuit declared a nullity due to the Government's complete disregard of due process.[16]  *Whitman*, 336 F.3d at 1246 ("[The EAB] entirely ignor[ed] the concept of the rule of law."). That decision, issued as part of the Government's misguided enforcement initiative, involved earlier versions of the rules—not the 2002 NSR Reform Rules—and was the first to adopt the remarkable position that a project that does not cause an increase could nonetheless be deemed a major modification.  That reading of the earlier rules is inconsistent with the CAA's definition of "modification" as a project "which *increases the amount* of any air pollutant emitted by such source."  42 U.S.C. § 7411(a)(4) (emphasis added).  In any event, the 2002 NSR Reform Rules explicitly reject that reading and restore the statute's focus on an actual increase in emissions as the defining characteristic of major modifications by making clear that a project "is not a major modification if it does not cause a significant emissions increase," and that "[r]egardless of any such preconstruction projections," the occurrence of a major modification depends on

---

[16] The decision in *SIGECO* was issued before the Eleventh Circuit struck down the EAB's decision in *TVA*, and it relies exclusively on *TVA* for this point. *See* 2002 WL 1629817, at *3.  The *Ohio Edison* decision relies on *SIGECO*, *see* 276 F. Supp. 2d at 881, and the *Duke Energy* decision relies on *Ohio Edison*, *see* 2010 WL 3023517, at *5.  The district court's decision in *Cinergy* was issued by the same judge that decided *SIGECO* and merely affirms that decision.  *See* 384 F. Supp. 2d at 1276.

whether it "causes a significant emissions increase and a significant net emissions increase."  40 C.F.R. § 52.21(a)(2)(iv)(*a*)-(*b*).

### C.    The Government Seeks to Prove, Through Second-Guessing, That DTE Violated the Regulations.

The Government attempts to cram its Orwellian enforcement approach into the narrow framework this Court envisioned for remand by accusing DTE of violating the regulations governing emission projections in three respects.  Each argument is baseless and simply reinforces that the Government's case amounts to no more than a continued desire to replace DTE's pre-project projection with one that is now "verifiably inaccurate."

### 1.    DTE Considered All Relevant Information.

The Government first accuses DTE of failing to adhere to the requirement to consider "all relevant information."  Gov't Br. at 26.  But DTE did just that, as the Government itself acknowledges.  For example, the Government concedes that DTE's projection was  based on a "'sophisticated' computer model" that considered "'exhaustive' input[s]," including not only "future outage rates," "coal prices," and "demand," but also "many other factors."  *Id.* at 13.  DTE told the Government as much in 2010.[17]    The Government's critique is thus not that DTE

---

[17] *See* 2010 DTE Notification Letter at 2, RE 166-4, Page ID # 6790 (explaining that any increase in emissions over baseline emissions would be "a function of expected electricity market conditions"); 2010 DTE Letter in Response

failed to consider relevant information, but rather apparently that DTE placed more

significance on some "relevant" factors, such as power demand and fuel prices,

than would the Government's litigation expert, who instead would base his

judgment on reduced outage rates alone. *Id.* at 36. This argument is not based on

any objective requirement of the regulations. There is no specific instruction on

whether and how an operator must consider these factors. Nor is reduced outage

rate even mentioned in the regulations. This is quintessential second-guessing.

### 2. DTE Properly Applied the Demand Growth Exclusion.

The Government also contends that DTE violated the regulations by mis-

applying the demand growth exclusion. *Id.* at 36-37. The Government points to

analyses by one of its hired experts, Mr. Hayet, who would opine that the projects

should have been expected to cause an increase in utilization of the unit and thus

the associated projected emission increases were "related to" the projects. *Id.* at

37. The Government also points to DTE's documents, and argues (without irony)

that DTE should have placed the significance the Government would place on

---

to § 114 Request at 3-4, RE 166-3, Page ID # 6778-79 (Boyd Decl. Ex. 3) ("[A] primary driver for a projected increase in generation (and commensurate projected increase in emissions) from the Monroe Power Plant was an expected increase in power demand accompanied by an increase in energy cost by $5.85/MWh"); June 23, 2010 DTE Response to NOV at 3, R 166-3, Page ID # 6784 (Boyd Decl. Ex. 4) (explaining that DTE's 2009 PROMOD runs show that "emissions and utilization projections are the product of independent factors such as demand and fuel prices").

those documents in litigation, not the significance that DTE placed on them when evaluating whether the projects would cause an increase in emissions. The Government protests that this is not impermissible "second-guessing," but rather a challenge to the "manner in which DTE used its own information," *id.* at 40, as if there is any difference.

Neither of these lines of argument establish that DTE violated any "specific instruction" in the regulations regarding the demand growth exclusion. Mr. Hayet's methodology is not codified in the rules. Nor do the rules say what weight an operator should place on certain documents. In the absence of these types of specific instructions, the application of the demand-growth exclusion rests with the operator's technical and engineering judgment, and would be judged, following the project, by actual post-project emissions. That the Government's hired expert would have reached a different conclusion had he done the projection in the first instance is of no moment. Otherwise, NSR would become a prior approval system—one where DTE's judgment is irrelevant, while the conclusions of outside litigation experts are deemed conclusive, and where DTE's understanding of its own documents and past practices is secondary to that of the Government's hired experts. The Government protests that it is not asking the Court to determine which of "two competing projections is 'better,'" *id.* at 51, but that is *exactly* what the Government is doing. As its counsel candidly responded to Judge Rogers's

56

questions previously, the only way to resolve the issue presented by the Government is for the district court to hold a trial to determine whether Mr. Hayet's (and other Government experts') application of the demand growth exclusion is more "reasonable" than that of DTE's engineers (and its experts). Oral Arg. at 50:39, Nov. 27, 2012. This is the epitome of second-guessing.

The Government also points to materials outside of the regulations and suggests that, while the rules themselves are silent on the method for determining whether an increase in emissions is unrelated to the projects, EPA has issued guidance that DTE did not follow. In this regard, the Government cites repeatedly to a determination made in response to another company's request that EPA determine whether a proposed switch to a higher polluting fuel at its plant triggered NSR. *See* Gov't Br. at 9 (citing Northampton Determination, RE 114-7); 28 (same); 35 (same). The determination's author states that increases in emissions must be "completely unrelated to" the proposed switch to a more polluting fuel to qualify for the demand growth exclusion. Northampton Determination at 4, RE 114-7, Page ID # 4895. But this determination does not provide "specific instructions" governing an operator's exercise of technical and engineering judgment regarding the future emissions impact of the repair and replacement of boiler tubes, let alone codify the methodology the Government's experts would have used in this case. It only adds the adverb, "completely," to the language

57

already in the rules—language that DTE applied in projecting that there would be no emissions increase caused by the project.[18]  *See supra* at 19-20.

The Government also argues that a sentence in the preamble for a notice of proposed rulemaking from 1996 dictates that any change that improves the operational characteristics of a unit must be deemed a "major modification."  *See, e.g.,* Gov't Br. at 28 (citing 61 Fed. Reg. 38,250, 38,268 (July 23, 1996)).  Putting to one side that the projects here were undertaken to maintain historic operating conditions, it is telling that the Government omits other language from the same section of that preamble, where EPA explains that it "declined to create a presumption that every emissions increase that follows a change in efficiency … is inextricably linked to the efficiency change."  61 Fed. Reg. at 38,268.  The preamble then invited comment on utilities' experience with the demand growth exclusion under the 1992 rules and whether the rule should be modified.  *Id.*

In the course of that rulemaking, which ultimately resulted in the 2002 NSR Reform Rules, EPA acknowledged that the 1992 rules gave operators substantial

---

[18] In any event, EPA's characterization of the Northampton Determination is at odds with the regulatory language and with EPA's explanation of the "unrelated" prong in the 1992 rulemaking preamble, *see infra* note 20; 57 Fed. Reg. at 32,327 (EPA explained in that preamble that the "unrelated" prong amounted to a "predominant cause" test), and due no deference.  *See Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000) ("To defer to the agency's position [in such circumstances] would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation.").

discretion to determine how to apply the demand growth exclusion.  At one point,

EPA viewed this feature of the 1992 rules negatively, worrying it left the operators

with *too much* discretion, and even considered doing away with the demand-

growth exclusion:

> [T]he demand growth exclusion is problematic because it
> is *self-implementing and self-policing*.  Because *there is
> no specific test available for determining whether an
> emissions increase indeed results from an independent
> factor such as demand growth, versus factors relating to
> the change at the unit*, each company with a utility unit
> presently adopts its own interpretation.  Interpretations
> may vary from source to source, as well as from what a
> permitting agency would accept as appropriate.

63 Fed. Reg. 39,857, 39,861 (July 24, 1998) (emphases added).  EPA thus

proposed not only to eliminate the demand-growth exclusion, but also to require

the operator to submit its projection to the permitting authority for approval and the

imposition of permit limits based on the projection.  *Id.* at 39,862.  But in the end,

EPA not only kept the demand growth exclusion, it expanded its availability.[19]

---

[19] As is clear from the language adopted by EPA in the 2002 NSR Reform
Rules, EPA emphatically rejected the suggestions in the 1996 proposal and the
1998 notice to do away with the demand growth exclusion or even to create a
presumption that projects that improve the operational characteristics of a unit
likely result in emissions increases.  *See also* 67 Fed. Reg. at 80,244 (explaining
that "[t]oday's rule improves the ability of sources to ... maintain the reliability of
production facilities, and effectively utilize and improve existing capacity.").  As
EPA explained in its 2002 Report to the President, EPA's NSR reform rules
rejected any per se rule of causation to address ambiguities in earlier iterations of
the rules that actually discouraged projects that improve the operational

And by 2007, EPA came to recognize that "[i]n most cases, it is unlikely that 'demand growth' emissions could ultimately be found to be related to changes made at a facility," and that the record-keeping and reporting requirements of the rule would be "sufficient…to verify post-project demand growth," and whether there is "ultimately… a significant emissions increase."  72 Fed. Reg. 72,607, 72,610-11 (Dec. 21, 2007).

In short, DTE has applied the demand growth exclusion consistent with the language and intent of the NSR rules that apply here.[20]  Nothing in the rules or any

characteristics of power plants.  EPA, *New Source Review: Report to the President* at 1 (June 2002), *available at* http://www.epa.gov/nsr/documents/nsr_report_to_president.pdf).  "[T]he NSR program ha[d] impeded or resulted in the cancellation of projects which would maintain and improve reliability, efficiency and safety of existing energy capacity."  EPA sought to address these concerns through the 2002 reforms, *id.* at 32, and to remove "barriers and create[] incentives for more energy efficient or lower-emitting processes … without requiring a full NSR permit process."  EPA, *Supplemental Analysis of the Environmental Impact of the 2002 Final NSR Improvement Rules* at 5 (Nov. 21, 2002), *available at* http://www.epa.gov/nsr/documents/nsr-analysis.pdf.

[20] The Government takes DTE's Vice President of Environmental Management and Resources, Skiles Boyd, to task for stating only that DTE "'determined that any increase in emissions . . . were *attributable* to demand growth. . . .'" Gov't Br. at 34 (quoting Supp. Boyd Decl. ¶ 5.e, RE 166-5, Page ID # 6798) (emphasis added by Gov't).  The problem, the Government contends, is that Boyd's "declaration does not say that the projected increase was unrelated to the project, as explicitly required by the rules."  *Id.* (emphasis omitted).  But EPA itself has used the same language as Boyd did—i.e., describing projected emissions increase as "attributable to an independent factor" as the equivalent of "unrelated to the project."  Said EPA, "By definition in our regulations, 'projected actual

"guidance" required DTE to assess the causation requirement of the rules in the way the Government's litigation experts would. The Government's argument that the rules required DTE to apply this unwritten method to project a result that is now "verifiably inaccurate" is pure second-guessing.

### 3.    DTE Complied With the Notice and Recordkeeping Requirements, and the Government and Sierra Club Have Waived Any Further Argument to the Contrary.

The Government and Intervenor also accuse DTE of failing to adequately "demonstrate" that any projected post-project increase in emissions was unrelated to the projects. But neither the Government nor Sierra Club point to any "instruction" in the projection rules that imposes such a requirement or to any provision that instructs operators how to make such a demonstration, or when a demonstration would cross the subjective line the Government would have this Court draw. To the contrary, the projection regulations direct only that the source "[s]hall," after considering "all relevant information," exclude emissions that are "unrelated to the particular project" that it "could have accommodated"—an

---

emissions' excludes emissions attributable to an independent factor (such as demand growth)); *see, e.g.*, 40 CFR 52.21(b)(41)." 72 Fed. Reg. at 72,609 (internal footnote omitted). And Boyd, in his 2010 declaration, *did* say: "As required under the NSR regulations, Detroit Edison then excluded from the projections any emissions increases that are *unrelated* to the Unit 2 Project (because they are related to the system assumptions in the PROMOD model) …." Boyd Decl. ¶ 17, RE 166-3, Page ID # 6745 (emphasis added).

instruction that DTE indisputably satisfied.  *See supra* at 54-55.  If EPA is allowed to base a challenge to an operator's projection not on a failure to comply with an objective requirement of the regulations but on the claim the operator did not "adequately demonstrate" some aspect of its projection analysis, there would be no way for the operator to determine whether its analysis is adequate in the eyes of the agency other than to seek that agency's concurrence with the projection before undertaking the project.  That is precisely the "prior approval" system that this Court rejected.  *DTE*, 711 F.3d at 649.

In a similar vein, the Government and Sierra Club accuse DTE of violating the recordkeeping requirement in the "reasonable possibility" rule.  *See* Gov't Br. at 32-33 (citing 40 C.F.R. § 52.21(r)(6)(i)(*c*)); Br. of Pl.-Appellant Sierra Club at 12 (Case No. 14-2275) (same).  Section 52.21(r)(6)(i)(*c*) requires the operator to:

> document and maintain … [a] description of the
> applicability test used to determine that the project is not
> a major modification for any regulated NSR pollutant …,
> the projected actual emissions, the amount of emissions
> excluded under paragraph (b)(41)(ii)(*c*) of this section
> and an explanation for why such amount was excluded
> … .

And where the operator concludes that there is a "reasonable possibility" of a project causing a significant emissions increase, it must submit this information to the relevant regulatory authority.  *See* 40 C.F.R. § 52.21(r)(6)(ii).

DTE submitted its section 52.21(r)(6)(i)(*c*) demonstration to MDEQ as required by section 52.21(r)(6)(ii).  The district court already held that this notice—which includes the very demonstration that the Government and Sierra Club accuse DTE of failing to make—fully complied with the regulations, and this Court agreed.  *DTE*, 711 F.3d at 650.  If the notice complied with section 52.21(r)(6)(ii) (requiring the "operator…[to] provide a copy of the information set out in paragraph (r)(6)(i) of this section to the [permitting authority]"), then DTE necessarily complied with section 52.21(r)(6)(i)(*c*). The Government and Intervenor cannot relitigate that issue now.  *Rouse v. DaimlerChrysler Corp.*, 300 F.3d 711, 715 (6th Cir. 2002).

More importantly, the district court's holding was not only correct (and unchallenged on appeal); its reasoning is directly applicable here and compels rejection of the Government's and Sierra Club's argument:

> While the explanation of the emissions exclusion in the Notice Letter is not very specific, and the accompanying table shows the results of the calculations without their back-up data, *Plaintiff does not point to any provision in [the NSR] rules requiring specificity beyond that which was provided* ….

Summ. J. Op. & Order I at 12, RE 160, Page ID # 6645 (emphasis added).  That remains true: the Government points to no provision in the regulations that requires DTE to justify its projection with any more specificity beyond that which DTE provided.

63

In all events, the propriety of DTE's reliance on the demand growth exclusion is staring the Government right in the face—DTE performed the projects, but Monroe Unit 2's emissions have actually decreased, because low natural gas prices and the poor economy, among other factors, have depressed demand for coal-fired electricity. DTE generally identified these considerations in its March 2010 notice as relevant to its prediction that there would be no emissions increase due to the projects, and further addressed these factors in June 2010 in response to a request from the Government. *See supra* at 54-55 n.17. The actual post-project data, uncontested by the Government, prove that DTE was right—the projected increase in emissions in DTE's projection based on the 2010 PSCR was due to factors unrelated to the 2010 projects and thus was properly excluded.

And on top of all of that, in response to information requests sent by EPA before it brought this enforcement action, DTE explained that its 2009 and 2011 PSCR filings—the regulatory filings that included the "sophisticated" PROMOD computer modeling for the years immediately before and immediately after the year in which the projects at issue took place—confirmed the validity of DTE's conclusion that any increases in emissions calculated in the 2010 PSCR submittal were due to factors unrelated to the projects. The inputs for the 2009 and 2011 PSCR filings accounted for the projects in the same way as the 2010 PSCR filing, which formed the basis for the projection for the 2010 projects. But both of these

64

filings predicted that post-project emissions would *decrease* in all years following the Monroe Unit 2 projects, thus confirming the increase projected in the 2010 projection was due to factors unrelated to the projects. *See* June 23, 2010 DTE Response to NOV, RE 166-3, Page # 6782-87 (Boyd Decl. Ex. 4); Decl. of Michael J. King, RE 46-11. So the Government is simply wrong to suggest that "DTE has never provided an explanation for excluding its entire predicted emissions increase under the demand growth exclusion," Gov't Br. at 32, and that DTE's application of the demand growth exclusion is based only on a general "belief" that the projects would not cause an emissions increase, *id.* at 33. Nor is it correct for the Government to argue that DTE "never disputed" that the projects would "[i]ncrease[] generation at Monroe 2; and [t]hat much of the predicted increase was related to the project." Gov't Br. at 36, 37. DTE has consistently disputed these contentions, starting with its March 2010 pre-project notification and continuing through letters to EPA in 2010, declarations of DTE engineers, expert reports, and multiple rounds of briefing in the district court and this Court.

In spite of all of this, the Government persists in asking the Court to hold that DTE should have (a) projected that emissions would increase (even though they have decreased); and (b) concluded that the increase was caused by the projects. This is "reality control" at its finest. If it is not second-guessing, it is hard to imagine what is.

65

## II.    The Government's Litigation Position Is Not Entitled to Deference.

The Government cannot take refuge in deference under *Auer v. Robbins*, 519 U.S. 452 (1997).  An agency's interpretation of its own rules is entitled to deference only where the rules are ambiguous.  *See Christensen*, 529 U.S. at 588. The Court need not defer to the Government's interpretation if an "alternative reading is compelled by the regulation's plain language or by other indications of the [the agency's] intent at the time of the regulation's promulgation."  *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotation marks omitted).  The rules here state unambiguously that a project "is not a major modification if it does not cause a significant emissions increase."  40 C.F.R. § 52.21(a)(2)(iv)(*a*).  And this Court already has concluded that the rules preclude enforcement by "second-guess[ing]."  *DTE*, 711 F.3d at 649.  That is the end of the matter.

Furthermore, deference does not apply to litigating positions that are no more than post-hoc rationalizations.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-13 (1988) (deference to an agency's "convenient litigati[on] position" would be "entirely inappropriate" where the agency's position is contrary to the view advocated by the agency in past cases and is not "reasoned and consistent"); *Auer*, 519 U.S. at 462 (contrasting an agency's "post hoc rationalization" with a "fair and considered judgment").  Thus, contrary to the

66

Government's bald assertion that "Courts have long recognized that deference is particularly appropriate for EPA's NSR rules," Gov't Br. at 54, courts have routinely refused to defer to the Government's ever-shifting positions on NSR applicability.[21]

The Government nonetheless argues for "deference" to various statements it has made about various versions of the rules, none of which have any bearing on the issues presented here.  First, the Government asks for deference to this statement in the preamble to the 2002 NSR Reform Rules:  "If you are subsequently determined not to have … properly project[ed] emissions … you will

---

[21] *Ala. Power Co.*, 372 F. Supp. 2d at 1306 (EPA's "zigs and zags represented by its contradictory… statements and rules" and its failure to speak "with one voice, or a consistent voice, or even a clear voice, on this issue" undermine its claim for deference); *Sierra Club v. Tenn. Valley Auth.*, No. CV-02-2279-VEH, slip op. at 9 (N.D. Ala. July 5, 2006) ("[I]t is singularly unwise, under any standard of administrative deference, to say grace over the retroactive agency interpretation of regulations affecting a huge, nationally regulated industry where the new interpretation will result in the expenditures, collectively, of billions of dollars trying to retrofit work that wasn't designed to meet the standards now being imposed."); *United States v. E. Ky. Power Coop., Inc.*, 498 F. Supp. 2d 976, 993 (E.D. Ky.  2007) (holding EPA's interpretation deserves no deference where the agency "takes an inconsistent view of the regulations, makes inconsistent statements with respect to the regulation, and also enforces the regulation with no discernable consistency"); *Pa. Dep't of Envtl. Prot. v. Allegheny Energy, Inc.*, No. 05-885, 2008 WL 4960100, at *5, 7 (W.D. Pa. Sept. 2, 2008) (adopting standard of courts that "have not accorded deference to the EPA's narrow interpretation of [the regulations] due to the agency's conflicting guidance," but instead comporting with "EPA's original interpretations"); *Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, 618 F. Supp. 2d 815, 827 (E.D. Tenn. 2009) (refusing to defer to EPA's new interpretation of the regulations).

be subject to any applicable enforcement provisions." Gov't Br. at 55 (citing 67 Fed. Reg. at 80,190). But that passage says nothing about second-guessing or how federal or State enforcement agencies can prove that the operator did not "properly project emissions." On *that* question, the 2002 NSR Reform Rules, not to mention repeated comments by EPA in the rulemaking record, demonstrate that EPA expected post-construction emissions to be the measure by which the preconstruction projection would be judged. *See supra* at 28-29. And this Court held as much. *DTE*, 711 F.3d at 651 ("A project-and-report scheme is entirely compatible with the statute's intent …. If a company's projections are later proven incorrect, EPA can bring an enforcement action. *See* 40 C.F.R. § 52.21(a)(2)(iv)(b).").

The Government next asks for deference to the very same EAB decision that the Eleventh Circuit nullified in toto as an affront to due process. *See id.* at 56 (citing *In re Tenn. Valley Auth.*, 9 E.A.D. at 359). Surely this Court is not required to (and should not) defer to a decision that "entirely ignor[ed] the concept of the rule of law." *Whitman*, 336 F.3d at 1246. In any event, to the extent the EAB's statements in this decision have any significance at all, they are irrelevant here because they are not interpretations of the 2002 NSR Reform Rules. And even if they were, the EAB's statements cannot be squared with this Court's unequivocal proscription against second-guessing.

68

It is notable that the Government does not expressly seek deference to its view of how operators should apply the demand growth exclusion. The Government does not, that is, ask this Court to defer to its position that the methodology employed by its litigation experts must be used by operators when projecting whether projects will cause an emissions increase. Nor could it. The rules leave that question to the operator's technical and engineering judgment. The Government could not lawfully substitute a system that affords that measure of judgment for one that requires strict adherence to an unwritten methodology announced for the first time in an enforcement proceeding. *Cf. Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2168 (2012) ("It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference."). And as the rules and this Court have made clear, the operator is not "require[d] … to obtain any determination from the Administrator before beginning actual construction." 40 C.F.R. § 52.21(r)(6)(ii); *see also DTE*, 711 F.3d at 649 (explaining that the regulations do not require approval of projections).

69

In sum, the Government's position contradicts EPA's "fair and considered judgment" reflected in its 2002 rulemaking and is nothing more than a "convenient litigati[on] position" designed to achieve a desired enforcement result.  "It has become axiomatic that an agency is bound by its own regulations.  The fact that a regulation as written does not provide [an agency] a quick way to reach a desired result does not authorize it to ignore the regulation or label it 'inappropriate' [or absurd]."  *Panhandle E. Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979) (citing *Service v. Dulles*, 354 U.S. 363 (1957)).  The Government's interpretation of the rules to allow second-guessing is not entitled to deference.

## III.  EPA Has Not Alleged a Violation of Projection Regulations.

This Court's 2013 opinion also precludes the Government from contending that the 2010 projects were "major modifications."  DTE projected that the 2010 projects at Monroe 2 would not cause an increase in emissions, and actual post-project data confirm that projection.  The Government cannot second-guess that projection, substituting for it one that is "now verifiably inaccurate."  Construction is now complete, so whether the projects were "major modifications" will be determined by actual emissions data, which show decreased emissions.  *See supra* at 28-29.  The Government instead may contend, at most, that DTE violated the projection regulations set forth in 40 C.F.R. § 52.21(b)(41)(ii).  And as set forth above, the Government has failed as a matter of law to show that.

70

But even if the Government could establish a violation of the projection regulations, it faces an insurmountable jurisdictional problem—it failed to allege any violation of the projection regulations in its NOV.  The authority to bring a claim—and this Court's jurisdiction to hear it—are premised on EPA's providing the required pre-suit notice.  *See United States v. LTV Steel Co.*, 116 F. Supp. 2d 624, 632 (W.D. Pa. 2000).  The Government is only authorized to bring civil actions under 42 U.S.C. § 7413(b) based on the "specific violation[s] alleged in the NOV."  *United States v. AM Gen. Corp.*, 808 F. Supp. 1353, 1362 (N.D. Ind. 1992).  The Government's NOV thus defines the permissible scope of its Complaint, and the district court has already held that the Government "is barred from pursuing claims not specified in its [NOV]."  Summ. J. Op. & Order I at 12, RE 160, Page ID # 6645.  Failure to comply with the notice requirements warrants dismissal for lack of subject matter jurisdiction.  *United States v. Pan Am. Grain Mfg. Co.*, 29 F. Supp. 2d 53, 56 (D.P.R. 1998).

The Government suggests that it *did* allege a violation of § 52.21(b)(41)(ii) on page 4 of its NOV.  Gov't Br. at 38 n.8.  But nowhere on page 4, or anywhere else in its NOV, does EPA allege a violation of the projection regulations, much less the specific provisions of § 52.21(b)(41)(ii).  Rather, the NOV relates *solely* to

the allegation that DTE undertook a "major modification" at Monroe Unit 2,[22] a contention that this Court already has ruled will be judged by post-project emissions data. *DTE*, 711 F.3d at 649. That is very different from any claim based on a "specific" alleged violation of § 52.21(b)(41)(ii).[23] Because the Government failed to assert that claim in its NOV, this Court lacks jurisdiction to hear it.

And even if the Government had alleged a violation of section 52.21(b)(41)(ii) in its NOV and could prove it, the result would not be a finding that the 2010 projects at Monroe Unit 2 were major modifications because emissions have verifiably *decreased*. Instead, the result would be a finding of a one-time violation of the regulations governing projections, justifying at most, a civil penalty for the violation, *see* 42 U.S.C. § 7413(b); 40 C.F.R. § 19.4, or perhaps an injunction requiring DTE to go back and "do the projection right," *see DTE,* 711 F.3d at 650. But, as the district court noted, what would be the use of that? Summ. J. Op. & Order II at 3-4, RE 196, Page ID # 7515-16. Emissions

---

[22] *See, e.g.*, NOV at ¶ 25, RE 166-2, Page ID # 6727, ("DTE is in violation of PSD requirements … for constructing a major modification.").

[23] EPA knows how to assert an alleged violation of the projection rules. In *United States v. Okla. Gas & Elec. Co.*, EPA recently alleged *not* that the utility undertook a "major modification," but that it "failed to include [in its notice to the state] a projection of post-project emissions as required by … regulations." Compl. ¶ 44, No. 13-cv-690-D (W.D. Okla. filed July 8, 2013), ECF No. 1. There are no similar allegations here.

have decreased after the projects; the only "correct" projection would be one that shows likewise.[24]  *Id.*

## CONCLUSION

DTE complied with the "specific instructions" in the 2002 NSR Reform Rules for projecting before construction whether the 2010 projects at Monroe Unit 2 would cause a significant emissions increase.  The Government can point to no "specific instruction" with which DTE failed to comply.  The Government instead disputes DTE's technical and engineering judgment—its conclusion that the projected increase in emissions in the 2010 PSCR filing was due to factors unrelated to the projects.  Had the Government been responsible for that projection, it would have reached a different conclusion by using a methodology that is not reflected in the rules.  That is second-guessing pure and simple, and it is not tolerated by the rules or this Court's 2013 decision.  The district court correctly entered summary judgment in DTE's favor.  That judgment should be affirmed.

---

[24] In this respect, the Government is confused about the import of the district court's observation that emissions have decreased since DTE completed the projects.  The district court did not hold that post-project emissions data can "erase NSR applicability."  Gov't Br. at 1.  Rather, the district court made the unexceptional observation that requiring DTE to redo the projection now could not lead to the conclusion that the projects were, in fact, major modifications, because the only "reasonable" projection at this time is one that is generally consistent with what actually happened after the project.

Respectfully submitted,

/s/ F. William Brownell

Harry M. Johnson, III
George P. Sibley, III
**HUNTON & WILLIAMS LLP**
951 E. Byrd Street
Richmond, VA  23219
(804) 788-8200
pjohnson@hunton.com
gsibley@hunton.com

Michael J. Solo
DTE Energy
One Energy Plaza
Detroit, MI  48226
(313) 235-9512

F. William Brownell
Mark B. Bierbower
Makram B. Jaber
**HUNTON & WILLIAMS LLP**
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
(202) 955-1500
bbrownell@hunton.com
mbierbower@hunton.com
mjaber@hunton.com

Brent A. Rosser
**HUNTON & WILLIAMS LLP**
101 South Tryon Street, Suite 3500
Charlotte, NC 28280
(704) 378-4707
brosser@hunton.com

*Counsel for DTE Energy Company and*
*Detroit Edison Company*

Dated:  February 27, 2015

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure and Circuit Rule 32, I hereby certify that the foregoing Brief of Defendants-Appellees DTE Energy Company and Detroit Edison Company contains 17,975 words, as counted by a word processing system that includes headings, footnotes, quotations, and citations in the count, and therefore is within the word limit set by the Court.  The brief complies with the typeface requirements of Rule 32(a)(5) and (6) of the Federal Rules of Appellate Procedure as it was prepared using the Microsoft Word 2003 word processing program in 14-point Times New Roman font.

/s/ F. William Brownell
F. William Brownell
**HUNTON & WILLIAMS LLP**
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
(202) 955-1500
bbrownell@hunton.com

*Counsel for DTE Energy Company and Detroit Edison Company*

Dated: February 27, 2015

## CERTIFICATE OF SERVICE

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure and Circuit Rule 25, I hereby certify that on this 27th day of February, 2015, I served a copy of the foregoing Brief of Defendants-Appellees DTE Energy Company and Detroit Edison Company electronically through the Court's CM/ECF system on the following registered CM/ECF counsel of record:

Thomas A. Benson
U.S. Department of Justice
Environment & Natural Resources
  Division
P.O. Box 7611
Washington, D.C.  20044
(202) 514-5261
thomas.benson@usdoj.gov

Shannon W. Fisk
Mary M. Whittle
Earthjustice
1617 John F. Kennedy Blvd., Suite 1675
Philadelphia, PA  19103
(217) 717-4520
sfisk@earthjustice.org
mwhittle@earthjustice.org

/s/ F. William Brownell

## RELEVANT DISTRICT COURT DOCUMENTS

| | | |
|---|---|---|
| RE 46-10 | Declaration of Jerry L. Golden (Nov. 4, 2010) | Page ID # 1350 - 439 |
| RE 46-11 | Declaration of Michael J. King (Nov. 2, 2010) | Page ID # 1440 - 98 |
| RE 114-7 | Letter from Dianne McNally, EPA Region III, to Mark Wejkszner, Pennsylvania Department of Environmental Protection re: Northampton Generating Company PSD/NSR Analysis (Apr. 20, 2010) | Page ID # 4895 |
| RE 160 | Opinion and Order Granting Defendants' Motion for Sumary Judgment, (Aug. 23, 2011) | Page ID # 6634-45 |
| RE 166-2 | Notice and Finding of Violation (June 4, 2010) | Page ID # 6727 |
| RE 166-3 | Declaration of Skiles W. Boyd (Nov. 3, 2010) | Page ID # 6734, 6736, 6743, 6745-46 |
| RE 166-3 | Exhibit 3 to Declaration of Skiles W. Boyd (Nov. 3, 2010):  Letter from Michael J. Solo, Jr., DTE Energy to Sabrina Argentieri, EPA Region 5, re: Request to Provide Information Pursuant to the Clean Air Act Dated May 28, 2010 (June 1, 2010) | Page ID # 6776-80 |
| RE 166-3 | Exhibit 4 to Declaration of Skiles W. Boyd (Nov. 3, 2010):  Letter from Michael J. Solo, Jr., DTE Energy, to Mark Palermo, EPA Region 5, re: EPA's June 4, 2010 NOV (June 23, 2010) | Page ID # 6782-87 |

| RE 166-4 | Letter from Kelly L. Guertin, DTE Energy, to William Presson, Michigan Department of Environmental Quality, re: 2010 Planned Outage Notification – Monroe Power Plant (B2816), Unit 2 (Mar. 12, 2010) | Page ID # 6789-93 |
| RE 166-5 | Supplemental Declaration of Skiles W. Boyd (May 20, 2013) | Page ID # 6795-99 |
| RE 166-6 | Transcript of Gordon P. Usitalo 30(b)(6) Deposition (June 9, 2011) (excerpts) | Page ID # 6802-03 |
| RE 196 | Opinion and Order Granting Defendants' Motion for Summary Judgment (Mar. 30, 2014) | Page ID # 7513-16 |
| RE 178 | Plaintiff United States' Opposition to DTE's Motion for Summary Judgment Based on Compliance with Pre-Construction Projection Requirements (Aug. 2, 2013) (filed under seal) | n/a |

**STATUTORY AND REGULATORY ADDENDUM**

# STATUTORY AND REGULATORY ADDENDUM

## TABLE OF CONTENTS

1.     Clean Air Act § 109, 42 U.S.C. § 7409 .................................. Addendum-001

2.     Clean Air Act § 110, 42 U.S.C. § 7410 .................................. Addendum-002

3.     Clean Air Act § 111(a)(4), 42 U.S.C. § 7411(a)(4)................. Addendum-009

4.     Clean Air Act § 113(b), 42 U.S.C. § 7413(b)......................... Addendum-012

5.     Clean Air Act § 160, 42 U.S.C. § 7470 .................................. Addendum-013

6.     Clean Air Act § 163, 42 U.S.C. § 7473 .................................. Addendum-014

7.     Clean Air Act § 169(4), 42 U.S.C. § 7479(4)......................... Addendum-016

8.     Clean Air Act § 169A, 42 U.S.C. § 7491 ............................... Addendum-017

9.     Clean Air Act § 169B, 42 U.S.C. § 7492 ............................... Addendum-019

10.    Clean Air Act § 171, 42 U.S.C. § 7501 .................................. Addendum-020

11.    Clean Air Act §§ 401-416, 42 U.S.C. §§ 7651-7651*o* ............ Addendum-021

12.    40 C.F.R. § 19.4 ....................................................................... Addendum-050

13.    40 C.F.R. § 51.166 .................................................................. Addendum-055

14.    40 C.F.R. § 52.21(a)(2) ........................................................... Addendum-093

15.    40 C.F.R. § 52.21(b)(2) ........................................................... Addendum-095

16.    40 C.F.R. § 52.21(b)(20) ......................................................... Addendum-097

17.    40 C.F.R. § 52.21(b)(23) ......................................................... Addendum-097

18.    40 C.F.R. § 52.21(b)(41)(i)-(ii) .............................................. Addendum-099

1

19.   40 C.F.R. § 52.21(b)(48)(i)...................................................... Addendum-100

20.   40 C.F.R. § 52.21(r)(4) ........................................................... Addendum-101

21.   40 C.F.R. § 52.21(r)(6) ........................................................... Addendum-101

22.   40 C.F.R. § 52.21(b)(33)(ii) (1992)........................................ Addendum-106



EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7409. National primary and secondary ambient air quality standards

### (a) Promulgation

(1) The Administrator—

(A) within 30 days after December 31, 1970, shall publish proposed regulations prescribing a national primary ambient air quality standard and a national secondary ambient air quality standard for each air pollutant for which air quality criteria have been issued prior to such date; and

(B) after a reasonable time for interested persons to submit written comments thereon (but no later than 90 days after the initial publication of such proposed standards) shall by regulation promulgate such proposed national primary and secondary ambient air quality standards with such modifications as he deems appropriate.

(2) With respect to any air pollutant for which air quality criteria are issued after December 31, 1970, the Administrator shall publish, simultaneously with the issuance of such criteria and information, proposed national primary and secondary ambient air quality standards for any such pollutant. The procedure provided for in paragraph (1)(B) of this subsection shall apply to the promulgation of such standards.

### (b) Protection of public health and welfare

(1) National primary ambient air quality standards, prescribed under subsection (a) of this section shall be ambient air quality standards the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and allowing an adequate margin of safety, are requisite to protect the public health. Such primary standards may be revised in the same manner as promulgated.

(2) Any national secondary ambient air quality standard prescribed under subsection (a) of this section shall specify a level of air quality the attainment and maintenance of which in the judgment of the Administrator, based on such criteria, is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air. Such secondary standards may be revised in the same manner as promulgated.

### (c) National primary ambient air quality standard for nitrogen dioxide

The Administrator shall, not later than one year after August 7, 1977, promulgate a national primary ambient air quality standard for $NO_2$ concentrations over a period of not more than 3 hours unless, based on the criteria issued under section 7408(c) of this title, he finds that there is no significant evidence that such a standard for such a period is requisite to protect public health.

### (d) Review and revision of criteria and standards; independent scientific review committee; appointment; advisory functions

(1) Not later than December 31, 1980, and at five-year intervals thereafter, the Administrator shall complete a thorough review of the criteria published under section 7408 of this title and the national ambient air quality standards promulgated under this section and shall make such revisions in such criteria and standards and promulgate such new standards as may be appropriate in accordance with section 7408 of this title and subsection (b) of this section. The Administrator may review and revise criteria or promulgate new standards earlier or more frequently than required under this paragraph.

(2)(A) The Administrator shall appoint an independent scientific review committee composed of seven members including at least one member of the National Academy of Sciences, one physician, and one person representing State air pollution control agencies.

(B) Not later than January 1, 1980, and at five-year intervals thereafter, the committee referred to in subparagraph (A) shall complete a review of the criteria published under section 7408 of this title and the national primary and secondary ambient air quality standards promulgated under this section and shall recommend to the Administrator any new national ambient air quality standards and revisions of existing criteria and standards as may be appropriate under section 7408 of this title and subsection (b) of this section.

(C) Such committee shall also (i) advise the Administrator of areas in which additional knowledge is required to appraise the adequacy and basis of existing, new, or revised national ambient air quality standards, (ii) describe the research efforts necessary to provide the required information, (iii) advise the Administrator on the relative contribution to air pollution concentrations of natural as well as anthropogenic activity, and (iv) advise the Administrator of any adverse public health, welfare, social, economic, or energy effects which may result from various strategies for attainment and maintenance of such national ambient air quality standards.

(July 14, 1955, ch. 360, title I, § 109, as added Pub. L. 91–604, § 4(a), Dec. 31, 1970, 84 Stat. 1679; amended Pub. L. 95–95, title I, § 106, Aug. 7, 1977, 91 Stat. 691.)

CODIFICATION

Section was formerly classified to section 1857c–4 of this title.

### PRIOR PROVISIONS

A prior section 109 of act July 14, 1955, was renumbered section 116 by Pub. L. 91–604 and is classified to section 7416 of this title.

### AMENDMENTS

1977—Subsec. (c). Pub. L. 95–95, § 106(b), added subsec. (c).

Subsec. (d). Pub. L. 95–95, § 106(a), added subsec. (d).

### EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

### MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### TERMINATION OF ADVISORY COMMITTEES

Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided for by law. See section 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

### ROLE OF SECONDARY STANDARDS

Pub. L. 101–549, title VIII, § 817, Nov. 15, 1990, 104 Stat. 2697, provided that:

"(a) REPORT.—The Administrator shall request the National Academy of Sciences to prepare a report to the Congress on the role of national secondary ambient air quality standards in protecting welfare and the environment. The report shall:

"(1) include information on the effects on welfare and the environment which are caused by ambient concentrations of pollutants listed pursuant to section 108 [42 U.S.C. 7408] and other pollutants which may be listed;

"(2) estimate welfare and environmental costs incurred as a result of such effects;

"(3) examine the role of secondary standards and the State implementation planning process in preventing such effects;

"(4) determine ambient concentrations of each such pollutant which would be adequate to protect welfare and the environment from such effects;

"(5) estimate the costs and other impacts of meeting secondary standards; and

"(6) consider other means consistent with the goals and objectives of the Clean Air Act [42 U.S.C. 7401 et seq.] which may be more effective than secondary standards in preventing or mitigating such effects.

"(b) SUBMISSION TO CONGRESS; COMMENTS; AUTHORIZATION.—(1) The report shall be transmitted to the Congress not later than 3 years after the date of enactment of the Clean Air Act Amendments of 1990 [Nov. 15, 1990].

"(2) At least 90 days before issuing a report the Administrator shall provide an opportunity for public comment on the proposed report. The Administrator shall include in the final report a summary of the comments received on the proposed report.

"(3) There are authorized to be appropriated such sums as are necessary to carry out this section."

## § 7410. State implementation plans for national primary and secondary ambient air quality standards

### (a) Adoption of plan by State; submission to Administrator; content of plan; revision; new sources; indirect source review program; supplemental or intermittent control systems

(1) Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 7409 of this title for any air pollutant, a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State. In addition, such State shall adopt and submit to the Administrator (either as a part of a plan submitted under the preceding sentence or separately) within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national ambient air quality secondary standard (or revision thereof), a plan which provides for implementation, maintenance, and enforcement of such secondary standard in each air quality control region (or portion thereof) within such State. Unless a separate public hearing is provided, each State shall consider its plan implementing such secondary standard at the hearing required by the first sentence of this paragraph.

(2) Each implementation plan submitted by a State under this chapter shall be adopted by the State after reasonable notice and public hearing. Each such plan shall—

(A) include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter;

(B) provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to—

(i) monitor, compile, and analyze data on ambient air quality, and

(ii) upon request, make such data available to the Administrator;

(C) include a program to provide for the enforcement of the measures described in subparagraph (A), and regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D of this subchapter;

(D) contain adequate provisions—

(i) prohibiting, consistent with the provisions of this subchapter, any source or other

type of emissions activity within the State from emitting any air pollutant in amounts which will—

    (I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard, or

    (II) interfere with measures required to be included in the applicable implementation plan for any other State under part C of this subchapter to prevent significant deterioration of air quality or to protect visibility,

   (ii) insuring compliance with the applicable requirements of sections 7426 and 7415 of this title (relating to interstate and international pollution abatement);

(E) provide (i) necessary assurances that the State (or, except where the Administrator deems inappropriate, the general purpose local government or governments, or a regional agency designated by the State or general purpose local governments for such purpose) will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan (and is not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof), (ii) requirements that the State comply with the requirements respecting State boards under section 7428 of this title, and (iii) necessary assurances that, where the State has relied on a local or regional government, agency, or instrumentality for the implementation of any plan provision, the State has responsibility for ensuring adequate implementation of such plan provision;

(F) require, as may be prescribed by the Administrator—

   (i) the installation, maintenance, and replacement of equipment, and the implementation of other necessary steps, by owners or operators of stationary sources to monitor emissions from such sources,

   (ii) periodic reports on the nature and amounts of emissions and emissions-related data from such sources, and

   (iii) correlation of such reports by the State agency with any emission limitations or standards established pursuant to this chapter, which reports shall be available at reasonable times for public inspection;

(G) provide for authority comparable to that in section 7603 of this title and adequate contingency plans to implement such authority;

(H) provide for revision of such plan—

   (i) from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of attaining such standard, and

   (ii) except as provided in paragraph (3)(C), whenever the Administrator finds on the basis of information available to the Administrator that the plan is substantially inadequate to attain the national ambient air quality standard which it implements or to

otherwise comply with any additional requirements established under this chapter;

   (I) in the case of a plan or plan revision for an area designated as a nonattainment area, meet the applicable requirements of part D of this subchapter (relating to nonattainment areas);

   (J) meet the applicable requirements of section 7421 of this title (relating to consultation), section 7427 of this title (relating to public notification), and part C of this subchapter (relating to prevention of significant deterioration of air quality and visibility protection);

   (K) provide for—

    (i) the performance of such air quality modeling as the Administrator may prescribe for the purpose of predicting the effect on ambient air quality of any emissions of any air pollutant for which the Administrator has established a national ambient air quality standard, and

    (ii) the submission, upon request, of data related to such air quality modeling to the Administrator;

   (L) require the owner or operator of each major stationary source to pay to the permitting authority, as a condition of any permit required under this chapter, a fee sufficient to cover—

    (i) the reasonable costs of reviewing and acting upon any application for such a permit, and

    (ii) if the owner or operator receives a permit for such source, the reasonable costs of implementing and enforcing the terms and conditions of any such permit (not including any court costs or other costs associated with any enforcement action),

until such fee requirement is superseded with respect to such sources by the Administrator's approval of a fee program under subchapter V of this chapter; and

   (M) provide for consultation and participation by local political subdivisions affected by the plan.

(3)(A) Repealed. Pub. L. 101–549, title I, §101(d)(1), Nov. 15, 1990, 104 Stat. 2409.

(B) As soon as practicable, the Administrator shall, consistent with the purposes of this chapter and the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C. 791 et seq.], review each State's applicable implementation plans and report to the State on whether such plans can be revised in relation to fuel burning stationary sources (or persons supplying fuel to such sources) without interfering with the attainment and maintenance of any national ambient air quality standard within the period permitted in this section. If the Administrator determines that any such plan can be revised, he shall notify the State that a plan revision may be submitted by the State. Any plan revision which is submitted by the State shall, after public notice and opportunity for public hearing, be approved by the Administrator if the revision relates only to fuel burning stationary sources (or persons supplying fuel to such sources), and the plan as revised complies with paragraph (2) of this subsection. The Administrator shall ap-

prove or disapprove any revision no later than three months after its submission.

(C) Neither the State, in the case of a plan (or portion thereof) approved under this subsection, nor the Administrator, in the case of a plan (or portion thereof) promulgated under subsection (c) of this section, shall be required to revise an applicable implementation plan because one or more exemptions under section 7418 of this title (relating to Federal facilities), enforcement orders under section 7413(d)[1] of this title, suspensions under subsection (f) or (g) of this section (relating to temporary energy or economic authority), orders under section 7419 of this title (relating to primary nonferrous smelters), or extensions of compliance in decrees entered under section 7413(e)[1] of this title (relating to iron-and steel-producing operations) have been granted, if such plan would meet the requirements of this section if no such exemptions, orders, or extensions had been granted.

(4) Repealed. Pub. L. 101–549, title I, § 101(d)(2), Nov. 15, 1990, 104 Stat. 2409.

(5)(A)(i) Any State may include in a State implementation plan, but the Administrator may not require as a condition of approval of such plan under this section, any indirect source review program. The Administrator may approve and enforce, as part of an applicable implementation plan, an indirect source review program which the State chooses to adopt and submit as part of its plan.

(ii) Except as provided in subparagraph (B), no plan promulgated by the Administrator shall include any indirect source review program for any air quality control region, or portion thereof.

(iii) Any State may revise an applicable implementation plan approved under this subsection to suspend or revoke any program included in such plan, provided that such plan meets the requirements of this section.

(B) The Administrator shall have the authority to promulgate, implement and enforce regulations under subsection (c) of this section respecting indirect source review programs which apply only to federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated indirect sources.

(C) For purposes of this paragraph, the term "indirect source" means a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution. Such term includes parking lots, parking garages, and other facilities subject to any measure for management of parking supply (within the meaning of subsection (c)(2)(D)(ii) of this section), including regulation of existing off-street parking but such term does not include new or existing on-street parking. Direct emissions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources for the purpose of this paragraph.

(D) For purposes of this paragraph the term "indirect source review program" means the facility-by-facility review of indirect sources of air pollution, including such measures as are

necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations—

(i) exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or

(ii) preventing maintenance of any such standard after such date.

(E) For purposes of this paragraph and paragraph (2)(B), the term "transportation control measure" does not include any measure which is an "indirect source review program".

(6) No State plan shall be treated as meeting the requirements of this section unless such plan provides that in the case of any source which uses a supplemental, or intermittent control system for purposes of meeting the requirements of an order under section 7413(d)[1] of this title or section 7419 of this title (relating to primary nonferrous smelter orders), the owner or operator of such source may not temporarily reduce the pay of any employee by reason of the use of such supplemental or intermittent or other dispersion dependent control system.

**(b) Extension of period for submission of plans**

The Administrator may, wherever he determines necessary, extend the period for submission of any plan or portion thereof which implements a national secondary ambient air quality standard for a period not to exceed 18 months from the date otherwise required for submission of such plan.

**(c) Preparation and publication by Administrator of proposed regulations setting forth implementation plan; transportation regulations study and report; parking surcharge; suspension authority; plan implementation**

(1) The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator—

(A) finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A) of this section, or

(B) disapproves a State implementation plan submission in whole or in part,

unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan.

(2)(A) Repealed. Pub. L. 101–549, title I, § 101(d)(3)(A), Nov. 15, 1990, 104 Stat. 2409.

(B) No parking surcharge regulation may be required by the Administrator under paragraph (1) of this subsection as a part of an applicable implementation plan. All parking surcharge regulations previously required by the Administrator shall be void upon June 22, 1974. This subparagraph shall not prevent the Administrator from approving parking surcharges if they are adopted and submitted by a State as part of an applicable implementation plan. The Administrator may not condition approval of any implementation plan submitted by a State on such plan's including a parking surcharge regulation.

---

[1] See References in Text note below.

(C) Repealed. Pub. L. 101–549, title I, § 101(d)(3)(B), Nov. 15, 1990, 104 Stat. 2409.

(D) For purposes of this paragraph—

(i) The term ''parking surcharge regulation'' means a regulation imposing or requiring the imposition of any tax, surcharge, fee, or other charge on parking spaces, or any other area used for the temporary storage of motor vehicles.

(ii) The term ''management of parking supply'' shall include any requirement providing that any new facility containing a given number of parking spaces shall receive a permit or other prior approval, issuance of which is to be conditioned on air quality considerations.

(iii) The term ''preferential bus/carpool lane'' shall include any requirement for the setting aside of one or more lanes of a street or highway on a permanent or temporary basis for the exclusive use of buses or carpools, or both.

(E) No standard, plan, or requirement, relating to management of parking supply or preferential bus/carpool lanes shall be promulgated after June 22, 1974, by the Administrator pursuant to this section, unless such promulgation has been subjected to at least one public hearing which has been held in the area affected and for which reasonable notice has been given in such area. If substantial changes are made following public hearings, one or more additional hearings shall be held in such area after such notice.

(3) Upon application of the chief executive officer of any general purpose unit of local government, if the Administrator determines that such unit has adequate authority under State or local law, the Administrator may delegate to such unit the authority to implement and enforce within the jurisdiction of such unit any part of a plan promulgated under this subsection. Nothing in this paragraph shall prevent the Administrator from implementing or enforcing any applicable provision of a plan promulgated under this subsection.

(4) Repealed. Pub. L. 101–549, title I, § 101(d)(3)(C), Nov. 15, 1990, 104 Stat. 2409.

(5)(A) Any measure in an applicable implementation plan which requires a toll or other charge for the use of a bridge located entirely within one city shall be eliminated from such plan by the Administrator upon application by the Governor of the State, which application shall include a certification by the Governor that he will revise such plan in accordance with subparagraph (B).

(B) In the case of any applicable implementation plan with respect to which a measure has been eliminated under subparagraph (A), such plan shall, not later than one year after August 7, 1977, be revised to include comprehensive measures to:

(i) establish, expand, or improve public transportation measures to meet basic transportation needs, as expeditiously as is practicable; and

(ii) implement transportation control measures necessary to attain and maintain national ambient air quality standards,

and such revised plan shall, for the purpose of implementing such comprehensive public transportation measures, include requirements to use (insofar as is necessary) Federal grants, State or local funds, or any combination of such grants and funds as may be consistent with the terms of the legislation providing such grants and funds. Such measures shall, as a substitute for the tolls or charges eliminated under subparagraph (A), provide for emissions reductions equivalent to the reductions which may reasonably be expected to be achieved through the use of the tolls or charges eliminated.

(C) Any revision of an implementation plan for purposes of meeting the requirements of subparagraph (B) shall be submitted in coordination with any plan revision required under part D of this subchapter.

**(d), (e) Repealed. Pub. L. 101–549, title I, § 101(d)(4), (5), Nov. 15, 1990, 104 Stat. 2409**

**(f) National or regional energy emergencies; determination by President**

(1) Upon application by the owner or operator of a fuel burning stationary source, and after notice and opportunity for public hearing, the Governor of the State in which such source is located may petition the President to determine that a national or regional energy emergency exists of such severity that—

(A) a temporary suspension of any part of the applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) may be necessary, and

(B) other means of responding to the energy emergency may be inadequate.

Such determination shall not be delegable by the President to any other person. If the President determines that a national or regional energy emergency of such severity exists, a temporary emergency suspension of any part of an applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) adopted by the State may be issued by the Governor of any State covered by the President's determination under the condition specified in paragraph (2) and may take effect immediately.

(2) A temporary emergency suspension under this subsection shall be issued to a source only if the Governor of such State finds that—

(A) there exists in the vicinity of such source a temporary energy emergency involving high levels of unemployment or loss of necessary energy supplies for residential dwellings; and

(B) such unemployment or loss can be totally or partially alleviated by such emergency suspension.

Not more than one such suspension may be issued for any source on the basis of the same set of circumstances or on the basis of the same emergency.

(3) A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator, if any. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of paragraph (2).

(4) This subsection shall not apply in the case of a plan provision or requirement promulgated by the Administrator under subsection (c) of this section, but in any such case the President may grant a temporary emergency suspension for a four month period of any such provision or requirement if he makes the determinations and findings specified in paragraphs (1) and (2).

(5) The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10 [2] of this title, as in effect before August 7, 1977, or section 7413(d) [2] of this title, upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(g) Governor's authority to issue temporary emergency suspensions**

(1) In the case of any State which has adopted and submitted to the Administrator a proposed plan revision which the State determines—

(A) meets the requirements of this section, and

(B) is necessary (i) to prevent the closing for one year or more of any source of air pollution, and (ii) to prevent substantial increases in unemployment which would result from such closing, and

which the Administrator has not approved or disapproved under this section within 12 months of submission of the proposed plan revision, the Governor may issue a temporary emergency suspension of the part of the applicable implementation plan for such State which is proposed to be revised with respect to such source. The determination under subparagraph (B) may not be made with respect to a source which would close without regard to whether or not the proposed plan revision is approved.

(2) A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of this subsection.

(3) The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10 [2] of this title as in effect before August 7, 1977, or under section 7413(d) [2] of this title upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(h) Publication of comprehensive document for each State setting forth requirements of applicable implementation plan**

(1) Not later than 5 years after November 15, 1990, and every 3 years thereafter, the Adminis-

_____
[2] See References in Text note below.

trator shall assemble and publish a comprehensive document for each State setting forth all requirements of the applicable implementation plan for such State and shall publish notice in the Federal Register of the availability of such documents.

(2) The Administrator may promulgate such regulations as may be reasonably necessary to carry out the purpose of this subsection.

**(i) Modification of requirements prohibited**

Except for a primary nonferrous smelter order under section 7419 of this title, a suspension under subsection (f) or (g) of this section (relating to emergency suspensions), an exemption under section 7418 of this title (relating to certain Federal facilities), an order under section 7413(d) [2] of this title (relating to compliance orders), a plan promulgation under subsection (c) of this section, or a plan revision under subsection (a)(3) of this section; no order, suspension, plan revision, or other action modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source by the State or by the Administrator.

**(j) Technological systems of continuous emission reduction on new or modified stationary sources; compliance with performance standards**

As a condition for issuance of any permit required under this subchapter, the owner or operator of each new or modified stationary source which is required to obtain such a permit must show to the satisfaction of the permitting authority that the technological system of continuous emission reduction which is to be used at such source will enable it to comply with the standards of performance which are to apply to such source and that the construction or modification and operation of such source will be in compliance with all other requirements of this chapter.

**(k) Environmental Protection Agency action on plan submissions**

**(1) Completeness of plan submissions**

**(A) Completeness criteria**

Within 9 months after November 15, 1990, the Administrator shall promulgate minimum criteria that any plan submission must meet before the Administrator is required to act on such submission under this subsection. The criteria shall be limited to the information necessary to enable the Administrator to determine whether the plan submission complies with the provisions of this chapter.

**(B) Completeness finding**

Within 60 days of the Administrator's receipt of a plan or plan revision, but no later than 6 months after the date, if any, by which a State is required to submit the plan or revision, the Administrator shall determine whether the minimum criteria established pursuant to subparagraph (A) have been met. Any plan or plan revision that a State submits to the Administrator, and that has not been determined by the Administrator (by the date 6 months after receipt

of the submission) to have failed to meet the minimum criteria established pursuant to subparagraph (A), shall on that date be deemed by operation of law to meet such minimum criteria.

**(C) Effect of finding of incompleteness**

Where the Administrator determines that a plan submission (or part thereof) does not meet the minimum criteria established pursuant to subparagraph (A), the State shall be treated as not having made the submission (or, in the Administrator's discretion, part thereof).

**(2) Deadline for action**

Within 12 months of a determination by the Administrator (or a determination deemed by operation of law) under paragraph (1) that a State has submitted a plan or plan revision (or, in the Administrator's discretion, part thereof) that meets the minimum criteria established pursuant to paragraph (1), if applicable (or, if those criteria are not applicable, within 12 months of submission of the plan or revision), the Administrator shall act on the submission in accordance with paragraph (3).

**(3) Full and partial approval and disapproval**

In the case of any submittal on which the Administrator is required to act under paragraph (2), the Administrator shall approve such submittal as a whole if it meets all of the applicable requirements of this chapter. If a portion of the plan revision meets all the applicable requirements of this chapter, the Administrator may approve the plan revision in part and disapprove the plan revision in part. The plan revision shall not be treated as meeting the requirements of this chapter until the Administrator approves the entire plan revision as complying with the applicable requirements of this chapter.

**(4) Conditional approval**

The Administrator may approve a plan revision based on a commitment of the State to adopt specific enforceable measures by a date certain, but not later than 1 year after the date of approval of the plan revision. Any such conditional approval shall be treated as a disapproval if the State fails to comply with such commitment.

**(5) Calls for plan revisions**

Whenever the Administrator finds that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant national ambient air quality standard, to mitigate adequately the interstate pollutant transport described in section 7506a of this title or section 7511c of this title, or to otherwise comply with any requirement of this chapter, the Administrator shall require the State to revise the plan as necessary to correct such inadequacies. The Administrator shall notify the State of the inadequacies, and may establish reasonable deadlines (not to exceed 18 months after the date of such notice) for the submission of such plan revisions. Such findings and notice shall be public. Any finding under this paragraph shall, to the extent the Administrator deems appropriate,

subject the State to the requirements of this chapter to which the State was subject when it developed and submitted the plan for which such finding was made, except that the Administrator may adjust any dates applicable under such requirements as appropriate (except that the Administrator may not adjust any attainment date prescribed under part D of this subchapter, unless such date has elapsed).

**(6) Corrections**

Whenever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof), area designation, redesignation, classification, or reclassification was in error, the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State. Such determination and the basis thereof shall be provided to the State and public.

**(*l*) Plan revisions**

Each revision to an implementation plan submitted by a State under this chapter shall be adopted by such State after reasonable notice and public hearing. The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter.

**(m) Sanctions**

The Administrator may apply any of the sanctions listed in section 7509(b) of this title at any time (or at any time after) the Administrator makes a finding, disapproval, or determination under paragraphs (1) through (4), respectively, of section 7509(a) of this title in relation to any plan or plan item (as that term is defined by the Administrator) required under this chapter, with respect to any portion of the State the Administrator determines reasonable and appropriate, for the purpose of ensuring that the requirements of this chapter relating to such plan or plan item are met. The Administrator shall, by rule, establish criteria for exercising his authority under the previous sentence with respect to any deficiency referred to in section 7509(a) of this title to ensure that, during the 24-month period following the finding, disapproval, or determination referred to in section 7509(a) of this title, such sanctions are not applied on a statewide basis where one or more political subdivisions covered by the applicable implementation plan are principally responsible for such deficiency.

**(n) Savings clauses**

**(1) Existing plan provisions**

Any provision of any applicable implementation plan that was approved or promulgated by the Administrator pursuant to this section as in effect before November 15, 1990, shall remain in effect as part of such applicable implementation plan, except to the extent that a revision to such provision is approved or pro-

mulgated by the Administrator pursuant to this chapter.

**(2) Attainment dates**

For any area not designated nonattainment, any plan or plan revision submitted or required to be submitted by a State—

(A) in response to the promulgation or revision of a national primary ambient air quality standard in effect on November 15, 1990, or

(B) in response to a finding of substantial inadequacy under subsection (a)(2) of this section (as in effect immediately before November 15, 1990),

shall provide for attainment of the national primary ambient air quality standards within 3 years of November 15, 1990, or within 5 years of issuance of such finding of substantial inadequacy, whichever is later.

**(3) Retention of construction moratorium in certain areas**

In the case of an area to which, immediately before November 15, 1990, the prohibition on construction or modification of major stationary sources prescribed in subsection (a)(2)(I) of this section (as in effect immediately before November 15, 1990) applied by virtue of a finding of the Administrator that the State containing such area had not submitted an implementation plan meeting the requirements of section 7502(b)(6) of this title (relating to establishment of a permit program) (as in effect immediately before November 15, 1990) or 7502(a)(1) of this title (to the extent such requirements relate to provision for attainment of the primary national ambient air quality standard for sulfur oxides by December 31, 1982) as in effect immediately before November 15, 1990, no major stationary source of the relevant air pollutant or pollutants shall be constructed or modified in such area until the Administrator finds that the plan for such area meets the applicable requirements of section 7502(c)(5) of this title (relating to permit programs) or subpart 5 of part D of this subchapter (relating to attainment of the primary national ambient air quality standard for sulfur dioxide), respectively.

**(o) Indian tribes**

If an Indian tribe submits an implementation plan to the Administrator pursuant to section 7601(d) of this title, the plan shall be reviewed in accordance with the provisions for review set forth in this section for State plans, except as otherwise provided by regulation promulgated pursuant to section 7601(d)(2) of this title. When such plan becomes effective in accordance with the regulations promulgated under section 7601(d) of this title, the plan shall become applicable to all areas (except as expressly provided otherwise in the plan) located within the exterior boundaries of the reservation, notwithstanding the issuance of any patent and including rights-of-way running through the reservation.

**(p) Reports**

Any State shall submit, according to such schedule as the Administrator may prescribe,

such reports as the Administrator may require relating to emission reductions, vehicle miles traveled, congestion levels, and any other information the Administrator may deem necessary to assess the development[3] effectiveness, need for revision, or implementation of any plan or plan revision required under this chapter.

(July 14, 1955, ch. 360, title I, §110, as added Pub. L. 91–604, §4(a), Dec. 31, 1970, 84 Stat. 1680; amended Pub. L. 93–319, §4, June 22, 1974, 88 Stat. 256; Pub. L. 95–95, title I, §§107, 108, Aug. 7, 1977, 91 Stat. 691, 693; Pub. L. 95–190, §14(a)(1)–(6), Nov. 16, 1977, 91 Stat. 1399; Pub. L. 97–23, §3, July 17, 1981, 95 Stat. 142; Pub. L. 101–549, title I, §§101(b)–(d), 102(h), 107(c), 108(d), title IV, §412, Nov. 15, 1990, 104 Stat. 2404–2408, 2422, 2464, 2466, 2634.)

REFERENCES IN TEXT

The Energy Supply and Environmental Coordination Act of 1974, referred to in subsec. (a)(3)(B), is Pub. L. 93–319, June 22, 1974, 88 Stat. 246, as amended, which is classified principally to chapter 16C (§791 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 791 of Title 15 and Tables.

Section 7413 of this title, referred to in subsecs. (a)(3)(C), (6), (f)(5), (g)(3), and i), was amended generally by Pub. L. 101–549, title VII, §701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, subsecs. (d) and (e) of section 7413 no longer relates to final compliance orders and steel industry compliance extension, respectively.

Section 1857c–10 of this title, as in effect before August 7, 1977, referred to in subsecs. (f)(5) and (g)(3), was in the original "section 119, as in effect before the date of the enactment of this paragraph", meaning section 119 of act July 14, 1955, ch. 360, title I, as added June 22, 1974, Pub. L. 93–319, §3, 88 Stat. 248, (which was classified to section 1857c–10 of this title) as in effect prior to the enactment of subsecs. (f)(5) and (g)(3) of this section by Pub. L. 95–95, §107, Aug. 7, 1977, 91 Stat. 691, effective Aug. 7, 1977. Section 112(b)(1) of Pub. L. 95–95 repealed section 119 of act July 14, 1955, ch. 360, title I, as added by Pub. L. 93–319, and provided that all references to such section 119 in any subsequent enactment which supersedes Pub. L. 93–319 shall be construed to refer to section 113(d) of the Clean Air Act and to paragraph (5) thereof in particular which is classified to section 7413(d)(5) of this title. Section 7413 of this title was subsequently amended generally by Pub. L. 101–549, title VII, §701, Nov. 15, 1990, 104 Stat. 2672, see note above. Section 117(b) of Pub. L. 95–95 added a new section 119 of act July 14, 1955, which is classified to section 7419 of this title.

CODIFICATION

Section was formerly classified to section 1857c–5 of this title.

PRIOR PROVISIONS

A prior section 110 of act July 14, 1955, was renumbered section 117 by Pub. L. 91–604 and is classified to section 7417 of this title.

AMENDMENTS

1990—Subsec. (a)(1). Pub. L. 101–549, §101(d)(8), substituted "3 years (or such shorter period as the Administrator may prescribe)" for "nine months" in two places.

Subsec. (a)(2). Pub. L. 101–549, §101(b), amended par. (2) generally, substituting present provisions for provisions setting the time within which the Administrator was to approve or disapprove a plan or portion thereof

---

[3] So in original. Probably should be followed by a comma.

Subsec. (h). Pub. L. 95–190, § 14(a)(5), redesignated subsec. (g), added by Pub. L. 95–95, § 108(g), as (h). Former subsec. (h) redesignated (i).

Subsec. (i). Pub. L. 95–190, § 14(a)(5), redesignated subsec. (h), added by Pub. L. 95–95, § 108(g), as (i). Former subsec. (i) redesignated (j) and amended.

Subsec. (j). Pub. L. 95–190 § 14(a)(5), (6), redesignated subsec. (i), added by Pub. L. 95–95, § 108(g), as (j) and in subsec. (j) as so redesignated, substituted "will enable such source" for "at such source will enable it".

1974—Subsec. (a)(3). Pub. L. 93–319, § 4(a), designated existing provisions as subpar. (A) and added subpar. (B).

Subsec. (c). Pub. L. 93–319, § 4(b), designated existing provisions as par. (1) and existing pars. (1), (2), and (3) as subpars. (A), (B), and (C), respectively, of such redesignated par. (1), and added par. (2).

#### Effective Date of 1977 Amendment

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

#### Pending Actions and Proceedings

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

#### Modification or Rescission of Rules, Regulations, Orders, Determinations, Contracts, Certifications, Authorizations, Delegations, and Other Actions

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

#### Modification or Rescission of Implementation Plans Approved and In Effect Prior to Aug. 7, 1977

Nothing in the Clean Air Act Amendments of 1977 [Pub. L. 95–95] to affect any requirement of an approved implementation plan under this section or any other provision in effect under this chapter before Aug. 7, 1977, until modified or rescinded in accordance with this chapter as amended by the Clean Air Act Amendments of 1977, see section 406(c) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

#### Savings Provision

Pub. L. 91–604, § 16, Dec. 31, 1970, 84 Stat. 1713, provided that:

"(a)(1) Any implementation plan adopted by any State and submitted to the Secretary of Health, Education, and Welfare, or to the Administrator pursuant to the Clean Air Act [this chapter] prior to enactment of this Act [Dec. 31, 1970] may be approved under section 110 of the Clean Air Act [this section] (as amended by this Act) [Pub. L. 91–604] and shall remain in effect, unless the Administrator determines that such implementation plan, or any portion thereof, is not consistent with applicable requirements of the Clean Air Act [this chapter] (as amended by this Act) and will not provide for the attainment of national primary ambi-

ent air quality standards in the time required by such Act. If the Administrator so determines, he shall, within 90 days after promulgation of any national ambient air quality standards pursuant to section 109(a) of the Clean Air Act [section 7409(a) of this title], notify the State and specify in what respects changes are needed to meet the additional requirements of such Act, including requirements to implement national secondary ambient air quality standards. If such changes are not adopted by the State after public hearings and within six months after such notification, the Administrator shall promulgate such changes pursuant to section 110(c) of such Act [subsec. (c) of this section].

"(2) The amendments made by section 4(b) [amending sections 7403 and 7415 of this title] shall not be construed as repealing or modifying the powers of the Administrator with respect to any conference convened under section 108(d) of the Clean Air Act [section 7415 of this title] before the date of enactment of this Act [Dec. 31, 1970].

"(b) Regulations or standards issued under this title II of the Clean Air Act [subchapter II of this chapter] prior to the enactment of this Act [Dec. 31, 1970] shall continue in effect until revised by the Administrator consistent with the purposes of such Act [this chapter]."

#### Federal Energy Administrator

"Federal Energy Administrator", for purposes of this chapter, to mean Administrator of Federal Energy Administration established by Pub. L. 93–275, May 7, 1974, 88 Stat. 97, which is classified to section 761 et seq. of Title 15, Commerce and Trade, but with the term to mean any officer of the United States designated as such by the President until Federal Energy Administrator takes office and after Federal Energy Administration ceases to exist, see section 798 of Title 15, Commerce and Trade.

Federal Energy Administration terminated and functions vested by law in Administrator thereof transferred to Secretary of Energy (unless otherwise specifically provided) by sections 7151(a) and 7293 of this title.

### § 7411. Standards of performance for new stationary sources

#### (a) Definitions

For purposes of this section—

(1) The term "standard of performance" means a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated.

(2) The term "new source" means any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source.

(3) The term "stationary source" means any building, structure, facility, or installation which emits or may emit any air pollutant. Nothing in subchapter II of this chapter relating to nonroad engines shall be construed to apply to stationary internal combustion engines.

(4) The term "modification" means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emit-

ted by such source or which results in the emission of any air pollutant not previously emitted.

(5) The term "owner or operator" means any person who owns, leases, operates, controls, or supervises a stationary source.

(6) The term "existing source" means any stationary source other than a new source.

(7) The term "technological system of continuous emission reduction" means—

(A) a technological process for production or operation by any source which is inherently low-polluting or nonpolluting, or

(B) a technological system for continuous reduction of the pollution generated by a source before such pollution is emitted into the ambient air, including precombustion cleaning or treatment of fuels.

(8) A conversion to coal (A) by reason of an order under section 2(a) of the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C. 792(a)] or any amendment thereto, or any subsequent enactment which supersedes such Act [15 U.S.C. 791 et seq.], or (B) which qualifies under section 7413(d)(5)(A)(ii)[1] of this title, shall not be deemed to be a modification for purposes of paragraphs (2) and (4) of this subsection.

**(b) List of categories of stationary sources; standards of performance; information on pollution control techniques; sources owned or operated by United States; particular systems; revised standards**

(1)(A) The Administrator shall, within 90 days after December 31, 1970, publish (and from time to time thereafter shall revise) a list of categories of stationary sources. He shall include a category of sources in such list if in his judgment it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare.

(B) Within one year after the inclusion of a category of stationary sources in a list under subparagraph (A), the Administrator shall publish proposed regulations, establishing Federal standards of performance for new sources within such category. The Administrator shall afford interested persons an opportunity for written comment on such proposed regulations. After considering such comments, he shall promulgate, within one year after such publication, such standards with such modifications as he deems appropriate. The Administrator shall, at least every 8 years, review and, if appropriate, revise such standards following the procedure required by this subsection for promulgation of such standards. Notwithstanding the requirements of the previous sentence, the Administrator need not review any such standard if the Administrator determines that such review is not appropriate in light of readily available information on the efficacy of such standard. Standards of performance or revisions thereof shall become effective upon promulgation. When implementation and enforcement of any requirement of this chapter indicate that emission limitations and percent reductions beyond those required by the standards promulgated under this section are achieved in practice, the Administrator shall, when revising standards promulgated under this section, consider the emission limitations and percent reductions achieved in practice.

(2) The Administrator may distinguish among classes, types, and sizes within categories of new sources for the purpose of establishing such standards.

(3) The Administrator shall, from time to time, issue information on pollution control techniques for categories of new sources and air pollutants subject to the provisions of this section.

(4) The provisions of this section shall apply to any new source owned or operated by the United States.

(5) Except as otherwise authorized under subsection (h) of this section, nothing in this section shall be construed to require, or to authorize the Administrator to require, any new or modified source to install and operate any particular technological system of continuous emission reduction to comply with any new source standard of performance.

(6) The revised standards of performance required by enactment of subsection (a)(1)(A)(i) and (ii)[1] of this section shall be promulgated not later than one year after August 7, 1977. Any new or modified fossil fuel fired stationary source which commences construction prior to the date of publication of the proposed revised standards shall not be required to comply with such revised standards.

**(c) State implementation and enforcement of standards of performance**

(1) Each State may develop and submit to the Administrator a procedure for implementing and enforcing standards of performance for new sources located in such State. If the Administrator finds the State procedure is adequate, he shall delegate to such State any authority he has under this chapter to implement and enforce such standards.

(2) Nothing in this subsection shall prohibit the Administrator from enforcing any applicable standard of performance under this section.

**(d) Standards of performance for existing sources; remaining useful life of source**

(1) The Administrator shall prescribe regulations which shall establish a procedure similar to that provided by section 7410 of this title under which each State shall submit to the Administrator a plan which (A) establishes standards of performance for any existing source for any air pollutant (i) for which air quality criteria have not been issued or which is not included on a list published under section 7408(a) of this title or emitted from a source category which is regulated under section 7412 of this title but (ii) to which a standard of performance under this section would apply if such existing source were a new source, and (B) provides for the implementation and enforcement of such standards of performance. Regulations of the Administrator under this paragraph shall permit the State in applying a standard of performance to any particular source under a plan submitted under this paragraph to take into consideration, among other factors, the remaining use-

---

[1] See References in Text note below.



MATS Rule provided under section 112(i)(3)(B) of the Clean Air Act broadly available to sources, consistent with law, and to invoke this flexibility expeditiously where justified.

2. Promote early, coordinated, and orderly planning and execution of the measures needed to implement the MATS Rule while maintaining the reliability of the electric power system. Consistent with Executive Order 13563, this process should be designed to "promote predictability and reduce uncertainty," and should include engagement and coordination with DOE, the Federal Energy Regulatory Commission, State utility regulators, Regional Transmission Organizations, the North American Electric Reliability Corporation and regional electric reliability organizations, other grid planning authorities, electric utilities, and other stakeholders, as appropriate.

3. Make available to the public, including relevant stakeholders, information concerning any anticipated use of authorities: (a) under section 112(i)(3)(B) of the Clean Air Act in the event that additional time to comply with the MATS Rule is necessary for the installation of technology; and (b) under section 113(a) of the Clean Air Act in the event that additional time to comply with the MATS Rule is necessary to address a specific and documented electric reliability issue. This information should describe the process for working with entities with relevant expertise to identify circumstances where electric reliability concerns might justify allowing additional time to comply.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

You are hereby authorized and directed to publish this memorandum in the Federal Register.

BARACK OBAMA.

## § 7413. Federal enforcement

### (a) In general

#### (1) Order to comply with SIP

Whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated or is in violation of any requirement or prohibition of an applicable implementation plan or permit, the Administrator shall notify the person and the State in which the plan applies of such finding. At any time after the expiration of 30 days following the date on which such notice of a violation is issued, the Administrator may, without regard to the period of violation (subject to section 2462 of title 28)—

(A) issue an order requiring such person to comply with the requirements or prohibitions of such plan or permit,

(B) issue an administrative penalty order in accordance with subsection (d) of this section, or

(C) bring a civil action in accordance with subsection (b) of this section.

#### (2) State failure to enforce SIP or permit program

Whenever, on the basis of information available to the Administrator, the Administrator finds that violations of an applicable implementation plan or an approved permit program under subchapter V of this chapter are so widespread that such violations appear to result from a failure of the State in which the plan or permit program applies to enforce the

plan or permit program effectively, the Administrator shall so notify the State. In the case of a permit program, the notice shall be made in accordance with subchapter V of this chapter. If the Administrator finds such failure extends beyond the 30th day after such notice (90 days in the case of such permit program), the Administrator shall give public notice of such finding. During the period beginning with such public notice and ending when such State satisfies the Administrator that it will enforce such plan or permit program (hereafter referred to in this section as "period of federally assumed enforcement"), the Administrator may enforce any requirement or prohibition of such plan or permit program with respect to any person by—

(A) issuing an order requiring such person to comply with such requirement or prohibition,

(B) issuing an administrative penalty order in accordance with subsection (d) of this section, or

(C) bringing a civil action in accordance with subsection (b) of this section.

### (3) EPA enforcement of other requirements

Except for a requirement or prohibition enforceable under the preceding provisions of this subsection, whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated, or is in violation of, any other requirement or prohibition of this subchapter, section 7603 of this title, subchapter IV–A, subchapter V, or subchapter VI of this chapter, including, but not limited to, a requirement or prohibition of any rule, plan, order, waiver, or permit promulgated, issued, or approved under those provisions or subchapters, or for the payment of any fee owed to the United States under this chapter (other than subchapter II of this chapter), the Administrator may—

(A) issue an administrative penalty order in accordance with subsection (d) of this section,

(B) issue an order requiring such person to comply with such requirement or prohibition,

(C) bring a civil action in accordance with subsection (b) of this section or section 7605 of this title, or

(D) request the Attorney General to commence a criminal action in accordance with subsection (c) of this section.

### (4) Requirements for orders

An order issued under this subsection (other than an order relating to a violation of section 7412 of this title) shall not take effect until the person to whom it is issued has had an opportunity to confer with the Administrator concerning the alleged violation. A copy of any order issued under this subsection shall be sent to the State air pollution control agency of any State in which the violation occurs. Any order issued under this subsection shall state with reasonable specificity the nature of the violation and specify a time for compliance which the Administrator determines is reasonable, taking into account the seriousness of the violation and any good faith efforts

to comply with applicable requirements. In any case in which an order under this subsection (or notice to a violator under paragraph (1)) is issued to a corporation, a copy of such order (or notice) shall be issued to appropriate corporate officers. An order issued under this subsection shall require the person to whom it was issued to comply with the requirement as expeditiously as practicable, but in no event longer than one year after the date the order was issued, and shall be nonrenewable. No order issued under this subsection shall prevent the State or the Administrator from assessing any penalties nor otherwise affect or limit the State's or the United States authority to enforce under other provisions of this chapter, nor affect any person's obligations to comply with any section of this chapter or with a term or condition of any permit or applicable implementation plan promulgated or approved under this chapter.

**(5) Failure to comply with new source requirements**

Whenever, on the basis of any available information, the Administrator finds that a State is not acting in compliance with any requirement or prohibition of the chapter relating to the construction of new sources or the modification of existing sources, the Administrator may—

   (A) issue an order prohibiting the construction or modification of any major stationary source in any area to which such requirement applies;[1]

   (B) issue an administrative penalty order in accordance with subsection (d) of this section, or

   (C) bring a civil action under subsection (b) of this section.

Nothing in this subsection shall preclude the United States from commencing a criminal action under subsection (c) of this section at any time for any such violation.

**(b) Civil judicial enforcement**

The Administrator shall, as appropriate, in the case of any person that is the owner or operator of an affected source, a major emitting facility, or a major stationary source, and may, in the case of any other person, commence a civil action for a permanent or temporary injunction, or to assess and recover a civil penalty of not more than $25,000 per day for each violation, or both, in any of the following instances:

   (1) Whenever such person has violated, or is in violation of, any requirement or prohibition of an applicable implementation plan or permit. Such an action shall be commenced (A) during any period of federally assumed enforcement, or (B) more than 30 days following the date of the Administrator's notification under subsection (a)(1) of this section that such person has violated, or is in violation of, such requirement or prohibition.

   (2) Whenever such person has violated, or is in violation of, any other requirement or prohibition of this subchapter, section 7603 of this title, subchapter IV–A, subchapter V, or sub-

chapter VI of this chapter, including, but not limited to, a requirement or prohibition of any rule, order, waiver or permit promulgated, issued, or approved under this chapter, or for the payment of any fee owed the United States under this chapter (other than subchapter II of this chapter).

   (3) Whenever such person attempts to construct or modify a major stationary source in any area with respect to which a finding under subsection (a)(5) of this section has been made.

Any action under this subsection may be brought in the district court of the United States for the district in which the violation is alleged to have occurred, or is occurring, or in which the defendant resides, or where the defendant's principal place of business is located, and such court shall have jurisdiction to restrain such violation, to require compliance, to assess such civil penalty, to collect any fees owed the United States under this chapter (other than subchapter II of this chapter) and any noncompliance assessment and nonpayment penalty owed under section 7420 of this title, and to award any other appropriate relief. Notice of the commencement of such action shall be given to the appropriate State air pollution control agency. In the case of any action brought by the Administrator under this subsection, the court may award costs of litigation (including reasonable attorney and expert witness fees) to the party or parties against whom such action was brought if the court finds that such action was unreasonable.

**(c) Criminal penalties**

   (1) Any person who knowingly violates any requirement or prohibition of an applicable implementation plan (during any period of federally assumed enforcement or more than 30 days after having been notified under subsection (a)(1) of this section by the Administrator that such person is violating such requirement or prohibition), any order under subsection (a) of this section, requirement or prohibition of section 7411(e) of this title (relating to new source performance standards), section 7412 of this title, section 7414 of this title (relating to inspections, etc.), section 7429 of this title (relating to solid waste combustion), section 7475(a) of this title (relating to preconstruction requirements), an order under section 7477 of this title (relating to preconstruction requirements), an order under section 7603 of this title (relating to emergency orders), section 7661a(a) or 7661b(c) of this title (relating to permits), or any requirement or prohibition of subchapter IV–A of this chapter (relating to acid deposition control), or subchapter VI of this chapter (relating to stratospheric ozone control), including a requirement of any rule, order, waiver, or permit promulgated or approved under such sections or subchapters, and including any requirement for the payment of any fee owed the United States under this chapter (other than subchapter II of this chapter) shall, upon conviction, be punished by a fine pursuant to title 18 or by imprisonment for not to exceed 5 years, or both. If a conviction of any person under this paragraph is for a violation committed after a first conviction of such person under this paragraph, the maximum punish-

---

[1] So in original. The semicolon probably should be a comma.



## § 7430. Emission factors

Within 6 months after November 15, 1990, and at least every 3 years thereafter, the Administrator shall review and, if necessary, revise, the methods ("emission factors") used for purposes of this chapter to estimate the quantity of emissions of carbon monoxide, volatile organic compounds, and oxides of nitrogen from sources of such air pollutants (including area sources and mobile sources). In addition, the Administrator shall establish emission factors for sources for which no such methods have previously been established by the Administrator. The Administrator shall permit any person to demonstrate improved emissions estimating techniques, and following approval of such techniques, the Administrator shall authorize the use of such techniques. Any such technique may be approved only after appropriate public participation. Until the Administrator has completed the revision required by this section, nothing in this section shall be construed to affect the validity of emission factors established by the Administrator before November 15, 1990.

(July 14, 1955, ch. 360, title I, § 130, as added Pub. L. 101–549, title VIII, § 804, Nov. 15, 1990, 104 Stat. 2689.)

## § 7431. Land use authority

Nothing in this chapter constitutes an infringement on the existing authority of counties and cities to plan or control land use, and nothing in this chapter provides or transfers authority over such land use.

(July 14, 1955, ch. 360, title I, § 131, as added Pub. L. 101–549, title VIII, § 805, Nov. 15, 1990, 104 Stat. 2689.)

### PART B—OZONE PROTECTION

### §§ 7450 to 7459. Repealed. Pub. L. 101–549, title VI, § 601, Nov. 15, 1990, 104 Stat. 2648

Section 7450, act July 14, 1955, ch. 360, title I, § 150, as added Aug. 7, 1977, Pub. L. 95–95, title I, § 126, 91 Stat. 725, set forth Congressional declaration of purpose.

Section 7451, act July 14, 1955, ch. 360, title I, § 151, as added Aug. 7, 1977, Pub. L. 95–95, title I, § 126, 91 Stat. 726, set forth Congressional findings.

Section 7452, act July 14, 1955, ch. 360, title I, § 152, as added Aug. 7, 1977, Pub. L. 95–95, title I, § 126, 91 Stat. 726, set forth definitions applicable to this part.

Section 7453, act July 14, 1955, ch. 360, title I, § 153, as added Aug. 7, 1977, Pub. L. 95–95, title I, § 126, 91 Stat. 726, related to studies by Environmental Protection Agency.

Section 7454, act July 14, 1955, ch. 360, title I, § 154, as added Aug. 7, 1977, Pub. L. 95–95, title I, § 126, 91 Stat. 728; amended Pub. L. 96–88, title V, § 509(b), Oct. 17, 1979, 93 Stat. 695, related to research and monitoring activities by Federal agencies.

Section 7455, act July 14, 1955, ch. 360, title I, § 155, as added Aug. 7, 1977, Pub. L. 95–95, title I, § 126, 91 Stat. 729, related to reports on progress of regulation.

Section 7456, act July 14, 1955, ch. 360, title I, § 156, as added Aug. 7, 1977, Pub. L. 95–95, title I, § 126, 91 Stat. 729, authorized President to enter into international agreements to foster cooperative research.

Section 7457, act July 14, 1955, ch. 360, title I, § 157, as added Aug. 7, 1977, Pub. L. 95–95, title I, § 126, 91 Stat. 729, related to promulgation of regulations.

Section 7458, act July 14, 1955, ch. 360, title I, § 158, as added Aug. 7, 1977, Pub. L. 95–95, title I, § 126, 91 Stat.

730, set forth other provisions of law that would be unaffected by this part.

Section 7459, act July 14, 1955, ch. 360, title I, § 159, as added Aug. 7, 1977, Pub. L. 95–95, title I, § 126, 91 Stat. 730, related to authority of States to protect the stratosphere.

### SIMILAR PROVISIONS

For provisions relating to stratospheric ozone protection, see section 7671 et seq. of this title.

### PART C—PREVENTION OF SIGNIFICANT DETERIORATION OF AIR QUALITY

### SUBPART I—CLEAN AIR

## § 7470. Congressional declaration of purpose

The purposes of this part are as follows:

(1) to protect public health and welfare from any actual or potential adverse effect which in the Administrator's judgment may reasonably be anticipate[1] to occur from air pollution or from exposures to pollutants in other media, which pollutants originate as emissions to the ambient air)[2], notwithstanding attainment and maintenance of all national ambient air quality standards;

(2) to preserve, protect, and enhance the air quality in national parks, national wilderness areas, national monuments, national seashores, and other areas of special national or regional natural, recreational, scenic, or historic value;

(3) to insure that economic growth will occur in a manner consistent with the preservation of existing clean air resources;

(4) to assure that emissions from any source in any State will not interfere with any portion of the applicable implementation plan to prevent significant deterioration of air quality for any other State; and

(5) to assure that any decision to permit increased air pollution in any area to which this section applies is made only after careful evaluation of all the consequences of such a decision and after adequate procedural opportunities for informed public participation in the decisionmaking process.

(July 14, 1955, ch. 360, title I, § 160, as added Pub. L. 95–95, title I, § 127(a), Aug. 7, 1977, 91 Stat. 731.)

### EFFECTIVE DATE

Subpart effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### GUIDANCE DOCUMENT

Pub. L. 95–95, title I, § 127(c), Aug. 7, 1977, 91 Stat. 741, required Administrator, not later than 1 year after Aug. 7, 1977, to publish a guidance document to assist States in carrying out their functions under part C of title I of the Clean Air Act (this part) with respect to pollutants for which national ambient air quality standards are promulgated.

### STUDY AND REPORT ON PROGRESS MADE IN PROGRAM RELATING TO SIGNIFICANT DETERIORATION OF AIR QUALITY

Pub. L. 95–95, title I, § 127(d), Aug. 7, 1977, 91 Stat. 742, directed Administrator, not later than 2 years after

---

[1] So in original. Probably should be "anticipated".

[2] So in original. Section was enacted without an opening parenthesis.

Aug. 7, 1977, to complete a study and report to Congress on progress made in carrying out part C of title I of the Clean Air Act (this part) and the problems associated in carrying out such section.

## § 7471. Plan requirements

In accordance with the policy of section 7401(b)(1) of this title, each applicable implementation plan shall contain emission limitations and such other measures as may be necessary, as determined under regulations promulgated under this part, to prevent significant deterioration of air quality in each region (or portion thereof) designated pursuant to section 7407 of this title as attainment or unclassifiable.

(July 14, 1955, ch. 360, title I, § 161, as added Pub. L. 95–95, title I, § 127(a), Aug. 7, 1977, 91 Stat. 731; amended Pub. L. 101–549, title I, § 110(1), Nov. 15, 1990, 104 Stat. 2470.)

AMENDMENTS

1990—Pub. L. 101–549 substituted ''designated pursuant to section 7407 of this title as attainment or unclassifiable'' for ''identified pursuant to section 7407(d)(1)(D) or (E) of this title''.

## § 7472. Initial classifications

### (a) Areas designated as class I

Upon the enactment of this part, all—
    (1) international parks,
    (2) national wilderness areas which exceed 5,000 acres in size,
    (3) national memorial parks which exceed 5,000 acres in size, and
    (4) national parks which exceed six thousand acres in size,

and which are in existence on August 7, 1977, shall be class I areas and may not be redesignated. All areas which were redesignated as class I under regulations promulgated before August 7, 1977, shall be class I areas which may be redesignated as provided in this part. The extent of the areas designated as Class I under this section shall conform to any changes in the boundaries of such areas which have occurred subsequent to August 7, 1977, or which may occur subsequent to November 15, 1990.

### (b) Areas designated as class II

All areas in such State designated pursuant to section 7407(d) of this title as attainment or unclassifiable which are not established as class I under subsection (a) of this section shall be class II areas unless redesignated under section 7474 of this title.

(July 14, 1955, ch. 360, title I, § 162, as added Pub. L. 95–95, title I, § 127(a), Aug. 7, 1977, 91 Stat. 731; amended Pub. L. 95–190, § 14(a)(40), Nov. 16, 1977, 91 Stat. 1401; Pub. L. 101–549, title I, §§ 108(m), 110(2), Nov. 15, 1990, 104 Stat. 2469, 2470.)

AMENDMENTS

1990—Subsec. (a). Pub. L. 101–549, § 108(m), inserted at end ''The extent of the areas designated as Class I under this section shall conform to any changes in the boundaries of such areas which have occurred subsequent to August 7, 1977, or which may occur subsequent to November 15, 1990.''
Subsec. (b). Pub. L. 101–549, § 110(2), substituted ''designated pursuant to section 7407(d) of this title as attainment or unclassifiable'' for ''identified pursuant to section 7407(d)(1)(D) or (E) of this title''.

1977—Subsec. (a)(4). Pub. L. 95–190 inserted a comma after ''size''.

## § 7473. Increments and ceilings

### (a) Sulfur oxide and particulate matter; requirement that maximum allowable increases and maximum allowable concentrations not be exceeded

In the case of sulfur oxide and particulate matter, each applicable implementation plan shall contain measures assuring that maximum allowable increases over baseline concentrations of, and maximum allowable concentrations of, such pollutant shall not be exceeded. In the case of any maximum allowable increase (except an allowable increase specified under section 7475(d)(2)(C)(iv) of this title) for a pollutant based on concentrations permitted under national ambient air quality standards for any period other than an annual period, such regulations shall permit such maximum allowable increase to be exceeded during one such period per year.

### (b) Maximum allowable increases in concentrations over baseline concentrations

(1) For any class I area, the maximum allowable increase in concentrations of sulfur dioxide and particulate matter over the baseline concentration of such pollutants shall not exceed the following amounts:

| Pollutant | Maximum allowable increase (in micrograms per cubic meter) |
|---|---|
| Particulate matter: | |
|   Annual geometric mean | 5 |
|   Twenty-four-hour maximum | 10 |
| Sulfur dioxide: | |
|   Annual arithmetic mean | 2 |
|   Twenty-four-hour maximum | 5 |
|   Three-hour maximum | 25 |

(2) For any class II area, the maximum allowable increase in concentrations of sulfur dioxide and particulate matter over the baseline concentration of such pollutants shall not exceed the following amounts:

| Pollutant | Maximum allowable increase (in micrograms per cubic meter) |
|---|---|
| Particulate matter: | |
|   Annual geometric mean | 19 |
|   Twenty-four-hour maximum | 37 |
| Sulfur dioxide: | |
|   Annual arithmetic mean | 20 |
|   Twenty-four-hour maximum | 91 |
|   Three-hour maximum | 512 |

(3) For any class III area, the maximum allowable increase in concentrations of sulfur dioxide and particulate matter over the baseline concentration of such pollutants shall not exceed the following amounts:

| Pollutant | Maximum allowable increase (in micrograms per cubic meter) |
|---|---|
| Particulate matter: | |
|   Annual geometric mean | 37 |
|   Twenty-four-hour maximum | 75 |
| Sulfur dioxide: | |
|   Annual arithmetic mean | 40 |
|   Twenty-four-hour maximum | 182 |
|   Three-hour maximum | 700 |

(4) The maximum allowable concentration of any air pollutant in any area to which this part applies shall not exceed a concentration for such pollutant for each period of exposure equal to—

(A) the concentration permitted under the national secondary ambient air quality standard, or

(B) the concentration permitted under the national primary ambient air quality standard,

whichever concentration is lowest for such pollutant for such period of exposure.

**(c) Orders or rules for determining compliance with maximum allowable increases in ambient concentrations of air pollutants**

(1) In the case of any State which has a plan approved by the Administrator for purposes of carrying out this part, the Governor of such State may, after notice and opportunity for public hearing, issue orders or promulgate rules providing that for purposes of determining compliance with the maximum allowable increases in ambient concentrations of an air pollutant, the following concentrations of such pollutant shall not be taken into account:

(A) concentrations of such pollutant attributable to the increase in emissions from stationary sources which have converted from the use of petroleum products, or natural gas, or both, by reason of an order which is in effect under the provisions of sections 792(a) and (b) of title 15 (or any subsequent legislation which supersedes such provisions) over the emissions from such sources before the effective date of such order.[1]

(B) the concentrations of such pollutant attributable to the increase in emissions from stationary sources which have converted from using natural gas by reason of a natural gas curtailment pursuant to a natural gas curtailment plan in effect pursuant to the Federal Power Act [16 U.S.C. 791a et seq.] over the emissions from such sources before the effective date of such plan,

(C) concentrations of particulate matter attributable to the increase in emissions from construction or other temporary emission-related activities, and

(D) the increase in concentrations attributable to new sources outside the United States over the concentrations attributable to existing sources which are included in the baseline concentration determined in accordance with section 7479(4) of this title.

(2) No action taken with respect to a source under paragraph (1)(A) or (1)(B) shall apply more than five years after the effective date of the order referred to in paragraph (1)(A) or the plan referred to in paragraph (1)(B), whichever is applicable. If both such order and plan are applicable, no such action shall apply more than five years after the later of such effective dates.

(3) No action under this subsection shall take effect unless the Governor submits the order or rule providing for such exclusion to the Administrator and the Administrator determines that such order or rule is in compliance with the provisions of this subsection.

(July 14, 1955, ch. 360, title I, §163, as added Pub. L. 95–95, title I, §127(a), Aug. 7, 1977, 91 Stat. 732; amended Pub. L. 95–190, §14(a)(41), Nov. 16, 1977, 91 Stat. 1401.)

REFERENCES IN TEXT

The Federal Power Act, referred to in subsec. (c)(1)(B), is act June 10, 1920, ch. 285, 41 Stat. 1063, as amended, which is classified generally to chapter 12 (§791a et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see section 791a of Title 16 and Tables.

AMENDMENTS

1977—Subsec. (a). Pub. L. 95–190 inserted "section" before "7475".

## § 7474. Area redesignation

**(a) Authority of States to redesignate areas**

Except as otherwise provided under subsection (c) of this section, a State may redesignate such areas as it deems appropriate as class I areas. The following areas may be redesignated only as class I or II:

(1) an area which exceeds ten thousand acres in size and is a national monument, a national primitive area, a national preserve, a national recreation area, a national wild and scenic river, a national wildlife refuge, a national lakeshore or seashore, and

(2) a national park or national wilderness area established after August 7, 1977, which exceeds ten thousand acres in size.

The extent of the areas referred to in paragraph[1] (1) and (2) shall conform to any changes in the boundaries of such areas which have occurred subsequent to August 7, 1977, or which may occur subsequent to November 15, 1990. Any area (other than an area referred to in paragraph (1) or (2) or an area established as class I under the first sentence of section 7472(a) of this title) may be redesignated by the State as class III if—

(A) such redesignation has been specifically approved by the Governor of the State, after consultation with the appropriate Committees of the legislature if it is in session or with the leadership of the legislature if it is not in session (unless State law provides that such redesignation must be specifically approved by State legislation) and if general purpose units of local government representing a majority of the residents of the area so redesignated enact legislation (including for such units of local government resolutions where appropriate) concurring in the State's redesignation;

(B) such redesignation will not cause, or contribute to, concentrations of any air pollutant which exceed any maximum allowable increase or maximum allowable concentration permitted under the classification of any other area; and

(C) such redesignation otherwise meets the requirements of this part.

Subparagraph (A) of this paragraph shall not apply to area redesignations by Indian tribes.

**(b) Notice and hearing; notice to Federal land manager; written comments and recommendations; regulations; disapproval of redesignation**

(1)(A) Prior to redesignation of any area under this part, notice shall be afforded and public

---

[1] So in original. The period probably should be a comma.          [1] So in original. Probably should be "paragraphs".

(July 14, 1955, ch. 360, title I, § 167, as added Pub. L. 95–95, title I, § 127(a), Aug. 7, 1977, 91 Stat. 740; amended Pub. L. 101–549, title I, § 110(3), title VII, § 708, Nov. 15, 1990, 104 Stat. 2470, 2684.)

AMENDMENTS

1990—Pub. L. 101–549, § 708, substituted ''construction or modification of a major emitting facility'' for ''construction of a major emitting facility''.

Pub. L. 101–549, § 110(3), substituted ''designated pursuant to section 7407(d) as attainment or unclassifiable'' for ''included in the list promulgated pursuant to paragraph (1)(D) or (E) of subsection (d) of section 7407 of this title''.

## § 7478. Period before plan approval

### (a) Existing regulations to remain in effect

Until such time as an applicable implementation plan is in effect for any area, which plan meets the requirements of this part to prevent significant deterioration of air quality with respect to any air pollutant, applicable regulations under this chapter prior to August 7, 1977, shall remain in effect to prevent significant deterioration of air quality in any such area for any such pollutant except as otherwise provided in subsection (b) of this section.

### (b) Regulations deemed amended; construction commenced after June 1, 1975

If any regulation in effect prior to August 7, 1977, to prevent significant deterioration of air quality would be inconsistent with the requirements of section 7472(a), section 7473(b) or section 7474(a) of this title, then such regulations shall be deemed amended so as to conform with such requirements. In the case of a facility on which construction was commenced (in accordance with the definition of ''commenced'' in section 7479(2) of this title) after June 1, 1975, and prior to August 7, 1977, the review and permitting of such facility shall be in accordance with the regulations for the prevention of significant deterioration in effect prior to August 7, 1977.

(July 14, 1955, ch. 360, title I, § 168, as added Pub. L. 95–95, title I, § 127(a), Aug. 7, 1977, 91 Stat. 740; amended Pub. L. 95–190, § 14(a)(52), Nov. 16, 1977, 91 Stat. 1402.)

AMENDMENTS

1977—Subsec. (b). Pub. L. 95–190 substituted ''(in accordance with the definition of 'commenced' in section 7479(2) of this title)'' for ''in accordance with this definition''.

## § 7479. Definitions

For purposes of this part—

(1) The term ''major emitting facility'' means any of the following stationary sources of air pollutants which emit, or have the potential to emit, one hundred tons per year or more of any air pollutant from the following types of stationary sources: fossil-fuel fired steam electric plants of more than two hundred and fifty million British thermal units per hour heat input, coal cleaning plants (thermal dryers), kraft pulp mills, Portland Cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants, primary copper smelters, municipal incinerators capable of charging more than fifty tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production facilities, chemical process plants, fossil-fuel boilers of more than two hundred and fifty million British thermal units per hour heat input, petroleum storage and transfer facilities with a capacity exceeding three hundred thousand barrels, taconite ore processing facilities, glass fiber processing plants, charcoal production facilities. Such term also includes any other source with the potential to emit two hundred and fifty tons per year or more of any air pollutant. This term shall not include new or modified facilities which are nonprofit health or education institutions which have been exempted by the State.

(2)(A) The term ''commenced'' as applied to construction of a major emitting facility means that the owner or operator has obtained all necessary preconstruction approvals or permits required by Federal, State, or local air pollution emissions and air quality laws or regulations and either has (i) begun, or caused to begin, a continuous program of physical onsite construction of the facility or (ii) entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of construction of the facility to be completed within a reasonable time.

(B) The term ''necessary preconstruction approvals or permits'' means those permits or approvals, required by the permitting authority as a precondition to undertaking any activity under clauses (i) or (ii) of subparagraph (A) of this paragraph.

(C) The term ''construction'' when used in connection with any source or facility, includes the modification (as defined in section 7411(a) of this title) of any source or facility.

(3) The term ''best available control technology'' means an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility, which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility through application of production processes and available methods, systems, and techniques, including fuel cleaning, clean fuels, or treatment or innovative fuel combustion techniques for control of each such pollutant. In no event shall application of ''best available control technology'' result in emissions of any pollutants which will exceed the emissions allowed by any applicable standard established pursuant to section 7411 or 7412 of this title. Emissions from any source utilizing clean fuels, or any other means, to comply with this paragraph shall not be allowed to increase above levels that would have been required under this paragraph as it existed prior to November 15, 1990.

(4) The term ''baseline concentration'' means, with respect to a pollutant, the ambient concentration levels which exist at the time of the first application for a permit in an area subject to this part, based on air quality data available in the Environmental Protection Agency or a State air pollution control agency and on such monitoring data as the permit applicant is required to submit. Such ambient concentration levels shall take into account all projected emissions in, or which may affect, such area from any major emitting facility on which construction commenced prior to January 6, 1975, but which has not begun operation by the date of the baseline air quality concentration determination. Emissions of sulfur oxides and particulate matter from any major emitting facility on which construction commenced after January 6, 1975, shall not be included in the baseline and shall be counted against the maximum allowable increases in pollutant concentrations established under this part.

(July 14, 1955, ch. 360, title I, §169, as added Pub. L. 95–95, title I, §127(a), Aug. 7, 1977, 91 Stat. 740; amended Pub. L. 95–190, §14(a)(54), Nov. 16, 1977, 91 Stat. 1402; Pub. L. 101–549, title III, §305(b), title IV, §403(d), Nov. 15, 1990, 104 Stat. 2583, 2631.)

AMENDMENTS

1990—Par. (1). Pub. L. 101–549, §305(b), struck out ''two hundred and'' after ''municipal incinerators capable of charging more than''.

Par. (3). Pub. L. 101–549, §403(d), directed the insertion of '', clean fuels,'' after ''including fuel cleaning,'', which was executed by making the insertion after ''including fuel cleaning'' to reflect the probable intent of Congress, and inserted at end ''Emissions from any source utilizing clean fuels, or any other means, to comply with this paragraph shall not be allowed to increase above levels that would have been required under this paragraph as it existed prior to November 15, 1990.''

1977—Par.(2)(C). Pub. L. 95–190 added subpar. (C).

STUDY OF MAJOR EMITTING FACILITIES WITH
POTENTIAL OF EMITTING 250 TONS PER YEAR

Pub. L. 95–95, title I, §127(b), Aug. 7, 1977, 91 Stat. 741, directed Administrator, within 1 year after Aug. 7, 1977, to report to Congress on consequences of that portion of definition of ''major emitting facility'' under this subpart which applies to facilities with potential to emit 250 tons per year or more.

SUBPART II—VISIBILITY PROTECTION

CODIFICATION

As originally enacted, subpart II of part C of subchapter I of this chapter was added following section 7478 of this title. Pub. L. 95–190, §14(a)(53), Nov. 16, 1977, 91 Stat. 1402, struck out subpart II and inserted such subpart following section 7479 of this title.

§ 7491. Visibility protection for Federal class I areas

(a) Impairment of visibility; list of areas; study and report

(1) Congress hereby declares as a national goal the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory class I Federal areas which impairment results from manmade air pollution.

(2) Not later than six months after August 7, 1977, the Secretary of the Interior in consultation with other Federal land managers shall review all mandatory class I Federal areas and identify those where visibility is an important value of the area. From time to time the Secretary of the Interior may revise such identifications. Not later than one year after August 7, 1977, the Administrator shall, after consultation with the Secretary of the Interior, promulgate a list of mandatory class I Federal areas in which he determines visibility is an important value.

(3) Not later than eighteen months after August 7, 1977, the Administrator shall complete a study and report to Congress on available methods for implementing the national goal set forth in paragraph (1). Such report shall include recommendations for—

(A) methods for identifying, characterizing, determining, quantifying, and measuring visibility impairment in Federal areas referred to in paragraph (1), and

(B) modeling techniques (or other methods) for determining the extent to which manmade air pollution may reasonably be anticipated to cause or contribute to such impairment, and

(C) methods for preventing and remedying such manmade air pollution and resulting visibility impairment.

Such report shall also identify the classes or categories of sources and the types of air pollutants which, alone or in conjunction with other sources or pollutants, may reasonably be anticipated to cause or contribute significantly to impairment of visibility.

(4) Not later than twenty-four months after August 7, 1977, and after notice and public hearing, the Administrator shall promulgate regulations to assure (A) reasonable progress toward meeting the national goal specified in paragraph (1), and (B) compliance with the requirements of this section.

(b) Regulations

Regulations under subsection (a)(4) of this section shall—

(1) provide guidelines to the States, taking into account the recommendations under subsection (a)(3) of this section on appropriate techniques and methods for implementing this section (as provided in subparagraphs (A) through (C) of such subsection (a)(3)), and

(2) require each applicable implementation plan for a State in which any area listed by the Administrator under subsection (a)(2) of this section is located (or for a State the emissions from which may reasonably be anticipated to cause or contribute to any impairment of visibility in any such area) to contain such emission limits, schedules of compliance and other measures as may be necessary to make reasonable progress toward meeting the national goal specified in subsection (a) of this section, including—

(A) except as otherwise provided pursuant to subsection (c) of this section, a requirement that each major stationary source which is in existence on August 7, 1977, but which has not been in operation for more than fifteen years as of such date, and

which, as determined by the State (or the Administrator in the case of a plan promulgated under section 7410(c) of this title) emits any air pollutant which may reasonably be anticipated to cause or contribute to any impairment of visibility in any such area, shall procure, install, and operate, as expeditiously as practicable (and maintain thereafter) the best available retrofit technology, as determined by the State (or the Administrator in the case of a plan promulgated under section 7410(c) of this title) for controlling emissions from such source for the purpose of eliminating or reducing any such impairment, and

(B) a long-term (ten to fifteen years) strategy for making reasonable progress toward meeting the national goal specified in subsection (a) of this section.

In the case of a fossil-fuel fired generating powerplant having a total generating capacity in excess of 750 megawatts, the emission limitations required under this paragraph shall be determined pursuant to guidelines, promulgated by the Administrator under paragraph (1).

**(c) Exemptions**

(1) The Administrator may, by rule, after notice and opportunity for public hearing, exempt any major stationary source from the requirement of subsection (b)(2)(A) of this section, upon his determination that such source does not or will not, by itself or in combination with other sources, emit any air pollutant which may reasonably be anticipated to cause or contribute to a significant impairment of visibility in any mandatory class I Federal area.

(2) Paragraph (1) of this subsection shall not be applicable to any fossil-fuel fired powerplant with total design capacity of 750 megawatts or more, unless the owner or operator of any such plant demonstrates to the satisfaction of the Administrator that such powerplant is located at such distance from all areas listed by the Administrator under subsection (a)(2) of this section that such powerplant does not or will not, by itself or in combination with other sources, emit any air pollutant which may reasonably be anticipated to cause or contribute to significant impairment of visibility in any such area.

(3) An exemption under this subsection shall be effective only upon concurrence by the appropriate Federal land manager or managers with the Administrator's determination under this subsection.

**(d) Consultations with appropriate Federal land managers**

Before holding the public hearing on the proposed revision of an applicable implementation plan to meet the requirements of this section, the State (or the Administrator, in the case of a plan promulgated under section 7410(c) of this title) shall consult in person with the appropriate Federal land manager or managers and shall include a summary of the conclusions and recommendations of the Federal land managers in the notice to the public.

**(e) Buffer zones**

In promulgating regulations under this section, the Administrator shall not require the use of any automatic or uniform buffer zone or zones.

**(f) Nondiscretionary duty**

For purposes of section 7604(a)(2) of this title, the meeting of the national goal specified in subsection (a)(1) of this section by any specific date or dates shall not be considered a "nondiscretionary duty" of the Administrator.

**(g) Definitions**

For the purpose of this section—

(1) in determining reasonable progress there shall be taken into consideration the costs of compliance, the time necessary for compliance, and the energy and nonair quality environmental impacts of compliance, and the remaining useful life of any existing source subject to such requirements;

(2) in determining best available retrofit technology the State (or the Administrator in determining emission limitations which reflect such technology) shall take into consideration the costs of compliance, the energy and nonair quality environmental impacts of compliance, any existing pollution control technology in use at the source, the remaining useful life of the source, and the degree of improvement in visibility which may reasonably be anticipated to result from the use of such technology;

(3) the term "manmade air pollution" means air pollution which results directly or indirectly from human activities;

(4) the term "as expeditiously as practicable" means as expeditiously as practicable but in no event later than five years after the date of approval of a plan revision under this section (or the date of promulgation of such a plan revision in the case of action by the Administrator under section 7410(c) of this title for purposes of this section);

(5) the term "mandatory class I Federal areas" means Federal areas which may not be designated as other than class I under this part;

(6) the terms "visibility impairment" and "impairment of visibility" shall include reduction in visual range and atmospheric discoloration; and

(7) the term "major stationary source" means the following types of stationary sources with the potential to emit 250 tons or more of any pollutant: fossil-fuel fired steam electric plants of more than 250 million British thermal units per hour heat input, coal cleaning plants (thermal dryers), kraft pulp mills, Portland Cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants, primary copper smelters, municipal incinerators capable of charging more than 250 tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production facilities, chemical process plants, fossil-fuel boilers of more than 250 million British thermal units per hour heat input, petroleum storage and trans-

fer facilities with a capacity exceeding 300,000 barrels, taconite ore processing facilities, glass fiber processing plants, charcoal production facilities.

(July 14, 1955, ch. 360, title I, §169A, as added Pub. L. 95–95, title I, §128, Aug. 7, 1977, 91 Stat. 742.)

EFFECTIVE DATE

Subpart effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7492. Visibility

### (a) Studies

(1) The Administrator, in conjunction with the National Park Service and other appropriate Federal agencies, shall conduct research to identify and evaluate sources and source regions of both visibility impairment and regions that provide predominantly clean air in class I areas. A total of $8,000,000 per year for 5 years is authorized to be appropriated for the Environmental Protection Agency and the other Federal agencies to conduct this research. The research shall include—

(A) expansion of current visibility related monitoring in class I areas;

(B) assessment of current sources of visibility impairing pollution and clean air corridors;

(C) adaptation of regional air quality models for the assessment of visibility;

(D) studies of atmospheric chemistry and physics of visibility.

(2) Based on the findings available from the research required in subsection (a)(1) of this section as well as other available scientific and technical data, studies, and other available information pertaining to visibility source-receptor relationships, the Administrator shall conduct an assessment and evaluation that identifies, to the extent possible, sources and source regions of visibility impairment including natural sources as well as source regions of clear air for class I areas. The Administrator shall produce interim findings from this study within 3 years after November 15, 1990.

### (b) Impacts of other provisions

Within 24 months after November 15, 1990, the Administrator shall conduct an assessment of the progress and improvements in visibility in class I areas that are likely to result from the implementation of the provisions of the Clean Air Act Amendments of 1990 other than the provisions of this section. Every 5 years thereafter the Administrator shall conduct an assessment of actual progress and improvement in visibility in class I areas. The Administrator shall prepare a written report on each assessment and transmit copies of these reports to the appropriate committees of Congress.

### (c) Establishment of visibility transport regions and commissions

#### (1) Authority to establish visibility transport regions

Whenever, upon the Administrator's motion or by petition from the Governors of at least two affected States, the Administrator has reason to believe that the current or projected interstate transport of air pollutants from one or more States contributes significantly to visibility impairment in class I areas located in the affected States, the Administrator may establish a transport region for such pollutants that includes such States. The Administrator, upon the Administrator's own motion or upon petition from the Governor of any affected State, or upon the recommendations of a transport commission established under subsection (b) of this section[1] may—

(A) add any State or portion of a State to a visibility transport region when the Administrator determines that the interstate transport of air pollutants from such State significantly contributes to visibility impairment in a class I area located within the transport region, or

(B) remove any State or portion of a State from the region whenever the Administrator has reason to believe that the control of emissions in that State or portion of the State pursuant to this section will not significantly contribute to the protection or enhancement of visibility in any class I area in the region.

#### (2) Visibility transport commissions

Whenever the Administrator establishes a transport region under subsection (c)(1) of this section, the Administrator shall establish a transport commission comprised of (as a minimum) each of the following members:

(A) the Governor of each State in the Visibility Transport Region, or the Governor's designee;

(B) The[2] Administrator or the Administrator's designee; and

(C) A[2] representative of each Federal agency charged with the direct management of each class I area or areas within the Visibility Transport Region.

#### (3) Ex officio members

All representatives of the Federal Government shall be ex officio members.

#### (4) Federal Advisory Committee Act

The visibility transport commissions shall be exempt from the requirements of the Federal Advisory Committee Act [5 U.S.C. App.].

### (d) Duties of visibility transport commissions

A Visibility Transport Commission—

(1) shall assess the scientific and technical data, studies, and other currently available information, including studies conducted pursuant to subsection (a)(1) of this section, pertaining to adverse impacts on visibility from potential or projected growth in emissions from sources located in the Visibility Transport Region; and

(2) shall, within 4 years of establishment, issue a report to the Administrator recommending what measures, if any, should be taken under this chapter to remedy such adverse impacts. The report required by this sub-

---

[1] So in original. Words "subsection (b) of this section" probably should be "paragraph (2)".

[2] So in original. Probably should not be capitalized.

section shall address at least the following measures:

(A) the establishment of clean air corridors, in which additional restrictions on increases in emissions may be appropriate to protect visibility in affected class I areas;

(B) the imposition of the requirements of part D of this subchapter affecting the construction of new major stationary sources or major modifications to existing sources in such clean air corridors specifically including the alternative siting analysis provisions of section 7503(a)(5) of this title; and

(C) the promulgation of regulations under section 7491 of this title to address long range strategies for addressing regional haze which impairs visibility in affected class I areas.

**(e) Duties of Administrator**

(1) The Administrator shall, taking into account the studies pursuant to subsection (a)(1) of this section and the reports pursuant to subsection (d)(2) of this section and any other relevant information, within eighteen months of receipt of the report referred to in subsection (d)(2) of this section, carry out the Administrator's regulatory responsibilities under section 7491 of this title, including criteria for measuring "reasonable progress" toward the national goal.

(2) Any regulations promulgated under section 7491 of this title pursuant to this subsection shall require affected States to revise within 12 months their implementation plans under section 7410 of this title to contain such emission limits, schedules of compliance, and other measures as may be necessary to carry out regulations promulgated pursuant to this subsection.

**(f) Grand Canyon visibility transport commission**

The Administrator pursuant to subsection (c)(1) of this section shall, within 12 months, establish a visibility transport commission for the region affecting the visibility of the Grand Canyon National Park.

(July 14, 1955, ch. 360, title I, §169B, as added Pub. L. 101–549, title VIII, §816, Nov. 15, 1990, 104 Stat. 2695.)

REFERENCES IN TEXT

The Clean Air Act Amendments of 1990, referred to in subsec. (b), probably means Pub. L. 101–549, Nov. 15, 1990, 104 Stat. 2399. For complete classification of this Act to the Code, see Short Title note set out under section 7401 of this title and Tables.

The Federal Advisory Committee Act, referred to in subsec. (c)(4), is Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 770, as amended, which is set out in the Appendix to Title 5, Government Organization and Employees.

PART D—PLAN REQUIREMENTS FOR NONATTAINMENT AREAS

SUBPART 1—NONATTAINMENT AREAS IN GENERAL

**§ 7501. Definitions**

For the purpose of this part—

(1) REASONABLE FURTHER PROGRESS.—The term "reasonable further progress" means such annual incremental reductions in emissions of the relevant air pollutant as are re-

quired by this part or may reasonably be required by the Administrator for the purpose of ensuring attainment of the applicable national ambient air quality standard by the applicable date.

(2) NONATTAINMENT AREA.—The term "nonattainment area" means, for any air pollutant, an area which is designated "nonattainment" with respect to that pollutant within the meaning of section 7407(d) of this title.

(3) The term "lowest achievable emission rate" means for any source, that rate of emissions which reflects—

(A) the most stringent emission limitation which is contained in the implementation plan of any State for such class or category of source, unless the owner or operator of the proposed source demonstrates that such limitations are not achievable, or

(B) the most stringent emission limitation which is achieved in practice by such class or category of source, whichever is more stringent.

In no event shall the application of this term permit a proposed new or modified source to emit any pollutant in excess of the amount allowable under applicable new source standards of performance.

(4) The terms "modifications" and "modified" mean the same as the term "modification" as used in section 7411(a)(4) of this title.

(July 14, 1955, ch. 360, title I, §171, as added Pub. L. 95–95, title I, §129(b), Aug. 7, 1977, 91 Stat. 745; amended Pub. L. 101–549, title I, §102(a)(2), Nov. 15, 1990, 104 Stat. 2412.)

AMENDMENTS

1990—Pub. L. 101–549, §102(a)(2)(A), struck out "and section 7410(a)(2)(I) of this title" after "purpose of this part".

Pars. (1), (2). Pub. L. 101–549, §102(a)(2)(B), (C), amended pars. (1) and (2) generally. Prior to amendment, pars. (1) and (2) read as follows:

"(1) The term 'reasonable further progress' means annual incremental reductions in emissions of the applicable air pollutant (including substantial reductions in the early years following approval or promulgation of plan provisions under this part and section 7410(a)(2)(I) of this title and regular reductions thereafter) which are sufficient in the judgment of the Administrator, to provide for attainment of the applicable national ambient air quality standard by the date required in section 7502(a) of this title.

"(2) The term 'nonattainment area' means, for any air pollutant an area which is shown by monitored data or which is calculated by air quality modeling (or other methods determined by the Administrator to be reliable) to exceed any national ambient air quality standard for such pollutant. Such term includes any area identified under subparagraphs (A) through (C) of section 7407(d)(1) of this title."

EFFECTIVE DATE

Part effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

**§ 7502. Nonattainment plan provisions in general**

**(a) Classifications and attainment dates**

**(1) Classifications**

(A) On or after the date the Administrator promulgates the designation of an area as a



(F) effect of sonic booms on property (including values); and

(G) such other matters as may be of interest in the public welfare.

**(b) Investigation techniques; report and recommendations**

In conducting such investigation, the Administrator shall hold public hearings, conduct research, experiments, demonstrations, and studies. The Administrator shall report the results of such investigation and study, together with his recommendations for legislation or other action, to the President and the Congress not later than one year after December 31, 1970.

**(c) Abatement of noise from Federal activities**

In any case where any Federal department or agency is carrying out or sponsoring any activity resulting in noise which the Administrator determines amounts to a public nuisance or is otherwise objectionable, such department or agency shall consult with the Administrator to determine possible means of abating such noise.

(July 14, 1955, ch. 360, title IV, §402, as added Pub. L. 91–604, §14, Dec. 31, 1970, 84 Stat. 1709.)

CODIFICATION

Another section 402 of act July 14, 1955, as added by Pub. L. 101–549, title IV, §401, Nov. 15, 1990, 104 Stat. 2585, is classified to section 7651a of this title.

Section was formerly classified to section 1858 of this title.

**§ 7642. Authorization of appropriations**

There is authorized to be appropriated such amount, not to exceed $30,000,000, as may be necessary for the purposes of this subchapter.

(July 14, 1955, ch. 360, title IV, §403, as added Pub. L. 91–604, §14, Dec. 31, 1970, 84 Stat. 1710.)

CODIFICATION

Another section 403 of act July 14, 1955, as added by Pub. L. 101–549, title IV, §401, Nov. 15, 1990, 104 Stat. 2589, is classified to section 7651b of this title.

Section was formerly classified to section 1858a of this title.

SUBCHAPTER IV–A—ACID DEPOSITION CONTROL

CODIFICATION

Another title IV of act July 14, 1955, as added by Pub. L. 91–604, §14, Dec. 31, 1970, 84 Stat. 1709, is classified principally to subchapter IV (§7641 et seq.) of this chapter.

**§ 7651. Findings and purposes**

**(a) Findings**

The Congress finds that—

(1) the presence of acidic compounds and their precursors in the atmosphere and in deposition from the atmosphere represents a threat to natural resources, ecosystems, materials, visibility, and public health;

(2) the principal sources of the acidic compounds and their precursors in the atmosphere are emissions of sulfur and nitrogen oxides from the combustion of fossil fuels;

(3) the problem of acid deposition is of national and international significance;

(4) strategies and technologies for the control of precursors to acid deposition exist now

that are economically feasible, and improved methods are expected to become increasingly available over the next decade;

(5) current and future generations of Americans will be adversely affected by delaying measures to remedy the problem;

(6) reduction of total atmospheric loading of sulfur dioxide and nitrogen oxides will enhance protection of the public health and welfare and the environment; and

(7) control measures to reduce precursor emissions from steam-electric generating units should be initiated without delay.

**(b) Purposes**

The purpose of this subchapter is to reduce the adverse effects of acid deposition through reductions in annual emissions of sulfur dioxide of ten million tons from 1980 emission levels, and, in combination with other provisions of this chapter, of nitrogen oxides emissions of approximately two million tons from 1980 emission levels, in the forty-eight contiguous States and the District of Columbia. It is the intent of this subchapter to effectuate such reductions by requiring compliance by affected sources with prescribed emission limitations by specified deadlines, which limitations may be met through alternative methods of compliance provided by an emission allocation and transfer system. It is also the purpose of this subchapter to encourage energy conservation, use of renewable and clean alternative technologies, and pollution prevention as a long-range strategy, consistent with the provisions of this subchapter, for reducing air pollution and other adverse impacts of energy production and use.

(July 14, 1955, ch. 360, title IV, §401, as added Pub. L. 101–549, title IV, §401, Nov. 15, 1990, 104 Stat. 2584.)

CODIFICATION

Another section 401 of act July 14, 1955, as added by Pub. L. 91–604, §14, Dec. 31, 1970, 84 Stat. 1709, is set out as a Short Title note under section 7401 of this title.

ACID DEPOSITION STANDARDS

Pub. L. 101–549, title IV, §404, Nov. 15, 1990, 104 Stat. 2632, directed Administrator of Environmental Protection Agency, not later than 36 months after Nov. 15, 1990, to transmit to Congress a report on the feasibility and effectiveness of an acid deposition standard or standards to protect sensitive and critically sensitive aquatic and terrestrial resources.

INDUSTRIAL SO₂ EMISSIONS

Pub. L. 101–549, title IV, §406, Nov. 15, 1990, 104 Stat. 2632, provided that:

"(a) REPORT.—Not later than January 1, 1995 and every 5 years thereafter, the Administrator of the Environmental Protection Agency shall transmit to the Congress a report containing an inventory of national annual sulfur dioxide emissions from industrial sources (as defined in title IV of the Act [42 U.S.C. 7651 et seq.]), including units subject to section 405(g)(6) of the Clean Air Act [42 U.S.C. 7651d(g)(6)], for all years for which data are available, as well as the likely trend in such emissions over the following twenty-year period. The reports shall also contain estimates of the actual emission reduction in each year resulting from promulgation of the diesel fuel desulfurization regulations under section 214 [42 U.S.C. 7548].

"(b) 5.60 MILLION TON CAP.—Whenever the inventory required by this section indicates that sulfur dioxide

emissions from industrial sources, including units subject to section 405(g)(5) of the Clean Air Act [42 U.S.C. 7651d(g)(5)], may reasonably be expected to reach levels greater than 5.60 million tons per year, the Administrator of the Environmental Protection Agency shall take such actions under the Clean Air Act [42 U.S.C. 7401 et seq.] as may be appropriate to ensure that such emissions do not exceed 5.60 million tons per year. Such actions may include the promulgation of new and revised standards of performance for new sources, including units subject to section 405(g)(5) of the Clean Air Act, under section 111(b) of the Clean Air Act [42 U.S.C. 7411(b)], as well as promulgation of standards of performance for existing sources, including units subject to section 405(g)(5) of the Clean Air Act, under authority of this section. For an existing source regulated under this section, 'standard of performance' means a standard which the Administrator determines is applicable to that source and which reflects the degree of emission reduction achievable through the application of the best system of continuous emission reduction which (taking into consideration the cost of achieving such emission reduction, and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated for that category of sources.

''(c) ELECTION.—Regulations promulgated under section 405(b) of the Clean Air Act [42 U.S.C. 7651d(b)] shall not prohibit a source from electing to become an affected unit under section 410 of the Clean Air Act [42 U.S.C. 7651i].''

[For termination, effective May 15, 2000, of reporting provisions in section 406(a) of Pub. L. 101–549, set out above, see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance, and the 10th item on page 162 of House Document No. 103–7.]

SENSE OF CONGRESS ON EMISSION REDUCTIONS COSTS

Pub. L. 101–549, title IV, § 407, Nov. 15, 1990, 104 Stat. 2633, provided that: ''It is the sense of Congress that the Clean Air Act Amendments of 1990 [Pub. L. 101–549, see Tables for classification], through the allowance program, allocates the costs of achieving the required reductions in emissions of sulfur dioxide and oxides of nitrogen among sources in the United States. Broad based taxes and emissions fees that would provide for payment of the costs of achieving required emissions reductions by any party or parties other than the sources required to achieve the reductions are undesirable.''

MONITORING OF ACID RAIN PROGRAM IN CANADA

Pub. L. 101–549, title IV, § 408, Nov. 15, 1990, 104 Stat. 2633, provided that:

''(a) REPORTS TO CONGRESS.—The Administrator of the Environmental Protection Agency, in consultation with the Secretary of State, the Secretary of Energy, and other persons the Administrator deems appropriate, shall prepare and submit a report to Congress on January 1, 1994, January 1, 1999, and January 1, 2005.

''(b) CONTENTS.—The report to Congress shall analyze the current emission levels of sulfur dioxide and nitrogen oxides in each of the provinces participating in Canada's acid rain control program, the amount of emission reductions of sulfur dioxide and oxides of nitrogen achieved by each province, the methods utilized by each province in making those reductions, the costs to each province and the employment impacts in each province of making and maintaining those reductions.

''(c) COMPLIANCE.—Beginning on January 1, 1999, the reports shall also assess the degree to which each province is complying with its stated emissions cap.''

## § 7651a. Definitions

As used in this subchapter:

(1) The term ''affected source'' means a source that includes one or more affected units.

(2) The term ''affected unit'' means a unit that is subject to emission reduction requirements or limitations under this subchapter.

(3) The term ''allowance'' means an authorization, allocated to an affected unit by the Administrator under this subchapter, to emit, during or after a specified calendar year, one ton of sulfur dioxide.

(4) The term ''baseline'' means the annual quantity of fossil fuel consumed by an affected unit, measured in millions of British Thermal Units (''mmBtu's''), calculated as follows:

(A) For each utility unit that was in commercial operation prior to January 1, 1985, the baseline shall be the annual average quantity of mmBtu's consumed in fuel during calendar years 1985, 1986, and 1987, as recorded by the Department of Energy pursuant to Form 767. For any utility unit for which such form was not filed, the baseline shall be the level specified for such unit in the 1985 National Acid Precipitation Assessment Program (NAPAP) Emissions Inventory, Version 2, National Utility Reference File (NURF) or in a corrected data base as established by the Administrator pursuant to paragraph (3).[1] For nonutility units, the baseline is the NAPAP Emissions Inventory, Version 2. The Administrator, in the Administrator's sole discretion, may exclude periods during which a unit is shutdown for a continuous period of four calendar months or longer, and make appropriate adjustments under this paragraph. Upon petition of the owner or operator of any unit, the Administrator may make appropriate baseline adjustments for accidents that caused prolonged outages.

(B) For any other nonutility unit that is not included in the NAPAP Emissions Inventory, Version 2, or a corrected data base as established by the Administrator pursuant to paragraph (3),[1] the baseline shall be the annual average quantity, in mmBtu consumed in fuel by that unit, as calculated pursuant to a method which the administrator shall prescribe by regulation to be promulgated not later than eighteen months after November 15, 1990.

(C) The Administrator shall, upon application or on his own motion, by December 31, 1991, supplement data needed in support of this subchapter and correct any factual errors in data from which affected Phase II units' baselines or actual 1985 emission rates have been calculated. Corrected data shall be used for purposes of issuing allowances under the[2] subchapter. Such corrections shall not be subject to judicial review, nor shall the failure of the Administrator to correct an alleged factual error in such reports be subject to judicial review.

(5) The term ''capacity factor'' means the ratio between the actual electric output from a unit and the potential electric output from that unit.

---

[1] So in original. The reference to ''paragraph (3)'' probably should be to ''subparagraph (C)''.

[2] So in original. Probably should be ''this''.

(6) The term "compliance plan" means, for purposes of the requirements of this subchapter, either—

(A) a statement that the source will comply with all applicable requirements under this subchapter, or

(B) where applicable, a schedule and description of the method or methods for compliance and certification by the owner or operator that the source is in compliance with the requirements of this subchapter.

(7) The term "continuous emission monitoring system" (CEMS) means the equipment as required by section 7651k of this title, used to sample, analyze, measure, and provide on a continuous basis a permanent record of emissions and flow (expressed in pounds per million British thermal units (lbs/mmBtu), pounds per hour (lbs/hr) or such other form as the Administrator may prescribe by regulations under section 7651k of this title).

(8) The term "existing unit" means a unit (including units subject to section 7411 of this title) that commenced commercial operation before November 15, 1990. Any unit that commenced commercial operation before November 15, 1990, which is modified, reconstructed, or repowered after November 15, 1990, shall continue to be an existing unit for the purposes of this subchapter. For the purposes of this subchapter, existing units shall not include simple combustion turbines, or units which serve a generator with a nameplate capacity of 25MWe or less.

(9) The term "generator" means a device that produces electricity and which is reported as a generating unit pursuant to Department of Energy Form 860.

(10) The term "new unit" means a unit that commences commercial operation on or after November 15, 1990.

(11) The term "permitting authority" means the Administrator, or the State or local air pollution control agency, with an approved permitting program under part B[3] of title III of the Act.

(12) The term "repowering" means replacement of an existing coal-fired boiler with one of the following clean coal technologies: atmospheric or pressurized fluidized bed combustion, integrated gasification combined cycle, magnetohydrodynamics, direct and indirect coal-fired turbines, integrated gasification fuel cells, or as determined by the Administrator, in consultation with the Secretary of Energy, a derivative of one or more of these technologies, and any other technology capable of controlling multiple combustion emissions simultaneously with improved boiler or generation efficiency and with significantly greater waste reduction relative to the performance of technology in widespread commercial use as of November 15, 1990. Notwithstanding the provisions of section 7651h(a) of this title, for the purpose of this subchapter, the term "repowering" shall also include any oil and/or gas-fired unit which has been awarded clean coal technology demonstration funding as of January 1, 1991, by the Department of Energy.

(13) The term "reserve" means any bank of allowances established by the Administrator under this subchapter.

(14) The term "State" means one of the 48 contiguous States and the District of Columbia.

(15) The term "unit" means a fossil fuel-fired combustion device.

(16) The term "actual 1985 emission rate", for electric utility units means the annual sulfur dioxide or nitrogen oxides emission rate in pounds per million Btu as reported in the NAPAP Emissions Inventory, Version 2, National Utility Reference File. For nonutility units, the term "actual 1985 emission rate" means the annual sulfur dioxide or nitrogen oxides emission rate in pounds per million Btu as reported in the NAPAP Emission Inventory, Version 2.

(17)(A) The term "utility unit" means—

(i) a unit that serves a generator in any State that produces electricity for sale, or

(ii) a unit that, during 1985, served a generator in any State that produced electricity for sale.

(B) Notwithstanding subparagraph (A), a unit described in subparagraph (A) that—

(i) was in commercial operation during 1985, but

(ii) did not, during 1985, serve a generator in any State that produced electricity for sale shall not be a utility unit for purposes of this subchapter.

(C) A unit that cogenerates steam and electricity is not a "utility unit" for purposes of this subchapter unless the unit is constructed for the purpose of supplying, or commences construction after November 15, 1990, and supplies, more than one-third of its potential electric output capacity and more than 25 megawatts electrical output to any utility power distribution system for sale.

(18) The term "allowable 1985 emissions rate" means a federally enforceable emissions limitation for sulfur dioxide or oxides of nitrogen, applicable to the unit in 1985 or the limitation applicable in such other subsequent year as determined by the Administrator if such a limitation for 1985 does not exist. Where the emissions limitation for a unit is not expressed in pounds of emissions per million Btu, or the averaging period of that emissions limitation is not expressed on an annual basis, the Administrator shall calculate the annual equivalent of that emissions limitation in pounds per million Btu to establish the allowable 1985 emissions rate.

(19) The term "qualifying phase I technology" means a technological system of continuous emission reduction which achieves a 90 percent reduction in emissions of sulfur dioxide from the emissions that would have resulted from the use of fuels which were not subject to treatment prior to combustion.

(20) The term "alternative method of compliance" means a method of compliance in accordance with one or more of the following authorities:

_____
[3] See References in Text note below.

(A) a substitution plan submitted and approved in accordance with subsections[4] 7651c(b) and (c) of this title;

(B) a Phase I extension plan approved by the Administrator under section 7651c(d) of this title, using qualifying phase I technology as determined by the Administrator in accordance with that section; or

(C) repowering with a qualifying clean coal technology under section 7651h of this title.

(21) The term ''commenced'' as applied to construction of any new electric utility unit means that an owner or operator has undertaken a continuous program of construction or that an owner or operator has entered into a contractual obligation to undertake and complete, within a reasonable time, a continuous program of construction.

(22) The term ''commenced commercial operation'' means to have begun to generate electricity for sale.

(23) The term ''construction'' means fabrication, erection, or installation of an affected unit.

(24) The term ''industrial source'' means a unit that does not serve a generator that produces electricity, a ''nonutility unit'' as defined in this section, or a process source as defined in section 7651i(e)[5] of this title.

(25) The term ''nonutility unit'' means a unit other than a utility unit.

(26) The term ''designated representative'' means a responsible person or official authorized by the owner or operator of a unit to represent the owner or operator in matters pertaining to the holding, transfer, or disposition of allowances allocated to a unit, and the submission of and compliance with permits, permit applications, and compliance plans for the unit.

(27) The term ''life-of-the-unit, firm power contractual arrangement'' means a unit participation power sales agreement under which a utility or industrial customer reserves, or is entitled to receive, a specified amount or percentage of capacity and associated energy generated by a specified generating unit (or units) and pays its proportional amount of such unit's total costs, pursuant to a contract either—

(A) for the life of the unit;

(B) for a cumulative term of no less than 30 years, including contracts that permit an election for early termination; or

(C) for a period equal to or greater than 25 years or 70 percent of the economic useful life of the unit determined as of the time the unit was built, with option rights to purchase or re-lease some portion of the capacity and associated energy generated by the unit (or units) at the end of the period.

(28) The term ''basic Phase II allowance allocations'' means:

(A) For calendar years 2000 through 2009 inclusive, allocations of allowances made by the Administrator pursuant to section 7651b of this title and subsections (b)(1), (3), and

(4); (c)(1), (2), (3), and (5); (d)(1), (2), (4), and (5); (e); (f); (g)(1), (2), (3), (4), and (5); (h)(1); (i) and (j) of section 7651d of this title.

(B) For each calendar year beginning in 2010, allocations of allowances made by the Administrator pursuant to section 7651b of this title and subsections (b)(1), (3), and (4); (c)(1), (2), (3), and (5); (d)(1), (2), (4) and (5); (e); (f); (g)(1), (2), (3), and (5); (h)(1) and (3); (i) and (j) of section 7651d of this title.

(29) The term ''Phase II bonus allowance allocations'' means, for calendar year 2000 through 2009, inclusive, and only for such years, allocations made by the Administrator pursuant to section 7651b of this title, subsections (a)(2), (b)(2), (c)(4), (d)(3) (except as otherwise provided therein), and (h)(2) of section 7651d of this title, and section 7651e of this title.

(July 14, 1955, ch. 360, title IV, §402, as added Pub. L. 101–549, title IV, §401, Nov. 15, 1990, 104 Stat. 2585.)

REFERENCES IN TEXT

Part B of title III of the Act, referred to in par. (11), means title III of the Clean Air Act, act July 14, 1955, ch. 360, as added, which is classified to subchapter III of this chapter, but title III does not contain parts. For provisions of the Clean Air Act relating to permits, see subchapter V (§7661 et seq.) of this chapter.

CODIFICATION

Another section 402 of act July 14, 1955, as added by Pub. L. 91–604, §14, Dec. 31, 1970, 84 Stat. 1709, is classified to section 7641 of this title.

## § 7651b. Sulfur dioxide allowance program for existing and new units

### (a) Allocations of annual allowances for existing and new units

(1)[1] For the emission limitation programs under this subchapter, the Administrator shall allocate annual allowances for the unit, to be held or distributed by the designated representative of the owner or operator of each affected unit at an affected source in accordance with this subchapter, in an amount equal to the annual tonnage emission limitation calculated under section 7651c, 7651d, 7651e, 7651h, or 7651i of this title except as otherwise specifically provided elsewhere in this subchapter. Except as provided in sections 7651d(a)(2), 7651d(a)(3), 7651h and 7651i of this title, beginning January 1, 2000, the Administrator shall not allocate annual allowances to emit sulfur dioxide pursuant to section 7651d of this title in such an amount as would result in total annual emissions of sulfur dioxide from utility units in excess of 8.90 million tons except that the Administrator shall not take into account unused allowances carried forward by owners and operators of affected units or by other persons holding such allowances, following the year for which they were allocated. If necessary to meeting the restrictions imposed in the preceding sentence, the Administrator shall reduce, pro rata, the basic Phase II allowance allocations for each unit subject to the requirements of section 7651d of this title.

---

[4] So in original. Probably should be ''section''.

[5] So in original. Probably should be section ''7651i(d)''.

---

[1] So in original. No pars. (2) and (3) have been enacted.

Subject to the provisions of section 7651*o* of this title, the Administrator shall allocate allowances for each affected unit at an affected source annually, as provided in paragraphs (2) and (3)[1] and section 7651g of this title. Except as provided in sections 7651h and 7651i of this title, the removal of an existing affected unit or source from commercial operation at any time after November 15, 1990 (whether before or after January 1, 1995, or January 1, 2000) shall not terminate or otherwise affect the allocation of allowances pursuant to section 7651c or 7651d of this title to which the unit is entitled. Allowances shall be allocated by the Administrator without cost to the recipient, except for allowances sold by the Administrator pursuant to section 7651*o* of this title. Not later than December 31, 1991, the Administrator shall publish a proposed list of the basic Phase II allowance allocations, the Phase II bonus allowance allocations and, if applicable, allocations pursuant to section 7651d(a)(3) of this title for each unit subject to the emissions limitation requirements of section 7651d of this title for the year 2000 and the year 2010. After notice and opportunity for public comment, but not later than December 31, 1992, the Administrator shall publish a final list of such allocations, subject to the provisions of section 7651d(a)(2) of this title. Any owner or operator of an existing unit subject to the requirements of section 7651d(b) or (c) of this title who is considering applying for an extension of the emission limitation requirement compliance deadline for that unit from January 1, 2000, until not later than December 31, 2000, pursuant to section 7651h of this title, shall notify the Administrator no later than March 31, 1991. Such notification shall be used as the basis for estimating the basic Phase II allowances under this subsection. Prior to June 1, 1998, the Administrator shall publish a revised final statement of allowance allocations, subject to the provisions of section 7651d(a)(2) of this title and taking into account the effect of any compliance date extensions granted pursuant to section 7651h of this title on such allocations. Any person who may make an election concerning the amount of allowances to be allocated to a unit or units shall make such election and so inform the Administrator not later than March 31, 1991, in the case of an election under section 7651d of this title (or June 30, 1991, in the case of an election under section 7651e of this title). If such person fails to make such election, the Administrator shall set forth for each unit owned or operated by such person, the amount of allowances reflecting the election that would, in the judgment of the Administrator, provide the greatest benefit for the owner or operator of the unit. If such person is a Governor who may make an election under section 7651e of this title and the Governor fails to make an election, the Administrator shall set forth for each unit in the State the amount of allowances reflecting the election that would, in the judgment of the Administrator, provide the greatest benefit for units in the State.

**(b) Allowance transfer system**

Allowances allocated under this subchapter may be transferred among designated representatives of the owners or operators of affected sources under this subchapter and any other person who holds such allowances, as provided by the allowance system regulations to be promulgated by the Administrator not later than eighteen months after November 15, 1990. Such regulations shall establish the allowance system prescribed under this section, including, but not limited to, requirements for the allocation, transfer, and use of allowances under this subchapter. Such regulations shall prohibit the use of any allowance prior to the calendar year for which the allowance was allocated, and shall provide, consistent with the purposes of this subchapter, for the identification of unused allowances, and for such unused allowances to be carried forward and added to allowances allocated in subsequent years, including allowances allocated to units subject to Phase I requirements (as described in section 7651c of this title) which are applied to emissions limitations requirements in Phase II (as described in section 7651d of this title). Transfers of allowances shall not be effective until written certification of the transfer, signed by a responsible official of each party to the transfer, is received and recorded by the Administrator. Such regulations shall permit the transfer of allowances prior to the issuance of such allowances. Recorded pre-allocation transfers shall be deducted by the Administrator from the number of allowances which would otherwise be allocated to the transferor, and added to those allowances allocated to the transferee. Pre-allocation transfers shall not affect the prohibition contained in this subsection against the use of allowances prior to the year for which they are allocated.

**(c) Interpollutant trading**

Not later than January 1, 1994, the Administrator shall furnish to the Congress a study evaluating the environmental and economic consequences of amending this subchapter to permit trading sulfur dioxide allowances for nitrogen oxides allowances.

**(d) Allowance tracking system**

(1) The Administrator shall promulgate, not later than 18 months after November 15, 1990, a system for issuing, recording, and tracking allowances, which shall specify all necessary procedures and requirements for an orderly and competitive functioning of the allowance system. All allowance allocations and transfers shall, upon recordation by the Administrator, be deemed a part of each unit's permit requirements pursuant to section 7651g of this title, without any further permit review and revision.

(2) In order to insure electric reliability, such regulations shall not prohibit or affect temporary increases and decreases in emissions within utility systems, power pools, or utilities entering into allowance pool agreements, that result from their operations, including emergencies and central dispatch, and such temporary emissions increases and decreases shall not require transfer of allowances among units nor shall it require recordation. The owners or operators of such units shall act through a designated representative. Notwithstanding the preceding sentence, the total tonnage of emissions in any calendar year (calculated at the end thereof) from all units in such a utility system,

power pool, or allowance pool agreements shall not exceed the total allowances for such units for the calendar year concerned.

**(e) New utility units**

After January 1, 2000, it shall be unlawful for a new utility unit to emit an annual tonnage of sulfur dioxide in excess of the number of allowances to emit held for the unit by the unit's owner or operator. Such new utility units shall not be eligible for an allocation of sulfur dioxide allowances under subsection (a)(1) of this section, unless the unit is subject to the provisions of subsection (g)(2) or (3) of section 7651d of this title. New utility units may obtain allowances from any person, in accordance with this subchapter. The owner or operator of any new utility unit in violation of this subsection shall be liable for fulfilling the obligations specified in section 7651j of this title.

**(f) Nature of allowances**

An allowance allocated under this subchapter is a limited authorization to emit sulfur dioxide in accordance with the provisions of this subchapter. Such allowance does not constitute a property right. Nothing in this subchapter or in any other provision of law shall be construed to limit the authority of the United States to terminate or limit such authorization. Nothing in this section relating to allowances shall be construed as affecting the application of, or compliance with, any other provision of this chapter to an affected unit or source, including the provisions related to applicable National Ambient Air Quality Standards and State implementation plans. Nothing in this section shall be construed as requiring a change of any kind in any State law regulating electric utility rates and charges or affecting any State law regarding such State regulation or as limiting State regulation (including any prudency review) under such a State law. Nothing in this section shall be construed as modifying the Federal Power Act [16 U.S.C. 791a et seq.] or as affecting the authority of the Federal Energy Regulatory Commission under that Act. Nothing in this subchapter shall be construed to interfere with or impair any program for competitive bidding for power supply in a State in which such program is established. Allowances, once allocated to a person by the Administrator, may be received, held, and temporarily or permanently transferred in accordance with this subchapter and the regulations of the Administrator without regard to whether or not a permit is in effect under subchapter V of this chapter or section 7651g of this title with respect to the unit for which such allowance was originally allocated and recorded. Each permit under this subchapter and each permit issued under subchapter V of this chapter for any affected unit shall provide that the affected unit may not emit an annual tonnage of sulfur dioxide in excess of the allowances held for that unit.

**(g) Prohibition**

It shall be unlawful for any person to hold, use, or transfer any allowance allocated under this subchapter, except in accordance with regulations promulgated by the Administrator. It shall be unlawful for any affected unit to emit

sulfur dioxide in excess of the number of allowances held for that unit for that year by the owner or operator of the unit. Upon the allocation of allowances under this subchapter, the prohibition contained in the preceding sentence shall supersede any other emission limitation applicable under this subchapter to the units for which such allowances are allocated. Allowances may not be used prior to the calendar year for which they are allocated. Nothing in this section or in the allowance system regulations shall relieve the Administrator of the Administrator's permitting, monitoring and enforcement obligations under this chapter, nor relieve affected sources of their requirements and liabilities under this chapter.

**(h) Competitive bidding for power supply**

Nothing in this subchapter shall be construed to interfere with or impair any program for competitive bidding for power supply in a State in which such program is established.

**(i) Applicability of antitrust laws**

(1) Nothing in this section affects—

(A) the applicability of the antitrust laws to the transfer, use, or sale of allowances, or

(B) the authority of the Federal Energy Regulatory Commission under any provision of law respecting unfair methods of competition or anticompetitive acts or practices.

(2) As used in this section, "antitrust laws" means those Acts set forth in section 12 of title 15.

**(j) Public Utility Holding Company Act**

The acquisition or disposition of allowances pursuant to this subchapter including the issuance of securities or the undertaking of any other financing transaction in connection with such allowances shall not be subject to the provisions of the Public Utility Holding Company Act of 1935.[2]

(July 14, 1955, ch. 360, title IV, § 403, as added Pub. L. 101–549, title IV, § 401, Nov. 15, 1990, 104 Stat. 2589.)

REFERENCES IN TEXT

The Federal Power Act, referred to in subsec. (f), is act June 10, 1920, ch. 285, 41 Stat. 1063, as amended, which is classified generally to chapter 12 (§ 791a et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see section 791a of Title 16 and Tables.

The Public Utility Holding Company Act of 1935, referred to in subsec. (j), is title I of act Aug. 26, 1935, ch. 687, 49 Stat. 803, as amended, which was classified generally to chapter 2C (§ 79 et seq.) of Title 15, Commerce and Trade, prior to repeal by Pub. L. 109–58, title XII, § 1263, Aug. 8, 2005, 119 Stat. 974. For complete classification of this Act to the Code, see Tables.

CODIFICATION

Another section 403 of act July 14, 1955, as added by Pub. L. 91–604, § 14, Dec. 31, 1970, 84 Stat. 1710, is classified to section 7642 of this title.

FOSSIL FUEL USE

Pub. L. 101–549, title IV, § 402, Nov. 15, 1990, 104 Stat. 2631, provided that:

"(a) CONTRACTS FOR HYDROELECTRIC ENERGY.—Any person who, after the date of the enactment of the

---

[2] See References in Text note below.

Clean Air Act Amendments of 1990 [Nov. 15, 1990], enters into a contract under which such person receives hydroelectric energy in return for the provision of electric energy by such person shall use allowances held by such person as necessary to satisfy such person's obligations under such contract.

''(b) FEDERAL POWER MARKETING ADMINISTRATION.—A Federal Power Marketing Administration shall not be subject to the provisions and requirements of this title [enacting this subchapter, amending sections 7410, 7411, and 7479 of this title, and enacting provisions set out as notes under sections 7403, 7411, and 7651 of this title] with respect to electric energy generated by hydroelectric facilities and marketed by such Power Marketing Administration. Any person who sells or provides electric energy to a Federal Power Marketing Administration shall comply with the provisions and requirements of this title.''

## § 7651c. Phase I sulfur dioxide requirements

### (a) Emission limitations

(1) After January 1, 1995, each source that includes one or more affected units listed in table A is an affected source under this section. After January 1, 1995, it shall be unlawful for any affected unit (other than an eligible phase I unit under subsection (d)(2) of this section) to emit sulfur dioxide in excess of the tonnage limitation stated as a total number of allowances in table A for phase I, unless (A) the emissions reduction requirements applicable to such unit have been achieved pursuant to subsection (b) or (d) of this section, or (B) the owner or operator of such unit holds allowances to emit not less than the unit's total annual emissions, except that, after January 1, 2000, the emissions limitations established in this section shall be superseded by those established in section 7651d of this title. The owner or operator of any unit in violation of this section shall be fully liable for such violation including, but not limited to, liability for fulfilling the obligations specified in section 7651j of this title.

(2) Not later than December 31, 1991, the Administrator shall determine the total tonnage of reductions in the emissions of sulfur dioxide from all utility units in calendar year 1995 that will occur as a result of compliance with the emissions limitation requirements of this section, and shall establish a reserve of allowances equal in amount to the number of tons determined thereby not to exceed a total of 3.50 million tons. In making such a determination, the Administrator shall compute for each unit subject to the emissions limitation requirements of this section the difference between:

(A) the product of its baseline multiplied by the lesser of each unit's allowable 1985 emissions rate and its actual 1985 emissions rate, divided by 2,000, and

(B) the product of each unit's baseline multiplied by 2.50 lbs/mmBtu divided by 2,000,

and sum the computations. The Administrator shall adjust the foregoing calculation to reflect projected calendar year 1995 utilization of the units subject to the emissions limitations of this subchapter that the Administrator finds would have occurred in the absence of the imposition of such requirements. Pursuant to subsection (d) of this section, the Administrator shall allocate allowances from the reserve established hereinunder until the earlier of such time

as all such allowances in the reserve are allocated or December 31, 1999.

(3) In addition to allowances allocated pursuant to paragraph (1), in each calendar year beginning in 1995 and ending in 1999, inclusive, the Administrator shall allocate for each unit on Table A that is located in the States of Illinois, Indiana, or Ohio (other than units at Kyger Creek, Clifty Creek and Joppa Steam), allowances in an amount equal to 200,000 multiplied by the unit's pro rata share of the total number of allowances allocated for all units on Table A in the 3 States (other than units at Kyger Creek, Clifty Creek, and Joppa Steam) pursuant to paragraph (1). Such allowances shall be excluded from the calculation of the reserve under paragraph (2).

### (b) Substitutions

The owner or operator of an affected unit under subsection (a) of this section may include in its section 7651g of this title permit application and proposed compliance plan a proposal to reassign, in whole or in part, the affected unit's sulfur dioxide reduction requirements to any other unit(s) under the control of such owner or operator. Such proposal shall specify—

(1) the designation of the substitute unit or units to which any part of the reduction obligations of subsection (a) of this section shall be required, in addition to, or in lieu of, any original affected units designated under such subsection;

(2) the original affected unit's baseline, the actual and allowable 1985 emissions rate for sulfur dioxide, and the authorized annual allowance allocation stated in table A;

(3) calculation of the annual average tonnage for calendar years 1985, 1986, and 1987, emitted by the substitute unit or units, based on the baseline for each unit, as defined in section 7651a(d)[1] of this title, multiplied by the lesser of the unit's actual or allowable 1985 emissions rate;

(4) the emissions rates and tonnage limitations that would be applicable to the original and substitute affected units under the substitution proposal;

(5) documentation, to the satisfaction of the Administrator, that the reassigned tonnage limits will, in total, achieve the same or greater emissions reduction than would have been achieved by the original affected unit and the substitute unit or units without such substitution; and

(6) such other information as the Administrator may require.

### (c) Administrator's action on substitution proposals

(1) The Administrator shall take final action on such substitution proposal in accordance with section 7651g(c) of this title if the substitution proposal fulfills the requirements of this subsection. The Administrator may approve a substitution proposal in whole or in part and with such modifications or conditions as may be consistent with the orderly functioning of the allowance system and which will ensure the emissions reductions contemplated by this sub-

---

[1] So in original. Probably should be section ''7651a(4)''.

chapter. If a proposal does not meet the requirements of subsection (b) of this section, the Administrator shall disapprove it. The owner or operator of a unit listed in table A shall not substitute another unit or units without the prior approval of the Administrator.

(2) Upon approval of a substitution proposal, each substitute unit, and each source with such unit, shall be deemed affected under this subchapter, and the Administrator shall issue a permit to the original and substitute affected source and unit in accordance with the approved substitution plan and section 7651i of this title. The Administrator shall allocate allowances for the original and substitute affected units in accordance with the approved substitution proposal pursuant to section 7651b of this title. It shall be unlawful for any source or unit that is allocated allowances pursuant to this section to emit sulfur dioxide in excess of the emissions limitation provided for in the approved substitution permit and plan unless the owner or operator of such unit governed by the permit and approved substitution plan holds allowances to emit not less than the units[2] total annual emissions. The owner or operator of any original or substitute affected unit operated in violation of this subsection shall be fully liable for such violation, including liability for fulfilling the obligations specified in section 7651j of this title. If a substitution proposal is disapproved, the Administrator shall allocate allowances to the original affected unit or units in accordance with subsection (a) of this section.

**(d) Eligible phase I extension units**

(1) The owner or operator of any affected unit subject to an emissions limitation requirement under this section may petition the Administrator in its permit application under section 7651g of this title for an extension of 2 years of the deadline for meeting such requirement, provided that the owner or operator of any such unit holds allowances to emit not less than the unit's total annual emissions for each of the 2 years of the period of extension. To qualify for such an extension, the affected unit must either employ a qualifying phase I technology, or transfer its phase I emissions reduction obligation to a unit employing a qualifying phase I technology. Such transfer shall be accomplished in accordance with a compliance plan, submitted and approved under section 7651g of this title, that shall govern operations at all units included in the transfer, and that specifies the emissions reduction requirements imposed pursuant to this subchapter.

(2) Such extension proposal shall—

(A) specify the unit or units proposed for designation as an eligible phase I extension unit;

(B) provide a copy of an executed contract, which may be contingent upon the Administrator approving the proposal, for the design engineering, and construction of the qualifying phase I technology for the extension unit, or for the unit or units to which the extension unit's emission reduction obligation is to be transferred;

(C) specify the unit's or units' baseline, actual 1985 emissions rate, allowable 1985 emissions rate, and projected utilization for calendar years 1995 through 1999;

(D) require CEMS on both the eligible phase I extension unit or units and the transfer unit or units beginning no later than January 1, 1995; and

(E) specify the emission limitation and number of allowances expected to be necessary for annual operation after the qualifying phase I technology has been installed.

(3) The Administrator shall review and take final action on each extension proposal in order of receipt, consistent with section 7651g of this title, and for an approved proposal shall designate the unit or units as an eligible phase I extension unit. The Administrator may approve an extension proposal in whole or in part, and with such modifications or conditions as may be necessary, consistent with the orderly functioning of the allowance system, and to ensure the emissions reductions contemplated by the[3] subchapter.

(4) In order to determine the number of proposals eligible for allocations from the reserve under subsection (a)(2) of this section and the number of allowances remaining available after each proposal is acted upon, the Administrator shall reduce the total number of allowances remaining available in the reserve by the number of allowances calculated according to subparagraphs (A), (B) and (C) until either no allowances remain available in the reserve for further allocation or all approved proposals have been acted upon. If no allowances remain available in the reserve for further allocation before all proposals have been acted upon by the Administrator, any pending proposals shall be disapproved. The Administrator shall calculate allowances equal to—

(A) the difference between the lesser of the average annual emissions in calendar years 1988 and 1989 or the projected emissions tonnage for calendar year 1995 of each eligible phase I extension unit, as designated under paragraph (3), and the product of the unit's baseline multiplied by an emission rate of 2.50 lbs/mmBtu, divided by 2,000;

(B) the difference between the lesser of the average annual emissions in calendar years 1988 and 1989 or the projected emissions tonnage for calendar year 1996 of each eligible phase I extension unit, as designated under paragraph (3), and the product of the unit's baseline multiplied by an emission rate of 2.50 lbs/mmBtu, divided by 2,000; and

(C) the amount by which (i) the product of each unit's baseline multiplied by an emission rate of 1.20 lbs/mmBtu, divided by 2,000, exceeds (ii) the tonnage level specified under subparagraph (E) of paragraph (2) of this subsection multiplied by a factor of 3.

(5) Each eligible Phase I extension unit shall receive allowances determined under subsection (a)(1) or (c) of this section. In addition, for calendar year 1995, the Administrator shall allocate to each eligible Phase I extension unit, from the

---

[2] So in original. Probably should be ''unit's''.

[3] So in original. Probably should be ''this''.

allowance reserve created pursuant to subsection (a)(2) of this section, allowances equal to the difference between the lesser of the average annual emissions in calendar years 1988 and 1989 or its projected emissions tonnage for calendar year 1995 and the product of the unit's baseline multiplied by an emission rate of 2.50 lbs/mmBtu, divided by 2,000. In calendar year 1996, the Administrator shall allocate for each eligible unit, from the allowance reserve created pursuant to subsection (a)(2) of this section, allowances equal to the difference between the lesser of the average annual emissions in calendar years 1988 and 1989 or its projected emissions tonnage for calendar year 1996 and the product of the unit's baseline multiplied by an emission rate of 2.50 lbs/mmBtu, divided by 2,000. It shall be unlawful for any source or unit subject to an approved extension plan under this subsection to emit sulfur dioxide in excess of the emissions limitations provided for in the permit and approved extension plan, unless the owner or operator of each unit governed by the permit and approved plan holds allowances to emit not less than the unit's total annual emissions.

(6) In addition to allowances specified in paragraph (5), the Administrator shall allocate for each eligible Phase I extension unit employing qualifying Phase I technology, for calendar years 1997, 1998, and 1999, additional allowances, from any remaining allowances in the reserve created pursuant to subsection (a)(2) of this section, following the reduction in the reserve provided for in paragraph (4), not to exceed the amount by which (A) the product of each eligible unit's baseline times an emission rate of 1.20 lbs/mmBtu, divided by 2,000, exceeds (B) the tonnage level specified under subparagraph (E) of paragraph (2) of this subsection.

(7) After January 1, 1997, in addition to any liability under this chapter, including under section 7651j of this title, if any eligible phase I extension unit employing qualifying phase I technology or any transfer unit under this subsection emits sulfur dioxide in excess of the annual tonnage limitation specified in the extension plan, as approved in paragraph (3) of this subsection, the Administrator shall, in the calendar year following such excess, deduct allowances equal to the amount of such excess from such unit's annual allowance allocation.

**(e) Allocation of allowances**

(1) In the case of a unit that receives authorization from the Governor of the State in which such unit is located to make reductions in the emissions of sulfur dioxide prior to calendar year 1995 and that is part of a utility system that meets the following requirements: (A) the total coal-fired generation within the utility system as a percentage of total system generation decreased by more than 20 percent between January 1, 1980, and December 31, 1985; and (B) the weighted capacity factor of all coal-fired units within the utility system averaged over the period from January 1, 1985, through December 31, 1987, was below 50 percent, the Administrator shall allocate allowances under this paragraph for the unit pursuant to this subsection. The Administrator shall allocate allowances for a unit that is an affected unit pursuant to section 7651d of this title (but is not also an affected unit under this section) and part of a utility system that includes 1 or more affected units under section 7651d of this title for reductions in the emissions of sulfur dioxide made during the period 1995–1999 if the unit meets the requirements of this subsection and the requirements of the preceding sentence, except that for the purposes of applying this subsection to any such unit, the prior year concerned as specified below, shall be any year after January 1, 1995 but prior to January 1, 2000.

(2) In the case of an affected unit under this section described in subparagraph (A),[4] the allowances allocated under this subsection for early reductions in any prior year may not exceed the amount which (A) the product of the unit's baseline multiplied by the unit's 1985 actual sulfur dioxide emission rate (in lbs. per mmBtu), divided by 2,000, exceeds (B) the allowances specified for such unit in Table A. In the case of an affected unit under section 7651d of this title described in subparagraph (A),[4] the allowances awarded under this subsection for early reductions in any prior year may not exceed the amount by which (i) the product of the quantity of fossil fuel consumed by the unit (in mmBtu) in the prior year multiplied by the lesser of 2.50 or the most stringent emission rate (in lbs. per mmBtu) applicable to the unit under the applicable implementation plan, divided by 2,000, exceeds (ii) the unit's actual tonnage of sulfur dioxide emission for the prior year concerned. Allowances allocated under this subsection for units referred to in subparagraph (A)[4] may be allocated only for emission reductions achieved as a result of physical changes or changes in the method of operation made after November 15, 1990, including changes in the type or quality of fossil fuel consumed.

(3) In no event shall the provisions of this paragraph[5] be interpreted as an event of force majeur[6] or a commercial impracticibility[7] or in any other way as a basis for excused non-performance by a utility system under a coal sales contract in effect before November 15, 1990.

TABLE A.—AFFECTED SOURCES AND UNITS IN PHASE I
AND THEIR SULFUR DIOXIDE ALLOWANCES (TONS)

| State | Plant Name | Generator | Phase I Allowances |
|---|---|---|---|
| Alabama .......... | Colbert ................ | 1 | 13,570 |
| | | 2 | 15,310 |
| | | 3 | 15,400 |
| | | 4 | 15,410 |
| | | 5 | 37,180 |
| | E.C. Gaston ......... | 1 | 18,100 |
| | | 2 | 18,540 |
| | | 3 | 18,310 |
| | | 4 | 19,280 |
| | | 5 | 59,840 |
| Florida ............ | Big Bend ............. | 1 | 28,410 |
| | | 2 | 27,100 |
| | | 3 | 26,740 |
| | Crist ................... | 6 | 19,200 |
| | | 7 | 31,680 |

---

[4] So in original. Probably should be "paragraph (1)".
[5] So in original. Probably should be "subsection".
[6] So in original. Probably should be "majeure".
[7] So in original. Probably should be "impracticability".

TABLE A.—AFFECTED SOURCES AND UNITS IN PHASE I AND THEIR SULFUR DIOXIDE ALLOWANCES (TONS)—CONTINUED

| State | Plant Name | Generator | Phase I Allowances |
|---|---|---|---|
| Georgia | Bowen | 1 | 56,320 |
| | | 2 | 54,770 |
| | | 3 | 71,750 |
| | | 4 | 71,740 |
| | Hammond | 1 | 8,780 |
| | | 2 | 9,220 |
| | | 3 | 8,910 |
| | | 4 | 37,640 |
| | J. McDonough | 1 | 19,910 |
| | | 2 | 20,600 |
| | Wansley | 1 | 70,770 |
| | | 2 | 65,430 |
| | Yates | 1 | 7,210 |
| | | 2 | 7,040 |
| | | 3 | 6,950 |
| | | 4 | 8,910 |
| | | 5 | 9,410 |
| | | 6 | 24,760 |
| | | 7 | 21,480 |
| Illinois | Baldwin | 1 | 42,010 |
| | | 2 | 44,420 |
| | | 3 | 42,550 |
| | Coffeen | 1 | 11,790 |
| | | 2 | 35,670 |
| | Grand Tower | 4 | 5,910 |
| | Hennepin | 2 | 18,410 |
| | Joppa Steam | 1 | 12,590 |
| | | 2 | 10,770 |
| | | 3 | 12,270 |
| | | 4 | 11,360 |
| | | 5 | 11,420 |
| | | 6 | 10,620 |
| | Kincaid | 1 | 31,530 |
| | | 2 | 33,810 |
| | Meredosia | 3 | 13,890 |
| | Vermilion | 2 | 8,880 |
| Indiana | Bailly | 7 | 11,180 |
| | | 8 | 15,630 |
| | Breed | 1 | 18,500 |
| | Cayuga | 1 | 33,370 |
| | | 2 | 34,130 |
| | Clifty Creek | 1 | 20,150 |
| | | 2 | 19,810 |
| | | 3 | 20,410 |
| | | 4 | 20,080 |
| | | 5 | 19,360 |
| | | 6 | 20,380 |
| | E. W. Stout | 5 | 3,880 |
| | | 6 | 4,770 |
| | | 7 | 23,610 |
| | F. B. Culley | 2 | 4,290 |
| | | 3 | 16,970 |
| | F. E. Ratts | 1 | 8,330 |
| | | 2 | 8,480 |
| | Gibson | 1 | 40,400 |
| | | 2 | 41,010 |
| | | 3 | 41,080 |
| | | 4 | 40,320 |
| | H. T. Pritchard | 6 | 5,770 |
| | Michigan City | 12 | 23,310 |
| | Petersburg | 1 | 16,430 |
| | | 2 | 32,380 |
| | R. Gallagher | 1 | 6,490 |
| | | 2 | 7,280 |
| | | 3 | 6,530 |
| | | 4 | 7,650 |
| | Tanners Creek | 4 | 24,820 |
| | Wabash River | 1 | 4,000 |
| | | 2 | 2,860 |
| | | 3 | 3,750 |
| | | 5 | 3,670 |
| | | 6 | 12,280 |

TABLE A.—AFFECTED SOURCES AND UNITS IN PHASE I AND THEIR SULFUR DIOXIDE ALLOWANCES (TONS)—CONTINUED

| State | Plant Name | Generator | Phase I Allowances |
|---|---|---|---|
| | Warrick | 4 | 26,980 |
| Iowa | Burlington | 1 | 10,710 |
| | Des Moines | 7 | 2,320 |
| | George Neal | 1 | 1,290 |
| | M.L. Kapp | 2 | 13,800 |
| | Prairie Creek | 4 | 8,180 |
| | Riverside | 5 | 3,990 |
| Kansas | Quindaro | 2 | 4,220 |
| Kentucky | Coleman | 1 | 11,250 |
| | | 2 | 12,840 |
| | | 3 | 12,340 |
| | Cooper | 1 | 7,450 |
| | | 2 | 15,320 |
| | E.W. Brown | 1 | 7,110 |
| | | 2 | 10,910 |
| | | 3 | 26,100 |
| | Elmer Smith | 1 | 6,520 |
| | | 2 | 14,410 |
| | Ghent | 1 | 28,410 |
| | Green River | 4 | 7,820 |
| | H.L. Spurlock | 1 | 22,780 |
| | Henderson II | 1 | 13,340 |
| | | 2 | 12,310 |
| | Paradise | 3 | 59,170 |
| | Shawnee | 10 | 10,170 |
| Maryland | Chalk Point | 1 | 21,910 |
| | | 2 | 24,330 |
| | C. P. Crane | 1 | 10,330 |
| | | 2 | 9,230 |
| | Morgantown | 1 | 35,260 |
| | | 2 | 38,480 |
| Michigan | J. H. Campbell | 1 | 19,280 |
| | | 2 | 23,060 |
| Minnesota | High Bridge | 6 | 4,270 |
| Mississippi | Jack Watson | 4 | 17,910 |
| | | 5 | 36,700 |
| Missouri | Asbury | 1 | 16,190 |
| | James River | 5 | 4,850 |
| | Labadie | 1 | 40,110 |
| | | 2 | 37,710 |
| | | 3 | 40,310 |
| | | 4 | 35,940 |
| | Montrose | 1 | 7,390 |
| | | 2 | 8,200 |
| | | 3 | 10,090 |
| | New Madrid | 1 | 28,240 |
| | | 2 | 32,480 |
| | Sibley | 3 | 15,580 |
| | Sioux | 1 | 22,570 |
| | | 2 | 23,690 |
| | Thomas Hill | 1 | 10,250 |
| | | 2 | 19,390 |
| New Hampshire | Merrimack | 1 | 10,190 |
| | | 2 | 22,000 |
| New Jersey | B.L. England | 1 | 9,060 |
| | | 2 | 11,720 |
| New York | Dunkirk | 3 | 12,600 |
| | | 4 | 14,060 |
| | Greenidge | 4 | 7,540 |
| | Milliken | 1 | 11,170 |
| | | 2 | 12,410 |
| | Northport | 1 | 19,810 |
| | | 2 | 24,110 |
| | | 3 | 26,480 |
| | Port Jefferson | 3 | 10,470 |
| | | 4 | 12,330 |
| Ohio | Ashtabula | 5 | 16,740 |
| | Avon Lake | 8 | 11,650 |
| | | 9 | 30,480 |
| | Cardinal | 1 | 34,270 |
| | | 2 | 38,320 |

TABLE A.—AFFECTED SOURCES AND UNITS IN PHASE I AND THEIR SULFUR DIOXIDE ALLOWANCES (TONS)—CONTINUED

| State | Plant Name | Generator | Phase I Allowances |
|-------|-----------|-----------|--------------------|
| | Conesville | 1 | 4,210 |
| | | 2 | 4,890 |
| | | 3 | 5,500 |
| | | 4 | 48,770 |
| | Eastlake | 1 | 7,800 |
| | | 2 | 8,640 |
| | | 3 | 10,020 |
| | | 4 | 14,510 |
| | | 5 | 34,070 |
| | Edgewater | 4 | 5,050 |
| | Gen. J.M. Gavin | 1 | 79,080 |
| | | 2 | 80,560 |
| | Kyger Creek | 1 | 19,280 |
| | | 2 | 18,560 |
| | | 3 | 17,910 |
| | | 4 | 18,710 |
| | | 5 | 18,740 |
| | Miami Fort | 5 | 760 |
| | | 6 | 11,380 |
| | | 7 | 38,510 |
| | Muskingum River | 1 | 14,880 |
| | | 2 | 14,170 |
| | | 3 | 13,950 |
| | | 4 | 11,780 |
| | | 5 | 40,470 |
| | Niles | 1 | 6,940 |
| | | 2 | 9,100 |
| | Picway | 5 | 4,930 |
| | R.E. Burger | 3 | 6,150 |
| | | 4 | 10,780 |
| | | 5 | 12,430 |
| | W.H. Sammis | 5 | 24,170 |
| | | 6 | 39,930 |
| | | 7 | 43,220 |
| | W.C. Beckjord | 5 | 8,950 |
| | | 6 | 23,020 |
| Pennsylvania | Armstrong | 1 | 14,410 |
| | | 2 | 15,430 |
| | Brunner Island | 1 | 27,760 |
| | | 2 | 31,100 |
| | | 3 | 53,820 |
| | Cheswick | 1 | 39,170 |
| | Conemaugh | 1 | 59,790 |
| | | 2 | 66,450 |
| | Hatfield's Ferry | 1 | 37,830 |
| | | 2 | 37,320 |
| | | 3 | 40,270 |
| | Martins Creek | 1 | 12,660 |
| | | 2 | 12,820 |
| | Portland | 1 | 5,940 |
| | | 2 | 10,230 |
| | Shawville | 1 | 10,320 |
| | | 2 | 10,320 |
| | | 3 | 14,220 |
| | | 4 | 14,070 |
| | Sunbury | 3 | 8,760 |
| | | 4 | 11,450 |
| Tennessee | Allen | 1 | 15,320 |
| | | 2 | 16,770 |
| | | 3 | 15,670 |
| | Cumberland | 1 | 86,700 |
| | | 2 | 94,840 |
| | Gallatin | 1 | 17,870 |
| | | 2 | 17,310 |
| | | 3 | 20,020 |
| | | 4 | 21,260 |

TABLE A.—AFFECTED SOURCES AND UNITS IN PHASE I AND THEIR SULFUR DIOXIDE ALLOWANCES (TONS)—CONTINUED

| State | Plant Name | Generator | Phase I Allowances |
|-------|-----------|-----------|--------------------|
| | Johnsonville | 1 | 7,790 |
| | | 2 | 8,040 |
| | | 3 | 8,410 |
| | | 4 | 7,990 |
| | | 5 | 8,240 |
| | | 6 | 7,890 |
| | | 7 | 8,980 |
| | | 8 | 8,700 |
| | | 9 | 7,080 |
| | | 10 | 7,550 |
| West Virginia | Albright | 3 | 12,000 |
| | Fort Martin | 1 | 41,590 |
| | | 2 | 41,200 |
| | Harrison | 1 | 48,620 |
| | | 2 | 46,150 |
| | | 3 | 41,500 |
| | Kammer | 1 | 18,740 |
| | | 2 | 19,460 |
| | | 3 | 17,390 |
| | Mitchell | 1 | 43,980 |
| | | 2 | 45,510 |
| | Mount Storm | 1 | 43,720 |
| | | 2 | 35,580 |
| | | 3 | 42,430 |
| Wisconsin | Edgewater | 4 | 24,750 |
| | La Crosse/Genoa | 3 | 22,700 |
| | Nelson Dewey | 1 | 6,010 |
| | | 2 | 6,680 |
| | N. Oak Creek | 1 | 5,220 |
| | | 2 | 5,140 |
| | | 3 | 5,370 |
| | | 4 | 6,320 |
| | Pulliam | 8 | 7,510 |
| | S. Oak Creek | 5 | 9,670 |
| | | 6 | 12,040 |
| | | 7 | 16,180 |
| | | 8 | 15,790 |

**(f) Energy conservation and renewable energy**

**(1) Definitions**

As used in this subsection:

**(A) Qualified energy conservation measure**

The term ''qualified energy conservation measure'' means a cost effective measure, as identified by the Administrator in consultation with the Secretary of Energy, that increases the efficiency of the use of electricity provided by an electric utility to its customers.

**(B) Qualified renewable energy**

The term ''qualified renewable energy'' means energy derived from biomass, solar, geothermal, or wind as identified by the Administrator in consultation with the Secretary of Energy.

**(C) Electric utility**

The term ''electric utility'' means any person, State agency, or Federal agency, which sells electric energy.

**(2) Allowances for emissions avoided through energy conservation and renewable energy**

**(A) In general**

The regulations under paragraph (4) of this subsection shall provide that for each ton of sulfur dioxide emissions avoided by an elec-

tric utility, during the applicable period, through the use of qualified energy conservation measures or qualified renewable energy, the Administrator shall allocate a single allowance to such electric utility, on a first-come-first-served basis from the Conservation and Renewable Energy Reserve established under subsection (g) of this section, up to a total of 300,000 allowances for allocation from such Reserve.

**(B) Requirements for issuance**

The Administrator shall allocate allowances to an electric utility under this subsection only if all of the following requirements are met:

(i) Such electric utility is paying for the qualified energy conservation measures or qualified renewable energy directly or through purchase from another person.

(ii) The emissions of sulfur dioxide avoided through the use of qualified energy conservation measures or qualified renewable energy are quantified in accordance with regulations promulgated by the Administrator under this subsection.

(iii)(I) Such electric utility has adopted and is implementing a least cost energy conservation and electric power plan which evaluates a range of resources, including new power supplies, energy conservation, and renewable energy resources, in order to meet expected future demand at the lowest system cost.

(II) The qualified energy conservation measures or qualified renewable energy, or both, are consistent with that plan.

(III) Electric utilities subject to the jurisdiction of a State regulatory authority must have such plan approved by such authority. For electric utilities not subject to the jurisdiction of a State regulatory authority such plan shall be approved by the entity with rate-making authority for such utility.

(iv) In the case of qualified energy conservation measures undertaken by a State regulated electric utility, the Secretary of Energy certifies that the State regulatory authority with jurisdiction over the electric rates of such electric utility has established rates and charges which ensure that the net income of such electric utility after implementation of specific cost effective energy conservation measures is at least as high as such net income would have been if the energy conservation measures had not been implemented. Upon the date of any such certification by the Secretary of Energy, all allowances which, but for this paragraph, would have been allocated under subparagraph (A) before such date, shall be allocated to the electric utility. This clause is not a requirement for qualified renewable energy.

(v) Such utility or any subsidiary of the utility's holding company owns or operates at least one affected unit.

**(C) Period of applicability**

Allowances under this subsection shall be allocated only with respect to kilowatt hours of electric energy saved by qualified energy conservation measures or generated by qualified renewable energy after January 1, 1992 and before the earlier of (i) December 31, 2000, or (ii) the date on which any electric utility steam generating unit owned or operated by the electric utility to which the allowances are allocated becomes subject to this subchapter (including those sources that elect to become affected by this subchapter, pursuant to section 7651i of this title).

**(D) Determination of avoided emissions**

**(i) [8] Application**

In order to receive allowances under this subsection, an electric utility shall make an application which—

(I) designates the qualified energy conservation measures implemented and the qualified renewable energy sources used for purposes of avoiding emissions,[9]

(II) calculates, in accordance with subparagraphs (F) and (G), the number of tons of emissions avoided by reason of the implementation of such measures or the use of such renewable energy sources; and

(III) demonstrates that the requirements of subparagraph (B) have been met.

Such application for allowances by a State-regulated electric utility shall require approval by the State regulatory authority with jurisdiction over such electric utility. The authority shall review the application for accuracy and compliance with this subsection and the rules under this subsection. Electric utilities whose retail rates are not subject to the jurisdiction of a State regulatory authority shall apply directly to the Administrator for such approval.

**(E) Avoided emissions from qualified energy conservation measures**

For the purposes of this subsection, the emission tonnage deemed avoided by reason of the implementation of qualified energy conservation measures for any calendar year shall be a tonnage equal to the product of multiplying—

(i) the kilowatt hours that would otherwise have been supplied by the utility during such year in the absence of such qualified energy conservation measures, by

(ii) 0.004,

and dividing by 2,000.

**(F) Avoided emissions from the use of qualified renewable energy**

The emissions tonnage deemed avoided by reason of the use of qualified renewable energy by an electric utility for any calendar year shall be a tonnage equal to the product of multiplying—

(i) the actual kilowatt hours generated by, or purchased from, qualified renewable energy, by

_____

[8] So in original. There is no cl. (ii).

[9] So in original. The comma probably should be a semicolon.

(ii) 0.004,

and dividing by 2,000.

### (G) Prohibitions

(i) No allowances shall be allocated under this subsection for the implementation of programs that are exclusively informational or educational in nature.

(ii) No allowances shall be allocated for energy conservation measures or renewable energy that were operational before January 1, 1992.

### (3) Savings provision

Nothing in this subsection precludes a State or State regulatory authority from providing additional incentives to utilities to encourage investment in demand-side resources.

### (4) Regulations

Not later than 18 months after November 15, 1990, and in conjunction with the regulations required to be promulgated under subsections (b) and (c) of this section, the Administrator shall, in consultation with the Secretary of Energy, promulgate regulations under this subsection. Such regulations shall list energy conservation measures and renewable energy sources which may be treated as qualified energy conservation measures and qualified renewable energy for purposes of this subsection. Allowances shall only be allocated if all requirements of this subsection and the rules promulgated to implement this subsection are complied with. The Administrator shall review the determinations of each State regulatory authority under this subsection to encourage consistency from electric utility to electric utility and from State to State in accordance with the Administrator's rules. The Administrator shall publish the findings of this review no less than annually.

### (g) Conservation and Renewable Energy Reserve

The Administrator shall establish a Conservation and Renewable Energy Reserve under this subsection. Beginning on January 1, 1995, the Administrator may allocate from the Conservation and Renewable Energy Reserve an amount equal to a total of 300,000 allowances for emissions of sulfur dioxide pursuant to section 7651b of this title. In order to provide 300,000 allowances for such reserve, in each year beginning in calendar year 2000 and until calendar year 2009, inclusive, the Administrator shall reduce each unit's basic Phase II allowance allocation on the basis of its pro rata share of 30,000 allowances. If allowances remain in the reserve after January 2, 2010, the Administrator shall allocate such allowances for affected units under section 7651d of this title on a pro rata basis. For purposes of this subsection, for any unit subject to the emissions limitation requirements of section 7651d of this title, the term ''pro rata basis'' refers to the ratio which the reductions made in such unit's allowances in order to establish the reserve under this subsection bears to the total of such reductions for all such units.

### (h) Alternative allowance allocation for units in certain utility systems with optional baseline

#### (1) Optional baseline for units in certain systems

In the case of a unit subject to the emissions limitation requirements of this section which (as of November 15, 1990)—

(A) has an emission rate below 1.0 lbs/mmBtu,

(B) has decreased its sulfur dioxide emissions rate by 60 percent or greater since 1980, and

(C) is part of a utility system which has a weighted average sulfur dioxide emissions rate for all fossil fueled-fired units below 1.0 lbs/mmBtu,

at the election of the owner or operator of such unit, the unit's baseline may be calculated (i) as provided under section 7651a(d)[10] of this title, or (ii) by utilizing the unit's average annual fuel consumption at a 60 percent capacity factor. Such election shall be made no later than March 1, 1991.

#### (2) Allowance allocation

Whenever a unit referred to in paragraph (1) elects to calculate its baseline as provided in clause (ii) of paragraph (1), the Administrator shall allocate allowances for the unit pursuant to section 7651b(a)(1) of this title, this section, and section 7651d of this title (as basic Phase II allowance allocations) in an amount equal to the baseline selected multiplied by the lower of the average annual emission rate for such unit in 1989, or 1.0 lbs./mmBtu. Such allowance allocation shall be in lieu of any allocation of allowances under this section and section 7651d of this title.

(July 14, 1955, ch. 360, title IV, §404, as added Pub. L. 101–549, title IV, §401, Nov. 15, 1990, 104 Stat. 2592.)

### § 7651d. Phase II sulfur dioxide requirements

#### (a) Applicability

(1) After January 1, 2000, each existing utility unit as provided below is subject to the limitations or requirements of this section. Each utility unit subject to an annual sulfur dioxide tonnage emission limitation under this section is an affected unit under this subchapter. Each source that includes one or more affected units is an affected source. In the case of an existing unit that was not in operation during calendar year 1985, the emission rate for a calendar year after 1985, as determined by the Administrator, shall be used in lieu of the 1985 rate. The owner or operator of any unit operated in violation of this section shall be fully liable under this chapter for fulfilling the obligations specified in section 7651j of this title.

(2) In addition to basic Phase II allowance allocations, in each year beginning in calendar year 2000 and ending in calendar year 2009, inclusive, the Administrator shall allocate up to 530,000 Phase II bonus allowances pursuant to subsections (b)(2), (c)(4), (d)(3)(A) and (B), and (h)(2) of this section and section 7651e of this

---

[10] So in original. Probably should be section ''7651a(4)''.

title. Not later than June 1, 1998, the Administrator shall calculate, for each unit granted an extension pursuant to section 7651h of this title the difference between (A) the number of allowances allocated for the unit in calendar year 2000, and (B) the product of the unit's baseline multiplied by 1.20 lbs/mmBtu, divided by 2000, and sum the computations. In each year, beginning in calendar year 2000 and ending in calendar year 2009, inclusive, the Administrator shall deduct from each unit's basic Phase II allowance allocation its pro rata share of 10 percent of the sum calculated pursuant to the preceding sentence.

(3) In addition to basic Phase II allowance allocations and Phase II bonus allowance allocations, beginning January 1, 2000, the Administrator shall allocate for each unit listed on Table A in section 7651c of this title (other than units at Kyger Creek, Clifty Creek, and Joppa Steam) and located in the States of Illinois, Indiana, Ohio, Georgia, Alabama, Missouri, Pennsylvania, West Virginia, Kentucky, or Tennessee allowances in an amount equal to 50,000 multiplied by the unit's pro rata share of the total number of basic allowances allocated for all units listed on Table A (other than units at Kyger Creek, Clifty Creek, and Joppa Steam). Allowances allocated pursuant to this paragraph shall not be subject to the 8,900,000 ton limitation in section 7651b(a) of this title.

**(b) Units equal to, or above, 75 MWe and 1.20 lbs/mmBtu**

(1) Except as otherwise provided in paragraph (3), after January 1, 2000, it shall be unlawful for any existing utility unit that serves a generator with nameplate capacity equal to, or greater, than 75 MWe and an actual 1985 emission rate equal to or greater than 1.20 lbs/mmBtu to exceed an annual sulfur dioxide tonnage emission limitation equal to the product of the unit's baseline multiplied by an emission rate equal to 1.20 lbs/mmBtu, divided by 2,000, unless the owner or operator of such unit holds allowances to emit not less than the unit's total annual emissions.

(2) In addition to allowances allocated pursuant to paragraph (1) and section 7651b(a)(1) of this title as basic Phase II allowance allocations, beginning January 1, 2000, and for each calendar year thereafter until and including 2009, the Administrator shall allocate annually for each unit subject to the emissions limitation requirements of paragraph (1) with an actual 1985 emissions rate greater than 1.20 lbs/mmBtu and less than 2.50 lbs/mmBtu and a baseline capacity factor of less than 60 percent, allowances from the reserve created pursuant to subsection (a)(2) of this section in an amount equal to 1.20 lbs/mmBtu multiplied by 50 percent of the difference, on a Btu basis, between the unit's baseline and the unit's fuel consumption at a 60 percent capacity factor.

(3) After January 1, 2000, it shall be unlawful for any existing utility unit with an actual 1985 emissions rate equal to or greater than 1.20 lbs/mmBtu whose annual average fuel consumption during 1985, 1986, and 1987 on a Btu basis exceeded 90 percent in the form of lignite coal which is located in a State in which, as of July 1, 1989, no county or portion of a county was designated nonattainment under section 7407 of this title for any pollutant subject to the requirements of section 7409 of this title to exceed an annual sulfur dioxide tonnage limitation equal to the product of the unit's baseline multiplied by the lesser of the unit's actual 1985 emissions rate or its allowable 1985 emissions rate, divided by 2,000, unless the owner or operator of such unit holds allowances to emit not less than the unit's total annual emissions.

(4) After January 1, 2000, the Administrator shall allocate annually for each unit, subject to the emissions limitation requirements of paragraph (1), which is located in a State with an installed electrical generating capacity of more than 30,000,000 kw in 1988 and for which was issued a prohibition order or a proposed prohibition order (from burning oil), which unit subsequently converted to coal between January 1, 1980 and December 31, 1985, allowances equal to the difference between (A) the product of the unit's annual fuel consumption, on a Btu basis, at a 65 percent capacity factor multiplied by the lesser of its actual or allowable emissions rate during the first full calendar year after conversion, divided by 2,000, and (B) the number of allowances allocated for the unit pursuant to paragraph (1): *Provided,* That the number of allowances allocated pursuant to this paragraph shall not exceed an annual total of five thousand. If necessary to meeting the restriction imposed in the preceding sentence the Administrator shall reduce, pro rata, the annual allowances allocated for each unit under this paragraph.

**(c) Coal or oil-fired units below 75 MWe and above 1.20 lbs/mmBtu**

(1) Except as otherwise provided in paragraph (3), after January 1, 2000, it shall be unlawful for a coal or oil-fired existing utility unit that serves a generator with nameplate capacity of less than 75 MWe and an actual 1985 emission rate equal to, or greater than, 1.20 lbs/mmBtu and which is a unit owned by a utility operating company whose aggregate nameplate fossil fuel steam-electric capacity is, as of December 31, 1989, equal to, or greater than, 250 MWe to exceed an annual sulfur dioxide emissions limitation equal to the product of the unit's baseline multiplied by an emission rate equal to 1.20 lbs/mmBtu, divided by 2,000, unless the owner or operator of such unit holds allowances to emit not less than the unit's total annual emissions.

(2) After January 1, 2000, it shall be unlawful for a coal or oil-fired existing utility unit that serves a generator with nameplate capacity of less than 75 MWe and an actual 1985 emission rate equal to, or greater than, 1.20 lbs/mmBtu (excluding units subject to section 7411 of this title or to a federally enforceable emissions limitation for sulfur dioxide equivalent to an annual rate of less than 1.20 lbs/mmBtu) and which is a unit owned by a utility operating company whose aggregate nameplate fossil fuel steam-electric capacity is, as of December 31, 1989, less than 250 MWe, to exceed an annual sulfur dioxide tonnage emissions limitation equal to the product of the unit's baseline multiplied by the lesser of its actual 1985 emissions rate or its al-

lowable 1985 emissions rate, divided by 2,000, unless the owner or operator of such unit holds allowances to emit not less than the unit's total annual emissions.

(3) After January 1, 2000, it shall be unlawful for any existing utility unit with a nameplate capacity below 75 MWe and an actual 1985 emissions rate equal to, or greater than, 1.20 lbs/mmBtu which became operational on or before December 31, 1965, which is owned by a utility operating company with, as of December 31, 1989, a total fossil fuel steam-electric generating capacity greater than 250 MWe, and less than 450 MWe which serves fewer than 78,000 electrical customers as of November 15, 1990, to exceed an annual sulfur dioxide emissions tonnage limitation equal to the product of its baseline multiplied by the lesser of its actual or allowable 1985 emission rate, divided by 2,000, unless the owner or operator holds allowances to emit not less than the units[1] total annual emissions. After January 1, 2010, it shall be unlawful for each unit subject to the emissions limitation requirements of this paragraph to exceed an annual emissions tonnage limitation equal to the product of its baseline multiplied by an emissions rate of 1.20 lbs/mmBtu, divided by 2,000, unless the owner or operator holds allowances to emit not less than the unit's total annual emissions.

(4) In addition to allowances allocated pursuant to paragraph (1) and section 7651b(a)(1) of this title as basic Phase II allowance allocations, beginning January 1, 2000, and for each calendar year thereafter until and including 2009, inclusive, the Administrator shall allocate annually for each unit subject to the emissions limitation requirements of paragraph (1) with an actual 1985 emissions rate equal to, or greater than, 1.20 lbs/mmBtu and less than 2.50 lbs/mmBtu and a baseline capacity factor of less than 60 percent, allowances from the reserve created pursuant to subsection (a)(2) of this section in an amount equal to 1.20 lbs/mmBtu multiplied by 50 percent of the difference, on a Btu basis, between the unit's baseline and the unit's fuel consumption at a 60 percent capacity factor.

(5) After January 1, 2000, it shall be unlawful for any existing utility unit with a nameplate capacity below 75 MWe and an actual 1985 emissions rate equal to, or greater than, 1.20 lbs/mmBtu which is part of an electric utility system which, as of November 15, 1990, (A) has at least 20 percent of its fossil-fuel capacity controlled by flue gas desulfurization devices, (B) has more than 10 percent of its fossil-fuel capacity consisting of coal-fired units of less than 75 MWe, and (C) has large units (greater than 400 MWe) all of which have difficult or very difficult FGD Retrofit Cost Factors (according to the Emissions and the FGD Retrofit Feasibility at the 200 Top Emitting Generating Stations, prepared for the United States Environmental Protection Agency on January 10, 1986) to exceed an annual sulfur dioxide emissions tonnage limitation equal to the product of its baseline multiplied by an emissions rate of 2.5 lbs/mmBtu, divided by 2,000, unless the owner or operator holds allowances to emit not less than the unit's

total annual emissions. After January 1, 2010, it shall be unlawful for each unit subject to the emissions limitation requirements of this paragraph to exceed an annual emissions tonnage limitation equal to the product of its baseline multiplied by an emissions rate of 1.20 lbs/mmBtu, divided by 2,000, unless the owner or operator holds for use allowances to emit not less than the unit's total annual emissions.

**(d) Coal-fired units below 1.20 lbs/mmBtu**

(1) After January 1, 2000, it shall be unlawful for any existing coal-fired utility unit the lesser of whose actual or allowable 1985 sulfur dioxide emissions rate is less than 0.60 lbs/mmBtu to exceed an annual sulfur dioxide tonnage emission limitation equal to the product of the unit's baseline multiplied by (A) the lesser of 0.60 lbs/mmBtu or the unit's allowable 1985 emissions rate, and (B) a numerical factor of 120 percent, divided by 2,000, unless the owner or operator of such unit holds allowances to emit not less than the unit's total annual emissions.

(2) After January 1, 2000, it shall be unlawful for any existing coal-fired utility unit the lesser of whose actual or allowable 1985 sulfur dioxide emissions rate is equal to, or greater than, 0.60 lbs/mmBtu and less than 1.20 lbs/mmBtu to exceed an annual sulfur dioxide tonnage emissions limitation equal to the product of the unit's baseline multiplied by (A) the lesser of its actual 1985 emissions rate or its allowable 1985 emissions rate, and (B) a numerical factor of 120 percent, divided by 2,000, unless the owner or operator of such unit holds allowances to emit not less than the unit's total annual emissions.

(3)(A) In addition to allowances allocated pursuant to paragraph (1) and section 7651b(a)(1) of this title as basic Phase II allowance allocations, at the election of the designated representative of the operating company, beginning January 1, 2000, and for each calendar year thereafter until and including 2009, the Administrator shall allocate annually for each unit subject to the emissions limitation requirements of paragraph (1) allowances from the reserve created pursuant to subsection (a)(2) of this section in an amount equal to the amount by which (i) the product of the lesser of 0.60 lbs/mmBtu or the unit's allowable 1985 emissions rate multiplied by the unit's baseline adjusted to reflect operation at a 60 percent capacity factor, divided by 2,000, exceeds (ii) the number of allowances allocated for the unit pursuant to paragraph (1) and section 7651b(a)(1) of this title as basic Phase II allowance allocations.

(B) In addition to allowances allocated pursuant to paragraph (2) and section 7651b(a)(1) of this title as basic Phase II allowance allocations, at the election of the designated representative of the operating company, beginning January 1, 2000, and for each calendar year thereafter until and including 2009, the Administrator shall allocate annually for each unit subject to the emissions limitation requirements of paragraph (2) allowances from the reserve created pursuant to subsection (a)(2) of this section in an amount equal to the amount by which (i) the product of the lesser of the unit's actual 1985 emissions rate or its allowable 1985 emissions rate multiplied by the unit's baseline adjusted

---

[1] So in original. Probably should be "unit's".

to reflect operation at a 60 percent capacity factor, divided by 2,000, exceeds (ii) the number of allowances allocated for the unit pursuant to paragraph (2) and section 7651b(a)(1) of this title as basic Phase II allowance allocations.

(C) An operating company with units subject to the emissions limitation requirements of this subsection may elect the allocation of allowances as provided under subparagraphs (A) and (B). Such election shall apply to the annual allowance allocation for each and every unit in the operating company subject to the emissions limitation requirements of this subsection. The Administrator shall allocate allowances pursuant to subparagraphs (A) and (B) only in accordance with this subparagraph.

(4) Notwithstanding any other provision of this section, at the election of the owner or operator, after January 1, 2000, the Administrator shall allocate in lieu of allocation, pursuant to paragraph (1), (2), (3), (5), or (6),[2] allowances for a unit subject to the emissions limitation requirements of this subsection that commenced commercial operation on or after January 1, 1981 and before December 31, 1985, which was subject to, and in compliance with, section 7411 of this title in an amount equal to the unit's annual fuel consumption, on a Btu basis, at a 65 percent capacity factor multiplied by the unit's allowable 1985 emissions rate, divided by 2,000.

(5) For the purposes of this section, in the case of an oil- and gas-fired unit which has been awarded a clean coal technology demonstration grant as of January 1, 1991, by the United States Department of Energy, beginning January 1, 2000, the Administrator shall allocate for the unit allowances in an amount equal to the unit's baseline multiplied by 1.20 lbs/mmBtu, divided by 2,000.

**(e) Oil and gas-fired units equal to or greater than 0.60 lbs/mmBtu and less than 1.20 lbs/mmBtu**

After January 1, 2000, it shall be unlawful for any existing oil and gas-fired utility unit the lesser of whose actual or allowable 1985 sulfur dioxide emission rate is equal to, or greater than, 0.60 lbs/mmBtu, but less than 1.20 lbs/mmBtu to exceed an annual sulfur dioxide tonnage limitation equal to the product of the unit's baseline multiplied by (A) the lesser of the unit's allowable 1985 emissions rate or its actual 1985 emissions rate and (B) a numerical factor of 120 percent divided by 2,000, unless the owner or operator of such unit holds allowances to emit not less than the unit's total annual emissions.

**(f) Oil and gas-fired units less than 0.60 lbs/mmBtu**

(1) After January 1, 2000, it shall be unlawful for any oil and gas-fired existing utility unit the lesser of whose actual or allowable 1985 emission rate is less than 0.60 lbs/mmBtu and whose average annual fuel consumption during the period 1980 through 1989 on a Btu basis was 90 percent or less in the form of natural gas to exceed an annual sulfur dioxide tonnage emissions limitation equal to the product of the unit's baseline

multiplied by (A) the lesser of 0.60 lbs/mmBtu or the unit's allowable 1985 emissions, and (B) a numerical factor of 120 percent, divided by 2,000, unless the owner or operator of such unit holds allowances to emit not less than the unit's total annual emissions.

(2) In addition to allowances allocated pursuant to paragraph (1) as basic Phase II allowance allocations and section 7651b(a)(1) of this title, beginning January 1, 2000, the Administrator shall,[3] in the case of any unit operated by a utility that furnishes electricity, electric energy, steam, and natural gas within an area consisting of a city and 1 contiguous county, and in the case of any unit owned by a State authority, the output of which unit is furnished within that same area consisting of a city and 1 contiguous county, the Administrator shall allocate for each unit in the utility its pro rata share of 7,000 allowances and for each unit in the State authority its pro rata share of pro rata allowances.

**(g) Units that commence operation between 1986 and December 31, 1995**

(1) After January 1, 2000, it shall be unlawful for any utility unit that has commenced commercial operation on or after January 1, 1986, but not later than September 30, 1990 to exceed an annual tonnage emission limitation equal to the product of the unit's annual fuel consumption, on a Btu basis, at a 65 percent capacity factor multiplied by the unit's allowable 1985 sulfur dioxide emission rate (converted, if necessary, to pounds per mmBtu), divided by 2,000 unless the owner or operator of such unit holds allowances to emit not less than the unit's total annual emissions.

(2) After January 1, 2000, the Administrator shall allocate allowances pursuant to section 7651b of this title to each unit which is listed in table B of this paragraph in an annual amount equal to the amount specified in table B.

TABLE B

| Unit | Allowances |
|------|-----------:|
| Brandon Shores | 8,907 |
| Miller 4 | 9,197 |
| TNP One 2 | 4,000 |
| Zimmer 1 | 18,458 |
| Spruce 1 | 7,647 |
| Clover 1 | 2,796 |
| Clover 2 | 2,796 |
| Twin Oak 2 | 1,760 |
| Twin Oak 1 | 9,158 |
| Cross 1 | 6,401 |
| Malakoff 1 | 1,759 |

Notwithstanding any other paragraph of this subsection, for units subject to this paragraph, the Administrator shall not allocate allowances pursuant to any other paragraph of this subsection, Provided[4] that the owner or operator of a unit listed on Table B may elect an allocation of allowances under another paragraph of this subsection in lieu of an allocation under this paragraph.

(3) Beginning January 1, 2000, the Administrator shall allocate to the owner or operator of any utility unit that commences commercial operation, or has commenced commercial oper-

---

[2] So in original. This subsection does not contain a paragraph (6).

[3] So in original. The words ''the Administrator shall,'' probably should not appear.

[4] So in original. Probably should not be capitalized.

ation, on or after October 1, 1990, but not later than December 31, 1992 allowances in an amount equal to the product of the unit's annual fuel consumption, on a Btu basis, at a 65 percent capacity factor multiplied by the lesser of 0.30 lbs/mmBtu or the unit's allowable sulfur dioxide emission rate (converted, if necessary, to pounds per mmBtu), divided by 2,000.

(4) Beginning January 1, 2000, the Administrator shall allocate to the owner or operator of any utility unit that has commenced construction before December 31, 1990 and that commences commercial operation between January 1, 1993 and December 31, 1995, allowances in an amount equal to the product of the unit's annual fuel consumption, on a Btu basis, at a 65 percent capacity factor multiplied by the lesser of 0.30 lbs/mmBtu or the unit's allowable sulfur dioxide emission rate (converted, if necessary, to pounds per mmBtu), divided by 2,000.

(5) After January 1, 2000, it shall be unlawful for any existing utility unit that has completed conversion from predominantly gas fired existing operation to coal fired operation between January 1, 1985 and December 31, 1987, for which there has been allocated a proposed or final prohibition order pursuant to section 301(b)[5] of the Powerplant and Industrial Fuel Use Act of 1978 (42 U.S.C. 8301 et seq,[6] repealed 1987) to exceed an annual sulfur dioxide tonnage emissions limitation equal to the product of the unit's annual fuel consumption, on a Btu basis, at a 65 percent capacity factor multiplied by the lesser of 1.20 lbs/mmBtu or the unit's allowable 1987 sulfur dioxide emissions rate, divided by 2,000, unless the owner or operator of such unit has obtained allowances equal to its actual emissions.

(6)(A)[7] Unless the Administrator has approved a designation of such facility under section 7651i of this title, the provisions of this subchapter shall not apply to a "qualifying small power production facility" or "qualifying cogeneration facility" (within the meaning of section 796(17)(C) or 796(18)(B) of title 16) or to a "new independent power production facility" as defined in section 7651o of this title except[8] that clause (iii)[9] of such definition in section 7651o of this title shall not apply for purposes of this paragraph if, as of November 15, 1990,

(i) an applicable power sales agreement has been executed;

(ii) the facility is the subject of a State regulatory authority order requiring an electric utility to enter into a power sales agreement with, purchase capacity from, or (for purposes of establishing terms and conditions of the electric utility's purchase of power) enter into arbitration concerning, the facility;

(iii) an electric utility has issued a letter of intent or similar instrument committing to purchase power from the facility at a previously offered or lower price and a power sales agreement is executed within a reasonable period of time; or

(iv) the facility has been selected as a winning bidder in a utility competitive bid solicitation.

[5] See References in Text note below.
[6] So in original. Probably should be "seq.,".
[7] So in original. No subpar. (B) has been enacted.
[8] So in original. Probably should be preceded by a comma.
[9] So in original. Probably means clause "(C)".

**(h) Oil and gas-fired units less than 10 percent oil consumed**

(1) After January 1, 2000, it shall be unlawful for any oil- and gas-fired utility unit whose average annual fuel consumption during the period 1980 through 1989 on a Btu basis exceeded 90 percent in the form of natural gas to exceed an annual sulfur dioxide tonnage limitation equal to the product of the unit's baseline multiplied by the unit's actual 1985 emissions rate divided by 2,000 unless the owner or operator of such unit holds allowances to emit not less than the unit's total annual emissions.

(2) In addition to allowances allocated pursuant to paragraph (1) and section 7651b(a)(1) of this title as basic Phase II allowance allocations, beginning January 1, 2000, and for each calendar year thereafter until and including 2009, the Administrator shall allocate annually for each unit subject to the emissions limitation requirements of paragraph (1) allowances from the reserve created pursuant to subsection (a)(2) of this section in an amount equal to the unit's baseline multiplied by 0.050 lbs/mmBtu, divided by 2,000.

(3) In addition to allowances allocated pursuant to paragraph (1) and section 7651b(a)(1) of this title, beginning January 1, 2010, the Administrator shall allocate annually for each unit subject to the emissions limitation requirements of paragraph (1) allowances in an amount equal to the unit's baseline multiplied by 0.050 lbs/mmBtu, divided by 2,000.

**(i) Units in high growth States**

(1) In addition to allowances allocated pursuant to this section and section 7651b(a)(1) of this title as basic Phase II allowance allocations, beginning January 1, 2000, the Administrator shall allocate annually allowances for each unit, subject to an emissions limitation requirement under this section, and located in a State that—

(A) has experienced a growth in population in excess of 25 percent between 1980 and 1988 according to State Population and Household Estimates, With Age, Sex, and Components of Change: 1981–1988 allocated by the United States Department of Commerce, and

(B) had an installed electrical generating capacity of more than 30,000,000 kw in 1988,

in an amount equal to the difference between (A) the number of allowances that would be allocated for the unit pursuant to the emissions limitation requirements of this section applicable to the unit adjusted to reflect the unit's annual average fuel consumption on a Btu basis of any three consecutive calendar years between 1980 and 1989 (inclusive) as elected by the owner or operator and (B) the number of allowances allocated for the unit pursuant to the emissions limitation requirements of this section: *Provided*, That the number of allowances allocated pursuant to this subsection shall not exceed an annual total of 40,000. If necessary to meeting the 40,000 allowance restriction imposed under this subsection the Administrator shall reduce, pro rata, the additional annual allowances allocated to each unit under this subsection.

(2) Beginning January 1, 2000, in addition to allowances allocated pursuant to this section and section 7651b(a)(1) of this title as basic Phase II

allowance allocations, the Administrator shall allocate annually for each unit subject to the emissions limitation requirements of subsection (b)(1) of this section, (A) the lesser of whose actual or allowable 1980 emissions rate has declined by 50 percent or more as of November 15, 1990, (B) whose actual emissions rate is less than 1.2 lbs/mmBtu as of January 1, 2000, (C) which commenced operation after January 1, 1970, (D) which is owned by a utility company whose combined commercial and industrial kilowatt-hour sales have increased by more than 20 percent between calendar year 1980 and November 15, 1990, and (E) whose company-wide fossil-fuel sulfur dioxide emissions rate has declined 40 per centum or more from 1980 to 1988, allowances in an amount equal to the difference between (i) the number of allowances that would be allocated for the unit pursuant to the emissions limitation requirements of subsection (b)(1) of this section adjusted to reflect the unit's annual average fuel consumption on a Btu basis for any three consecutive years between 1980 and 1989 (inclusive) as elected by the owner or operator and (ii) the number of allowances allocated for the unit pursuant to the emissions limitation requirements of subsection (b)(1) of this section: *Provided*, That the number of allowances allocated pursuant to this paragraph shall not exceed an annual total of 5,000. If necessary to meeting the 5,000-allowance restriction imposed in the last clause of the preceding sentence the Administrator shall reduce, pro rata, the additional allowances allocated to each unit pursuant to this paragraph.

**(j) Certain municipally owned power plants**

Beginning January 1, 2000, in addition to allowances allocated pursuant to this section and section 7651b(a)(1) of this title as basic Phase II allowance allocations, the Administrator shall allocate annually for each existing municipally owned oil and gas-fired utility unit with nameplate capacity equal to, or less than, 40 MWe, the lesser of whose actual or allowable 1985 sulfur dioxide emission rate is less than 1.20 lbs/mmBtu, allowances in an amount equal to the product of the unit's annual fuel consumption on a Btu basis at a 60 percent capacity factor multiplied by the lesser of its allowable 1985 emission rate or its actual 1985 emission rate, divided by 2,000.

(July 14, 1955, ch. 360, title IV, § 405, as added Pub. L. 101–549, title IV, § 401, Nov. 15, 1990, 104 Stat. 2605.)

REFERENCES IN TEXT

Section 301(b) of the Powerplant and Industrial Fuel Use Act of 1978, referred to in subsec. (g)(5), is section 301(b) of Pub. L. 95–620, which is classified to section 8341(b) of this title. A prior section 301(b) of Pub. L. 95–620, title III, Nov. 9, 1978, 92 Stat. 3305, which was formerly classified to section 8341(b) of this title, was repealed by Pub. L. 97–35, title X, § 1021(a), Aug. 13, 1981, 95 Stat. 614.

**§ 7651e. Allowances for States with emissions rates at or below 0.80 lbs/mmBtu**

**(a) Election of Governor**

In addition to basic Phase II allowance allocations, upon the election of the Governor of any State, with a 1985 state-wide annual sulfur dioxide emissions rate equal to or less than, 0.80 lbs/mmBtu, averaged over all fossil fuel-fired utility steam generating units, beginning January 1, 2000, and for each calendar year thereafter until and including 2009, the Administrator shall allocate, in lieu of other Phase II bonus allowance allocations, allowances from the reserve created pursuant to section 7651d(a)(2) of this title to all such units in the State in an amount equal to 125,000 multiplied by the unit's pro rata share of electricity generated in calendar year 1985 at fossil fuel-fired utility steam units in all States eligible for the election.

**(b) Notification of Administrator**

Pursuant to section 7651b(a)(1) of this title, each Governor of a State eligible to make an election under paragraph[1] (a) shall notify the Administrator of such election. In the event that the Governor of any such State fails to notify the Administrator of the Governor's elections, the Administrator shall allocate allowances pursuant to section 7651d of this title.

**(c) Allowances after January 1, 2010**

After January 1, 2010, the Administrator shall allocate allowances to units subject to the provisions of this section pursuant to section 7651d of this title.

(July 14, 1955, ch. 360, title IV, § 406, as added Pub. L. 101–549, title IV, § 401, Nov. 15, 1990, 104 Stat. 2613.)

**§ 7651f. Nitrogen oxides emission reduction program**

**(a) Applicability**

On the date that a coal-fired utility unit becomes an affected unit pursuant to sections 7651c, 7651d,[1] 7651h of this title, or on the date a unit subject to the provisions of section 7651c(d) or 7651h(b) of this title, must meet the $SO_2$ reduction requirements, each such unit shall become an affected unit for purposes of this section and shall be subject to the emission limitations for nitrogen oxides set forth herein.

**(b) Emission limitations**

(1) Not later than eighteen months after November 15, 1990, the Administrator shall by regulation establish annual allowable emission limitations for nitrogen oxides for the types of utility boilers listed below, which limitations shall not exceed the rates listed below: *Provided*, That the Administrator may set a rate higher than that listed for any type of utility boiler if the Administrator finds that the maximum listed rate for that boiler type cannot be achieved using low $NO_x$ burner technology. The maximum allowable emission rates are as follows:

(A) for tangentially fired boilers, 0.45 lb/mmBtu;

(B) for dry bottom wall-fired boilers (other than units applying cell burner technology), 0.50 lb/mmBtu.

After January 1, 1995, it shall be unlawful for any unit that is an affected unit on that date

and is of the type listed in this paragraph to emit nitrogen oxides in excess of the emission rates set by the Administrator pursuant to this paragraph.

(2) Not later than January 1, 1997, the Administrator shall, by regulation, establish allowable emission limitations on a lb/mmBtu, annual average basis, for nitrogen oxides for the following types of utility boilers:

   (A) wet bottom wall-fired boilers;
   (B) cyclones;
   (C) units applying cell burner technology;
   (D) all other types of utility boilers.

The Administrator shall base such rates on the degree of reduction achievable through the retrofit application of the best system of continuous emission reduction, taking into account available technology, costs and energy and environmental impacts; and which is comparable to the costs of nitrogen oxides controls set pursuant to subsection (b)(1) of this section. Not later than January 1, 1997, the Administrator may revise the applicable emission limitations for tangentially fired and dry bottom, wall-fired boilers (other than cell burners) to be more stringent if the Administrator determines that more effective low NO$_x$ burner technology is available: *Provided*, That, no unit that is an affected unit pursuant to section 7651c of this title and that is subject to the requirements of subsection (b)(1) of this section, shall be subject to the revised emission limitations, if any.

**(c) Revised performance standards**

(1)[2] Not later than January 1, 1993, the Administrator shall propose revised standards of performance to section 7411 of this title for nitrogen oxides emissions from fossil-fuel fired steam generating units, including both electric utility and nonutility units. Not later than January 1, 1994, the Administrator shall promulgate such revised standards of performance. Such revised standards of performance shall reflect improvements in methods for the reduction of emissions of oxides of nitrogen.

**(d) Alternative emission limitations**

The permitting authority shall, upon request of an owner or operator of a unit subject to this section, authorize an emission limitation less stringent than the applicable limitation established under subsection (b)(1) or (b)(2) of this section upon a determination that—

   (1) a unit subject to subsection (b)(1) of this section cannot meet the applicable limitation using low NO$_x$ burner technology; or

   (2) a unit subject to subsection (b)(2) of this section cannot meet the applicable rate using the technology on which the Administrator based the applicable emission limitation.

The permitting authority shall base such determination upon a showing satisfactory to the permitting authority, in accordance with regulations established by the Administrator not later than eighteen months after November 15, 1990, that the owner or operator—

   (1) has properly installed appropriate control equipment designed to meet the applicable emission rate;

(2) has properly operated such equipment for a period of fifteen months (or such other period of time as the Administrator determines through the regulations), and provides operating and monitoring data for such period demonstrating that the unit cannot meet the applicable emission rate; and

(3) has specified an emission rate that such unit can meet on an annual average basis.

The permitting authority shall issue an operating permit for the unit in question, in accordance with section 7651g of this title and part B[3] of title III—

   (i) that permits the unit during the demonstration period referred to in subparagraph (2) above, to emit at a rate in excess of the applicable emission rate;

   (ii) at the conclusion of the demonstration period to revise the operating permit to reflect the alternative emission rate demonstrated in paragraphs (2) and (3) above.

Units subject to subsection (b)(1) of this section for which an alternative emission limitation is established shall not be required to install any additional control technology beyond low NO$_x$ burners. Nothing in this section shall preclude an owner or operator from installing and operating an alternative NO$_x$ control technology capable of achieving the applicable emission limitation. If the owner or operator of a unit subject to the emissions limitation requirements of subsection (b)(1) of this section demonstrates to the satisfaction of the Administrator that the technology necessary to meet such requirements is not in adequate supply to enable its installation and operation at the unit, consistent with system reliability, by January 1, 1995, then the Administrator shall extend the deadline for compliance for the unit by a period of 15 months. Any owner or operator may petition the Administrator to make a determination under the previous sentence. The Administrator shall grant or deny such petition within 3 months of submittal.

**(e) Emissions averaging**

In lieu of complying with the applicable emission limitations under subsection (b)(1), (2), or (d) of this section, the owner or operator of two or more units subject to one or more of the applicable emission limitations set pursuant to these sections,[4] may petition the permitting authority for alternative contemporaneous annual emission limitations for such units that ensure that (1) the actual annual emission rate in pounds of nitrogen oxides per million Btu averaged over the units in question is a rate that is less than or equal to (2) the Btu-weighted average annual emission rate for the same units if they had been operated, during the same period of time, in compliance with limitations set in accordance with the applicable emission rates set pursuant to subsections (b)(1) and (2) of this section.

If the permitting authority determines, in accordance with regulations issued by the Administrator not later than eighteen months after

---

[2] So in original. No par. (2) has been enacted.

[3] See References in Text note below.

[4] So in original. Probably should be "subsections,".

November 15, 1990;[5] that the conditions in the paragraph above can be met, the permitting authority shall issue operating permits for such units, in accordance with section 7651g of this title and part B[3] of title III, that allow alternative contemporaneous annual emission limitations. Such emission limitations shall only remain in effect while both units continue operation under the conditions specified in their respective operating permits.

(July 14, 1955, ch. 360, title IV, § 407, as added Pub. L. 101–549, title IV, § 401, Nov. 15, 1990, 104 Stat. 2613.)

REFERENCES IN TEXT

Part B of title III, referred to in subsecs. (d) and (e), means title III of the Clean Air Act, act July 14, 1955, ch. 360, as added, which is classified to subchapter III of this chapter, but title III does not contain parts. For provisions of the Clean Air Act relating to permits, see subchapter V (§ 7661 et seq.) of this chapter.

## § 7651g. Permits and compliance plans

### (a) Permit program

The provisions of this subchapter shall be implemented, subject to section 7651b of this title, by permits issued to units subject to this subchapter (and enforced) in accordance with the provisions of subchapter V of this chapter, as modified by this subchapter. Any such permit issued by the Administrator, or by a State with an approved permit program, shall prohibit—

(1) annual emissions of sulfur dioxide in excess of the number of allowances to emit sulfur dioxide the owner or operator, or the designated representative of the owners or operators, of the unit hold for the unit,

(2) exceedances of applicable emissions rates,

(3) the use of any allowance prior to the year for which it was allocated, and

(4) contravention of any other provision of the permit.

Permits issued to implement this subchapter shall be issued for a period of 5 years, notwithstanding subchapter V of this chapter. No permit shall be issued that is inconsistent with the requirements of this subchapter, and subchapter V of this chapter as applicable.

### (b) Compliance plan

Each initial permit application shall be accompanied by a compliance plan for the source to comply with its requirements under this subchapter. Where an affected source consists of more than one affected unit, such plan shall cover all such units, and for purposes of section 7661a(c) of this title, such source shall be considered a "facility". Nothing in this section regarding compliance plans or in subchapter V of this chapter shall be construed as affecting allowances. Except as provided under subsection (c)(1)(B) of this section, submission of a statement by the owner or operator, or the designated representative of the owners and operators, of a unit subject to the emissions limitation requirements of sections 7651c, 7651d, and 7651f of this title, that the unit will meet the ap-

plicable emissions limitation requirements of such sections in a timely manner or that, in the case of the emissions limitation requirements of sections 7651c and 7651d of this title, the owners and operators will hold allowances to emit not less than the total annual emissions of the unit, shall be deemed to meet the proposed and approved compliance planning requirements of this section and subchapter V of this chapter, except that, for any unit that will meet the requirements of this subchapter by means of an alternative method of compliance authorized under section 7651c(b), (c), (d), or (f) of this title[1] section 7651f(d) or (e) of this title, section 7651h of this title and section 7651i of this title, the proposed and approved compliance plan, permit application and permit shall include, pursuant to regulations promulgated by the Administrator, for each alternative method of compliance a comprehensive description of the schedule and means by which the unit will rely on one or more alternative methods of compliance in the manner and time authorized under this subchapter. Recordation by the Administrator of transfers of allowances shall amend automatically all applicable proposed or approved permit applications, compliance plans and permits. The Administrator may also require—

(1) for a source, a demonstration of attainment of national ambient air quality standards, and

(2) from the owner or operator of two or more affected sources, an integrated compliance plan providing an overall plan for achieving compliance at the affected sources.

### (c) First phase permits

The Administrator shall issue permits to affected sources under sections 7651c and 7651f of this title.

#### (1) Permit application and compliance plan

(A) Not later than 27 months after November 15, 1990, the designated representative of the owners or operators, or the owner and operator, of each affected source under sections 7651c and 7651f of this title shall submit a permit application and compliance plan for that source in accordance with regulations issued by the Administrator under paragraph (3). The permit application and the compliance plan shall be binding on the owner or operator or the designated representative of owners and operators for purposes of this subchapter and section 7651a(a)[2] of this title, and shall be enforceable in lieu of a permit until a permit is issued by the Administrator for the source.

(B) In the case of a compliance plan for an affected source under sections 7651c and 7651f of this title for which the owner or operator proposes to meet the requirements of that section by reducing utilization of the unit as compared with its baseline or by shutting down the unit, the owner or operator shall include in the proposed compliance plan a specification of the unit or units that will provide electrical generation to compensate for the reduced output at the affected source, or a dem-

---

[5] So in original. The semicolon probably should be a comma.

[1] So in original. Probably should be followed by a comma.

[2] So in original. Section 7651a of this title does not contain subsections.

onstration that such reduced utilization will be accomplished through energy conservation or improved unit efficiency. The unit to be used for such compensating generation, which is not otherwise an affected unit under sections 7651c and 7651f of this title, shall be deemed an affected unit under section 7651c of this title, subject to all of the requirements for such units under this subchapter, except that allowances shall be allocated to such compensating unit in the amount of an annual limitation equal to the product of the unit's baseline multiplied by the lesser of the unit's actual 1985 emissions rate or its allowable 1985 emissions rate, divided by 2,000.

**(2) EPA action on compliance plans**

The Administrator shall review each proposed compliance plan to determine whether it satisfies the requirements of this subchapter, and shall approve or disapprove such plan within 6 months after receipt of a complete submission. If a plan is disapproved, it may be resubmitted for approval with such changes as the Administrator shall require consistent with the requirements of this subchapter and within such period as the Administrator prescribes as part of such disapproval.

**(3) Regulations; issuance of permits**

Not later than 18 months after November 15, 1990, the Administrator shall promulgate regulations, in accordance with subchapter V of this chapter, to implement a Federal permit program to issue permits for affected sources under this subchapter. Following promulgation, the Administrator shall issue a permit to implement the requirements of section 7651c of this title and the allowances provided under section 7651b of this title to the owner or operator of each affected source under section 7651c of this title. Such a permit shall supersede any permit application and compliance plan submitted under paragraph (1).

**(4) Fees**

During the years 1995 through 1999 inclusive, no fee shall be required to be paid under section 7661a(b)(3) of this title or under section 7410(a)(2)(L) of this title with respect to emissions from any unit which is an affected unit under section 7651c of this title.

**(d) Second phase permits**

(1) To provide for permits for (A) new electric utility steam generating units required under section 7651b(e) of this title to have allowances, (B) affected units or sources under section 7651d of this title, and (C) existing units subject to nitrogen oxide emission reductions under section 7651f of this title, each State in which one or more such units or sources are located shall submit in accordance with subchapter V of this chapter, a permit program for approval as provided by that subchapter. Upon approval of such program, for the units or sources subject to such approved program the Administrator shall suspend the issuance of permits as provided in subchapter V of this chapter.

(2) The owner or operator or the designated representative of each affected source under section 7651d of this title shall submit a permit ap-

plication and compliance plan for that source to the permitting authority, not later than January 1, 1996.

(3) Not later than December 31, 1997, each State with an approved permit program shall issue permits to the owner or operator, or the designated representative of the owners and operators, of affected sources under section 7651d of this title that satisfy the requirements of subchapter V of this chapter and this subchapter and that submitted to such State a permit application and compliance plan pursuant to paragraph (2). In the case of a State without an approved permit program by July 1, 1996, the Administrator shall, not later than January 1, 1998, issue a permit to the owner or operator or the designated representative of each such affected source. In the case of affected sources for which applications and plans are timely received under paragraph (2), the permit application and the compliance plan, including amendments thereto, shall be binding on the owner or operator or the designated representative of the owners and operators and shall be enforceable as a permit for purposes of this subchapter and subchapter V of this chapter until a permit is issued by the permitting authority for the affected source. The provisions of section 558(c) of title 5 (relating to renewals) shall apply to permits issued by a permitting authority under this subchapter and subchapter V of this chapter.

(4) The permit issued in accordance with this subsection for an affected source shall provide that the affected units at the affected source may not emit an annual tonnage of sulfur dioxide in excess of the number of allowances to emit sulfur dioxide the owner or operator or designated representative hold for the unit.

**(e) New units**

The owner or operator of each source that includes a new electric utility steam generating unit shall submit a permit application and compliance plan to the permitting authority not later than 24 months before the later of (1) January 1, 2000, or (2) the date on which the unit commences operation. The permitting authority shall issue a permit to the owner or operator, or the designated representative thereof, of the unit that satisfies the requirements of subchapter V of this chapter and this subchapter.

**(f) Units subject to certain other limits**

The owner or operator, or designated representative thereof, of any unit subject to an emission rate requirement under section 7651f of this title shall submit a permit application and compliance plan for such unit to the permitting authority, not later than January 1, 1998. The permitting authority shall issue a permit to the owner or operator that satisfies the requirements of subchapter V of this chapter and this subchapter, including any appropriate monitoring and reporting requirements.

**(g) Amendment of application and compliance plan**

At any time after the submission of an application and compliance plan under this section, the applicant may submit a revised application and compliance plan, in accordance with the requirements of this section. In considering any

permit application and compliance plan under this subchapter, the permitting authority shall ensure coordination with the applicable electric ratemaking authority, in the case of regulated utilities, and with unregulated public utilities.

**(h) Prohibition**

(1) It shall be unlawful for an owner or operator, or designated representative, required to submit a permit application or compliance plan under this subchapter to fail to submit such application or plan in accordance with the deadlines specified in this section or to otherwise fail to comply with regulations implementing this section.

(2) It shall be unlawful for any person to operate any source subject to this subchapter except in compliance with the terms and requirements of a permit application and compliance plan (including amendments thereto) or permit issued by the Administrator or a State with an approved permit program. For purposes of this subsection, compliance, as provided in section 7661c(f) of this title, with a permit issued under subchapter V of this chapter which complies with this subchapter for sources subject to this subchapter shall be deemed compliance with this subsection as well as section 7661a(a) of this title.

(3) In order to ensure reliability of electric power, nothing in this subchapter or subchapter V of this chapter shall be construed as requiring termination of operations of an electric utility steam generating unit for failure to have an approved permit or compliance plan, except that any such unit may be subject to the applicable enforcement provisions of section 7413 of this title.

**(i) Multiple owners**

No permit shall be issued under this section to an affected unit until the designated representative of the owners or operators has filed a certificate of representation with regard to matters under this subchapter, including the holding and distribution of allowances and the proceeds of transactions involving allowances. Where there are multiple holders of a legal or equitable title to, or a leasehold interest in, such a unit, or where a utility or industrial customer purchases power from an affected unit (or units) under life-of-the-unit, firm power contractual arrangements, the certificate shall state (1) that allowances and the proceeds of transactions involving allowances will be deemed to be held or distributed in proportion to each holder's legal, equitable, leasehold, or contractual reservation or entitlement, or (2) if such multiple holders have expressly provided for a different distribution of allowances by contract, that allowances and the proceeds of transactions involving allowances will be deemed to be held or distributed in accordance with the contract. A passive lessor, or a person who has an equitable interest through such lessor, whose rental payments are not based, either directly or indirectly, upon the revenues or income from the affected unit shall not be deemed to be a holder of a legal, equitable, leasehold, or contractual interest for the purpose of holding or distributing allowances as provided in this subsection, during either the term of such leasehold or thereafter, unless ex-

pressly provided for in the leasehold agreement. Except as otherwise provided in this subsection, where all legal or equitable title to or interest in an affected unit is held by a single person, the certification shall state that all allowances received by the unit are deemed to be held for that person.

(July 14, 1955, ch. 360, title IV, § 408, as added Pub. L. 101–549, title IV, § 401, Nov. 15, 1990, 104 Stat. 2616.)

**§ 7651h. Repowered sources**

**(a) Availability**

Not later than December 31, 1997, the owner or operator of an existing unit subject to the emissions limitation requirements of section 7651d(b) and (c) of this title may demonstrate to the permitting authority that one or more units will be repowered with a qualifying clean coal technology to comply with the requirements under section 7651d of this title. The owner or operator shall, as part of any such demonstration, provide, not later than January 1, 2000, satisfactory documentation of a preliminary design and engineering effort for such repowering and an executed and binding contract for the majority of the equipment to repower such unit and such other information as the Administrator may require by regulation. The replacement of an existing utility unit with a new utility unit using a repowering technology referred to in section 7651a(2)[1] of this title which is located at a different site, shall be treated as repowering of the existing unit for purposes of this subchapter, if—

(1) the replacement unit is designated by the owner or operator to replace such existing unit, and

(2) the existing unit is retired from service on or before the date on which the designated replacement unit enters commercial operation.

**(b) Extension**

(1) An owner or operator satisfying the requirements of subsection (a) of this section shall be granted an extension of the emission limitation requirement compliance date for that unit from January 1, 2000, to December 31, 2003. The extension shall be specified in the permit issued to the source under section 7651g of this title, together with any compliance schedule and other requirements necessary to meet second phase requirements by the extended date. Any unit that is granted an extension under this section shall not be eligible for a waiver under section 7411(j) of this title, and shall continue to be subject to requirements under this subchapter as if it were a unit subject to section 7651d of this title.

(2) If (A) the owner or operator of an existing unit has been granted an extension under paragraph (1) in order to repower such unit with a clean coal unit, and (B) such owner or operator demonstrates to the satisfaction of the Administrator that the repowering technology to be utilized by such unit has been properly constructed and tested on such unit, but nevertheless has been unable to achieve the emission reduction

---

[1] So in original. Probably should be section "7651a(12)".

limitations and is economically or technologically infeasible, such existing unit may be retrofitted or repowered with equipment or facilities utilizing another clean coal technology or other available control technology.

**(c) Allowances**

(1) For the period of the extension under this section, the Administrator shall allocate to the owner or operator of the affected unit, annual allowances for sulfur dioxide equal to the affected unit's baseline multiplied by the lesser of the unit's federally approved State Implementation Plan emissions limitation or its actual emission rate for 1995 in lieu of any other allocation. Such allowances may not be transferred or used by any other source to meet emission requirements under this subchapter. The source owner or operator shall notify the Administrator sixty days in advance of the date on which the affected unit for which the extension has been granted is to be removed from operation to install the repowering technology.

(2) Effective on that date, the unit shall be subject to the requirements of section 7651d of this title. Allowances for the year in which the unit is removed from operation to install the repowering technology shall be calculated as the product of the unit's baseline multiplied by 1.20 lbs/mmBtu, divided by 2,000, and prorated accordingly, and are transferable.

(3) Allowances for such existing utility units for calendar years after the year the repowering is complete shall be calculated as the product of the existing unit's baseline multiplied by 1.20 lbs/mmBtu, divided by 2,000.

(4) Notwithstanding the provisions of section 7651b(a) and (e) of this title, allowances shall be allocated under this section for a designated replacement unit which replaces an existing unit (as provided in the last sentence of subsection (a) of this section) in lieu of any further allocations of allowances for the existing unit.

(5) For the purpose of meeting the aggregate emissions limitation requirement set forth in section 7651b(a)(1) of this title, the units with an extension under this subsection shall be treated in each calendar year during the extension period as holding allowances allocated under paragraph (3).

**(d) Control requirements**

Any unit qualifying for an extension under this section that does not increase actual hourly emissions for any pollutant regulated under the[2] chapter shall not be subject to any standard of performance under section 7411 of this title. Notwithstanding the provisions of this subsection, no new unit (1) designated as a replacement for an existing unit, (2) qualifying for the extension under subsection (b) of this section, and (3) located at a different site than the existing unit shall receive an exemption from the requirements imposed under section 7411 of this title.

**(e) Expedited permitting**

State permitting authorities and, where applicable, the Administrator, are encouraged to give expedited consideration to permit applications

under parts C and D of subchapter I of this chapter for any source qualifying for an extension under this section.

**(f) Prohibition**

It shall be unlawful for the owner or operator of a repowered source to fail to comply with the requirement of this section, or any regulations of permit requirements to implement this section, including the prohibition against emitting sulfur dioxide in excess of allowances held.

(July 14, 1955, ch. 360, title IV, §409, as added Pub. L. 101–549, title IV, §401, Nov. 15, 1990, 104 Stat. 2619.)

**§ 7651i. Election for additional sources**

**(a) Applicability**

The owner or operator of any unit that is not, nor will become, an affected unit under section 7651b(e), 7651c, or 7651d of this title, or that is a process source under subsection (d) of this section, that emits sulfur dioxide, may elect to designate that unit or source to become an affected unit and to receive allowances under this subchapter. An election shall be submitted to the Administrator for approval, along with a permit application and proposed compliance plan in accordance with section 7651g of this title. The Administrator shall approve a designation that meets the requirements of this section, and such designated unit, or source, shall be allocated allowances, and be an affected unit for purposes of this subchapter.

**(b) Establishment of baseline**

The baseline for a unit designated under this section shall be established by the Administrator by regulation, based on fuel consumption and operating data for the unit for calendar years 1985, 1986, and 1987, or if such data is not available, the Administrator may prescribe a baseline based on alternative representative data.

**(c) Emission limitations**

Annual emissions limitations for sulfur dioxide shall be equal to the product of the baseline multiplied by the lesser of the unit's 1985 actual or allowable emission rate in lbs/mmBtu, or, if the unit did not operate in 1985, by the lesser of the unit's actual or allowable emission rate for a calendar year after 1985 (as determined by the Administrator), divided by 2,000.

**(d) Process sources**

Not later than 18 months after November 15, 1990, the Administrator shall establish a program under which the owner or operator of a process source that emits sulfur dioxide may elect to designate that source as an affected unit for the purpose of receiving allowances under this subchapter. The Administrator shall, by regulation, define the sources that may be designated; specify the emissions limitation; specify the operating, emission baseline, and other data requirements; prescribe CEMS or other monitoring requirements; and promulgate permit, reporting, and any other requirements necessary to implement such a program.

**(e) Allowances and permits**

The Administrator shall issue allowances to an affected unit under this section in an amount

---

[2] So in original. Probably should be "this".

equal to the emissions limitation calculated under subsection (c) or (d) of this section, in accordance with section 7651b of this title. Such allowance may be used in accordance with, and shall be subject to, the provisions of section 7651b of this title. Affected sources under this section shall be subject to the requirements of sections 7651b, 7651g, 7651j, 7651k, 7651*l*, and 7651m of this title.

**(f) Limitation**

Any unit designated under this section shall not transfer or bank allowances produced as a result of reduced utilization or shutdown, except that, such allowances may be transferred or carried forward for use in subsequent years to the extent that the reduced utilization or shutdown results from the replacement of thermal energy from the unit designated under this section, with thermal energy generated by any other unit or units subject to the requirements of this subchapter, and the designated unit's allowances are transferred or carried forward for use at such other replacement unit or units. In no case may the Administrator allocate to a source designated under this section allowances in an amount greater than the emissions resulting from operation of the source in full compliance with the requirements of this chapter. No such allowances shall authorize operation of a unit in violation of any other requirements of this chapter.

**(g) Implementation**

The Administrator shall issue regulations to implement this section not later than eighteen months after November 15, 1990.

**(h) Small diesel refineries**

The Administrator shall issue allowances to owners or operators of small diesel refineries who produce diesel fuel after October 1, 1993, meeting the requirements of subsection[1] 7545(i) of this title.

**(1) Allowance period**

Allowances may be allocated under this subsection only for the period from October 1, 1993, through December 31, 1999.

**(2) Allowance determination**

The number of allowances allocated pursuant to this paragraph shall equal the annual number of pounds of sulfur dioxide reduction attributable to desulfurization by a small refinery divided by 2,000. For the purposes of this calculation, the concentration of sulfur removed from diesel fuel shall be the difference between 0.274 percent (by weight) and 0.050 percent (by weight).

**(3) Refinery eligibility**

As used in this subsection, the term ''small refinery'' shall mean a refinery or portion of a refinery—

(A) which, as of November 15, 1990, has bona fide crude oil throughput of less than 18,250,000 barrels per year, as reported to the Department of Energy, and

(B) which, as of November 15, 1990, is owned or controlled by a refiner with a total

combined bona fide crude oil throughput of less than 50,187,500 barrels per year, as reported to the Department of Energy.

**(4) Limitation per refinery**

The maximum number of allowances that can be annually allocated to a small refinery pursuant to this subsection is one thousand and five hundred.

**(5) Limitation on total**

In any given year, the total number of allowances allocated pursuant to this subsection shall not exceed thirty-five thousand.

**(6) Required certification**

The Administrator shall not allocate any allowances pursuant to this subsection unless the owner or operator of a small diesel refinery shall have certified, at a time and in a manner prescribed by the Administrator, that all motor diesel fuel produced by the refinery for which allowances are claimed, including motor diesel fuel for off-highway use, shall have met the requirements of subsection[1] 7545(i) of this title.

(July 14, 1955, ch. 360, title IV, §410, as added Pub. L. 101–549, title IV, §401, Nov. 15, 1990, 104 Stat. 2621.)

**§ 7651j. Excess emissions penalty**

**(a) Excess emissions penalty**

The owner or operator of any unit or process source subject to the requirements of sections[1] 7651b, 7651c, 7651d, 7651e, 7651f or 7651h of this title, or designated under section 7651i of this title, that emits sulfur dioxide or nitrogen oxides for any calendar year in excess of the unit's emissions limitation requirement or, in the case of sulfur dioxide, of the allowances the owner or operator holds for use for the unit for that calendar year shall be liable for the payment of an excess emissions penalty, except where such emissions were authorized pursuant to section 7410(f) of this title. That penalty shall be calculated on the basis of the number of tons emitted in excess of the unit's emissions limitation requirement or, in the case of sulfur dioxide, of the allowances the operator holds for use for the unit for that year, multiplied by $2,000. Any such penalty shall be due and payable without demand to the Administrator as provided in regulations to be issued by the Administrator by no later than eighteen months after November 15, 1990. Any such payment shall be deposited in the United States Treasury pursuant to the Miscellaneous Receipts Act.[2] Any penalty due and payable under this section shall not diminish the liability of the unit's owner or operator for any fine, penalty or assessment against the unit for the same violation under any other section of this chapter.

**(b) Excess emissions offset**

The owner or operator of any affected source that emits sulfur dioxide during any calendar year in excess of the unit's emissions limitation requirement or of the allowances held for the

---

[1] So in original. Probably should be ''section''.

[1] So in original. Probably should be ''section''.
[2] See References in Text note below.

unit for the calendar year, shall be liable to off-set the excess emissions by an equal tonnage amount in the following calendar year, or such longer period as the Administrator may prescribe. The owner or operator of the source shall, within sixty days after the end of the year in which the excess emissions occured,[3] submit to the Administrator, and to the State in which the source is located, a proposed plan to achieve the required offsets. Upon approval of the proposed plan by the Administrator, as submitted, modified or conditioned, the plan shall be deemed at[4] a condition of the operating permit for the unit without further review or revision of the permit. The Administrator shall also deduct allowances equal to the excess tonnage from those allocated for the source for the calendar year, or succeeding years during which offsets are required, following the year in which the excess emissions occurred.

**(c) Penalty adjustment**

The Administrator shall, by regulation, adjust the penalty specified in subsection (a) of this section for inflation, based on the Consumer Price Index, on November 15, 1990, and annually thereafter.

**(d) Prohibition**

It shall be unlawful for the owner or operator of any source liable for a penalty and offset under this section to fail (1) to pay the penalty under subsection (a) of this section, (2) to provide, and thereafter comply with, a compliance plan as required by subsection (b) of this section, or (3) to offset excess emissions as required by subsection (b) of this section.

**(e) Savings provision**

Nothing in this subchapter shall limit or otherwise affect the application of section 7413, 7414, 7420, or 7604 of this title except as otherwise explicitly provided in this subchapter.

(July 14, 1955, ch. 360, title IV, § 411, as added Pub. L. 101–549, title IV, § 401, Nov. 15, 1990, 104 Stat. 2623.)

REFERENCES IN TEXT

The Miscellaneous Receipts Act, referred to in subsec. (a), is not a recognized popular name for an act. For provisions relating to deposit of monies, see section 3302 of Title 31, Money and Finance.

## § 7651k. Monitoring, reporting, and record-keeping requirements

**(a) Applicability**

The owner and operator of any source subject to this subchapter shall be required to install and operate CEMS on each affected unit at the source, and to quality assure the data for sulfur dioxide, nitrogen oxides, opacity and volumetric flow at each such unit. The Administrator shall, by regulations issued not later than eighteen months after November 15, 1990, specify the requirements for CEMS, for any alternative monitoring system that is demonstrated as providing information with the same precision, reliability, accessibility, and timeliness as that pro-

vided by CEMS, and for recordkeeping and reporting of information from such systems. Such regulations may include limitations or the use of alternative compliance methods by units equipped with an alternative monitoring system as may be necessary to preserve the orderly functioning of the allowance system, and which will ensure the emissions reductions contemplated by this subchapter. Where 2 or more units utilize a single stack, a separate CEMS shall not be required for each unit, and for such units the regulations shall require that the owner or operator collect sufficient information to permit reliable compliance determinations for each such unit.

**(b) First phase requirements**

Not later than thirty-six months after November 15, 1990, the owner or operator of each affected unit under section 7651c of this title, including, but not limited to, units that become affected units pursuant to subsections (b) and (c) and eligible units under subsection (d), shall install and operate CEMS, quality assure the data, and keep records and reports in accordance with the regulations issued under subsection (a).

**(c) Second phase requirements**

Not later than January 1, 1995, the owner or operator of each affected unit that has not previously met the requirements of subsections (a) and (b) shall install and operate CEMS, quality assure the data, and keep records and reports in accordance with the regulations issued under subsection (a). Upon commencement of commercial operation of each new utility unit, the unit shall comply with the requirements of subsection (a).

**(d) Unavailability of emissions data**

If CEMS data or data from an alternative monitoring system approved by the Administrator under subsection (a) is not available for any affected unit during any period of a calendar year in which such data is required under this subchapter, and the owner or operator cannot provide information, satisfactory to the Administrator, on emissions during that period, the Administrator shall deem the unit to be operating in an uncontrolled manner during the entire period for which the data was not available and shall, by regulation which shall be issued not later than eighteen months after November 15, 1990, prescribe means to calculate emissions for that period. The owner or operator shall be liable for excess emissions fees and off-sets under section 7651j of this title in accordance with such regulations. Any fee due and payable under this subsection shall not diminish the liability of the unit's owner or operator for any fine, penalty, fee or assessment against the unit for the same violation under any other section of this chapter.

**(e) Prohibition**

It shall be unlawful for the owner or operator of any source subject to this subchapter to operate a source without complying with the requirements of this section, and any regulations implementing this section.

(July 14, 1955, ch. 360, title IV, § 412, as added Pub. L. 101–549, title IV, § 401, Nov. 15, 1990, 104 Stat. 2624.)

---

[3] So in original. Probably should be ''occurred,''.
[4] So in original.

INFORMATION GATHERING ON GREENHOUSE GASES
CONTRIBUTING TO GLOBAL CLIMATE CHANGE

Pub. L. 101–549, title VIII, §821, Nov. 15, 1990, 104 Stat. 2699, provided that:

"(a) MONITORING.—The Administrator of the Environmental Protection Agency shall promulgate regulations within 18 months after the enactment of the Clean Air Act Amendments of 1990 [Nov. 15, 1990] to require that all affected sources subject to title V of the Clean Air Act [probably means title IV of the Clean Air Act as added by Pub. L. 101–549, which is classified to section 7651 et seq. of this title] shall also monitor carbon dioxide emissions according to the same timetable as in section 511(b) and (c) [probably means section 412(b) and (c) of the Clean Air Act, which is classified to section 7651k(b) and (c) of this title]. The regulations shall require that such data be reported to the Administrator. The provisions of section 511(e) of title V of the Clean Air Act [probably means section 412(e) of title IV of the Clean Air Act, which is classified to section 7651k(e) of this title] shall apply for purposes of this section in the same manner and to the same extent as such provision applies to the monitoring and data referred to in section 511 [probably means section 412 of the Clean Air Act, which is classified to section 7651k of this title].

"(b) PUBLIC AVAILABILITY OF CARBON DIOXIDE INFORMATION.—For each unit required to monitor and provide carbon dioxide data under subsection (a), the Administrator shall compute the unit's aggregate annual total carbon dioxide emissions, incorporate such data into a computer data base, and make such aggregate annual data available to the public."

### § 7651*l*. General compliance with other provisions

Except as expressly provided, compliance with the requirements of this subchapter shall not exempt or exclude the owner or operator of any source subject to this subchapter from compliance with any other applicable requirements of this chapter.

(July 14, 1955, ch. 360, title IV, §413, as added Pub. L. 101–549, title IV, §401, Nov. 15, 1990, 104 Stat. 2625.)

### § 7651m. Enforcement

It shall be unlawful for any person subject to this subchapter to violate any prohibition of, requirement of, or regulation promulgated pursuant to this subchapter shall be a violation of this chapter.[1] In addition to the other requirements and prohibitions provided for in this subchapter, the operation of any affected unit to emit sulfur dioxide in excess of allowances held for such unit shall be deemed a violation, with each ton emitted in excess of allowances held constituting a separate violation.

(July 14, 1955, ch. 360, title IV, §414, as added Pub. L. 101–549, title IV, §401, Nov. 15, 1990, 104 Stat. 2625.)

### § 7651n. Clean coal technology regulatory incentives

#### (a) "Clean coal technology" defined

For purposes of this section, "clean coal technology" means any technology, including technologies applied at the precombustion, combustion, or post combustion stage, at a new or existing facility which will achieve significant reductions in air emissions of sulfur dioxide or oxides of nitrogen associated with the utilization of coal in the generation of electricity, process steam, or industrial products, which is not in widespread use as of November 15, 1990.

#### (b) Revised regulations for clean coal technology demonstrations

##### (1) Applicability

This subsection applies to physical or operational changes to existing facilities for the sole purpose of installation, operation, cessation, or removal of a temporary or permanent clean coal technology demonstration project. For the purposes of this section, a clean coal technology demonstration project shall mean a project using funds appropriated under the heading "Department of Energy—Clean Coal Technology", up to a total amount of $2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations for the Environmental Protection Agency. The Federal contribution for a qualifying project shall be at least 20 percent of the total cost of the demonstration project.

##### (2) Temporary projects

Installation, operation, cessation, or removal of a temporary clean coal technology demonstration project that is operated for a period of five years or less, and which complies with the State implementation plans for the State in which the project is located and other requirements necessary to attain and maintain the national ambient air quality standards during and after the project is terminated, shall not subject such facility to the requirements of section 7411 of this title or part C or D of subchapter I of this chapter.

##### (3) Permanent projects

For permanent clean coal technology demonstration projects that constitute repowering as defined in section 7651a(*l*)[1] of this title, any qualifying project shall not be subject to standards of performance under section 7411 of this title or to the review and permitting requirements of part C[2] for any pollutant the potential emissions of which will not increase as a result of the demonstration project.

##### (4) EPA regulations

Not later than 12 months after November 15, 1990, the Administrator shall promulgate regulations or interpretive rulings to revise requirements under section 7411 of this title and parts C and D,[2] as appropriate, to facilitate projects consistent in[3] this subsection. With respect to parts C and D,[2] such regulations or rulings shall apply to all areas in which EPA is the permitting authority. In those instances in which the State is the permitting authority under part C or D,[2] any State may adopt and submit to the Administrator for approval revisions to its implementation plan to apply the

---

[1] So in original.

[1] So in original. Probably should be section "7651a(12)".
[2] See References in Text note below.
[3] So in original. Probably should be "with".

regulations or rulings promulgated under this subsection.

**(c) Exemption for reactivation of very clean units**

Physical changes or changes in the method of operation associated with the commencement of commercial operations by a coal-fired utility unit after a period of discontinued operation shall not subject the unit to the requirements of section 7411 of this title or part C of the Act[2] where the unit (1) has not been in operation for the two-year period prior to the enactment of the Clean Air Act Amendments of 1990 [November 15, 1990], and the emissions from such unit continue to be carried in the permitting authority's emissions inventory at the time of enactment, (2) was equipped prior to shut-down with a continuous system of emissions control that achieves a removal efficiency for sulfur dioxide of no less than 85 percent and a removal efficiency for particulates of no less than 98 percent, (3) is equipped with low-$NO_x$ burners prior to the time of commencement, and (4) is otherwise in compliance with the requirements of this chapter.

(July 14, 1955, ch. 360, title IV, §415, as added Pub. L. 101–549, title IV, §401, Nov. 15, 1990, 104 Stat. 2625.)

REFERENCES IN TEXT

Parts C and D and part C of the Act, referred to in subsecs. (b)(3), (4) and (c), probably mean parts C and D of subchapter I of this chapter.

**§ 7651o. Contingency guarantee, auctions, reserve**

**(a) Definitions**

For purposes of this section—

(1) The term ''independent power producer'' means any person who owns or operates, in whole or in part, one or more new independent power production facilities.

(2) The term ''new independent power production facility'' means a facility that—

(A) is used for the generation of electric energy, 80 percent or more of which is sold at wholesale;

(B) is nonrecourse project-financed (as such term is defined by the Secretary of Energy within 3 months of November 15, 1990);

(C) does not generate electric energy sold to any affiliate (as defined in section 79b(a)(11)[1] of title 15) of the facility's owner or operator unless the owner or operator of the facility demonstrates that it cannot obtain allowances from the affiliate; and

(D) is a new unit required to hold allowances under this subchapter.

(3) The term ''required allowances'' means the allowances required to operate such unit for so much of the unit's useful life as occurs after January 1, 2000.

**(b) Special reserve of allowances**

Within 36 months after November 15, 1990, the Administrator shall promulgate regulations establishing a Special Allowance Reserve contain-

ing allowances to be sold under this section. For purposes of establishing the Special Allowance Reserve, the Administrator shall withhold—

(1) 2.8 percent of the allocation of allowances for each year from 1995 through 1999 inclusive; and

(2) 2.8 percent of the basic Phase II allowance allocation of allowances for each year beginning in the year 2000

which would (but for this subsection) be issued for each affected unit at an affected source. The Administrator shall record such withholding for purposes of transferring the proceeds of the allowance sales under this subsection. The allowances so withheld shall be deposited in the Reserve under this section.

**(c) Direct sale at $1,500 per ton**

**(1) Subaccount for direct sales**

In accordance with regulations under this section, the Administrator shall establish a Direct Sale Subaccount in the Special Allowance Reserve established under this section. The Direct Sale Subaccount shall contain allowances in the amount of 50,000 tons per year for each year beginning in the year 2000.

**(2) Sales**

Allowances in the subaccount shall be offered for direct sale to any person at the times and in the amounts specified in table 1 at a price of $1,500 per allowance, adjusted by the Consumer Price Index in the same manner as provided in paragraph (3). Requests to purchase allowances from the Direct Sale Subaccount established under paragraph (1) shall be approved in the order of receipt until no allowances remain in such subaccount, except that an opportunity to purchase such allowances shall be provided to the independent power producers referred to in this subsection before such allowances are offered to any other person. Each applicant shall be required to pay 50 percent of the total purchase price of the allowances within 6 months after the approval of the request to purchase. The remainder shall be paid on or before the transfer of the allowances.

TABLE 1—NUMBER OF ALLOWANCES AVAILABLE FOR SALE AT $1,500 PER TON

| Year of Sale | Spot Sale (same year) | Advance Sale |
|---|---|---|
| 1993–1999 ............................. | ................. | 25,000 |
| 2000 and after ...................... | 25,000 | 25,000 |

Allowances sold in the spot sale in any year are allowances which may only be used in that year (unless banked for use in a later year). Allowances sold in the advance sale in any year are allowances which may only be used in the 7th year after the year in which they are first offered for sale (unless banked for use in a later year).

**(3) Entitlement to written guarantee**

Any independent power producer that submits an application to the Administrator establishing that such independent power producer—

(A) proposes to construct a new independent power production facility for which allowances are required under this subchapter;

(B) will apply for financing to construct such facility after January 1, 1990, and before the date of the first auction under this section;

(C) has submitted to each owner or operator of an affected unit listed in table A (in section 7651c of this title) a written offer to purchase the required allowances for $750 per ton; and

(D) has not received (within 180 days after submitting offers to purchase under subparagraph (C)) an acceptance of the offer to purchase the required allowances,

shall, within 30 days after submission of such application, be entitled to receive the Administrator's written guarantee (subject to the eligibility requirements set forth in paragraph (4)) that such required allowances will be made available for purchase from the Direct Sale Subaccount established under this subsection and at a guaranteed price. The guaranteed price at which such allowances shall be made available for purchase shall be $1,500 per ton, adjusted by the percentage, if any, by which the Consumer Price Index (as determined under section 7661a(b)(3)(B)(v) of this title) for the year in which the allowance is purchased exceeds the Consumer Price Index for the calendar year 1990.

**(4) Eligibility requirements**

The guarantee issued by the Administrator under paragraph (3) shall be subject to a demonstration by the independent power producer, satisfactory to the Administrator, that—

(A) the independent power producer has—

(i) made good faith efforts to purchase the required allowances from the owners or operators of affected units to which allowances will be allocated, including efforts to purchase at annual auctions under this section, and from industrial sources that have elected to become affected units pursuant to section 7651i of this title; and

(ii) such bids and efforts were unsuccessful in obtaining the required allowances; and

(B) the independent power producer will continue to make good faith efforts to purchase the required allowances from the owners or operators of affected units and from industrial sources.

**(5) Issuance of guaranteed allowances from Direct Sale Subaccount under this section**

From the allowances available in the Direct Sale Subaccount established under this subsection, upon payment of the guaranteed price, the Administrator shall issue to any person exercising the right to purchase allowances pursuant to a guarantee under this subsection the allowances covered by such guarantee. Persons to which guarantees under this subsection have been issued shall have the opportunity to purchase allowances pursuant to such guarantee from such subaccount before the allowances in such reserve are offered for sale to any other person.

**(6) Proceeds**

Notwithstanding section 3302 of title 31 or any other provision of law, the Administrator shall require that the proceeds of any sale under this subsection be transferred, within 90 days after the sale, without charge, on a pro rata basis to the owners or operators of the affected units from whom the allowances were withheld under subsection (b) of this section and that any unsold allowances be transferred to the Subaccount for Auction Sales established under subsection (d) of this section. No proceeds of any sale under this subsection shall be held by any officer or employee of the United States or treated for any purpose as revenue to the United States or to the Administrator.

**(7) Termination of subaccount**

If the Administrator determines that, during any period of 2 consecutive calendar years, less than 20 percent of the allowances available in the subaccount for direct sales established under this subsection have been purchased under this paragraph, the Administrator shall terminate the subaccount and transfer such allowances to the Auction Subaccount under subsection (d) of this section.

**(d) Auction sales**

**(1) Subaccount for auctions**

The Administrator shall establish an Auction Subaccount in the Special Reserve established under this section. The Auction Subaccount shall contain allowances to be sold at auction under this section in the amount of 150,000 tons per year for each year from 1995 through 1999, inclusive and 250,000 tons per year for each year beginning in the calendar year 2000.

**(2) Annual auctions**

Commencing in 1993 and in each year thereafter, the Administrator shall conduct auctions at which the allowances referred to in paragraph (1) shall be offered for sale in accordance with regulations promulgated by the Administrator, in consultation with the Secretary of the Treasury, within 12 months of November 15, 1990. The allowances referred to in paragraph (1) shall be offered for sale at auction in the amounts specified in table 2. The auction shall be open to any person. A person wishing to bid for such allowances shall submit (by a date set by the Administrator) to the Administrator (on a sealed bid schedule provided by the Administrator) offers to purchase specified numbers of allowances at specified prices. Such regulations shall specify that the auctioned allowances shall be allocated and sold on the basis of bid price, starting with the highest-priced bid and continuing until all allowances for sale at such auction have been allocated. The regulations shall not permit that a minimum price be set for the purchase of withheld allowances. Allowances purchased at the auction may be used for any purpose and at any time after the auction, subject to the provisions of this subchapter.

TABLE 2—NUMBER OF ALLOWANCES AVAILABLE FOR AUCTION

| Year of Sale | Spot Auction (same year) | Advance Auction |
|---|---|---|
| 1993 .................................... | 50,000* | 100,000 |
| 1994 .................................... | 50,000* | 100,000 |
| 1995 .................................... | 50,000* | 100,000 |
| 1996 .................................... | 150,000 | 100,000 |
| 1997 .................................... | 150,000 | 100,000 |
| 1998 .................................... | 150,000 | 100,000 |
| 1999 .................................... | 150,000 | 100,000 |
| 2000 and after ..................... | 100,000 | 100,000 |

Allowances sold in the spot sale in any year are allowances which may only be used in that year (unless banked for use in a later year), except as otherwise noted. Allowances sold in the advance auction in any year are allowances which may only be used in the 7th year after the year in which they are first offered for sale (unless banked for use in a later year).

*Available for use only in 1995 (unless banked for use in a later year).

**(3) Proceeds**

(A) Notwithstanding section 3302 of title 31 or any other provision of law, within 90 days of receipt, the Administrator shall transfer the proceeds from the auction under this section, on a pro rata basis, to the owners or operators of the affected units at an affected source from whom allowances were withheld under subsection (b) of this section. No funds transferred from a purchaser to a seller of allowances under this paragraph shall be held by any officer or employee of the United States or treated for any purpose as revenue to the United States or the Administrator.

(B) At the end of each year, any allowances offered for sale but not sold at the auction shall be returned without charge, on a pro rata basis, to the owner or operator of the affected units from whose allocation the allowances were withheld.

**(4) Additional auction participants**

Any person holding allowances or to whom allowances are allocated by the Administrator may submit those allowances to the Administrator to be offered for sale at auction under this subsection. The proceeds of any such sale shall be transferred at the time of sale by the purchaser to the person submitting such allowances for sale. The holder of allowances offered for sale under this paragraph may specify a minimum sale price. Any person may purchase allowances offered for auction under this paragraph. Such allowances shall be allocated and sold to purchasers on the basis of bid price after the auction under paragraph (2) is complete. No funds transferred from a purchaser to a seller of allowances under this paragraph shall be held by any officer or employee of the United States or treated for any purpose as revenue to the United States or the Administrator.

**(5) Recording by EPA**

The Administrator shall record and publicly report the nature, prices and results of each auction under this subsection, including the prices of successful bids, and shall record the transfers of allowances as a result of each auc-

tion in accordance with the requirements of this section. The transfer of allowances at such auction shall be recorded in accordance with the regulations promulgated by the Administrator under this subchapter.

**(e) Changes in sales, auctions, and withholding**

Pursuant to rulemaking after public notice and comment the Administrator may at any time after the year 1998 (in the case of advance sales or advance auctions) and 2005 (in the case of spot sales or spot auctions) decrease the number of allowances withheld and sold under this section.

**(f) Termination of auctions**

The Administrator may terminate the withholding of allowances and the auction sales under this section if the Administrator determines that, during any period of 3 consecutive calendar years after 2002, less than 20 percent of the allowances available in the auction subaccount have been purchased. Pursuant to regulations under this section, the Administrator may by delegation or contract provide for the conduct of sales or auctions under the Administrator's supervision by other departments or agencies of the United States Government or by nongovernmental agencies, groups, or organizations.

(July 14, 1955, ch. 360, title IV, §416, as added Pub. L. 101–549, title IV, §401, Nov. 15, 1990, 104 Stat. 2626.)

REFERENCES IN TEXT

Section 79b of title 15, referred to in subsec. (a)(2)(C), was repealed by Pub. L. 109–58, title XII, §1263, Aug. 8, 2005, 119 Stat. 974. See section 16451(1) of this title.

SUBCHAPTER V—PERMITS

**§ 7661. Definitions**

As used in this subchapter—

**(1) Affected source**

The term ''affected source'' shall have the meaning given such term in subchapter IV–A of this chapter.

**(2) Major source**

The term ''major source'' means any stationary source (or any group of stationary sources located within a contiguous area and under common control) that is either of the following:

(A) A major source as defined in section 7412 of this title.

(B) A major stationary source as defined in section 7602 of this title or part D of subchapter I of this chapter.

**(3) Schedule of compliance**

The term ''schedule of compliance'' means a schedule of remedial measures, including an enforceable sequence of actions or operations, leading to compliance with an applicable implementation plan, emission standard, emission limitation, or emission prohibition.

**(4) Permitting authority**

The term ''permitting authority'' means the Administrator or the air pollution control agency authorized by the Administrator to

**Environmental Protection Agency**                    **§ 19.4**

19.3  [Reserved]
19.4  Penalty adjustment and table.

AUTHORITY: Public Law 101–410, 28 U.S.C. 2461 note; Public Law 104–134, 31 U.S.C. 3701 note.

SOURCE: 73 FR 75345, Dec. 11, 2008, unless otherwise noted.

### § 19.1  Applicability.

This part applies to each statutory provision under the laws administered by the Environmental Protection Agency concerning the civil monetary penalties which may be assessed in either civil judicial or administrative proceedings.

### § 19.2  Effective date.

The increased penalty amounts set forth in the seventh and last column of Table 1 to § 19.4 apply to all violations under the applicable statutes and regulations which occur after December 6, 2013. The penalty amounts in the sixth column of Table 1 to § 19.4 apply to violations under the applicable statutes and regulations which occurred after January 12, 2009, through December 6, 2013. The penalty amounts in the fifth column of Table 1 to § 19.4 apply to all violations under the applicable statutes and regulations which occurred after March 15, 2004, through January 12, 2009. The penalty amounts in the fourth column of Table 1 to § 19.4 apply to all violations under the applicable statutes and regulations which occurred after January 30, 1997, through March 15, 2004.

[78 FR 66646, Nov. 6, 2013]

### § 19.3  [Reserved]

### § 19.4  Penalty adjustment and table.

The adjusted statutory penalty provisions and their applicable amounts are set out in Table 1. The last column in the table provides the newly effective statutory civil penalty amounts.

TABLE 1 OF SECTION 19.4—CIVIL MONETARY PENALTY INFLATION ADJUSTMENTS

| U.S. Code Citation | Environmental statute | Statutory penalties, as enacted | Penalties effective after January 30, 1997 through March 15, 2004 | Penalties effective after March 15, 2004 through January 12, 2009 | Penalties effective after January 12, 2009 through December 6, 2013 | Penalties effective after December 6, 2013 |
|---|---|---|---|---|---|---|
| 7 U.S.C. 136l(a)(1) | FEDERAL INSECTICIDE, FUNGICIDE, AND RODENTICIDE ACT (FIFRA). | $5,000 | $5,500 | $6,500 | $7,500 | $7,500 |
| 7 U.S.C. 136l(a)(2) | FIFRA | $500/$1,000 | $550/$1,000 | $650/$1,100 | $750/$1,100 | $750/$1,100 |
| 15 U.S.C. 2615(a)(1) | TOXIC SUBSTANCES CONTROL ACT (TSCA). | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 15 U.S.C. 2647(a) | TSCA | $5,000 | $5,500 | $6,500 | $7,500 | $7,500 |
| 15 U.S.C. 2647(g) | TSCA | $5,000 | $5,000 | $5,500 | $7,500 | $7,500 |
| 31 U.S.C. 3802(a)(1) | PROGRAM FRAUD CIVIL REMEDIES ACT (PFCRA). | $5,000 | $5,500 | $6,500 | $7,500 | $7,500 |
| 31 U.S.C. 3802(a)(2) | PFCRA | $5,000 | $5,500 | $6,500 | $7,500 | $7,500 |
| 33 U.S.C. 1319(d) | CLEAN WATER ACT (CWA). | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 33 U.S.C. 1319(g)(2)(A) | CWA | $10,000/$25,000 | $11,000/$27,500 | $11,000/$32,500 | $16,000/$32,500 | $16,000/$37,500 |
| 33 U.S.C. 1319(g)(2)(B) | CWA | $10,000/$125,000 | $11,000/$137,500 | $11,000/$157,500 | $16,000/$177,500 | $16,000/$187,500 |
| 33 U.S.C. 1321(b)(6)(B)(i). | CWA | $10,000/$25,000 | $11,000/$27,500 | $11,000/$32,500 | $16,000/$37,500 | $16,000/$37,500 |
| 33 U.S.C. 1321(b)(6)(B)(ii). | CWA | $10,000/$125,000 | $11,000/$137,500 | $11,000/$157,500 | $16,000/$177,500 | $16,000/$187,500 |
| 33 U.S.C. 1321(b)(7)(A) | CWA | $25,000/$1,000 | $27,500/$1,100 | $32,500/$1,100 | $37,500/$1,100 | $37,500/$2,100 |
| 33 U.S.C. 1321(b)(7)(B) | CWA | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 33 U.S.C. 1321(b)(7)(C) | CWA | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 33 U.S.C. 1321(b)(7)(D) | CWA | $100,000/$3,000 | $110,000/$3,300 | $130,000/$4,300 | $140,000/$4,300 | $150,000/$5,300 |
| 33 U.S.C. 1414b(d)(1) | MARINE PROTECTION, RESEARCH, AND SANCTUARIES ACT (MPRSA). | $600 | $660 | $760 | $860 | $860 |
| 33 U.S.C. 1415(a) | MPRSA | $50,000/$125,000 | $55,000/$137,500 | $65,000/$157,500 | $70,000/$177,500 | $75,000/$187,500 |
| 33 U.S.C. 1901 note (see 1409(a)(2)(A)). | CERTAIN ALASKAN CRUISE SHIP OPERATIONS (CACSO). | $10,000/$25,000 | $10,000/$25,000[2] | $10,000/$25,000 | $11,000/$27,500 | $11,000/$27,500 |
| 33 U.S.C. 1901 note (see 1409(a)(2)(B)). | CACSO | $10,000/$125,000 | $10,000/$125,000 | $10,000/$125,000 | $11,000/$137,500 | $11,000/$147,500 |

Addendum-051

**Environmental Protection Agency**  §19.4

| U.S. Code citation | Act | | | | | |
|---|---|---|---|---|---|---|
| 33 U.S.C. 1901 note (see 1409(b)(1)). 42 U.S.C. 300g–3(b) | CACSO | $25,000 | $25,000 | $25,000 | $27,500 | $27,500 |
| | SAFE DRINKING WATER ACT (SDWA). | | | | | |
| 42 U.S.C. 300g–3(A). | SDWA | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 42 U.S.C. 300g–3(g)(3)(A). | SDWA | $5,000/$25,000 | $5,000/$25,000 | $6,000/$27,500 | $7,000/$32,500 | $7,000/$32,500 |
| 42 U.S.C. 300g–3(g)(3)(B). | SDWA | $25,000 | $25,000 | $27,500 | $32,500 | $32,500 |
| 42 U.S.C. 300h–2(b)(1) | SDWA | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 42 U.S.C. 300h–2(c)(1) | SDWA | $10,000/$125,000 | $11,000/$137,500 | $11,000/$157,500 | $16,000/$177,500 | $16,000/$187,500 |
| 42 U.S.C. 300h–2(c)(2) | SDWA | $5,000/$125,000 | $5,500/$137,500 | $6,500/$157,500 | $7,500/$177,500 | $7,500/$187,500 |
| 42 U.S.C. 300h–3(c) | SDWA | $5,000/$10,000 | $5,500/$11,000 | $6,500/$11,000 | $7,500/$16,000 | $7,500/$16,000 |
| 42 U.S.C. 300i(b) | SDWA | $15,000 | $15,000 | $16,500 | $16,500 | $21,500 |
| 42 U.S.C. 300i–1(c) | SDWA | $20,000/$50,000 | $22,000/$55,000 [3] | $100,000/$1,000,000 | $110,000/$1,100,000 | $120,000/$1,150,000 |
| 42 U.S.C. 300j(e)(2) | SDWA | $2,500 | $2,750 | $2,750 | $3,750 | $3,750 |
| 42 U.S.C. 300j–4(c) | SDWA | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 42 U.S.C. 300j–6(b)(2) | SDWA | $25,000 | $25,000 | $27,500 | $32,500 | $32,500 |
| 42 U.S.C. 300j–23(d) | SDWA | $5,000/$50,000 | $5,500/$55,000 | $6,500/$65,000 | $7,500/$70,000 | $7,500/$75,000 |
| 42 U.S.C. 4852d(b)(5) | RESIDENTIAL LEAD-BASED PAINT HAZARD REDUCTION ACT OF 1992. | $10,000 | $11,000 | $11,000 | $16,000 | $16,000 |
| 42 U.S.C. 4910(a)(2) | NOISE CONTROL ACT OF 1972. | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 42 U.S.C. 6928(a)(3) | RESOURCE CONSERVATION AND RECOVERY ACT (RCRA). | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 42 U.S.C. 6928(c) | RCRA | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 42 U.S.C. 6928(g) | RCRA | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 42 U.S.C. 6928(h)(2) | RCRA | $5,000 | $5,500 | $6,500 | $7,500 | $7,500 |
| 42 U.S.C. 6934(e) | RCRA | $5,000 | $5,500 | $6,500 | $7,500 | $7,500 |
| 42 U.S.C. 6973(b) | RCRA | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 42 U.S.C. 6991e(a)(3) | RCRA | $10,000 | $11,000 | $11,000 | $16,000 | $16,000 |
| 42 U.S.C. 6991e(d)(1) | RCRA | $10,000 | $11,000 | $11,000 | $16,000 | $16,000 |
| 42 U.S.C. 6991e(d)(2) | RCRA | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 42 U.S.C. 7413(b) | CLEAN AIR ACT (CAA) | $25,000/$200,000 | $27,500/$220,000 | $32,500/$270,000 | $37,500/$295,000 | $37,500/$320,000 |
| 42 U.S.C. 7413(d)(1) | CAA | $5,000 | $5,500 | $6,500 | $7,500 | $7,500 |
| 42 U.S.C. 7413(d)(3) | CAA | $2,500/$25,000 | $2,750/$27,500 | $2,750/$32,500 | $3,750/$37,500 | $3,750/$37,500 |
| 42 U.S.C. 7524(a) | CAA | | | | | |

221

TABLE 1 OF SECTION 19.4—CIVIL MONETARY PENALTY INFLATION ADJUSTMENTS—Continued

| U.S. Code Citation | Environmental statute | Statutory penalties, as enacted | Penalties effective after January 30, 1997 through March 15, 2004 | Penalties effective after March 15, 2004 through January 12, 2009 | Penalties effective after January 12, 2009 through December 6, 2013 | Penalties effective after December 6, 2013 |
|---|---|---|---|---|---|---|
| 42 U.S.C. 7524(c)(1) | CAA | $200,000 | $220,000 | $270,000 | $295,000 | $320,000 |
| 42 U.S.C. 7545(d)(1) | CAA | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 42 U.S.C. 9604(e)(5)(B) | COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT (CERCLA). | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 42 U.S.C. 9606(b)(1) | CERCLA | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 42 U.S.C. 9609(a)(1) | CERCLA | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 42 U.S.C. 9609(b) | CERCLA | $25,000/$75,000 | $27,500/$82,500 | $32,500/$97,500 | $37,500/$107,500 | $37,500/$117,500 |
| 42 U.S.C. 9609(c) | CERCLA | $25,000/$75,000 | $27,500/$82,500 | $32,500/$97,500 | $37,500/$107,500 | $37,500/$117,500 |
| 42 U.S.C. 11045(a) | EMERGENCY PLANNING AND COMMUNITY RIGHT-TO-KNOW ACT (EPCRA). | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 42 U.S.C. 11045(b)(1)(A)[1] | EPCRA | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 42 U.S.C. 11045(b)(2) | EPCRA | $25,000/$75,000 | $27,500/$82,500 | $32,500/$97,500 | $37,500/$107,500 | $37,500/$117,500 |
| 42 U.S.C. 11045(b)(3) | EPCRA | $25,000/$75,000 | $27,500/$82,500 | $32,500/$97,500 | $37,500/$107,500 | $37,500/$117,500 |
| 42 U.S.C. 11045(c)(1) | EPCRA | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 42 U.S.C. 11045(c)(2) | EPCRA | $10,000 | $11,000 | $11,000 | $16,000 | $16,000 |
| 42 U.S.C. 11045(d)(1) | EPCRA | $25,000 | $27,500 | $32,500 | $37,500 | $37,500 |
| 42 U.S.C. 14304(a)(1) | MERCURY-CONTAINING AND RECHARGEABLE BATTERY MANAGEMENT ACT (BATTERY ACT). | $10,000 | $10,000 | $11,000 | $16,000 | $16,000 |
| 42 U.S.C. 14304(g) | BATTERY ACT | $10,000 | $10,000 | $11,000 | $16,000 | $16,000 |

[1] Note that 33 U.S.C. 1414b (d)(1)(B) contains additional penalty escalation provisions that must be applied to the penalty amounts set forth in this Table. The amounts set forth in this Table reflect an inflation adjustment to the calendar year 1992 penalty amount expressed in section 104B(d)(1)(A), which is used to calculate the applicable penalty amount under MPRSA section 104B(d)(1)(B) for violations that occur in any subsequent calendar year.

[2] CACSO was passed on December 21, 2000 as part of Title XIV of the Consolidated Appropriations Act of 2001, Pub. L. 106–554, 33 U.S.C. 1901 note.

**Environmental Protection Agency**                                    § 19.4

[3] The original statutory penalty amounts of $20,000 and $50,000 under section 1432(c) of the SDWA, 42 U.S.C. 300j-1(c), were subsequently increased by Congress pursuant to section 403 of the Public Health Security and Bioterrorism Preparedness and Response Act of 2002, Public Law No. 107-488 (June 12, 2002), to $100,000 and $1,000,000, respectively. EPA did not adjust these new penalty amounts in its 2004 Civil Monetary Penalty Inflation Adjustment Rule ("2004 Rule"), 69 FR 7121 (February 13, 2004), because they had gone into effect less than two years prior to the 2004 Rule.

[4] Consistent with how the EPA's other penalty authorities are displayed under Part 19.4, this Table now delineates, on a subpart-by-subpart basis, the penalty authorities enumerated under section 325(b) of EPCRA, 42 U.S.C. 11045(b) (i.e., 42 U.S.C. 11045(b)(1)(A), (b)(2), and (b)(3)).

[78 FR 66647, Nov. 6, 2013]

223

**Environmental Protection Agency**  §51.166

establishing the magnitude of the basic design parameter(s) specified in paragraphs (h)(2)(i) and (ii) of this section.

(v) If design information is not available for a process unit, then the owner or operator shall determine the process unit's basic design parameter(s) using the maximum value achieved by the process unit in the five-year period immediately preceding the planned activity.

(vi) Efficiency of a process unit is not a basic design parameter.

(3) The replacement activity shall not cause the process unit to exceed any emission limitation, or operational limitation that has the effect of constraining emissions, that applies to the process unit and that is legally enforceable.

[51 FR 40669, Nov. 7, 1986]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting §51.165, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.fdsys.gov*.

EFFECTIVE DATE NOTE: At 76 FR 17552, Mar. 30, 2011, §51.165, paragraphs (a)(1)(v)(G) and (v)(1)(vi)(C) *(3)* are stayed indefinitely.

§51.166  **Prevention of significant deterioration of air quality.**

(a)(1) *Plan requirements.* In accordance with the policy of section 101(b)(1) of the Act and the purposes of section 160 of the Act, each applicable State Implementation Plan and each applicable Tribal Implementation Plan shall contain emission limitations and such other measures as may be necessary to prevent significant deterioration of air quality.

(2) *Plan revisions.* If a State Implementation Plan revision would result in increased air quality deterioration over any baseline concentration, the plan revision shall include a demonstration that it will not cause or contribute to a violation of the applicable increment(s). If a plan revision proposing less restrictive requirements was submitted after August 7, 1977 but on or before any applicable baseline date and was pending action by the Administrator on that date, no such demonstration is necessary with respect to the area for which a baseline date would be established before final action is taken on the plan revision. Instead, the assessment described in paragraph (a)(4) of this section, shall review the expected impact to the applicable increment(s).

(3) *Required plan revision.* If the State or the Administrator determines that a plan is substantially inadequate to prevent significant deterioration or that an applicable increment is being violated, the plan shall be revised to correct the inadequacy or the violation. The plan shall be revised within 60 days of such a finding by a State or within 60 days following notification by the Administrator, or by such later date as prescribed by the Administrator after consultation with the State.

(4) *Plan assessment.* The State shall review the adequacy of a plan on a periodic basis and within 60 days of such time as information becomes available that an applicable increment is being violated.

(5) *Public participation.* Any State action taken under this paragraph shall be subject to the opportunity for public hearing in accordance with procedures equivalent to those established in §51.102.

(6) *Amendments.* (i) Any State required to revise its implementation plan by reason of an amendment to this section, with the exception of amendments to add new maximum allowable increases or other measures pursuant to section 166(a) of the Act, shall adopt and submit such plan revision to the Administrator for approval no later than 3 years after such amendment is published in the FEDERAL REGISTER. With regard to a revision to an implementation plan by reason of an amendment to paragraph (c) of this section to add maximum allowable increases or other measures, the State shall submit such plan revision to the Administrator for approval within 21 months after such amendment is published in the FEDERAL REGISTER.

(ii) Any revision to an implementation plan that would amend the provisions for the prevention of significant air quality deterioration in the plan shall specify when and as to what sources and modifications the revision is to take effect.

(iii) Any revision to an implementation plan that an amendment to this section required shall take effect no

251

later than the date of its approval and may operate prospectively.

(7) *Applicability.* Each plan shall contain procedures that incorporate the requirements in paragraphs (a)(7)(i) through (vi) of this section.

(i) The requirements of this section apply to the construction of any new major stationary source (as defined in paragraph (b)(1) of this section) or any project at an existing major stationary source in an area designated as attainment or unclassifiable under sections 107(d)(1)(A)(ii) or (iii) of the Act.

(ii) The requirements of paragraphs (j) through (r) of this section apply to the construction of any new major stationary source or the major modification of any existing major stationary source, except as this section otherwise provides.

(iii) No new major stationary source or major modification to which the requirements of paragraphs (j) through (r)(5) of this section apply shall begin actual construction without a permit that states that the major stationary source or major modification will meet those requirements.

(iv) Each plan shall use the specific provisions of paragraphs (a)(7)(iv)(*a*) through (*f*) of this section. Deviations from these provisions will be approved only if the State specifically demonstrates that the submitted provisions are more stringent than or at least as stringent in all respects as the corresponding provisions in paragraphs (a)(7)(iv)(*a*) through (*f*) of this section.

(*a*) Except as otherwise provided in paragraphs (a)(7)(v) and (vi) of this section, and consistent with the definition of major modification contained in paragraph (b)(2) of this section, a project is a major modification for a regulated NSR pollutant if it causes two types of emissions increases—a significant emissions increase (as defined in paragraph (b)(39) of this section), and a significant net emissions increase (as defined in paragraphs (b)(3) and (b)(23) of this section). The project is not a major modification if it does not cause a significant emissions increase. If the project causes a significant emissions increase, then the project is a major modification only if it also results in a significant net emissions increase.

(*b*) The procedure for calculating (before beginning actual construction) whether a significant emissions increase (*i.e.,* the first step of the process) will occur depends upon the type of emissions units being modified, according to paragraphs (a)(7)(iv)(*c*) through (*f*) of this section. The procedure for calculating (before beginning actual construction) whether a significant net emissions increase will occur at the major stationary source (*i.e.,* the second step of the process) is contained in the definition in paragraph (b)(3) of this section. Regardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase.

(*c*) *Actual-to-projected-actual applicability test for projects that only involve existing emissions units.* A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the projected actual emissions (as defined in paragraph (b)(40) of this section) and the baseline actual emissions (as defined in paragraphs (b)(47)(i) and (ii) of this section) for each existing emissions unit, equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(*d*) *Actual-to-potential test for projects that only involve construction of a new emissions unit(s).* A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the potential to emit (as defined in paragraph (b)(4) of this section) from each new emissions unit following completion of the project and the baseline actual emissions (as defined in paragraph (b)(47)(iii) of this section) of these units before the project equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(*e*) [Reserved]

(*f*) *Hybrid test for projects that involve multiple types of emissions units.* A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the emissions increases for each emissions unit, using the method specified in paragraphs

**Environmental Protection Agency**                                    **§ 51.166**

(a)(7)(iv)(*c*) through (*d*) of this section as applicable with respect to each emissions unit, for each type of emissions unit equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(v) The plan shall require that for any major stationary source for a PAL for a regulated NSR pollutant, the major stationary source shall comply with requirements under paragraph (w) of this section.

(b) *Definitions.* All State plans shall use the following definitions for the purposes of this section. Deviations from the following wording will be approved only if the State specifically demonstrates that the submitted definition is more stringent, or at least as stringent, in all respects as the corresponding definitions below:

(1)(i) *Major stationary source* means:

(*a*) Any of the following stationary sources of air pollutants which emits, or has the potential to emit, 100 tons per year or more of any regulated NSR pollutant: Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input, coal cleaning plants (with thermal dryers), kraft pulp mills, portland cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants (with thermal dryers), primary copper smelters, municipal incinerators capable of charging more than 250 tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production plants, chemical process plants (which does not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140), fossil-fuel boilers (or combinations thereof) totaling more than 250 million British thermal units per hour heat input, petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels, taconite ore processing plants, glass fiber processing plants, and charcoal production plants;

(*b*) Notwithstanding the stationary source size specified in paragraph (b)(1)(i)(*a*) of this section, any stationary source which emits, or has the potential to emit, 250 tons per year or more of a regulated NSR pollutant; or

(*c*) Any physical change that would occur at a stationary source not otherwise qualifying under paragraph (b)(1) of this section, as a major stationary source if the change would constitute a major stationary source by itself.

(ii) A major source that is major for volatile organic compounds or $NO_X$ shall be considered major for ozone.

(iii) The fugitive emissions of a stationary source shall not be included in determining for any of the purposes of this section whether it is a major stationary source, unless the source belongs to one of the following categories of stationary sources:

(*a*) Coal cleaning plants (with thermal dryers);

(*b*) Kraft pulp mills;

(*c*) Portland cement plants;

(*d*) Primary zinc smelters;

(*e*) Iron and steel mills;

(*f*) Primary aluminum ore reduction plants;

(*g*) Primary copper smelters;

(*h*) Municipal incinerators capable of charging more than 250 tons of refuse per day;

(*i*) Hydrofluoric, sulfuric, or nitric acid plants;

(*j*) Petroleum refineries;

(*k*) Lime plants;

(*l*) Phosphate rock processing plants;

(*m*) Coke oven batteries;

(*n*) Sulfur recovery plants;

(*o*) Carbon black plants (furnace process);

(*p*) Primary lead smelters;

(*q*) Fuel conversion plants;

(*r*) Sintering plants;

(*s*) Secondary metal production plants;

(*t*) Chemical process plants—The term chemical processing plant shall not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140;

(*u*) Fossil-fuel boilers (or combination thereof) totaling more than 250 million British thermal units per hour heat input;

253

(*v*) Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels;

(*w*) Taconite ore processing plants;

(*x*) Glass fiber processing plants;

(*y*) Charcoal production plants;

(*z*) Fossil fuel-fired steam electric plants of more that 250 million British thermal units per hour heat input;

(*aa*) Any other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the Act.

(2)(i) *Major modification* means any physical change in or change in the method of operation of a major stationary source that would result in: a significant emissions increase (as defined in paragraph (b)(39) of this section) of a regulated NSR pollutant (as defined in paragraph (b)(49) of this section); and a significant net emissions increase of that pollutant from the major stationary source.

(ii) Any significant emissions increase (as defined at paragraph (b)(39) of this section) from any emissions units or net emissions increase (as defined in paragraph (b)(3) of this section) at a major stationary source that is significant for volatile organic compounds or NO$_X$ shall be considered significant for ozone.

(iii) A physical change or change in the method of operation shall not include:

(*a*) Routine maintenance, repair and replacement. Routine maintenance, repair and replacement shall include, but not be limited to, any activity(s) that meets the requirements of the equipment replacement provisions contained in paragraph (y) of this section;

NOTE TO PARAGRAPH (b)(2)(iii)(*a*): On December 24, 2003, the second sentence of this paragraph (b)(2)(iii)(*a*) is stayed indefinitely by court order. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the FEDERAL REGISTER advising the public of the termination of the stay.

(*b*) Use of an alternative fuel or raw material by reason of any order under section 2 (a) and (b) of the Energy Supply and Environmental Coordination Act of 1974 (or any superseding legislation) or by reason of a natural gas cur-

tailment plan pursuant to the Federal Power Act;

(*c*) Use of an alternative fuel by reason of an order or rule under section 125 of the Act;

(*d*) Use of an alternative fuel at a steam generating unit to the extent that the fuel is generated from municipal solid waste;

(*e*) Use of an alternative fuel or raw material by a stationary source which:

(*1*) The source was capable of accommodating before January 6, 1975, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975 pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR subpart I or §51.166; or

(*2*) The source is approved to use under any permit issued under 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166;

(*f*) An increase in the hours of operation or in the production rate, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975, pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR subpart I or §51.166.

(*g*) Any change in ownership at a stationary source.

(*h*) [Reserved]

(*i*) The installation, operation, cessation, or removal of a temporary clean coal technology demonstration project, provided that the project complies with:

(*1*) The State implementation plan for the State in which the project is located; and

(*2*) Other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

(*j*) The installation or operation of a permanent clean coal technology demonstration project that constitutes repowering, provided that the project does not result in an increase in the potential to emit of any regulated pollutant emitted by the unit. This exemption shall apply on a pollutant-by-pollutant basis.

(*k*) The reactivation of a very clean coal-fired electric utility steam generating unit.

254

**Environmental Protection Agency**    **§ 51.166**

(iv) This definition shall not apply with respect to a particular regulated NSR pollutant when the major stationary source is complying with the requirements under paragraph (w) of this section for a PAL for that pollutant. Instead, the definition at paragraph (w)(2)(viii) of this section shall apply.

(v) Fugitive emissions shall not be included in determining for any of the purposes of this section whether a physical change in or change in the method of operation of a major stationary source is a major modification, unless the source belongs to one of the source categories listed in paragraph (b)(1)(iii) of this section.

(3)(i) *Net emissions increase* means, with respect to any regulated NSR pollutant emitted by a major stationary source, the amount by which the sum of the following exceeds zero:

(*a*) The increase in emissions from a particular physical change or change in the method of operation at a stationary source as calculated pursuant to paragraph (a)(7)(iv) of this section; and

(*b*) Any other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable. Baseline actual emissions for calculating increases and decreases under this paragraph (b)(3)(i)(*b*) shall be determined as provided in paragraph (b)(47), except that paragraphs (b)(47)(i)(*c*) and (b)(47)(ii)(*d*) of this section shall not apply.

(ii) An increase or decrease in actual emissions is contemporaneous with the increase from the particular change only if it occurs within a reasonable period (to be specified by the State) before the date that the increase from the particular change occurs.

(iii) An increase or decrease in actual emissions is creditable only if:

(*a*) It occurs within a reasonable period (to be specified by the reviewing authority); and

(*b*) The reviewing authority has not relied on it in issuing a permit for the source under regulations approved pursuant to this section, which permit is in effect when the increase in actual emissions from the particular change occurs; and

(*c*) The increase or decrease in emissions did not occur at a Clean Unit, except as provided in paragraphs (t)(8) and (u)(10) of this section.

(*d*) As it pertains to an increase or decrease in fugitive emissions (to the extent quantifiable), it occurs at an emissions unit that is part of one of the source categories listed in paragraph (b)(1)(iii) of this section or it occurs at an emission unit that is located at a major stationary source that belongs to one of the listed source categories. Fugitive emission increases or decreases are not included for those emissions units located at a facility whose primary activity is not represented by one of the source categories listed in paragraph (b)(1)(iii) of this section and that are not, by themselves, part of a listed source category.

(iv) An increase or decrease in actual emissions of sulfur dioxide, particulate matter, or nitrogen oxides that occurs before the applicable minor source baseline date is creditable only if it is required to be considered in calculating the amount of maximum allowable increases remaining available.

(v) An increase in actual emissions is creditable only to the extent that the new level of actual emissions exceeds the old level.

(vi) A decrease in actual emissions is creditable only to the extent that:

(*a*) The old level of actual emissions or the old level of allowable emissions, whichever is lower, exceeds the new level of actual emissions;

(*b*) It is enforceable as a practical matter at and after the time that actual construction on the particular change begins;

(*c*) It has approximately the same qualitative significance for public health and welfare as that attributed to the increase from the particular change; and

(vii) An increase that results from a physical change at a source occurs when the emissions unit on which construction occurred becomes operational and begins to emit a particular pollutant. Any replacement unit that requires shakedown becomes operational only after a reasonable shakedown period, not to exceed 180 days.

255

(viii) Paragraph (b)(21)(ii) of this section shall not apply for determining creditable increases and decreases.

(4) *Potential to emit* means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable. Secondary emissions do not count in determining the potential to emit of a stationary source.

(5) *Stationary source* means any building, structure, facility, or installation which emits or may emit a regulated NSR pollutant.

(6) *Building, structure, facility, or installation* means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control) except the activities of any vessel. Pollutant-emitting activities shall be considered as part of the same industrial grouping if they belong to the same *Major Group* (*i.e.*, which have the same two-digit code) as described in the *Standard Industrial Classification Manual, 1972*, as amended by the 1977 Supplement (U.S. Government Printing Office stock numbers 4101–0066 and 003–005–00176–0, respectively).

(7) *Emissions unit* means any part of a stationary source that emits or would have the potential to emit any regulated NSR pollutant and includes an electric utility steam generating unit as defined in paragraph (b)(30) of this section. For purposes of this section, there are two types of emissions units as described in paragraphs (b)(7)(i) and (ii) of this section.

(i) A new emissions unit is any emissions unit that is (or will be) newly constructed and that has existed for less than 2 years from the date such emissions unit first operated.

(ii) An existing emissions unit is any emissions unit that does not meet the requirements in paragraph (b)(7)(i) of this section. A replacement unit, as defined in paragraph (b)(32) of this section, is an existing emissions unit.

(8) *Construction* means any physical change or change in the method of operation (including fabrication, erection, installation, demolition, or modification of an emissions unit) that would result in a change in emissions.

(9) *Commence* as applied to construction of a major stationary source or major modification means that the owner or operator has all necessary preconstruction approvals or permits and either has:

(i) Begun, or caused to begin, a continuous program of actual on-site construction of the source, to be completed within a reasonable time; or

(ii) Entered into binding agreements or contractual obligations, which cannot be cancelled or modified without substantial loss to the owner or operator, to undertake a program of actual construction of the source to be completed within a reasonable time.

(10) *Necessary preconstruction approvals or permits* means those permits or approvals required under Federal air quality control laws and regulations and those air quality control laws and regulations which are part of the applicable State Implementation Plan.

(11) *Begin actual construction* means, in general, initiation of physical on-site construction activities on an emissions unit which are of a permanent nature. Such activities include, but are not limited to, installation of building supports and foundations, laying of underground pipework, and construction of permanent storage structures. With respect to a change in method of operation this term refers to those on-site activities, other than preparatory activities, which mark the initiation of the change.

(12) *Best available control technology* means an emissions limitation (including a visible emissions standard) based on the maximum degree of reduction for each a regulated NSR pollutant which would be emitted from any proposed major stationary source or major modification which the reviewing authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such

256

**Environmental Protection Agency**                                    **§ 51.166**

source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combination techniques for control of such pollutant. In no event shall application of best available control technology result in emissions of any pollutant which would exceed the emissions allowed by any applicable standard under 40 CFR parts 60 and 61. If the reviewing authority determines that technological or economic limitations on the application of measurement methodology to a particular emissions unit would make the imposition of an emissions standard infeasible, a design, equipment, work practice, operational standard or combination thereof, may be prescribed instead to satisfy the requirement for the application of best available control technology. Such standard shall, to the degree possible, set forth the emissions reduction achievable by implementation of such design, equipment, work practice or operation, and shall provide for compliance by means which achieve equivalent results.

(13)(i) *Baseline concentration* means that ambient concentration level that exists in the baseline area at the time of the applicable minor source baseline date. A baseline concentration is determined for each pollutant for which a minor source baseline date is established and shall include:

(*a*) The actual emissions, as defined in paragraph (b)(21) of this section, representative of sources in existence on the applicable minor source baseline date, except as provided in paragraph (b)(13)(ii) of this section;

(*b*) The allowable emissions of major stationary sources that commenced construction before the major source baseline date, but were not in operation by the applicable minor source baseline date.

(ii) The following will not be included in the baseline concentration and will affect the applicable maximum allowable increase(s):

(*a*) Actual emissions, as defined in paragraph (b)(21) of this section, from any major stationary source on which construction commenced after the major source baseline date; and

(*b*) Actual emissions increases and decreases, as defined in paragraph (b)(21) of this section, at any stationary source occurring after the minor source baseline date.

(14)(i) *Major source baseline date* means:

(*a*) In the case of $PM_{10}$ and sulfur dioxide, January 6, 1975;

(*b*) In the case of nitrogen dioxide, February 8, 1988; and

(*c*) In the case of $PM_{2.5}$, October 20, 2010.

(ii) *Minor source baseline date* means the earliest date after the trigger date on which a major stationary source or a major modification subject to 40 CFR 52.21 or to regulations approved pursuant to 40 CFR 51.166 submits a complete application under the relevant regulations. The trigger date is:

(*a*) In the case of $PM_{10}$ and sulfur dioxide, August 7, 1977;

(*b*) In the case of nitrogen dioxide, February 8, 1988; and

(*c*) In the case of $PM_{2.5}$, October 20, 2011.

(iii) The baseline date is established for each pollutant for which increments or other equivalent measures have been established if:

(*a*) The area in which the proposed source or modification would construct is designated as attainment or unclassifiable under section 107(d)(1)(A)(ii) or (iii) of the Act for the pollutant on the date of its complete application under 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166; and

(*b*) In the case of a major stationary source, the pollutant would be emitted in significant amounts, or, in the case of a major modification, there would be a significant net emissions increase of the pollutant.

(iv) Any minor source baseline date established originally for the TSP increments shall remain in effect and shall apply for purposes of determining the amount of available PM–10 increments, except that the reviewing authority may rescind any such minor source baseline date where it can be shown, to the satisfaction of the reviewing authority, that the emissions increase from the major stationary source, or the net emissions increase

257

from the major modification, responsible for triggering that date did not result in a significant amount of PM–10 emissions.

(15)(i) *Baseline area* means any intrastate area (and every part thereof) designated as attainment or unclassifiable under section 107(d)(1)(A)(ii) or (iii) of the Act in which the major source or major modification establishing the minor source baseline date would construct or would have an air quality impact for the pollutant for which the baseline date is established, as follows: Equal to or greater than 1 μg/m³ (annual average) for $SO_2$, $NO_2$, or $PM_{10}$; or equal or greater than 0.3 μg/m³ (annual average) for $PM_{2.5}$.

(ii) Area redesignations under section 107(d)(1)(A)(ii) or (iii) of the Act cannot intersect or be smaller than the area of impact of any major stationary source or major modification which:

(*a*) Establishes a minor source baseline date; or

(*b*) Is subject to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166, and would be constructed in the same State as the State proposing the redesignation.

(iii) Any baseline area established originally for the TSP increments shall remain in effect and shall apply for purposes of determining the amount of available PM–10 increments, except that such baseline area shall not remain in effect if the permit authority rescinds the corresponding minor source baseline date in accordance with paragraph (b)(14)(iv) of this section.

(16) *Allowable emissions* means the emissions rate of a stationary source calculated using the maximum rated capacity of the source (unless the source is subject to federally enforceable limits which restrict the operating rate, or hours of operation, or both) and the most stringent of the following:

(i) The applicable standards as set forth in 40 CFR parts 60 and 61;

(ii) The applicable State Implementation Plan emissions limitation, including those with a future compliance date; or

(iii) The emissions rate specified as a federally enforceable permit condition.

(17) *Federally enforceable* means all limitations and conditions which are enforceable by the Administrator, including those requirements developed pursuant to 40 CFR parts 60 and 61, requirements within any applicable State implementation plan, any permit requirements established pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR part 51, subpart I, including operating permits issued under an EPA-approved program that is incorporated into the State implementation plan and expressly requires adherence to any permit issued under such program.

(18) *Secondary emissions* means emissions which occur as a result of the construction or operation of a major stationary source or major modification, but do not come from the major stationary source or major modification itself. For the purposes of this section, secondary emissions must be specific, well defined, quantifiable, and impact the same general areas the stationary source modification which causes the secondary emissions. Secondary emissions include emissions from any offsite support facility which would not be constructed or increase its emissions except as a result of the construction or operation of the major stationary source or major modification. Secondary emissions do not include any emissions which come directly from a mobile source, such as emissions from the tailpipe of a motor vehicle, from a train, or from a vessel.

(19) *Innovative control technology* means any system of air pollution control that has not been adequately demonstrated in practice, but would have a substantial likelihood of achieving greater continuous emissions reduction than any control system in current practice or of achieving at least comparable reductions at lower cost in terms of energy, economics, or nonair quality environmental impacts.

(20) Fugitive emissions means those emissions which could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening.

(21)(i) *Actual emissions* means the actual rate of emissions of a regulated NSR pollutant from an emissions unit, as determined in accordance with paragraphs (b)(21)(ii) through (iv) of this section, except that this definition shall not apply for calculating whether

**Environmental Protection Agency** §51.166

a significant emissions increase has occurred, or for establishing a PAL under paragraph (w) of this section. Instead, paragraphs (b)(40) and (b)(47) of this section shall apply for those purposes.

(ii) In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a consecutive 24-month period which precedes the particular date and which is representative of normal source operation. The reviewing authority shall allow the use of a different time period upon a determination that it is more representative of normal source operation. Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.

(iii) The reviewing authority may presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit.

(iv) For any emissions unit that has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.

(22) *Complete* means, in reference to an application for a permit, that the application contains all the information necessary for processing the application. Designating an application complete for purposes of permit processing does not preclude the reviewing authority from requesting or accepting any additional information.

(23)(i) *Significant* means, in reference to a net emissions increase or the potential of a source to emit any of the following pollutants, a rate of emissions that would equal or exceed any of the following rates:

POLLUTANT AND EMISSIONS RATE

Carbon monoxide: 100 tons per year (tpy)
Nitrogen oxides: 40 tpy
Sulfur dioxide: 40 tpy
Particulate matter: 25 tpy of particulate matter emissions. 15 tpy of $PM_{10}$ emissions
$PM_{2.5}$: 10 tpy of direct $PM_{2.5}$ emissions; 40 tpy of sulfur dioxide emissions; 40 tpy of nitrogen oxide emissions unless demonstrated not to be a $PM_{2.5}$ precursor under paragraph (b)(49) of this section
Ozone: 40 tpy of volatile organic compounds or nitrogen oxides
Lead: 0.6 tpy

Fluorides: 3 tpy
Sulfuric acid mist: 7 tpy
Hydrogen sulfide ($H_2S$): 10 tpy
Total reduced sulfur (including $H_2S$): 10 tpy
Reduced sulfur compounds (including $H_2S$): 10 tpy
Municipal waste combustor organics (measured as total tetra-through octa-chlorinated dibenzo-p-dioxins and dibenzofurans): $3.2 \times 10^{-6}$ megagrams per year ($3.5 \times 10^{-6}$ tons per year)
Municipal waste combustor metals (measured as particulate matter): 14 megagrams per year (15 tons per year)
Municipal waste combustor acid gases (measured as sulfur dioxide and hydrogen chloride): 36 megagrams per year (40 tons per year)
Municipal solid waste landfill emissions (measured as nonmethane organic compounds): 45 megagrams per year (50 tons per year)

(ii) *Significant* means, in reference to a net emissions increase or the potential of a source to emit a regulated NSR pollutant that paragraph (b)(23)(i) of this section, does not list, any emissions rate.

(iii) Notwithstanding paragraph (b)(23)(i) of this section, *significant* means any emissions rate or any net emissions increase associated with a major stationary source or major modification, which would construct within 10 kilometers of a Class I area, and have an impact on such area equal to or greater than 1 μg/m³ (24-hour average).

(24) *Federal Land Manager* means, with respect to any lands in the United States, the Secretary of the department with authority over such lands.

(25) *High terrain* means any area having an elevation 900 feet or more above the base of the stack of a source.

(26) *Low terrain* means any area other than high terrain.

(27) *Indian Reservation* means any federally recognized reservation established by Treaty, Agreement, Executive Order, or Act of Congress.

(28) *Indian Governing Body* means the governing body of any tribe, band, or group of Indians subject to the jurisdiction of the United States and recognized by the United States as possessing power of self-government.

(29) *Volatile organic compounds (VOC)* is as defined in §51.100(s) of this part.

259

(30) *Electric utility steam generating unit* means any steam electric generating unit that is constructed for the purpose of supplying more than one-third of its potential electric output capacity and more than 25 MW electrical output to any utility power distribution system for sale. Any steam supplied to a steam distribution system for the purpose of providing steam to a steam-electric generator that would produce electrical energy for sale is also considered in determining the electrical energy output capacity of the affected facility.

(31) [Reserved]

(32) *Replacement unit* means an emissions unit for which all the criteria listed in paragraphs (b)(32)(i) through (iv) of this section are met. No creditable emission reductions shall be generated from shutting down the existing emissions unit that is replaced.

(i) The emissions unit is a reconstructed unit within the meaning of § 60.15(b)(1) of this chapter, or the emissions unit completely takes the place of an existing emissions unit.

(ii) The emissions unit is identical to or functionally equivalent to the replaced emissions unit.

(iii) The replacement does not change the basic design parameter(s) (as discussed in paragraph (y)(2) of this section) of the process unit.

(iv) The replaced emissions unit is permanently removed from the major stationary source, otherwise permanently disabled, or permanently barred from operation by a permit that is enforceable as a practical matter. If the replaced emissions unit is brought back into operation, it shall constitute a new emissions unit.

(33) *Clean coal technology* means any technology, including technologies applied at the precombustion, combustion, or post combustion stage, at a new or existing facility which will achieve significant reductions in air emissions of sulfur dioxide or oxides of nitrogen associated with the utilization of coal in the generation of electricity, or process steam which was not in widespread use as of November 15, 1990.

(34) *Clean coal technology demonstration project* means a project using funds appropriated under the heading ''De-

partment of Energy—Clean Coal Technology'', up to a total amount of $2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations for the Environmental Protection Agency. The Federal contribution for a qualifying project shall be at least 20 percent of the total cost of the demonstration project.

(35) *Temporary clean coal technology demonstration project* means a clean coal technology demonstration project that is operated for a period of 5 years or less, and which complies with the State implementation plan for the State in which the project is located and other requirements necessary to attain and maintain the national ambient air quality standards during and after the project is terminated.

(36)(i) *Repowering* means replacement of an existing coal-fired boiler with one of the following clean coal technologies: atmospheric or pressurized fluidized bed combustion, integrated gasification combined cycle, magneto-hydrodynamics, direct and indirect coal-fired turbines, integrated gasification fuel cells, or as determined by the Administrator, in consultation with the Secretary of Energy, a derivative of one or more of these technologies, and any other technology capable of controlling multiple combustion emissions simultaneously with improved boiler or generation efficiency and with significantly greater waste reduction relative to the performance of technology in widespread commercial use as of November 15, 1990.

(ii) Repowering shall also include any oil and/or gas-fired unit which has been awarded clean coal technology demonstration funding as of January 1, 1991, by the Department of Energy.

(iii) The reviewing authority shall give expedited consideration to permit applications for any source that satisfies the requirements of this subsection and is granted an extension under section 409 of the Clean Air Act.

(37) *Reactivation of a very clean coal-fired electric utility steam generating unit* means any physical change or change in the method of operation associated with the commencement of commercial operations by a coal-fired utility unit

**Environmental Protection Agency** §51.166

after a period of discontinued operation where the unit:

(i) Has not been in operation for the two-year period prior to the enactment of the Clean Air Act Amendments of 1990, and the emissions from such unit continue to be carried in the permitting authority's emissions inventory at the time of enactment;

(ii) Was equipped prior to shutdown with a continuous system of emissions control that achieves a removal efficiency for sulfur dioxide of no less than 85 percent and a removal efficiency for particulates of no less than 98 percent;

(iii) Is equipped with low-NO$_X$ burners prior to the time of commencement of operations following reactivation; and

(iv) Is otherwise in compliance with the requirements of the Clean Air Act.

(38) *Pollution prevention* means any activity that through process changes, product reformulation or redesign, or substitution of less polluting raw materials, eliminates or reduces the release of air pollutants (including fugitive emissions) and other pollutants to the environment prior to recycling, treatment, or disposal; it does not mean recycling (other than certain ''in-process recycling'' practices), energy recovery, treatment, or disposal.

(39) *Significant emissions increase* means, for a regulated NSR pollutant, an increase in emissions that is significant (as defined in paragraph (b)(23) of this section) for that pollutant.

(40)(i) *Projected actual emissions* means the maximum annual rate, in tons per year, at which an existing emissions unit is projected to emit a regulated NSR pollutant in any one of the 5 years (12-month period) following the date the unit resumes regular operation after the project, or in any one of the 10 years following that date, if the project involves increasing the emissions unit's design capacity or its potential to emit that regulated NSR pollutant, and full utilization of the unit would result in a significant emissions increase, or a significant net emissions increase at the major stationary source.

(ii) In determining the projected actual emissions under paragraph (b)(40)(i) of this section (before beginning actual construction), the owner or operator of the major stationary source:

(*a*) Shall consider all relevant information, including but not limited to, historical operational data, the company's own representations, the company's expected business activity and the company's highest projections of business activity, the company's filings with the State or Federal regulatory authorities, and compliance plans under the approved plan; and

(*b*) Shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions; and

(*c*) Shall exclude, in calculating any increase in emissions that results from the particular project, that portion of the unit's emissions following the project that an existing unit could have accommodated during the consecutive 24-month period used to establish the baseline actual emissions under paragraph (b)(47) of this section and that are also unrelated to the particular project, including any increased utilization due to product demand growth; or,

(*d*) In lieu of using the method set out in paragraphs (b)(40)(ii)(*a*) through (*c*) of this section, may elect to use the emissions unit's potential to emit, in tons per year, as defined under paragraph (b)(4) of this section.

(41) [Reserved]

(42) *Prevention of Significant Deterioration Program (PSD) program* means a major source preconstruction permit program that has been approved by the Administrator and incorporated into the plan to implement the requirements of this section, or the program in §52.21 of this chapter. Any permit issued under such a program is a major NSR permit.

(43) *Continuous emissions monitoring system (CEMS)* means all of the equipment that may be required to meet the data acquisition and availability requirements of this section, to sample, condition (if applicable), analyze, and provide a record of emissions on a continuous basis.

(44) *Predictive emissions monitoring system (PEMS)* means all of the equipment necessary to monitor process and control device operational parameters (for example, control device secondary

261

voltages and electric currents) and other information (for example, gas flow rate, $O^2$ or $CO^2$ concentrations), and calculate and record the mass emissions rate (for example, lb/hr) on a continuous basis.

(45) *Continuous parameter monitoring system (CPMS)* means all of the equipment necessary to meet the data acquisition and availability requirements of this section, to monitor process and control device operational parameters (for example, control device secondary voltages and electric currents) and other information (for example, gas flow rate, $O^2$ or $CO^2$ concentrations), and to record average operational parameter value(s) on a continuous basis.

(46) *Continuous emissions rate monitoring system (CERMS)* means the total equipment required for the determination and recording of the pollutant mass emissions rate (in terms of mass per unit of time).

(47) *Baseline actual emissions* means the rate of emissions, in tons per year, of a regulated NSR pollutant, as determined in accordance with paragraphs (b)(47)(i) through (iv) of this section.

(i) For any existing electric utility steam generating unit, baseline actual emissions means the average rate, in tons per year, at which the unit actually emitted the pollutant during any consecutive 24-month period selected by the owner or operator within the 5-year period immediately preceding when the owner or operator begins actual construction of the project. The reviewing authority shall allow the use of a different time period upon a determination that it is more representative of normal source operation.

(a) The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(b) The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above an emission limitation that was legally enforceable during the consecutive 24-month period.

(c) For a regulated NSR pollutant, when a project involves multiple emissions units, only one consecutive 24-month period must be used to determine the baseline actual emissions for the emissions units being changed. A different consecutive 24-month period can be used For each regulated NSR pollutant.

(d) The average rate shall not be based on any consecutive 24-month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by paragraph (b)(47)(i)(b) of this section.

(ii) For an existing emissions unit (other than an electric utility steam generating unit), baseline actual emissions means the average rate, in tons per year, at which the emissions unit actually emitted the pollutant during any consecutive 24-month period selected by the owner or operator within the 10-year period immediately preceding either the date the owner or operator begins actual construction of the project, or the date a complete permit application is received by the reviewing authority for a permit required either under this section or under a plan approved by the Administrator, whichever is earlier, except that the 10-year period shall not include any period earlier than November 15, 1990.

(a) The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(b) The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above an emission limitation that was legally enforceable during the consecutive 24-month period.

(c) The average rate shall be adjusted downward to exclude any emissions that would have exceeded an emission limitation with which the major stationary source must currently comply, had such major stationary source been required to comply with such limitations during the consecutive 24-month period. However, if an emission limitation is part of a maximum achievable control technology standard that the Administrator proposed or promulgated under part 63 of this chapter, the baseline actual emissions need only be adjusted if the State has taken credit

for such emissions reductions in an attainment demonstration or maintenance plan consistent with the requirements of §51.165(a)(3)(ii)(G).

(d) For a regulated NSR pollutant, when a project involves multiple emissions units, only one consecutive 24-month period must be used to determine the baseline actual emissions for the emissions units being changed. A different consecutive 24-month period can be used For each regulated NSR pollutant.

(e) The average rate shall not be based on any consecutive 24-month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by paragraphs (b)(47)(ii)(b) and (c) of this section.

(iii) For a new emissions unit, the baseline actual emissions for purposes of determining the emissions increase that will result from the initial construction and operation of such unit shall equal zero; and thereafter, for all other purposes, shall equal the unit's potential to emit.

(iv) For a PAL for a stationary source, the baseline actual emissions shall be calculated for existing electric utility steam generating units in accordance with the procedures contained in paragraph (b)(47)(i) of this section, for other existing emissions units in accordance with the procedures contained in paragraph (b)(47)(ii) of this section, and for a new emissions unit in accordance with the procedures contained in paragraph (b)(47)(iii) of this section.

(48) Subject to regulation means, for any air pollutant, that the pollutant is subject to either a provision in the Clean Air Act, or a nationally-applicable regulation codified by the Administrator in subchapter C of this chapter, that requires actual control of the quantity of emissions of that pollutant, and that such a control requirement has taken effect and is operative to control, limit or restrict the quantity of emissions of that pollutant released from the regulated activity. Except that:

(i) Greenhouse gases (GHGs), the air pollutant defined in §86.1818–12(a) of this chapter as the aggregate group of six greenhouse gases: Carbon dioxide, nitrous oxide, methane, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride, shall not be subject to regulation except as provided in paragraphs (b)(48)(iv) through (v) of this section.

(ii) For purposes of paragraphs (b)(48)(iii) through (v) of this section, the term tpy $CO_2$ equivalent emissions (CO2e) shall represent an amount of GHGs emitted, and shall be computed as follows:

(a) Multiplying the mass amount of emissions (tpy), for each of the six greenhouse gases in the pollutant GHGs, by the gas's associated global warming potential published at Table A–1 to subpart A of part 98 of this chapter—Global Warming Potentials. For purposes of this paragraph (b)(48)(ii)(a), prior to July 21, 2014, the mass of the greenhouse gas carbon dioxide shall not include carbon dioxide emissions resulting from the combustion or decomposition of non-fossilized and biodegradable organic material originating from plants, animals, or microorganisms (including products, byproducts, residues and waste from agriculture, forestry and related industries as well as the non-fossilized and biodegradable organic fractions of industrial and municipal wastes, including gases and liquids recovered from the decomposition of non-fossilized and biodegradable organic material).

(b) Sum the resultant value from paragraph (b)(48)(ii)(a) of this section for each gas to compute a tpy CO2e.

(iii) The term emissions increase as used in paragraphs (b)(48)(iv) through (v) of this section shall mean that both a significant emissions increase (as calculated using the procedures in (a)(7)(iv) of this section) and a significant net emissions increase (as defined in paragraphs (b)(3) and (b)(23) of this section) occur. For the pollutant GHGs, an emissions increase shall be based on tpy CO2e, and shall be calculated assuming the pollutant GHGs is a regulated NSR pollutant, and "significant" is defined as 75,000 tpy CO2e instead of applying the value in paragraph (b)(23)(ii) of this section.

(iv) Beginning January 2, 2011, the pollutant GHGs is subject to regulation if:

263

(a) The stationary source is a new major stationary source for a regulated NSR pollutant that is not GHGs, and also will emit or will have the potential to emit 75,000 tpy $CO_2$e or more; or

(b) The stationary source is an existing major stationary source for a regulated NSR pollutant that is not GHGs, and also will have an emissions increase of a regulated NSR pollutant, and an emissions increase of 75,000 tpy $CO_2$e or more; and,

(v) Beginning July 1, 2011, in addition to the provisions in paragraph (b)(48)(iv) of this section, the pollutant GHGs shall also be subject to regulation:

(a) At a new stationary source that will emit or have the potential to emit 100,000 tpy $CO_2$e; or

(b) At an existing stationary source that emits or has the potential to emit 100,000 tpy $CO_2$e, when such stationary source undertakes a physical change or change in the method of operation that will result in an emissions increase of 75,000 tpy $CO_2$e or more.

(49) *Regulated NSR pollutant*, for purposes of this section, means the following:

(i) Any pollutant for which a national ambient air quality standard has been promulgated. This includes, but is not limited to, the following:

(a) $PM_{2.5}$ emissions and $PM_{10}$ emissions shall include gaseous emissions from a source or activity which condense to form particulate matter at ambient temperatures. On or after January 1, 2011, such condensable particulate matter shall be accounted for in applicability determinations and in establishing emissions limitations for $PM_{2.5}$ and $PM_{10}$ in PSD permits. Compliance with emissions limitations for $PM_{2.5}$ and $PM_{10}$ issued prior to this date shall not be based on condensable particulate matter unless required by the terms and conditions of the permit or the applicable implementation plan. Applicability determinations made prior to this date without accounting for condensable particulate matter shall not be considered in violation of this section unless the applicable implementation plan required condensable particulate matter to be included;

(b) Any pollutant identified under this paragraph (b)(49)(i)(b) as a constituent or precursor to a pollutant for which a national ambient air quality standard has been promulgated. Precursors identified by the Administrator for purposes of NSR are the following:

(1) Volatile organic compounds and nitrogen oxides are precursors to ozone in all attainment and unclassifiable areas.

(2) Sulfur dioxide is a precursor to $PM_{2.5}$ in all attainment and unclassifiable areas.

(3) Nitrogen oxides are presumed to be precursors to $PM_{2.5}$ in all attainment and unclassifiable areas, unless the State demonstrates to the Administrator's satisfaction or EPA demonstrates that emissions of nitrogen oxides from sources in a specific area are not a significant contributor to that area's ambient $PM_{2.5}$ concentrations.

(4) Volatile organic compounds are presumed not to be precursors to $PM_{2.5}$ in any attainment or unclassifiable area, unless the State demonstrates to the Administrator's satisfaction or EPA demonstrates that emissions of volatile organic compounds from sources in a specific area are a significant contributor to that area's ambient $PM_{2.5}$ concentrations.

(ii) Any pollutant that is subject to any standard promulgated under section 111 of the Act;

(iii) Any Class I or II substance subject to a standard promulgated under or established by title VI of the Act;

(iv) Any pollutant that otherwise is subject to regulation under the Act as defined in paragraph (b)(48) of this section.

(v) Notwithstanding paragraphs (b)(49)(i) through (iv) of this section, the term *regulated NSR pollutant* shall not include any or all hazardous air pollutants either listed in section 112 of the Act, or added to the list pursuant to section 112(b)(2) of the Act, and which have not been delisted pursuant to section 112(b)(3) of the Act, unless the listed hazardous air pollutant is also regulated as a constituent or precursor of a general pollutant listed under section 108 of the Act.

(50) *Reviewing authority* means the State air pollution control agency,

local agency, other State agency, Indian tribe, or other agency authorized by the Administrator to carry out a permit program under §51.165 and this section, or the Administrator in the case of EPA-implemented permit programs under §52.21 of this chapter.

(51) *Project* means a physical change in, or change in method of operation of, an existing major stationary source.

(52) *Lowest achievable emission rate (LAER)* is as defined in §51.165(a)(1)(xiii).

(53)(i) In general, *process unit* means any collection of structures and/or equipment that processes, assembles, applies, blends, or otherwise uses material inputs to produce or store an intermediate or a completed product. A single stationary source may contain more than one process unit, and a process unit may contain more than one emissions unit.

(ii) Pollution control equipment is not part of the process unit, unless it serves a dual function as both process and control equipment. Administrative and warehousing facilities are not part of the process unit.

(iii) For replacement cost purposes, components shared between two or more process units are proportionately allocated based on capacity.

(iv) The following list identifies the process units at specific categories of stationary sources.

(*a*) For a steam electric generating facility, the process unit consists of those portions of the plant that contribute directly to the production of electricity. For example, at a pulverized coal-fired facility, the process unit would generally be the combination of those systems from the coal receiving equipment through the emission stack (excluding post-combustion pollution controls), including the coal handling equipment, pulverizers or coal crushers, feedwater heaters, ash handling, boiler, burners, turbine-generator set, condenser, cooling tower, water treatment system, air preheaters, and operating control systems. Each separate generating unit is a separate process unit.

(*b*) For a petroleum refinery, there are several categories of process units: those that separate and/or distill petroleum feedstocks; those that change mo-

lecular structures; petroleum treating processes; auxiliary facilities, such as steam generators and hydrogen production units; and those that load, unload, blend or store intermediate or completed products.

(*c*) For an incinerator, the process unit would consist of components from the feed pit or refuse pit to the stack, including conveyors, combustion devices, heat exchangers and steam generators, quench tanks, and fans.

NOTE TO PARAGRAPH (b)(53): By a court order on December 24, 2003, this paragraph (b)(53) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the FEDERAL REGISTER advising the public of the termination of the stay.

(54) *Functionally equivalent component* means a component that serves the same purpose as the replaced component.

NOTE TO PARAGRAPH (b)(54): By a court order on December 24, 2003, this paragraph (b)(54) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the FEDERAL REGISTER advising the public of the termination of the stay.

(55) *Fixed capital cost* means the capital needed to provide all the depreciable components. ''Depreciable components'' refers to all components of fixed capital cost and is calculated by subtracting land and working capital from the total capital investment, as defined in paragraph (b)(56) of this section.

NOTE TO PARAGRAPH (b)(55): By a court order on December 24, 2003, this paragraph (b)(55) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the FEDERAL REGISTER advising the public of the termination of the stay.

(56) *Total capital investment* means the sum of the following: all costs required to purchase needed process equipment (purchased equipment costs); the costs of labor and materials for installing that equipment (direct installation costs); the costs of site preparation and buildings; other costs such as engineering, construction and field expenses,

265

§ 51.166                                           40 CFR Ch. I (7–1–14 Edition)

fees to contractors, startup and performance tests, and contingencies (indirect installation costs); land for the process equipment; and working capital for the process equipment.

NOTE TO PARAGRAPH (b)(56): By a court order on December 24, 2003, this paragraph (b)(56) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the FEDERAL REGISTER advising the public of the termination of the stay.

(c) *Ambient air increments and other measures.* (1) The plan shall contain emission limitations and such other measures as may be necessary to assure that in areas designated as Class I, II, or III, increases in pollutant concentrations over the baseline concentration shall be limited to the following:

| Pollutant | Maximum allowable increase (micrograms per cubic meter) |
|---|---|
| Class I Area | |
| PM$_{2.5}$: | |
| Annual arithmetic mean | 1 |
| 24-hr maximum | 2 |
| PM$_{10}$: | |
| Annual arithmetic mean | 4 |
| 24-hr maximum | 8 |
| Sulfur dioxide: | |
| Annual arithmetic mean | 2 |
| 24-hr maximum | 5 |
| 3-hr maximum | 25 |
| Nitrogen dioxide: | |
| Annual arithmetic mean | 2.5 |
| Class II Area | |
| PM$_{2.5}$: | |
| Annual arithmetic mean | 4 |
| 24-hr maximum | 9 |
| PM$_{10}$: | |
| Annual arithmetic mean | 17 |
| 24-hr maximum | 30 |
| Sulfur dioxide: | |
| Annual arithmetic mean | 20 |
| 24-hr maximum | 91 |
| 3-hr maximum | 512 |
| Nitrogen dioxide: | |
| Annual arithmetic mean | 25 |
| Class III Area | |
| PM$_{2.5}$: | |
| Annual arithmetic mean | 8 |
| 24-hr maximum | 18 |
| PM$_{10}$: | |
| Annual arithmetic mean | 34 |
| 24-hr maximum | 60 |
| Sulfur dioxide: | |
| Annual arithmetic mean | 40 |
| 24-hr maximum | 182 |
| 3-hr maximum | 700 |
| Nitrogen dioxide: | |
| Annual arithmetic mean | 50 |

For any period other than an annual period, the applicable maximum allowable increase may be exceeded during one such period per year at any one location.

(2) Where the State can demonstrate that it has alternative measures in its plan other than maximum allowable increases as defined under paragraph (c)(1) of this section, that satisfy the

266

Addendum-070

requirements in sections 166(c) and
166(d) of the Clean Air Act for a regu-
lated NSR pollutant for which the Ad-
ministrator has established maximum
allowable increases pursuant to section
166(a) of the Act, the requirements for
maximum allowable increases for that
pollutant under paragraph (c)(1) of this
section shall not apply upon approval
of the plan by the Administrator. The
following regulated NSR pollutants are
eligible for such treatment:

(i) Nitrogen dioxide.

(ii) $PM_{2.5}$.

(d) *Ambient air ceilings.* The plan shall
provide that no concentration of a pol-
lutant shall exceed:

(1) The concentration permitted
under the national secondary ambient
air quality standard, or

(2) The concentration permitted
under the national primary ambient
air quality standard, whichever con-
centration is lowest for the pollutant
for a period of exposure.

(e) *Restrictions on area classifications.*
The plan shall provide that—

(1) All of the following areas which
were in existence on August 7, 1977,
shall be Class I areas and may not be
redesignated:

(i) International parks,

(ii) National wilderness areas which
exceed 5,000 acres in size,

(iii) National memorial parks which
exceed 5,000 acres in size, and

(iv) National parks which exceed 6,000
acres in size.

(2) Areas which were redesignated as
Class I under regulations promulgated
before August 7, 1977, shall remain
Class I, but may be redesignated as
provided in this section.

(3) Any other area, unless otherwise
specified in the legislation creating
such an area, is initially designated
Class II, but may be redesignated as
provided in this section.

(4) The following areas may be redes-
ignated only as Class I or II:

(i) An area which as of August 7, 1977,
exceeded 10,000 acres in size and was a
national monument, a national primi-
tive area, a national preserve, a na-
tional recreational area, a national
wild and scenic river, a national wild-
life refuge, a national lakeshore or sea-
shore; and

(ii) A national park or national wil-
derness area established after August 7,
1977, which exceeds 10,000 acres in size.

(f) *Exclusions from increment consump-
tion.* (1) The plan may provide that the
following concentrations shall be ex-
cluded in determining compliance with
a maximum allowable increase:

(i) Concentrations attributable to the
increase in emissions from stationary
sources which have converted from the
use of petroleum products, natural gas,
or both by reason of an order in effect
under section 2 (a) and (b) of the En-
ergy Supply and Environmental Co-
ordination Act of 1974 (or any super-
seding legislation) over the emissions
from such sources before the effective
date of such an order;

(ii) Concentrations attributable to
the increase in emissions from sources
which have converted from using nat-
ural gas by reason of natural gas cur-
tailment plan in effect pursuant to the
Federal Power Act over the emissions
from such sources before the effective
date of such plan;

(iii) Concentrations of particulate
matter attributable to the increase in
emissions from construction or other
temporary emission-related activities
of new or modified sources;

(iv) The increase in concentrations
attributable to new sources outside the
United States over the concentrations
attributable to existing sources which
are included in the baseline concentra-
tion; and

(v) Concentrations attributable to
the temporary increase in emissions of
sulfur dioxide, particulate matter, or
nitrogen oxides from stationary
sources which are affected by plan revi-
sions approved by the Administrator as
meeting the criteria specified in para-
graph (f)(4) of this section.

(2) If the plan provides that the con-
centrations to which paragraph (f)(1) (i)
or (ii) of this section, refers shall be ex-
cluded, it shall also provide that no ex-
clusion of such concentrations shall
apply more than five years after the ef-
fective date of the order to which para-
graph (f)(1)(i) of this section, refers or
the plan to which paragraph (f)(1)(ii) of
this section, refers, whichever is appli-
cable. If both such order and plan are
applicable, no such exclusion shall

267

apply more than five years after the later of such effective dates.

(3) [Reserved]

(4) For purposes of excluding concentrations pursuant to paragraph (f)(1)(v) of this section, the Administrator may approve a plan revision that:

(i) Specifies the time over which the temporary emissions increase of sulfur dioxide, particulate matter, or nitrogen oxides would occur. Such time is not to exceed 2 years in duration unless a longer time is approved by the Administrator.

(ii) Specifies that the time period for excluding certain contributions in accordance with paragraph (f)(4)(i) of this section, is not renewable;

(iii) Allows no emissions increase from a stationary source which would:

(*a*) Impact a Class I area or an area where an applicable increment is known to be violated; or

(*b*) Cause or contribute to the violation of a national ambient air quality standard;

(iv) Requires limitations to be in effect the end of the time period specified in accordance with paragraph (f)(4)(i) of this section, which would ensure that the emissions levels from stationary sources affected by the plan revision would not exceed those levels occurring from such sources before the plan revision was approved.

(g) *Redesignation.* (1) The plan shall provide that all areas of the State (except as otherwise provided under paragraph (e) of this section) shall be designated either Class I, Class II, or Class III. Any designation other than Class II shall be subject to the redesignation procedures of this paragraph. Redesignation (except as otherwise precluded by paragraph (e) of this section) may be proposed by the respective States or Indian Governing Bodies, as provided below, subject to approval by the Administrator as a revision to the applicable State implementation plan.

(2) The plan may provide that the State may submit to the Administrator a proposal to redesignate areas of the State Class I or Class II: *Provided,* That:

(i) At least one public hearing has been held in accordance with procedures established in § 51.102.

(ii) Other States, Indian Governing Bodies, and Federal Land Managers whose lands may be affected by the proposed redesignation were notified at least 30 days prior to the public hearing;

(iii) A discussion of the reasons for the proposed redesignation, including a satisfactory description and analysis of the health, environmental, economic, social, and energy effects of the proposed redesignation, was prepared and made available for public inspection at least 30 days prior to the hearing and the notice announcing the hearing contained appropriate notification of the availability of such discussion;

(iv) Prior to the issuance of notice respecting the redesignation of an area that includes any Federal lands, the State has provided written notice to the appropriate Federal Land Manager and afforded adequate opportunity (not in excess of 60 days) to confer with the State respecting the redesignation and to submit written comments and recommendations. In redesignating any area with respect to which any Federal Land Manager had submitted written comments and recommendations, the State shall have published a list of any inconsistency between such redesignation and such comments and recommendations (together with the reasons for making such redesignation against the recommendation of the Federal Land Manager); and

(v) The State has proposed the redesignation after consultation with the elected leadership of local and other substate general purpose governments in the area covered by the proposed redesignation.

(3) The plan may provide that any area other than an area to which paragraph (e) of this section refers may be redesignated as Class III if—

(i) The redesignation would meet the requirements of provisions established in accordance with paragraph (g)(2) of this section;

(ii) The redesignation, except any established by an Indian Governing Body, has been specifically approved by the Governor of the State, after consultation with the appropriate committees of the legislature, if it is in session, or with the leadership of the legislature, if it is not in session (unless State law

**Environmental Protection Agency** §51.166

provides that such redesignation must be specifically approved by State legislation) and if general purpose units of local government representing a majority of the residents of the area to be redesignated enact legislation (including resolutions where appropriate) concurring in the redesignation;

(iii) The redesignation would not cause, or contribute to, a concentration of any air pollutant which would exceed any maximum allowable increase permitted under the classification of any other area or any national ambient air quality standard; and

(iv) Any permit application for any major stationary source or major modification subject to provisions established in accordance with paragraph (l) of this section which could receive a permit only if the area in question were redesignated as Class III, and any material submitted as part of that application, were available, insofar as was practicable, for public inspection prior to any public hearing on redesignation of any area as Class III.

(4) The plan shall provide that lands within the exterior boundaries of Indian Reservations may be redesignated only by the appropriate Indian Governing Body. The appropriate Indian Governing Body may submit to the Administrator a proposal to redesignate areas Class I, Class II, or Class III: *Provided*, That:

(i) The Indian Governing Body has followed procedures equivalent to those required of a State under paragraphs (g) (2), (3)(iii), and (3)(iv) of this section; and

(ii) Such redesignation is proposed after consultation with the State(s) in which the Indian Reservation is located and which border the Indian Reservation.

(5) The Administrator shall disapprove, within 90 days of submission, a proposed redesignation of any area only if he finds, after notice and opportunity for public hearing, that such redesignation does not meet the procedural requirements of this section or is inconsistent with paragraph (e) of this section. If any such disapproval occurs, the classification of the area shall be that which was in effect prior to the redesignation which was disapproved.

(6) If the Administrator disapproves any proposed area designation, the State or Indian Governing Body, as appropriate, may resubmit the proposal after correcting the deficiencies noted by the Administrator.

(h) *Stack heights.* The plan shall provide, as a minimum, that the degree of emission limitation required for control of any air pollutant under the plan shall not be affected in any manner by—

(1) So much of a stack height, not in existence before December 31, 1970, as exceeds good engineering practice, or

(2) Any other dispersion technique not implemented before then.

(i) *Exemptions.* (1) The plan may provide that requirements equivalent to those contained in paragraphs (j) through (r) of this section do not apply to a particular major stationary source or major modification if:

(i) The major stationary source would be a nonprofit health or nonprofit educational institution or a major modification that would occur at such an institution; or

(ii) The source or modification would be a major stationary source or major modification only if fugitive emissions, to the extent quantifiable, are considered in calculating the potential to emit of the stationary source or modification and such source does not belong to any of the following categories:

(*a*) Coal cleaning plants (with thermal dryers);

(*b*) Kraft pulp mills;

(*c*) Portland cement plants;

(*d*) Primary zinc smelters;

(*e*) Iron and steel mills;

(*f*) Primary aluminum ore reduction plants;

(*g*) Primary copper smelters;

(*h*) Municipal incinerators capable of charging more than 250 tons of refuse per day;

(*i*) Hydrofluoric, sulfuric, or nitric acid plants;

(*j*) Petroleum refineries;

(*k*) Lime plants;

(*l*) Phosphate rock processing plants;

(*m*) Coke oven batteries;

(*n*) Sulfur recovery plants;

(*o*) Carbon black plants (furnace process);

(*p*) Primary lead smelters;

(*q*) Fuel conversion plants;

269

(*r*) Sintering plants;

(*s*) Secondary metal production plants;

(*t*) Chemical process plants—The term chemical processing plant shall not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140;

(*u*) Fossil-fuel boilers (or combination thereof) totaling more than 250 million British thermal units per hour heat input;

(*v*) Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels;

(*w*) Taconite ore processing plants;

(*x*) Glass fiber processing plants;

(*y*) Charcoal production plants;

(*z*) Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input;

(*aa*) Any other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the Act; or

(iii) The source or modification is a portable stationary source which has previously received a permit under requirements equivalent to those contained in paragraphs (j) through (r) of this section, if:

(*a*) The source proposes to relocate and emissions of the source at the new location would be temporary; and

(*b*) The emissions from the source would not exceed its allowable emissions; and

(*c*) The emissions from the source would impact no Class I area and no area where an applicable increment is known to be violated; and

(*d*) Reasonable notice is given to the reviewing authority prior to the relocation identifying the proposed new location and the probable duration of operation at the new location. Such notice shall be given to the reviewing authority not less than 10 days in advance of the proposed relocation unless a different time duration is previously approved by the reviewing authority.

(2) The plan may provide that requirements equivalent to those contained in paragraphs (j) through (r) of this section do not apply to a major stationary source or major modification with respect to a particular pollutant if the owner or operator demonstrates that, as to that pollutant, the source or modification is located in an area designated as nonattainment under section 107 of the Act.

(3) The plan may provide that requirements equivalent to those contained in paragraphs (k), (m), and (o) of this section do not apply to a proposed major stationary source or major modification with respect to a particular pollutant, if the allowable emissions of that pollutant from a new source, or the net emissions increase of that pollutant from a modification, would be temporary and impact no Class I area and no area where an applicable increment is known to be violated.

(4) The plan may provide that requirements equivalent to those contained in paragraphs (k), (m), and (o) of this section as they relate to any maximum allowable increase for a Class II area do not apply to a modification of a major stationary source that was in existence on March 1, 1978, if the net increase in allowable emissions of each a regulated NSR pollutant from the modification after the application of best available control technology would be less than 50 tons per year.

(5) The plan may provide that the reviewing authority may exempt a proposed major stationary source or major modification from the requirements of paragraph (m) of this section, with respect to monitoring for a particular pollutant, if:

(i) The emissions increase of the pollutant from a new stationary source or the net emissions increase of the pollutant from a modification would cause, in any area, air quality impacts less than the following amounts:

(*a*) Carbon monoxide—575 ug/m³, 8-hour average;

(*b*) Nitrogen dioxide—14 ug/m³, annual average;

(*c*) PM$_{2.5}$— 0 µg/m³;

NOTE TO PARAGRAPH (I)(5)(I)(c): In accordance with *Sierra Club* v. *EPA*, 706 F.3d 428 (D.C. Cir. 2013), no exemption is available with regard to PM$_{2.5}$.

(*d*) PM$_{10}$–10 µg/m³, 24-hour average;

(*e*) Sulfur dioxide—13 ug/m³, 24-hour average;

**Environmental Protection Agency** §51.166

(*f*) Ozone;[1]

(*g*) Lead—0.1 µg/m³, 3-month average.

(*h*) Fluorides—0.25 µg/m³, 24-hour average;

(*i*) Total reduced sulfur—10 µg/m³, 1-hour average

(*j*) Hydrogen sulfide—0.2 µg/m³, 1-hour average;

(*k*) Reduced sulfur compounds—10 µg/m³, 1-hour average; or

(ii) The concentrations of the pollutant in the area that the source or modification would affect are less than the concentrations listed in paragraph (i)(5)(i) of this section; or

(iii) The pollutant is not listed in paragraph (i)(5)(i) of this section.

(6) If EPA approves a plan revision under 40 CFR 51.166 as in effect before August 7, 1980, any subsequent revision which meets the requirements of this section may contain transition provisions which parallel the transition provisions of 40 CFR 52.21(i)(9), (i)(10) and (m)(1)(v) as in effect on that date, which provisions relate to requirements for best available control technology and air quality analyses. Any such subsequent revision may not contain any transition provision which in the context of the revision would operate any less stringently than would its counterpart in 40 CFR 52.21.

(7) If EPA approves a plan revision under §51.166 as in effect [before July 31, 1987], any subsequent revision which meets the requirements of this section may contain transition provisions which parallel the transition provisions of §52.21 (i)(11), and (m)(1) (vii) and (viii) of this chapter as in effect on that date, these provisions being related to monitoring requirements for particulate matter. Any such subsequent revision may not contain any transition provision which in the context of the revision would operate any less stringently than would its counterpart in §52.21 of this chapter.

(8) The plan may provide that the permitting requirements equivalent to those contained in paragraph (k)(1)(ii)

of this section do not apply to a stationary source or modification with respect to any maximum allowable increase for nitrogen oxides if the owner or operator of the source or modification submitted an application for a permit under the applicable permit program approved or promulgated under the Act before the provisions embodying the maximum allowable increase took effect as part of the plan and the permitting authority subsequently determined that the application as submitted before that date was complete.

(9) The plan may provide that the permitting requirements equivalent to those contained in paragraph (k)(1)(ii) of this section shall not apply to a stationary source or modification with respect to any maximum allowable increase for PM–10 if (i) the owner or operator of the source or modification submitted an application for a permit under the applicable permit program approved under the Act before the provisions embodying the maximum allowable increases for PM–10 took effect as part of the plan, and (ii) the permitting authority subsequently determined that the application as submitted before that date was complete. Instead, the applicable requirements equivalent to paragraph (k)(1)(ii) shall apply with respect to the maximum allowable increases for TSP as in effect on the date the application was submitted.

(10) The plan may provide that the requirements of paragraph (k)(1) of this section shall not apply to a stationary source or modification with respect to the national ambient air quality standards for PM$_{2.5}$ in effect on March 18, 2013 if:

(i) The reviewing authority has determined a permit application subject to this section to be complete on or before December 14, 2012. Instead, the requirements in paragraph (k)(1) of this section shall apply with respect to the national ambient air quality standards for PM$_{2.5}$ in effect at the time the reviewing authority determined the permit application to be complete; or

(ii) The reviewing authority has first published before March 18, 2013 a public notice of a preliminary determination for the permit application subject to this section. Instead, the requirements

---

[1] No *de minimis* air quality level is provided for ozone. However, any net emissions increase of 100 tons per year or more of volatile organic compounds or nitrogen oxides subject to PSD would be required to perform an ambient impact analysis, including the gathering of air quality data.

271

in paragraph (k)(1) of this section shall apply with respect to the national ambient air quality standards for PM$_{2.5}$ in effect at the time of first publication of a public notice on the preliminary determination.

(j) *Control technology review.* The plan shall provide that:

(1) A major stationary source or major modification shall meet each applicable emissions limitation under the State Implementation Plan and each applicable emission standards and standard of performance under 40 CFR parts 60 and 61.

(2) A new major stationary source shall apply best available control technology for each a regulated NSR pollutant that it would have the potential to emit in significant amounts.

(3) A major modification shall apply best available control technology for each a regulated NSR pollutant for which it would be a significant net emissions increase at the source. This requirement applies to each proposed emissions unit at which a net emissions increase in the pollutant would occur as a result of a physical change or change in the method of operation in the unit.

(4) For phased construction projects, the determination of best available control technology shall be reviewed and modified as appropriate at the least reasonable time which occurs no later than 18 months prior to commencement of construction of each independent phase of the project. At such time, the owner or operator of the applicable stationary source may be required to demonstrate the adequacy of any previous determination of best available control technology for the source.

(k) *Source impact analysis*—(1) *Required demonstration.* The plan shall provide that the owner or operator of the proposed source or modification shall demonstrate that allowable emission increases from the proposed source or modification, in conjunction with all other applicable emissions increases or reduction (including secondary emissions), would not cause or contribute to air pollution in violation of:

(i) Any national ambient air quality standard in any air quality control region; or

(ii) Any applicable maximum allowable increase over the baseline concentration in any area.

(2) [Reserved]

(l) *Air quality models.* The plan shall provide for procedures which specify that—

(1) All applications of air quality modeling involved in this subpart shall be based on the applicable models, data bases, and other requirements specified in appendix W of this part (Guideline on Air Quality Models).

(2) Where an air quality model specified in appendix W of this part (Guideline on Air Quality Models) is inappropriate, the model may be modified or another model substituted. Such a modification or substitution of a model may be made on a case-by-case basis or, where appropriate, on a generic basis for a specific State program. Written approval of the Administrator must be obtained for any modification or substitution. In addition, use of a modified or substituted model must be subject to notice and opportunity for public comment under procedures set forth in § 51.102.

(m) *Air quality analysis*—(1) *Preapplication analysis.* (i) The plan shall provide that any application for a permit under regulations approved pursuant to this section shall contain an analysis of ambient air quality in the area that the major stationary source or major modification would affect for each of the following pollutants:

(*a*) For the source, each pollutant that it would have the potential to emit in significant amount;

(*b*) For the modification, each pollutant for which it would result in a significant net emissions increase.

(ii) The plan shall provide that, with respect to any such pollutant for which no National Ambient Air Quality Standard exists, the analysis shall contain such air quality monitoring data as the reviewing authority determines is necessary to assess ambient air quality for that pollutant in any area that the emissions of that pollutant would affect.

(iii) The plan shall provide that with respect to any such pollutant (other than nonmethane hydrocarbons) for which such a standard does exist, the analysis shall contain continuous air

quality monitoring data gathered for purposes of determining whether emissions of that pollutant would cause or contribute to a violation of the standard or any maxiumum allowable increase.

(iv) The plan shall provide that, in general, the continuous air monitoring data that is required shall have been gathered over a period of one year and shall represent the year preceding receipt of the application, except that, if the reviewing authority determines that a complete and adequate analysis can be accomplished with monitoring data gathered over a period shorter than one year (but not to be less than four months), the data that is required shall have been gathered over at least that shorter period.

(v) The plan may provide that the owner or operator of a proposed major stationary source or major modification of volatile organic compounds who satisfies all conditions of 40 CFR part 51 appendix S, section IV may provide postapproval monitoring data for ozone in lieu of providing preconstruction data as required under paragraph (m)(1) of this section.

(2) *Post-construction monitoring.* The plan shall provide that the owner or operator of a major stationary source or major modification shall, after construction of the stationary source or modification, conduct such ambient monitoring as the reviewing authority determines is necessary to determine the effect emissions from the stationary source or modification may have, or are having, on air quality in any area.

(3) *Operation of monitoring stations.* The plan shall provide that the owner or operator of a major stationary source or major modification shall meet the requirements of appendix B to part 58 of this chapter during the operation of monitoring stations for purposes of satisfying paragraph (m) of this section.

(n) *Source information.* (1) The plan shall provide that the owner or operator of a proposed source or modification shall submit all information necessary to perform any analysis or make any determination required under procedures established in accordance with this section.

(2) The plan may provide that such information shall include:

(i) A description of the nature, location, design capacity, and typical operating schedule of the source or modification, including specifications and drawings showing its design and plant layout;

(ii) A detailed schedule for construction of the source or modification;

(iii) A detailed description as to what system of continuous emission reduction is planned by the source or modification, emission estimates, and any other information as necessary to determine that best available control technology as applicable would be applied;

(3) The plan shall provide that upon request of the State, the owner or operator shall also provide information on:

(i) The air quality impact of the source or modification, including meteorological and topographical data necessary to estimate such impact; and

(ii) The air quality impacts and the nature and extent of any or all general commercial, residential, industrial, and other growth which has occurred since August 7, 1977, in the area the source or modification would affect.

(o) *Additional impact analyses.* The plan shall provide that—

(1) The owner or operator shall provide an analysis of the impairment to visibility, soils, and vegetation that would occur as a result of the source or modification and general commercial, residential, industrial, and other growth associated with the source or modification. The owner or operator need not provide an analysis of the impact on vegetation having no significant commercial or recreational value.

(2) The owner or operator shall provide an analysis of the air quality impact projected for the area as a result of general commercial, residential, industrial, and other growth associated with the source or modification.

(p) *Sources impacting Federal Class I areas—additional requirements—*(1) *Notice to EPA.* The plan shall provide that the reviewing authority shall transmit to the Administrator a copy of each permit application relating to a major

273

§ 51.166                                                    40 CFR Ch. I (7–1–14 Edition)

stationary source or major modification and provide notice to the Administrator of every action related to the consideration of such permit.

(2) *Federal Land Manager.* The Federal Land Manager and the Federal official charged with direct responsibility for management of Class I lands have an affirmative responsibility to protect the air quality related values (including visibility) of any such lands and to consider, in consultation with the Administrator, whether a proposed source or modification would have an adverse impact on such values.

(3) *Denial—impact on air quality related values.* The plan shall provide a mechanism whereby a Federal Land Manager of any such lands may present to the State, after the reviewing authority's preliminary determination required under procedures developed in accordance with paragraph (r) of this section, a demonstration that the emissions from the proposed source or modification would have an adverse impact on the air quality-related values (including visibility) of any Federal mandatory Class I lands, notwithstanding that the change in air quality resulting from emissions from such source or modification would not cause or contribute to concentrations which would exceed the maximum allowable increases for a Class I area. If the State concurs with such demonstration, the reviewing authority shall not issue the permit.

(4) *Class I Variances.* The plan may provide that the owner or operator of a proposed source or modification may demonstrate to the Federal Land Manager that the emissions from such source would have no adverse impact on the air quality related values of such lands (including visibility), notwithstanding that the change in air quality resulting from emissions from such source or modification would cause or contribute to concentrations which would exceed the maximum allowable increases for a Class I area. If the Federal land manager concurs with such demonstration and so certifies to the State, the reviewing authority may: *Provided,* That applicable requirements are otherwise met, issue the permit with such emission limitations as may be necessary to assure that emissions of sulfur dioxide, $PM_{2.5}$, $PM_{10}$, and nitrogen oxides would not exceed the following maximum allowable increases over minor source baseline concentration for such pollutants:

| Pollutant | Maximum allowable increase (micrograms per cubic meter) |
|---|---|
| $PM_{2.5}$: | |
| Annual arithmetic mean | 4 |
| 24-hr maximum | 9 |
| $PM_{10}$: | |
| Annual arithmetic mean | 17 |
| 24-hr maximum | 30 |
| Sulfur dioxide: | |
| Annual arithmetic mean | 20 |
| 24-hr maximum | 91 |
| 3-hr maximum | 325 |
| Nitrogen dioxide: | |
| Annual arithmetic mean | 25 |

(5) *Sulfur dioxide variance by Governor with Federal Land Manager's concurrence.* The plan may provide that—

(i) The owner or operator of a proposed source or modification which cannot be approved under procedures developed pursuant to paragraph (q)(4) of this section may demonstrate to the Governor that the source or modification cannot be constructed by reason of any maximum allowable increase for sulfur dioxide for periods of twenty-four hours or less applicable to any Class I area and, in the case of Federal mandatory Class I areas, that a variance under this clause would not adversely affect the air quality related

274

**Environmental Protection Agency**                    **§ 51.166**

values of the area (including visibility);

(ii) The Governor, after consideration of the Federal Land Manager's recommendation (if any) and subject to his concurrence, may grant, after notice and an opportunity for a public hearing, a variance from such maximum allowable increase; and

(iii) If such variance is granted, the reviewing authority may issue a permit to such source or modification in accordance with provisions developed pursuant to paragraph (q)(7) of this section: *Provided*, That the applicable requirements of the plan are otherwise met.

(6) *Variance by the Governor with the President's concurrence.* The plan may provide that—

(i) The recommendations of the Governor and the Federal Land Manager shall be transferred to the President in any case where the Governor recommends a variance in which the Federal Land Manager does not concur;

(ii) The President may approve the Governor's recommendation if he finds that such variance is in the national interest; and

(iii) If such a variance is approved, the reviewing authority may issue a permit in accordance with provisions developed pursuant to the requirements of paragraph (q)(7) of this section: *Provided*, That the applicable requirements of the plan are otherwise met.

(7) *Emission limitations for Presidential or gubernatorial variance.* The plan shall provide that in the case of a permit issued under procedures developed pursuant to paragraph (q) (5) or (6) of this section, the source or modification shall comply with emission limitations as may be necessary to assure that emissions of sulfur dioxide from the source or modification would not (during any day on which the otherwise applicable maximum allowable increases are exceeded) cause or contribute to concentrations which would exceed the following maximum allowable increases over the baseline concentration and to assure that such emissions would not cause or contribute to concentrations which exceed the otherwise applicable maximum allowable increases for periods of exposure of 24

hours or less for more than 18 days, not necessarily consecutive, during any annual period:

MAXIMUM ALLOWABLE INCREASE
[Micrograms per cubic meter]

| Period of exposure | Terrain areas | |
|---|---|---|
| | Low | High |
| 24-hr maximum ............................................ | 36 | 62 |
| 3-hr maximum .............................................. | 130 | 221 |

(q) *Public participation.* The plan shall provide that—

(1) The reviewing authority shall notify all applicants within a specified time period as to the completeness of the application or any deficiency in the application or information submitted. In the event of such a deficiency, the date of receipt of the application shall be the date on which the reviewing authority received all required information.

(2) Within one year after receipt of a complete application, the reviewing authority shall:

(i) Make a preliminary determination whether construction should be approved, approved with conditions, or disapproved.

(ii) Make available in at least one location in each region in which the proposed source would be constructed a copy of all materials the applicant submitted, a copy of the preliminary determination, and a copy or summary of other materials, if any, considered in making the preliminary determination.

(iii) Notify the public, by advertisement in a newspaper of general circulation in each region in which the proposed source would be constructed, of the application, the preliminary determination, the degree of increment consumption that is expected from the source or modification, and of the opportunity for comment at a public hearing as well as written public comment.

(iv) Send a copy of the notice of public comment to the applicant, the Administrator and to officials and agencies having cognizance over the location where the proposed construction would occur as follows: Any other State or local air pollution control agencies, the chief executives of the

275

city and county where the source would be located; any comprehensive regional land use planning agency, and any State, Federal Land Manager, or Indian Governing body whose lands may be affected by emissions from the source or modification.

(v) Provide opportunity for a public hearing for interested persons to appear and submit written or oral comments on the air quality impact of the source, alternatives to it, the control technology required, and other appropriate considerations.

(vi) Consider all written comments submitted within a time specified in the notice of public comment and all comments received at any public hearing(s) in making a final decision on the approvability of the application. The reviewing authority shall make all comments available for public inspection in the same locations where the reviewing authority made available preconstruction information relating to the proposed source or modification.

(vii) Make a final determination whether construction should be approved, approved with conditions, or disapproved.

(viii) Notify the applicant in writing of the final determination and make such notification available for public inspection at the same location where the reviewing authority made available preconstruction information and public comments relating to the source.

(r) *Source obligation.* (1) The plan shall include enforceable procedures to provide that approval to construct shall not relieve any owner or operator of the responsibility to comply fully with applicable provisions of the plan and any other requirements under local, State or Federal law.

(2) The plan shall provide that at such time that a particular source or modification becomes a major stationary source or major modification solely by virtue of a relaxation in any enforceable limitation which was established after August 7, 1980, on the capacity of the source or modification otherwise to emit a pollutant, such as a restriction on hours of operation, then the requirements of paragraphs (j) through (s) of this section shall apply to the source or modification as though

construction had not yet commenced on the source or modification.

(3)–(5) [Reserved]

(6) Each plan shall provide that, except as otherwise provided in paragraph (r)(6)(vi) of this section, the following specific provisions apply with respect to any regulated NSR pollutant emitted from projects at existing emissions units at a major stationary source (other than projects at a source with a PAL) in circumstances where there is a reasonable possibility, within the meaning of paragraph (r)(6)(vi) of this section, that a project that is not a part of a major modification may result in a significant emissions increase of such pollutant, and the owner or operator elects to use the method specified in paragraphs (b)(40)(ii)(*a*) through (*c*) of this section for calculating projected actual emissions. Deviations from these provisions will be approved only if the State specifically demonstrates that the submitted provisions are more stringent than or at least as stringent in all respects as the corresponding provisions in paragraphs (r)(6)(i) through (vi) of this section.

(i) Before beginning actual construction of the project, the owner or operator shall document and maintain a record of the following information:

(*a*) A description of the project;

(*b*) Identification of the emissions unit(s) whose emissions of a regulated NSR pollutant could be affected by the project; and

(*c*) A description of the applicability test used to determine that the project is not a major modification for any regulated NSR pollutant, including the baseline actual emissions, the projected actual emissions, the amount of emissions excluded under paragraph (b)(40)(ii)(*c*) of this section and an explanation for why such amount was excluded, and any netting calculations, if applicable.

(ii) If the emissions unit is an existing electric utility steam generating unit, before beginning actual construction, the owner or operator shall provide a copy of the information set out in paragraph (r)(6)(i) of this section to the reviewing authority. Nothing in this paragraph (r)(6)(ii) shall be construed to require the owner or operator

276

**Environmental Protection Agency**                                    **§ 51.166**

of such a unit to obtain any determination from the reviewing authority before beginning actual construction.

(iii) The owner or operator shall monitor the emissions of any regulated NSR pollutant that could increase as a result of the project and that is emitted by any emissions unit identified in paragraph (r)(6)(i)(*b*) of this section; and calculate and maintain a record of the annual emissions, in tons per year on a calendar year basis, for a period of 5 years following resumption of regular operations after the change, or for a period of 10 years following resumption of regular operations after the change if the project increases the design capacity or potential to emit of that regulated NSR pollutant at such emissions unit.

(iv) If the unit is an existing electric utility steam generating unit, the owner or operator shall submit a report to the reviewing authority within 60 days after the end of each year during which records must be generated under paragraph (r)(6)(iii) of this section setting out the unit's annual emissions during the calendar year that preceded submission of the report.

(v) If the unit is an existing unit other than an electric utility steam generating unit, the owner or operator shall submit a report to the reviewing authority if the annual emissions, in tons per year, from the project identified in paragraph (r)(6)(i) of this section, exceed the baseline actual emissions (as documented and maintained pursuant to paragraph (r)(6)(i)(*c*) of this section) by a significant amount (as defined in paragraph (b)(23) of this section) for that regulated NSR pollutant, and if such emissions differ from the preconstruction projection as documented and maintained pursuant to paragraph (r)(6)(i)(*c*) of this section. Such report shall be submitted to the reviewing authority within 60 days after the end of such year. The report shall contain the following:

(*a*) The name, address and telephone number of the major stationary source;

(*b*) The annual emissions as calculated pursuant to paragraph (r)(6)(iii) of this section; and

(*c*) Any other information that the owner or operator wishes to include in the report (e.g., an explanation as to

why the emissions differ from the preconstruction projection).

(vi) A ''reasonable possibility'' under paragraph (r)(6) of this section occurs when the owner or operator calculates the project to result in either:

(*a*) A projected actual emissions increase of at least 50 percent of the amount that is a ''significant emissions increase,'' as defined under paragraph (b)(39) of this section (without reference to the amount that is a significant net emissions increase), for the regulated NSR pollutant; or

(*b*) A projected actual emissions increase that, added to the amount of emissions excluded under paragraph (b)(40)(ii)(*c*), sums to at least 50 percent of the amount that is a ''significant emissions increase,'' as defined under paragraph (b)(39) of this section (without reference to the amount that is a significant net emissions increase), for the regulated NSR pollutant. For a project for which a reasonable possibility occurs only within the meaning of paragraph (r)(6)(vi)(*b*) of this section, and not also within the meaning of paragraph (a)(6)(vi)(*a*) of this section, then provisions (a)(6)(ii) through (v) do not apply to the project.

(7) Each plan shall provide that the owner or operator of the source shall make the information required to be documented and maintained pursuant to paragraph (r)(6) of this section available for review upon request for inspection by the reviewing authority or the general public pursuant to the requirements contained in §70.4(b)(3)(viii) of this chapter.

(s) *Innovative control technology.* (1) The plan may provide that an owner or operator of a proposed major stationary source or major modification may request the reviewing authority to approve a system of innovative control technology.

(2) The plan may provide that the reviewing authority may, with the consent of the Governor(s) of other affected State(s), determine that the source or modification may employ a system of innovative control technology, if:

277

(i) The proposed control system would not cause or contribute to an unreasonable risk to public health, welfare, or safety in its operation or function;

(ii) The owner or operator agrees to achieve a level of continuous emissions reduction equivalent to that which would have been required under paragraph (j)(2) of this section, by a date specified by the reviewing authority. Such date shall not be later than 4 years from the time of startup or 7 years from permit issuance;

(iii) The source or modification would meet the requirements equivalent to those in paragraphs (j) and (k) of this section, based on the emissions rate that the stationary source employing the system of innovative control technology would be required to meet on the date specified by the reviewing authority;

(iv) The source or modification would not before the date specified by the reviewing authority:

(*a*) Cause or contribute to any violation of an applicable national ambient air quality standard; or

(*b*) Impact any area where an applicable increment is known to be violated;

(v) All other applicable requirements including those for public participation have been met.

(vi) The provisions of paragraph (p) of this section (relating to Class I areas) have been satisfied with respect to all periods during the life of the source or modification.

(3) The plan shall provide that the reviewing authority shall withdraw any approval to employ a system of innovative control technology made under this section, if:

(i) The proposed system fails by the specified date to achieve the required continuous emissions reduction rate; or

(ii) The proposed system fails before the specified date so as to contribute to an unreasonable risk to public health, welfare, or safety; or

(iii) The reviewing authority decides at any time that the proposed system is unlikely to achieve the required level of control or to protect the public health, welfare, or safety.

(4) The plan may provide that if a source or modification fails to meet the required level of continuous emissions reduction within the specified time period, or if the approval is withdrawn in accordance with paragraph (s)(3) of this section, the reviewing authority may allow the source or modification up to an additional 3 years to meet the requirement for the application of best available control technology through use of a demonstrated system of control.

(t)–(v) [Reserved]

(w) *Actuals PALs.* The plan shall provide for PALs according to the provisions in paragraphs (w)(1) through (15) of this section.

(1) *Applicability.* (i) The reviewing authority may approve the use of an actuals PAL for any existing major stationary source if the PAL meets the requirements in paragraphs (w)(1) through (15) of this section. The term ''PAL'' shall mean ''actuals PAL'' throughout paragraph (w) of this section.

(ii) Any physical change in or change in the method of operation of a major stationary source that maintains its total source-wide emissions below the PAL level, meets the requirements in paragraphs (w)(1) through (15) of this section, and complies with the PAL permit:

(*a*) Is not a major modification for the PAL pollutant;

(*b*) Does not have to be approved through the plan's major NSR program; and

(*c*) Is not subject to the provisions in paragraph (r)(2) of this section (restrictions on relaxing enforceable emission limitations that the major stationary source used to avoid applicability of the major NSR program).

(iii) Except as provided under paragraph (w)(1)(ii)(c) of this section, a major stationary source shall continue to comply with all applicable Federal or State requirements, emission limitations, and work practice requirements that were established prior to the effective date of the PAL.

(2) *Definitions.* The plan shall use the definitions in paragraphs (w)(2)(i) through (xi) of this section for the purpose of developing and implementing regulations that authorize the use of

**Environmental Protection Agency** §51.166

actuals PALs consistent with paragraphs (w)(1) through (15) of this section. When a term is not defined in these paragraphs, it shall have the meaning given in paragraph (b) of this section or in the Act.

(i) *Actuals PAL* for a major stationary source means a PAL based on the baseline actual emissions (as defined in paragraph (b)(47) of this section) of all emissions units (as defined in paragraph (b)(7) of this section) at the source, that emit or have the potential to emit the PAL pollutant.

(ii) *Allowable emissions* means "allowable emissions" as defined in paragraph (b)(16) of this section, except as this definition is modified according to paragraphs (w)(2)(ii)(*a*) and (*b*) of this section.

(*a*) The allowable emissions for any emissions unit shall be calculated considering any emission limitations that are enforceable as a practical matter on the emissions unit's potential to emit.

(*b*) An emissions unit's potential to emit shall be determined using the definition in paragraph (b)(4) of this section, except that the words "or enforceable as a practical matter" should be added after "federally enforceable."

(iii) *Small emissions unit* means an emissions unit that emits or has the potential to emit the PAL pollutant in an amount less than the significant level for that PAL pollutant, as defined in paragraph (b)(23) of this section or in the Act, whichever is lower.

(iv) *Major emissions unit* means:

(*a*) Any emissions unit that emits or has the potential to emit 100 tons per year or more of the PAL pollutant in an attainment area; or

(*b*) Any emissions unit that emits or has the potential to emit the PAL pollutant in an amount that is equal to or greater than the major source threshold for the PAL pollutant as defined by the Act for nonattainment areas. For example, in accordance with the definition of major stationary source in section 182(c) of the Act, an emissions unit would be a major emissions unit for VOC if the emissions unit is located in a serious ozone nonattainment area and it emits or has the potential to emit 50 or more tons of VOC per year.

(v) *Plantwide applicability limitation (PAL)* means an emission limitation expressed in tons per year, for a pollutant at a major stationary source, that is enforceable as a practical matter and established source-wide in accordance with paragraphs (w)(1) through (15) of this section.

(vi) *PAL effective date* generally means the date of issuance of the PAL permit. However, the PAL effective date for an increased PAL is the date any emissions unit that is part of the PAL major modification becomes operational and begins to emit the PAL pollutant.

(vii) *PAL effective period* means the period beginning with the PAL effective date and ending 10 years later.

(viii) *PAL major modification* means, notwithstanding paragraphs (b)(2) and (b)(3) of this section (the definitions for major modification and net emissions increase), any physical change in or change in the method of operation of the PAL source that causes it to emit the PAL pollutant at a level equal to or greater than the PAL.

(ix) *PAL permit* means the major NSR permit, the minor NSR permit, or the State operating permit under a program that is approved into the plan, or the title V permit issued by the reviewing authority that establishes a PAL for a major stationary source.

(x) *PAL pollutant* means the pollutant for which a PAL is established at a major stationary source.

(xi) *Significant emissions unit* means an emissions unit that emits or has the potential to emit a PAL pollutant in an amount that is equal to or greater than the significant level (as defined in paragraph (b)(23) of this section or in the Act, whichever is lower) for that PAL pollutant, but less than the amount that would qualify the unit as a major emissions unit as defined in paragraph (w)(2)(iv) of this section.

(3) *Permit application requirements.* As part of a permit application requesting a PAL, the owner or operator of a major stationary source shall submit the following information in paragraphs (w)(3)(i) through (iii) of this section to the reviewing authority for approval.

(i) A list of all emissions units at the source designated as small, significant

279

or major based on their potential to emit. In addition, the owner or operator of the source shall indicate which, if any, Federal or State applicable requirements, emission limitations, or work practices apply to each unit.

(ii) *Calculations of the baseline actual emissions (with supporting documentation).* Baseline actual emissions are to include emissions associated not only with operation of the unit, but also emissions associated with startup, shutdown, and malfunction.

(iii) The calculation procedures that the major stationary source owner or operator proposes to use to convert the monitoring system data to monthly emissions and annual emissions based on a 12-month rolling total for each month as required by paragraph (w)(13)(i) of this section.

(4) *General requirements for establishing PALs.* (i) The plan allows the reviewing authority to establish a PAL at a major stationary source, provided that at a minimum, the requirements in paragraphs (w)(4)(i)(a) through (g) of this section are met.

(*a*) The PAL shall impose an annual emission limitation in tons per year, that is enforceable as a practical matter, for the entire major stationary source. For each month during the PAL effective period after the first 12 months of establishing a PAL, the major stationary source owner or operator shall show that the sum of the monthly emissions from each emissions unit under the PAL for the previous 12 consecutive months is less than the PAL (a 12-month average, rolled monthly). For each month during the first 11 months from the PAL effective date, the major stationary source owner or operator shall show that the sum of the preceding monthly emissions from the PAL effective date for each emissions unit under the PAL is less than the PAL.

(*b*) The PAL shall be established in a PAL permit that meets the public participation requirements in paragraph (w)(5) of this section.

(*c*) The PAL permit shall contain all the requirements of paragraph (w)(7) of this section.

(*d*) The PAL shall include fugitive emissions, to the extent quantifiable, from all emissions units that emit or

have the potential to emit the PAL pollutant at the major stationary source.

(*e*) Each PAL shall regulate emissions of only one pollutant.

(*f*) Each PAL shall have a PAL effective period of 10 years.

(*g*) The owner or operator of the major stationary source with a PAL shall comply with the monitoring, recordkeeping, and reporting requirements provided in paragraphs (w)(12) through (14) of this section for each emissions unit under the PAL through the PAL effective period.

(ii) At no time (during or after the PAL effective period) are emissions reductions of a PAL pollutant that occur during the PAL effective period creditable as decreases for purposes of offsets under § 51.165(a)(3)(ii) of this chapter unless the level of the PAL is reduced by the amount of such emissions reductions and such reductions would be creditable in the absence of the PAL.

(5) *Public participation requirements for PALs.* PALs for existing major stationary sources shall be established, renewed, or increased, through a procedure that is consistent with §§ 51.160 and 51.161 of this chapter. This includes the requirement that the reviewing authority provide the public with notice of the proposed approval of a PAL permit and at least a 30-day period for submittal of public comment. The reviewing authority must address all material comments before taking final action on the permit.

(6) *Setting the 10-year actuals PAL level.* (i) Except as provided in paragraph (w)(6)(ii) of this section, the plan shall provide that the actuals PAL level for a major stationary source shall be established as the sum of the baseline actual emissions (as defined in paragraph (b)(47) of this section) of the PAL pollutant for each emissions unit at the source; plus an amount equal to the applicable significant level for the PAL pollutant under paragraph (b)(23) of this section or under the Act, whichever is lower. When establishing the actuals PAL level, for a PAL pollutant, only one consecutive 24-month period must be used to determine the baseline

280

**Environmental Protection Agency**                                    **§ 51.166**

actual emissions for all existing emissions units. However, a different consecutive 24-month period may be used for each different PAL pollutant. Emissions associated with units that were permanently shut down after this 24-month period must be subtracted from the PAL level. The reviewing authority shall specify a reduced PAL level(s) (in tons/yr) in the PAL permit to become effective on the future compliance date(s) of any applicable Federal or State regulatory requirement(s) that the reviewing authority is aware of prior to issuance of the PAL permit. For instance, if the source owner or operator will be required to reduce emissions from industrial boilers in half from baseline emissions of 60 ppm $NO_X$ to a new rule limit of 30 ppm, then the permit shall contain a future effective PAL level that is equal to the current PAL level reduced by half of the original baseline emissions of such unit(s).

(ii) For newly constructed units (which do not include modifications to existing units) on which actual construction began after the 24-month period, in lieu of adding the baseline actual emissions as specified in paragraph (w)(6)(i) of this section, the emissions must be added to the PAL level in an amount equal to the potential to emit of the units.

(7) *Contents of the PAL permit.* The plan shall require that the PAL permit contain, at a minimum, the information in paragraphs (w)(7)(i) through (x) of this section.

(i) The PAL pollutant and the applicable source-wide emission limitation in tons per year.

(ii) The PAL permit effective date and the expiration date of the PAL (PAL effective period).

(iii) Specification in the PAL permit that if a major stationary source owner or operator applies to renew a PAL in accordance with paragraph (w)(10) of this section before the end of the PAL effective period, then the PAL shall not expire at the end of the PAL effective period. It shall remain in effect until a revised PAL permit is issued by the reviewing authority.

(iv) A requirement that emission calculations for compliance purposes include emissions from startups, shutdowns and malfunctions.

(v) A requirement that, once the PAL expires, the major stationary source is subject to the requirements of paragraph (w)(9) of this section.

(vi) The calculation procedures that the major stationary source owner or operator shall use to convert the monitoring system data to monthly emissions and annual emissions based on a 12-month rolling total for each month as required by paragraph (w)(3)(i) of this section.

(vii) A requirement that the major stationary source owner or operator monitor all emissions units in accordance with the provisions under paragraph (w)(13) of this section.

(viii) A requirement to retain the records required under paragraph (w)(13) of this section on site. Such records may be retained in an electronic format.

(ix) A requirement to submit the reports required under paragraph (w)(14) of this section by the required deadlines.

(x) Any other requirements that the reviewing authority deems necessary to implement and enforce the PAL.

(8) *PAL effective period and reopening of the PAL permit.* The plan shall require the information in paragraphs (w)(8)(i) and (ii) of this section.

(i) *PAL effective period.* The reviewing authority shall specify a PAL effective period of 10 years.

(ii) *Reopening of the PAL permit.* (*a*) During the PAL effective period, the plan shall require the reviewing authority to reopen the PAL permit to:

(*1*) Correct typographical/calculation errors made in setting the PAL or reflect a more accurate determination of emissions used to establish the PAL;

(*2*) Reduce the PAL if the owner or operator of the major stationary source creates creditable emissions reductions for use as offsets under § 51.165(a)(3)(ii) of this chapter; and

(*3*) Revise the PAL to reflect an increase in the PAL as provided under paragraph (w)(11) of this section.

(*b*) The plan shall provide the reviewing authority discretion to reopen the PAL permit for the following:

(*1*) Reduce the PAL to reflect newly applicable Federal requirements (for example, NSPS) with compliance dates after the PAL effective date;

281

(*2*) Reduce the PAL consistent with any other requirement, that is enforceable as a practical matter, and that the State may impose on the major stationary source under the plan; and

(*3*) Reduce the PAL if the reviewing authority determines that a reduction is necessary to avoid causing or contributing to a NAAQS or PSD increment violation, or to an adverse impact on an AQRV that has been identified for a Federal Class I area by a Federal Land Manager and for which information is available to the general public.

(*c*) Except for the permit reopening in paragraph (w)(8)(ii)(*a*)(*1*) of this section for the correction of typographical/calculation errors that do not increase the PAL level, all reopenings shall be carried out in accordance with the public participation requirements of paragraph (w)(5) of this section.

(9) *Expiration of a PAL.* Any PAL that is not renewed in accordance with the procedures in paragraph (w)(10) of this section shall expire at the end of the PAL effective period, and the requirements in paragraphs (w)(9)(i) through (v) of this section shall apply.

(i) Each emissions unit (or each group of emissions units) that existed under the PAL shall comply with an allowable emission limitation under a revised permit established according to the procedures in paragraphs (w)(9)(i)(*a*) and (*b*) of this section.

(*a*) Within the time frame specified for PAL renewals in paragraph (w)(10)(ii) of this section, the major stationary source shall submit a proposed allowable emission limitation for each emissions unit (or each group of emissions units, if such a distribution is more appropriate as decided by the reviewing authority) by distributing the PAL allowable emissions for the major stationary source among each of the emissions units that existed under the PAL. If the PAL had not yet been adjusted for an applicable requirement that became effective during the PAL effective period, as required under paragraph (w)(10)(v) of this section, such distribution shall be made as if the PAL had been adjusted.

(*b*) The reviewing authority shall decide whether and how the PAL allowable emissions will be distributed and issue a revised permit incorporating allowable limits for each emissions unit, or each group of emissions units, as the reviewing authority determines is appropriate.

(ii) Each emissions unit(s) shall comply with the allowable emission limitation on a 12-month rolling basis. The reviewing authority may approve the use of monitoring systems (source testing, emission factors, etc.) other than CEMS, CERMS, PEMS or CPMS to demonstrate compliance with the allowable emission limitation.

(iii) Until the reviewing authority issues the revised permit incorporating allowable limits for each emissions unit, or each group of emissions units, as required under paragraph (w)(9)(i)(*b*) of this section, the source shall continue to comply with a source-wide, multi-unit emissions cap equivalent to the level of the PAL emission limitation.

(iv) Any physical change or change in the method of operation at the major stationary source will be subject to major NSR requirements if such change meets the definition of major modification in paragraph (b)(2) of this section.

(v) The major stationary source owner or operator shall continue to comply with any State or Federal applicable requirements (BACT, RACT, NSPS, etc.) that may have applied either during the PAL effective period or prior to the PAL effective period except for those emission limitations that had been established pursuant to paragraph (r)(2) of this section, but were eliminated by the PAL in accordance with the provisions in paragraph (w)(1)(ii)(c) of this section.

(10) *Renewal of a PAL.* (i) The reviewing authority shall follow the procedures specified in paragraph (w)(5) of this section in approving any request to renew a PAL for a major stationary source, and shall provide both the proposed PAL level and a written rationale for the proposed PAL level to the public for review and comment. During such public review, any person may propose a PAL level for the source for consideration by the reviewing authority.

(ii) *Application deadline.* The plan shall require that a major stationary

**Environmental Protection Agency** §51.166

source owner or operator shall submit a timely application to the reviewing authority to request renewal of a PAL. A timely application is one that is submitted at least 6 months prior to, but not earlier than 18 months from, the date of permit expiration. This deadline for application submittal is to ensure that the permit will not expire before the permit is renewed. If the owner or operator of a major stationary source submits a complete application to renew the PAL within this time period, then the PAL shall continue to be effective until the revised permit with the renewed PAL is issued.

(iii) *Application requirements.* The application to renew a PAL permit shall contain the information required in paragraphs (w)(10)(iii) (*a*) through (*d*) of this section.

(*a*) The information required in paragraphs (w)(3)(i) through (iii) of this section.

(*b*) A proposed PAL level.

(*c*) The sum of the potential to emit of all emissions units under the PAL (with supporting documentation).

(*d*) Any other information the owner or operator wishes the reviewing authority to consider in determining the appropriate level for renewing the PAL.

(iv) *PAL adjustment.* In determining whether and how to adjust the PAL, the reviewing authority shall consider the options outlined in paragraphs (w)(10)(iv) (*a*) and (*b*) of this section. However, in no case may any such adjustment fail to comply with paragraph (w)(10)(iv)(*c*) of this section.

(*a*) If the emissions level calculated in accordance with paragraph (w)(6) of this section is equal to or greater than 80 percent of the PAL level, the reviewing authority may renew the PAL at the same level without considering the factors set forth in paragraph (w)(10)(iv)(*b*) of this section; or

(*b*) The reviewing authority may set the PAL at a level that it determines to be more representative of the source's baseline actual emissions, or that it determines to be appropriate considering air quality needs, advances in control technology, anticipated economic growth in the area, desire to reward or encourage the source's voluntary emissions reductions, or other

factors as specifically identified by the reviewing authority in its written rationale.

(*c*) Notwithstanding paragraphs (w)(10)(iv) (*a*) and (*b*) of this section:

(*1*) If the potential to emit of the major stationary source is less than the PAL, the reviewing authority shall adjust the PAL to a level no greater than the potential to emit of the source; and

(*2*) The reviewing authority shall not approve a renewed PAL level higher than the current PAL, unless the major stationary source has complied with the provisions of paragraph (w)(11) of this section (increasing a PAL).

(v) If the compliance date for a State or Federal requirement that applies to the PAL source occurs during the PAL effective period, and if the reviewing authority has not already adjusted for such requirement, the PAL shall be adjusted at the time of PAL permit renewal or title V permit renewal, whichever occurs first.

(11) *Increasing a PAL during the PAL effective period.* (i) The plan shall require that the reviewing authority may increase a PAL emission limitation only if the major stationary source complies with the provisions in paragraphs (w)(11)(i) (*a*) through (*d*) of this section.

(*a*) The owner or operator of the major stationary source shall submit a complete application to request an increase in the PAL limit for a PAL major modification. Such application shall identify the emissions unit(s) contributing to the increase in emissions so as to cause the major stationary source's emissions to equal or exceed its PAL.

(*b*) As part of this application, the major stationary source owner or operator shall demonstrate that the sum of the baseline actual emissions of the small emissions units, plus the sum of the baseline actual emissions of the significant and major emissions units assuming application of BACT equivalent controls, plus the sum of the allowable emissions of the new or modified emissions unit(s), exceeds the PAL. The level of control that would result from BACT equivalent controls on each significant or major emissions unit shall be determined by conducting

283

a new BACT analysis at the time the application is submitted, unless the emissions unit is currently required to comply with a BACT or LAER requirement that was established within the preceding 10 years. In such a case, the assumed control level for that emissions unit shall be equal to the level of BACT or LAER with which that emissions unit must currently comply.

(*c*) The owner or operator obtains a major NSR permit for all emissions unit(s) identified in paragraph (w)(11)(i)(*a*) of this section, regardless of the magnitude of the emissions increase resulting from them (that is, no significant levels apply). These emissions unit(s) shall comply with any emissions requirements resulting from the major NSR process (for example, BACT), even though they have also become subject to the PAL or continue to be subject to the PAL.

(*d*) The PAL permit shall require that the increased PAL level shall be effective on the day any emissions unit that is part of the PAL major modification becomes operational and begins to emit the PAL pollutant.

(ii) The reviewing authority shall calculate the new PAL as the sum of the allowable emissions for each modified or new emissions unit, plus the sum of the baseline actual emissions of the significant and major emissions units (assuming application of BACT equivalent controls as determined in accordance with paragraph (w)(11)(i)(*b*) of this section), plus the sum of the baseline actual emissions of the small emissions units.

(iii) The PAL permit shall be revised to reflect the increased PAL level pursuant to the public notice requirements of paragraph (w)(5) of this section.

(12) *Monitoring requirements for PALs*—(i) *General requirements.* (*a*) Each PAL permit must contain enforceable requirements for the monitoring system that accurately determines plantwide emissions of the PAL pollutant in terms of mass per unit of time. Any monitoring system authorized for use in the PAL permit must be based on sound science and meet generally acceptable scientific procedures for data quality and manipulation. Additionally, the information generated by

such system must meet minimum legal requirements for admissibility in a judicial proceeding to enforce the PAL permit.

(*b*) The PAL monitoring system must employ one or more of the four general monitoring approaches meeting the minimum requirements set forth in paragraphs (w)(12)(ii) (*a*) through (*d*) of this section and must be approved by the reviewing authority.

(*c*) Notwithstanding paragraph (w)(12)(i)(*b*) of this section, you may also employ an alternative monitoring approach that meets paragraph (w)(12)(i)(*a*) of this section if approved by the reviewing authority.

(*d*) Failure to use a monitoring system that meets the requirements of this section renders the PAL invalid.

(ii) Minimum performance requirements for approved monitoring approaches. The following are acceptable general monitoring approaches when conducted in accordance with the minimum requirements in paragraphs (w)(12)(iii) through (ix) of this section:

(*a*) Mass balance calculations for activities using coatings or solvents;

(*b*) CEMS;

(*c*) CPMS or PEMS; and

(*d*) Emission factors.

(iii) Mass balance calculations. An owner or operator using mass balance calculations to monitor PAL pollutant emissions from activities using coating or solvents shall meet the following requirements:

(*a*) Provide a demonstrated means of validating the published content of the PAL pollutant that is contained in or created by all materials used in or at the emissions unit;

(*b*) Assume that the emissions unit emits all of the PAL pollutant that is contained in or created by any raw material or fuel used in or at the emissions unit, if it cannot otherwise be accounted for in the process; and

(*c*) Where the vendor of a material or fuel, which is used in or at the emissions unit, publishes a range of pollutant content from such material, the owner or operator must use the highest value of the range to calculate the PAL pollutant emissions unless the reviewing authority determines there is site-

284

**Environmental Protection Agency**                    **§ 51.166**

specific data or a site-specific monitoring program to support another content within the range.

(iv) CEMS. An owner or operator using CEMS to monitor PAL pollutant emissions shall meet the following requirements:

(*a*) CEMS must comply with applicable Performance Specifications found in 40 CFR part 60, appendix B; and

(*b*) CEMS must sample, analyze, and record data at least every 15 minutes while the emissions unit is operating.

(v) CPMS or PEMS. An owner or operator using CPMS or PEMS to monitor PAL pollutant emissions shall meet the following requirements:

(*a*) The CPMS or the PEMS must be based on current site-specific data demonstrating a correlation between the monitored parameter(s) and the PAL pollutant emissions across the range of operation of the emissions unit; and

(*b*) Each CPMS or PEMS must sample, analyze, and record data at least every 15 minutes, or at another less frequent interval approved by the reviewing authority, while the emissions unit is operating.

(vi) Emission factors. An owner or operator using emission factors to monitor PAL pollutant emissions shall meet the following requirements:

(*a*) All emission factors shall be adjusted, if appropriate, to account for the degree of uncertainty or limitations in the factors' development;

(*b*) The emissions unit shall operate within the designated range of use for the emission factor, if applicable; and

(*c*) If technically practicable, the owner or operator of a significant emissions unit that relies on an emission factor to calculate PAL pollutant emissions shall conduct validation testing to determine a site-specific emission factor within 6 months of PAL permit issuance, unless the reviewing authority determines that testing is not required.

(vii) A source owner or operator must record and report maximum potential emissions without considering enforceable emission limitations or operational restrictions for an emissions unit during any period of time that there is no monitoring data, unless another method for determining emis-

sions during such periods is specified in the PAL permit.

(viii) Notwithstanding the requirements in paragraphs (w)(12)(iii) through (vii) of this section, where an owner or operator of an emissions unit cannot demonstrate a correlation between the monitored parameter(s) and the PAL pollutant emissions rate at all operating points of the emissions unit, the reviewing authority shall, at the time of permit issuance:

(*a*) Establish default value(s) for determining compliance with the PAL based on the highest potential emissions reasonably estimated at such operating point(s); or

(*b*) Determine that operation of the emissions unit during operating conditions when there is no correlation between monitored parameter(s) and the PAL pollutant emissions is a violation of the PAL.

(ix) Re-validation. All data used to establish the PAL pollutant must be re-validated through performance testing or other scientifically valid means approved by the reviewing authority. Such testing must occur at least once every 5 years after issuance of the PAL.

(13) *Recordkeeping requirements.* (i) The PAL permit shall require an owner or operator to retain a copy of all records necessary to determine compliance with any requirement of paragraph (w) of this section and of the PAL, including a determination of each emissions unit's 12-month rolling total emissions, for 5 years from the date of such record.

(ii) The PAL permit shall require an owner or operator to retain a copy of the following records, for the duration of the PAL effective period plus 5 years:

(*a*) A copy of the PAL permit application and any applications for revisions to the PAL; and

(*b*) Each annual certification of compliance pursuant to title V and the data relied on in certifying the compliance.

(14) *Reporting and notification requirements.* The owner or operator shall submit semi-annual monitoring reports and prompt deviation reports to the reviewing authority in accordance with the applicable title V operating permit

285

program. The reports shall meet the requirements in paragraphs (w)(14)(i) through (iii) of this section.

(i) *Semi-annual report.* The semi-annual report shall be submitted to the reviewing authority within 30 days of the end of each reporting period. This report shall contain the information required in paragraphs (w)(14)(i)(*a*) through (*g*) of this section.

(*a*) The identification of owner and operator and the permit number.

(*b*) Total annual emissions (tons/year) based on a 12-month rolling total for each month in the reporting period recorded pursuant to paragraph (w)(13)(i) of this section.

(*c*) All data relied upon, including, but not limited to, any Quality Assurance or Quality Control data, in calculating the monthly and annual PAL pollutant emissions.

(*d*) A list of any emissions units modified or added to the major stationary source during the preceding 6-month period.

(*e*) The number, duration, and cause of any deviations or monitoring malfunctions (other than the time associated with zero and span calibration checks), and any corrective action taken.

(*f*) A notification of a shutdown of any monitoring system, whether the shutdown was permanent or temporary, the reason for the shutdown, the anticipated date that the monitoring system will be fully operational or replaced with another monitoring system, and whether the emissions unit monitored by the monitoring system continued to operate, and the calculation of the emissions of the pollutant or the number determined by method included in the permit, as provided by paragraph (w)(12)(vii) of this section.

(*g*) A signed statement by the responsible official (as defined by the applicable title V operating permit program) certifying the truth, accuracy, and completeness of the information provided in the report.

(ii) *Deviation report.* The major stationary source owner or operator shall promptly submit reports of any deviations or exceedance of the PAL requirements, including periods where no monitoring is available. A report submitted pursuant to §70.6(a)(3)(iii)(B) of this chapter shall satisfy this reporting requirement. The deviation reports shall be submitted within the time limits prescribed by the applicable program implementing §70.6(a)(3)(iii)(B) of this chapter. The reports shall contain the following information:

(*a*) The identification of owner and operator and the permit number;

(*b*) The PAL requirement that experienced the deviation or that was exceeded;

(*c*) Emissions resulting from the deviation or the exceedance; and

(*d*) A signed statement by the responsible official (as defined by the applicable title V operating permit program) certifying the truth, accuracy, and completeness of the information provided in the report.

(iii) Re-validation results. The owner or operator shall submit to the reviewing authority the results of any re-validation test or method within three months after completion of such test or method.

(15) *Transition requirements.* (i) No reviewing authority may issue a PAL that does not comply with the requirements in paragraphs (w)(1) through (15) of this section after the Administrator has approved regulations incorporating these requirements into a plan.

(ii) The reviewing authority may supersede any PAL which was established prior to the date of approval of the plan by the Administrator with a PAL that complies with the requirements of paragraphs (w)(1) through (15) of this section.

(x) If any provision of this section, or the application of such provision to any person or circumstance, is held invalid, the remainder of this section, or the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.

(y) *Equipment replacement provision.* Without regard to other considerations, routine maintenance, repair and replacement includes, but is not limited to, the replacement of any component of a process unit with an identical or functionally equivalent component(s), and maintenance and repair activities that are part of the replacement activity, provided that all of

**Environmental Protection Agency**                    **§ 51.166**

the requirements in paragraphs (y)(1) through (3) of this section are met.

(1) *Capital Cost threshold for Equipment Replacement.* (i) For an *electric utility steam generating unit,* as defined in §51.166(b)(30), the fixed capital cost of the replacement component(s) plus the cost of any associated maintenance and repair activities that are part of the replacement shall not exceed 20 percent of the replacement value of the process unit, at the time the equipment is replaced. For a process unit that is not an electric utility steam generating unit the fixed capital cost of the replacement component(s) plus the cost of any associated maintenance and repair activities that are part of the replacement shall not exceed 20 percent of the replacement value of the process unit, at the time the equipment is replaced.

(ii) In determining the replacement value of the process unit; and, except as otherwise allowed under paragraph (y)(1)(iii) of this section, the owner or operator shall determine the replacement value of the process unit on an estimate of the fixed capital cost of constructing a new process unit, or on the current appraised value of the process unit.

(iii) As an alternative to paragraph (y)(1)(ii) of this section for determining the replacement value of a process unit, an owner or operator may choose to use insurance value (where the insurance value covers only complete replacement), investment value adjusted for inflation, or another accounting procedure if such procedure is based on Generally Accepted Accounting Principles, provided that the owner or operator sends a notice to the reviewing authority. The first time that an owner or operator submits such a notice for a particular process unit, the notice may be submitted at any time, but any subsequent notice for that process unit may be submitted only at the beginning of the process unit's fiscal year. Unless the owner or operator submits a notice to the reviewing authority, then paragraph (y)(1)(ii) of this section will be used to establish the replacement value of the process unit. Once the owner or operator submits a notice to use an alternative accounting procedure, the owner or operator must con-

tinue to use that procedure for the entire fiscal year for that process unit. In subsequent fiscal years, the owner or operator must continue to use this selected procedure unless and until the owner or operator sends another notice to the reviewing authority selecting another procedure consistent with this paragraph or paragraph (y)(1)(ii) of this section at the beginning of such fiscal year.

(2) *Basic design parameters.* The replacement does not change the basic design parameter(s) of the process unit to which the activity pertains.

(i) Except as provided in paragraph (y)(2)(iii) of this section, for a process unit at a steam electric generating facility, the owner or operator may select as its basic design parameters either maximum hourly heat input and maximum hourly fuel consumption rate or maximum hourly electric output rate and maximum steam flow rate. When establishing fuel consumption specifications in terms of weight or volume, the minimum fuel quality based on British Thermal Units content shall be used for determining the basic design parameter(s) for a coal-fired electric utility steam generating unit.

(ii) Except as provided in paragraph (y)(2)(iii) of this section, the basic design parameter(s) for any process unit that is not at a steam electric generating facility are maximum rate of fuel or heat input, maximum rate of material input, or maximum rate of product output. Combustion process units will typically use maximum rate of fuel input. For sources having multiple end products and raw materials, the owner or operator should consider the primary product or primary raw material when selecting a basic design parameter.

(iii) If the owner or operator believes the basic design parameter(s) in paragraphs (y)(2)(i) and (ii) of this section is not appropriate for a specific industry or type of process unit, the owner or operator may propose to the reviewing authority an alternative basic design parameter(s) for the source's process unit(s). If the reviewing authority approves of the use of an alternative basic design parameter(s), the reviewing authority shall issue a permit that

287

is legally enforceable that records such basic design parameter(s) and requires the owner or operator to comply with such parameter(s).

(iv) The owner or operator shall use credible information, such as results of historic maximum capability tests, design information from the manufacturer, or engineering calculations, in establishing the magnitude of the basic design parameter(s) specified in paragraphs (y)(2)(i) and (ii) of this section.

(v) If design information is not available for a process unit, then the owner or operator shall determine the process unit's basic design parameter(s) using the maximum value achieved by the process unit in the five-year period immediately preceding the planned activity.

(vi) Efficiency of a process unit is not a basic design parameter.

(3) The replacement activity shall not cause the process unit to exceed any emission limitation, or operational limitation that has the effect of constraining emissions, that applies to the process unit and that is legally enforceable.

Note to Paragraph (y): By a court order on December 24, 2003, this paragraph (y) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the FEDERAL REGISTER advising the public of the termination of the stay.

(Secs. 101(b)(1), 110, 160–169, 171–178, and 301(a), Clean Air Act, as amended (42 U.S.C. 7401(b)(1), 7410, 7470–7479, 7501–7508, and 7601(a)); sec. 129(a), Clean Air Act Amendments of 1977 (Pub. L. 95–95, 91 Stat. 685 (Aug. 7, 1977)))

[43 FR 26382, June 19, 1978]

Editorial Note: For FEDERAL REGISTER citations affecting §51.166, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.fdsys.gov.*

Effective Date Note: At 76 FR 17553, Mar. 30, 2011, §51.166 paragraphs (b)(2)(v) and (b)(3)(iii)(*d*) are stayed indefinitely.

## Subpart J—Ambient Air Quality Surveillance

Authority: Secs. 110, 301(a), 313, 319, Clean Air Act (42 U.S.C. 7410, 7601(a), 7613, 7619).

### § 51.190 Ambient air quality monitoring requirements.

The requirements for monitoring ambient air quality for purposes of the plan are located in subpart C of part 58 of this chapter.

[44 FR 27569, May 10, 1979]

## Subpart K—Source Surveillance

Source: 51 FR 40673, Nov. 7, 1986, unless otherwise noted.

### § 51.210 General.

Each plan must provide for monitoring the status of compliance with any rules and regulations that set forth any portion of the control strategy. Specifically, the plan must meet the requirements of this subpart.

### § 51.211 Emission reports and recordkeeping.

The plan must provide for legally enforceable procedures for requiring owners or operators of stationary sources to maintain records of and periodically report to the State—

(a) Information on the nature and amount of emissions from the stationary sources; and

(b) Other information as may be necessary to enable the State to determine whether the sources are in compliance with applicable portions of the control strategy.

### § 51.212 Testing, inspection, enforcement, and complaints.

The plan must provide for—

(a) Periodic testing and inspection of stationary sources; and

(b) Establishment of a system for detecting violations of any rules and regulations through the enforcement of appropriate visible emission limitations and for investigating complaints.

(c) Enforceable test methods for each emission limit specified in the plan. For the purpose of submitting compliance certifications or establishing whether or not a person has violated or is in violation of any standard in this part, the plan must not preclude the use, including the exclusive use, of any credible evidence or information, relevant to whether a source would have

§ 52.21 Prevention of significant dete-
rioration of air quality.

(a)(1) *Plan disapproval.* The provisions
of this section are applicable to any
State implementation plan which has
been disapproved with respect to pre-
vention of significant deterioration of
air quality in any portion of any State
where the existing air quality is better
than the national ambient air quality
standards. Specific disapprovals are
listed where applicable, in subparts B
through DDD of this part. The provi-
sions of this section have been incor-
porated by reference into the applica-
ble implementation plans for various
States, as provided in subparts B
through DDD of this part. Where this
section is so incorporated, the provi-
sions shall also be applicable to all
lands owned by the Federal Govern-
ment and Indian Reservations located
in such State. No disapproval with re-
spect to a State's failure to prevent
significant deterioration of air quality
shall invalidate or otherwise affect the
obligations of States, emission sources,
or other persons with respect to all
portions of plans approved or promul-
gated under this part.

(2) *Applicability procedures.* (i) The re-
quirements of this section apply to the
construction of any new major sta-
tionary source (as defined in paragraph
(b)(1) of this section) or any project at
an existing major stationary source in
an area designated as attainment or
unclassifiable under sections
107(d)(1)(A)(ii) or (iii) of the Act.

(ii) The requirements of paragraphs
(j) through (r) of this section apply to
the construction of any new major sta-
tionary source or the major modifica-
tion of any existing major stationary
source, except as this section otherwise
provides.

(iii) No new major stationary source
or major modification to which the re-
quirements of paragraphs (j) through
(r)(5) of this section apply shall begin
actual construction without a permit
that states that the major stationary
source or major modification will meet
those requirements. The Administrator
has authority to issue any such permit.

(iv) The requirements of the program
will be applied in accordance with the
principles set out in paragraphs
(a)(2)(iv)(*a*) through (*f*) of this section.

(*a*) Except as otherwise provided in
paragraphs (a)(2)(v) and (vi) of this sec-
tion, and consistent with the definition
of major modification contained in
paragraph (b)(2) of this section, a
project is a major modification for a
regulated NSR pollutant if it causes
two types of emissions increases—a sig-
nificant emissions increase (as defined
in paragraph (b)(40) of this section),
and a significant net emissions in-
crease (as defined in paragraphs (b)(3)
and (b)(23) of this section). The project
is not a major modification if it does
not cause a significant emissions in-
crease. If the project causes a signifi-
cant emissions increase, then the
project is a major modification only if
it also results in a significant net emis-
sions increase.

(*b*) The procedure for calculating (be-
fore beginning actual construction)
whether a significant emissions in-
crease (i.e., the first step of the proc-
ess) will occur depends upon the type of
emissions units being modified, accord-
ing to paragraphs (a)(2)(iv)(*c*) through
(*f*) of this section. The procedure for
calculating (before beginning actual
construction) whether a significant net
emissions increase will occur at the
major stationary source (i.e., the sec-
ond step of the process) is contained in
the definition in paragraph (b)(3) of
this section. Regardless of any such
preconstruction projections, a major
modification results if the project
causes a significant emissions increase
and a significant net emissions in-
crease.

(*c*) *Actual-to-projected-actual applica-
bility test for projects that only involve
existing emissions units.* A significant
emissions increase of a regulated NSR
pollutant is projected to occur if the
sum of the difference between the pro-
jected actual emissions (as defined in
paragraph (b)(41) of this section) and
the baseline actual emissions (as de-
fined in paragraphs (b)(48)(i) and (ii) of
this section), for each existing emis-
sions unit, equals or exceeds the sig-
nificant amount for that pollutant (as
defined in paragraph (b)(23) of this sec-
tion).

(*d*) *Actual-to-potential test for projects
that only involve construction of a new*

15

*emissions unit(s).* A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the potential to emit (as defined in paragraph (b)(4) of this section) from each new emissions unit following completion of the project and the baseline actual emissions (as defined in paragraph (b)(48)(iii) of this section) of these units before the project equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(e) [Reserved]

(f) *Hybrid test for projects that involve multiple types of emissions units.* A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the emissions increases for each emissions unit, using the method specified in paragraphs (a)(2)(iv)(c) through (d) of this section as applicable with respect to each emissions unit, for each type of emissions unit equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(v) For any major stationary source for a PAL for a regulated NSR pollutant, the major stationary source shall comply with the requirements under paragraph (aa) of this section.

(b) *Definitions.* For the purposes of this section:

(1)(i) *Major stationary source* means:

(a) Any of the following stationary sources of air pollutants which emits, or has the potential to emit, 100 tons per year or more of any regulated NSR pollutant: Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input, coal cleaning plants (with thermal dryers), kraft pulp mills, portland cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants (with thermal dryers), primary copper smelters, municipal incinerators capable of charging more than 250 tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering

plants, secondary metal production plants, chemical process plants (which does not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140), fossil-fuel boilers (or combinations thereof) totaling more than 250 million British thermal units per hour heat input, petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels, taconite ore processing plants, glass fiber processing plants, and charcoal production plants;

(b) Notwithstanding the stationary source size specified in paragraph (b)(1)(i) of this section, any stationary source which emits, or has the potential to emit, 250 tons per year or more of a regulated NSR pollutant; or

(c) Any physical change that would occur at a stationary source not otherwise qualifying under paragraph (b)(1) of this section, as a major stationary source, if the changes would constitute a major stationary source by itself.

(ii) A major source that is major for volatile organic compounds or $NO_X$ shall be considered major for ozone.

(iii) The fugitive emissions of a stationary source shall not be included in determining for any of the purposes of this section whether it is a major stationary source, unless the source belongs to one of the following categories of stationary sources:

(a) Coal cleaning plants (with thermal dryers);

(b) Kraft pulp mills;

(c) Portland cement plants;

(d) Primary zinc smelters;

(e) Iron and steel mills;

(f) Primary aluminum ore reduction plants;

(g) Primary copper smelters;

(h) Municipal incinerators capable of charging more than 250 tons of refuse per day;

(i) Hydrofluoric, sulfuric, or nitric acid plants;

(j) Petroleum refineries;

(k) Lime plants;

(l) Phosphate rock processing plants;

(m) Coke oven batteries;

(n) Sulfur recovery plants;

(o) Carbon black plants (furnace process);

(p) Primary lead smelters;

(q) Fuel conversion plants;

**Environmental Protection Agency**                              **§ 52.21**

(*r*) Sintering plants;

(*s*) Secondary metal production plants;

(*t*) Chemical process plants—The term chemical processing plant shall not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140;

(*u*) Fossil-fuel boilers (or combination thereof) totaling more than 250 million British thermal units per hour heat input;

(*v*) Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels;

(*w*) Taconite ore processing plants;

(*x*) Glass fiber processing plants;

(*y*) Charcoal production plants;

(*z*) Fossil fuel-fired steam electric plants of more that 250 million British thermal units per hour heat input, and

(*aa*) Any other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the Act.

(2)(i) *Major modification* means any physical change in or change in the method of operation of a major stationary source that would result in: a significant emissions increase (as defined in paragraph (b)(40) of this section) of a regulated NSR pollutant (as defined in paragraph (b)(50) of this section); and a significant net emissions increase of that pollutant from the major stationary source.

(ii) Any significant emissions increase (as defined at paragraph (b)(40) of this section) from any emissions units or net emissions increase (as defined in paragraph (b)(3) of this section) at a major stationary source that is significant for volatile organic compounds or NO_X shall be considered significant for ozone.

(iii) A physical change or change in the method of operation shall not include:

(*a*) Routine maintenance, repair and replacement. Routine maintenance, repair and replacement shall include, but not be limited to, any activity(s) that meets the requirements of the equipment replacement provisions contained in paragraph (cc) of this section;

NOTE TO PARAGRAPH (b)(2)(iii)(a): By court order on December 24, 2003, the second sentence of this paragraph (b)(2)(iii)(a) is stayed

indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the FEDERAL REGISTER advising the public of the termination of the stay.

(*b*) Use of an alternative fuel or raw material by reason of an order under sections 2 (a) and (b) of the Energy Supply and Environmental Coordination Act of 1974 (or any superseding legislation) or by reason of a natural gas curtailment plant pursuant to the Federal Power Act;

(*c*) Use of an alternative fuel by reason of an order or rule under section 125 of the Act;

(*d*) Use of an alternative fuel at a steam generating unit to the extent that the fuel is generated from municipal solid waste;

(*e*) Use of an alternative fuel or raw material by a stationary source which:

(*1*) The source was capable of accommodating before January 6, 1975, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975 pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR subpart I or 40 CFR 51.166; or

(*2*) The source is approved to use under any permit issued under 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166;

(*f*) An increase in the hours of operation or in the production rate, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975, pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR subpart I or 40 CFR 51.166.

(*g*) Any change in ownership at a stationary source.

(*h*) [Reserved]

(*i*) The installation, operation, cessation, or removal of a temporary clean coal technology demonstration project, provided that the project complies with:

(*1*) The State implementation plan for the State in which the project is located, and

(*2*) Other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

17

(*j*) The installation or operation of a permanent clean coal technology demonstration project that constitutes repowering, provided that the project does not result in an increase in the potential to emit of any regulated pollutant emitted by the unit. This exemption shall apply on a pollutant-by-pollutant basis.

(*k*) The reactivation of a very clean coal-fired electric utility steam generating unit.

(iv) This definition shall not apply with respect to a particular regulated NSR pollutant when the major stationary source is complying with the requirements under paragraph (aa) of this section for a PAL for that pollutant. Instead, the definition at paragraph (aa)(2)(viii) of this section shall apply.

(v) Fugitive emissions shall not be included in determining for any of the purposes of this section whether a physical change in or change in the method of operation of a major stationary source is a major modification, unless the source belongs to one of the source categories listed in paragraph (b)(1)(iii) of this section.

(3)(i) *Net emissions increase* means, with respect to any regulated NSR pollutant emitted by a major stationary source, the amount by which the sum of the following exceeds zero:

(*a*) The increase in emissions from a particular physical change or change in the method of operation at a stationary source as calculated pursuant to paragraph (a)(2)(iv) of this section; and

(*b*) Any other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable. Baseline actual emissions for calculating increases and decreases under this paragraph (b)(3)(i)(*b*) shall be determined as provided in paragraph (b)(48) of this section, except that paragraphs (b)(48)(i)(*c*) and (b)(48)(ii)(*d*) of this section shall not apply.

(ii) An increase or decrease in actual emissions is contemporaneous with the increase from the particular change only if it occurs between:

(*a*) The date five years before construction on the particular change commences; and

(*b*) The date that the increase from the particular change occurs.

(iii) An increase or decrease in actual emissions is creditable only if:

(*a*) The Administrator or other reviewing authority has not relied on it in issuing a permit for the source under this section, which permit is in effect when the increase in actual emissions from the particular change occurs; and

(*b*) The increase or decrease in emissions did not occur at a Clean Unit except as provided in paragraphs (x)(8) and (y)(10) of this section.

(*c*) As it pertains to an increase or decrease in fugitive emissions (to the extent quantifiable), it occurs at an emissions unit that is part of one of the source categories listed in paragraph (b)(1)(iii) of this section or it occurs at an emission unit that is located at a major stationary source that belongs to one of the listed source categories.(iv) An increase or decrease in actual emissions of sulfur dioxide, particulate matter, or nitrogen oxides that occurs before the applicable minor source baseline date is creditable only if it is required to be considered in calculating the amount of maximum allowable increases remaining available.

(v) An increase in actual emissions is creditable only to the extent that the new level of actual emissions exceeds the old level.

(vi) A decrease in actual emissions is creditable only to the extent that:

(*a*) The old level of actual emissions or the old level of allowable emissions, whichever is lower, exceeds the new level of actual emissions;

(*b*) It is enforceable as a practical matter at and after the time that actual construction on the particular change begins.

(*c*) It has approximately the same qualitative significance for public health and welfare as that attributed to the increase from the particular change; and

(vii) [Reserved]

(viii) An increase that results from a physical change at a source occurs when the emissions unit on which construction occurred becomes operational and begins to emit a particular

(20) *Fugitive emissions* means those emissions which could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening.

(21)(i) *Actual emissions* means the actual rate of emissions of a regulated NSR pollutant from an emissions unit, as determined in accordance with paragraphs (b)(21)(ii) through (iv) of this section, except that this definition shall not apply for calculating whether a significant emissions increase has occurred, or for establishing a PAL under paragraph (aa) of this section. Instead, paragraphs (b)(41) and (b)(48) of this section shall apply for those purposes.

(ii) In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a consecutive 24-month period which precedes the particular date and which is representative of normal source operation. The Administrator shall allow the use of a different time period upon a determination that it is more representative of normal source operation. Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.

(iii) The Administrator may presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit.

(iv) For any emissions unit that has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.

(22) *Complete* means, in reference to an application for a permit, that the application contains all of the information necessary for processing the application.

(23)(i) Significant means, in reference to a net emissions increase or the potential of a source to emit any of the following pollutants, a rate of emissions that would equal or exceed any of the following rates:

POLLUTANT AND EMISSIONS RATE

Carbon monoxide: 100 tons per year (tpy)
Nitrogen oxides: 40 tpy
Sulfur dioxide: 40 tpy
Particulate matter: 25 tpy of particulate matter emissions

$PM_{10}$: 15 tpy
$PM_{2.5}$: 10 tpy of direct $PM_{2.5}$ emissions; 40 tpy of sulfur dioxide emissions; 40 tpy of nitrogen oxide emissions unless demonstrated not to be a $PM_{2.5}$ precursor under paragraph (b)(50) of this section
Ozone: 40 tpy of volatile organic compounds or nitrogen oxides
Lead: 0.6 tpy
Fluorides: 3 tpy
Sulfuric acid mist: 7 tpy
Hydrogen sulfide ($H_2S$): 10 tpy
Total reduced sulfur (including $H_2S$): 10 tpy
Reduced sulfur compounds (including $H_2S$): 10 tpy
Municipal waste combustor organics (measured as total tetra-through octa-chlorinated dibenzo-p-dioxins and dibenzofurans): $3.2 \times 10^{-6}$ megagrams per year ($3.5 \times 10^{-6}$ tons per year)
Municipal waste combustor metals (measured as particulate matter): 14 megagrams per year (15 tons per year)
Municipal waste combustor acid gases (measured as sulfur dioxide and hydrogen chloride): 36 megagrams per year (40 tons per year)
Municipal solid waste landfills emissions (measured as nonmethane organic compounds): 45 megagrams per year (50 tons per year)

(ii) *Significant* means, in reference to a net emissions increase or the potential of a source to emit a regulated NSR pollutant that paragraph (b)(23)(i) of this section, does not list, any emissions rate.

(iii) Notwithstanding paragraph (b)(23)(i) of this section, *significant* means any emissions rate or any net emissions increase associated with a major stationary source or major modification, which would construct within 10 kilometers of a Class I area, and have an impact on such area equal to or greater than 1 $\mu g/m^3$, (24-hour average).

(24) *Federal Land Manager* means, with respect to any lands in the United States, the Secretary of the department with authority over such lands.

(25) *High terrain* means any area having an elevation 900 feet or more above the base of the stack of a source.

(26) *Low terrain* means any area other than high terrain.

(27) *Indian Reservation* means any federally recognized reservation established by Treaty, Agreement, executive order, or act of Congress.

(28) *Indian Governing Body* means the governing body of any tribe, band, or

Addendum-097

group of Indians subject to the jurisdiction of the United States and recognized by the United States as possessing power of self government.

(29) *Adverse impact on visibility* means visibility impairment which interferes with the management, protection, preservation or enjoyment of the visitor's visual experience of the Federal Class I area. This determination must be made on a case-by-case basis taking into account the geographic extent, intensity, duration, frequency and time of visibility impairment, and how these factors correlate with (1) times of visitor use of the Federal Class I area, and (2) the frequency and timing of natural conditions that reduce visibility.

(30) *Volatile organic compounds (VOC)* is as defined in §51.100(s) of this chapter.

(31) *Electric utility steam generating unit* means any steam electric generating unit that is constructed for the purpose of supplying more than one-third of its potential electric output capacity and more than 25 MW electrical output to any utility power distribution system for sale. Any steam supplied to a steam distribution system for the purpose of providing steam to a steam-electric generator that would produce electrical energy for sale is also considered in determining the electrical energy output capacity of the affected facility.

(32) [Reserved]

(33) *Replacement unit* means an emissions unit for which all the criteria listed in paragraphs (b)(33)(i) through (iv) of this section are met. No creditable emission reductions shall be generated from shutting down the existing emissions unit that is replaced.

(i) The emissions unit is a reconstructed unit within the meaning of §60.15(b)(1) of this chapter, or the emissions unit completely takes the place of an existing emissions unit.

(ii) The emissions unit is identical to or functionally equivalent to the replaced emissions unit.

(iii) The replacement does not alter the basic design parameters (as discussed in paragraph (cc)(2) of this section) of the process unit.

(iv) The replaced emissions unit is permanently removed from the major stationary source, otherwise permanently disabled, or permanently barred from operation by a permit that is enforceable as a practical matter. If the replaced emissions unit is brought back into operation, it shall constitute a new emissions unit.

(34) *Clean coal technology* means any technology, including technologies applied at the precombustion, combustion, or post combustion stage, at a new or existing facility which will achieve significant reductions in air emissions of sulfur dioxide or oxides of nitrogen associated with the utilization of coal in the generation of electricity, or process steam which was not in widespread use as of November 15, 1990.

(35) *Clean coal technology demonstration project* means a project using funds appropriated under the heading "Department of Energy-Clean Coal Technology", up to a total amount of $2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations for the Environmental Protection Agency. The Federal contribution for a qualifying project shall be at least 20 percent of the total cost of the demonstration project.

(36) *Temporary clean coal technology demonstration project* means a clean coal technology demonstration project that is operated for a period of 5 years or less, and which complies with the State implementation plans for the State in which the project is located and other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

(37) (i) *Repowering* means replacement of an existing coal-fired boiler with one of the following clean coal technologies: atmospheric or pressurized fluidized bed combustion, integrated gasification combined cycle, magnetohydrodynamics, direct and indirect coal-fired turbines, integrated gasification fuel cells, or as determined by the Administrator, in consultation with the Secretary of Energy, a derivative of one or more of these technologies, and any other technology capable of controlling multiple combustion emissions simultaneously with improved boiler or generation efficiency and with significantly greater waste

23

reduction relative to the performance of technology in widespread commercial use as of November 15, 1990.

(ii) Repowering shall also include any oil and/or gas-fired unit which has been awarded clean coal technology demonstration funding as of January 1, 1991, by the Department of Energy.

(iii) The Administrator shall give expedited consideration to permit applications for any source that satisfies the requirements of this subsection and is granted an extension under section 409 of the Clean Air Act.

(38) *Reactivation of a very clean coal-fired electric utility steam generating unit* means any physical change or change in the method of operation associated with the commencement of commercial operations by a coal-fired utility unit after a period of discontinued operation where the unit:

(i) Has not been in operation for the two-year period prior to the enactment of the Clean Air Act Amendments of 1990, and the emissions from such unit continue to be carried in the permitting authority's emissions inventory at the time of enactment;

(ii) Was equipped prior to shut-down with a continuous system of emissions control that achieves a removal efficiency for sulfur dioxide of no less than 85 percent and a removal efficiency for particulates of no less than 98 percent;

(iii) Is equipped with low-NO$_X$ burners prior to the time of commencement of operations following reactivation; and

(iv) Is otherwise in compliance with the requirements of the Clean Air Act.

(39) *Pollution prevention* means any activity that through process changes, product reformulation or redesign, or substitution of less polluting raw materials, eliminates or reduces the release of air pollutants (including fugitive emissions) and other pollutants to the environment prior to recycling, treatment, or disposal; it does not mean recycling (other than certain "in-process recycling" practices), energy recovery, treatment, or disposal.

(40) *Significant emissions increase* means, for a regulated NSR pollutant, an increase in emissions that is significant (as defined in paragraph (b)(23) of this section) for that pollutant.

(41)(i) *Projected actual emissions* means the maximum annual rate, in tons per year, at which an existing emissions unit is projected to emit a regulated NSR pollutant in any one of the 5 years (12-month period) following the date the unit resumes regular operation after the project, or in any one of the 10 years following that date, if the project involves increasing the emissions unit's design capacity or its potential to emit that regulated NSR pollutant and full utilization of the unit would result in a significant emissions increase or a significant net emissions increase at the major stationary source.

(ii) In determining the projected actual emissions under paragraph (b)(41)(i) of this section (before beginning actual construction), the owner or operator of the major stationary source:

(a) Shall consider all relevant information, including but not limited to, historical operational data, the company's own representations, the company's expected business activity and the company's highest projections of business activity, the company's filings with the State or Federal regulatory authorities, and compliance plans under the approved State Implementation Plan; and

(b) Shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions; and

(c) Shall exclude, in calculating any increase in emissions that results from he particular project, that portion of the unit's emissions following the project that an existing unit could have accommodated during the consecutive 24-month period used to establish the baseline actual emissions under paragraph (b)(48) of this section and that are also unrelated to the particular project, including any increased utilization due to product demand growth; or

(d) In lieu of using the method set out in paragraphs (a)(41)(ii)(a) through (c) of this section, may elect to use the emissions unit's potential to emit, in tons per year, as defined under paragraph (b)(4) of this section.

(42) [Reserved]

(43) *Prevention of Significant Deterioration (PSD) program* means the EPA-implemented major source preconstruction permit programs under this section or a major source preconstruction permit program that has been approved by the Administrator and incorporated into the State Implementation Plan pursuant to §51.166 of this chapter to implement the requirements of that section. Any permit issued under such a program is a major NSR permit.

(44) *Continuous emissions monitoring system (CEMS)* means all of the equipment that may be required to meet the data acquisition and availability requirements of this section, to sample, condition (if applicable), analyze, and provide a record of emissions on a continuous basis.

(45) *Predictive emissions monitoring system (PEMS)* means all of the equipment necessary to monitor process and control device operational parameters (for example, control device secondary voltages and electric currents) and other information (for example, gas flow rate, $O_2$ or $CO_2$ concentrations), and calculate and record the mass emissions rate (for example, lb/hr) on a continuous basis.

(46) *Continuous parameter monitoring system (CPMS)* means all of the equipment necessary to meet the data acquisition and availability requirements of this section, to monitor process and control device operational parameters (for example, control device secondary voltages and electric currents) and other information (for example, gas flow rate, $O_2$ or $CO_2$ concentrations), and to record average operational parameter value(s) on a continuous basis.

(47) *Continuous emissions rate monitoring system (CERMS)* means the total equipment required for the determination and recording of the pollutant mass emissions rate (in terms of mass per unit of time).

(48) *Baseline actual emissions* means the rate of emissions, in tons per year, of a regulated NSR pollutant, as determined in accordance with paragraphs (b)(48)(i) through (iv) of this section.

(i) For any existing electric utility steam generating unit, baseline actual emissions means the average rate, in tons per year, at which the unit actu-

ally emitted the pollutant during any consecutive 24-month period selected by the owner or operator within the 5-year period immediately preceding when the owner or operator begins actual construction of the project. The Administrator shall allow the use of a different time period upon a determination that it is more representative of normal source operation.

(*a*) The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(*b*) The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above any emission limitation that was legally enforceable during the consecutive 24-month period.

(*c*) For a regulated NSR pollutant, when a project involves multiple emissions units, only one consecutive 24-month period must be used to determine the baseline actual emissions for the emissions units being changed. A different consecutive 24-month period can be used For each regulated NSR pollutant.

(*d*) The average rate shall not be based on any consecutive 24-month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by paragraph (b)(48)(i)(*b*) of this section.

(ii) For an existing emissions unit (other than an electric utility steam generating unit), baseline actual emissions means the average rate, in tons per year, at which the emissions unit actually emitted the pollutant during any consecutive 24-month period selected by the owner or operator within the 10-year period immediately preceding either the date the owner or operator begins actual construction of the project, or the date a complete permit application is received by the Administrator for a permit required under this section or by the reviewing authority for a permit required by a plan, whichever is earlier, except that the 10-year period shall not include any period earlier than November 15, 1990.

25

**Environmental Protection Agency** §52.21

where the Governor recommends a variance in which the Federal Land Manager does not concur, the recommendations of the Governor and the Federal Land Manager shall be transmitted to the President. The President may approve the Governor's recommendation if he finds that the variance is in the national interest. If the variance is approved, the Administrator shall issue a permit pursuant to the requirements of paragraph (q)(7) of this section: *Provided*, That the applicable requirements of this section are otherwise met.

(8) *Emission limitations for Presidential or gubernatorial variance.* In the case of a permit issued pursuant to paragraph (q) (5) or (6) of this section the source or modification shall comply with such emission limitations as may be necessary to assure that emissions of sulfur dioxide from the source or modification would not (during any day on which the otherwise applicable maximum allowable increases are exceeded) cause or contribute to concentrations which would exceed the following maximum allowable increases over the baseline concentration and to assure that such emissions would not cause or contribute to concentrations which exceed the otherwise applicable maximum allowable increases for periods of exposure of 24 hours or less for more than 18 days, not necessarily consecutive, during any annual period:

MAXIMUM ALLOWABLE INCREASE

[Micrograms per cubic meter]

| Period of exposure | Terrain areas | |
|---|---|---|
| | Low | High |
| 24-hr maximum ........................... | 36 | 62 |
| 3-hr maximum ........................... | 130 | 221 |

(q) *Public participation.* The Administrator shall follow the applicable procedures of 40 CFR part 124 in processing applications under this section. The Administrator shall follow the procedures at 40 CFR 52.21(r) as in effect on June 19, 1979, to the extent that the procedures of 40 CFR part 124 do not apply.

(r) *Source obligation.* (1) Any owner or operator who constructs or operates a source or modification not in accordance with the application submitted

pursuant to this section or with the terms of any approval to construct, or any owner or operator of a source or modification subject to this section who commences construction after the effective date of these regulations without applying for and receiving approval hereunder, shall be subject to appropriate enforcement action.

(2) Approval to construct shall become invalid if construction is not commenced within 18 months after receipt of such approval, if construction is discontinued for a period of 18 months or more, or if construction is not completed within a reasonable time. The Administrator may extend the 18-month period upon a satisfactory showing that an extension is justified. This provision does not apply to the time period between construction of the approved phases of a phased construction project; each phase must commence construction within 18 months of the projected and approved commencement date.

(3) Approval to construct shall not relieve any owner or operator of the responsibility to comply fully with applicable provisions of the State implementation plan and any other requirements under local, State, or Federal law.

(4) At such time that a particular source or modification becomes a major stationary source or major modification solely by virtue of a relaxation in any enforceable limitation which was established after August 7, 1980, on the capacity of the source or modification otherwise to emit a pollutant, such as a restriction on hours of operation, then the requirements or paragraphs (j) through (s) of this section shall apply to the source or modification as though construction had not yet commenced on the source or modification.

(5) [Reserved]

(6) Except as otherwise provided in paragraph (r)(6)(vi)(*b*) of this section, the provisions of this paragraph (r)(6) apply with respect to any regulated NSR pollutant emitted from projects at existing emissions units at a major stationary source (other than projects at a source with a PAL) in circumstances where there is a reasonable possibility, within the meaning of

39

paragraph (r)(6)(vi) of this section, that a project that is not a part of a major modification may result in a significant emissions increase of such pollutant, and the owner or operator elects to use the method specified in paragraphs (b)(41)(ii)(*a*) through (*c*) of this section for calculating projected actual emissions.

(i) Before beginning actual construction of the project, the owner or operator shall document and maintain a record of the following information:

(*a*) A description of the project;

(*b*) Identification of the emissions unit(s) whose emissions of a regulated NSR pollutant could be affected by the project; and

(*c*) A description of the applicability test used to determine that the project is not a major modification for any regulated NSR pollutant, including the baseline actual emissions, the projected actual emissions, the amount of emissions excluded under paragraph (b)(41)(ii)(*c*) of this section and an explanation for why such amount was excluded, and any netting calculations, if applicable.

(ii) If the emissions unit is an existing electric utility steam generating unit, before beginning actual construction, the owner or operator shall provide a copy of the information set out in paragraph (r)(6)(i) of this section to the Administrator. Nothing in this paragraph (r)(6)(ii) shall be construed to require the owner or operator of such a unit to obtain any determination from the Administrator before beginning actual construction.

(iii) The owner or operator shall monitor the emissions of any regulated NSR pollutant that could increase as a result of the project and that is emitted by any emissions unit identified in paragraph (r)(6)(i)(*b*) of this section; and calculate and maintain a record of the annual emissions, in tons per year on a calendar year basis, for a period of 5 years following resumption of regular operations after the change, or for a period of 10 years following resumption of regular operations after the change if the project increases the design capacity or potential to emit that regulated NSR pollutant at such emissions unit.

(iv) If the unit is an existing electric utility steam generating unit, the owner or operator shall submit a report to the Administrator within 60 days after the end of each year during which records must be generated under paragraph (r)(6)(iii) of this section setting out the unit's annual emissions during the calendar year that preceded submission of the report.

(v) If the unit is an existing unit other than an electric utility steam generating unit, the owner or operator shall submit a report to the Administrator if the annual emissions, in tons per year, from the project identified in paragraph (r)(6)(i) of this section, exceed the baseline actual emissions (as documented and maintained pursuant to paragraph (r)(6)(i)(*c*) of this section), by a significant amount (as defined in paragraph (b)(23) of this section) for that regulated NSR pollutant, and if such emissions differ from the preconstruction projection as documented and maintained pursuant to paragraph (r)(6)(i)(*c*) of this section. Such report shall be submitted to the Administrator within 60 days after the end of such year. The report shall contain the following:

(*a*) The name, address and telephone number of the major stationary source;

(*b*) The annual emissions as calculated pursuant to paragraph (r)(6)(iii) of this section; and

(*c*) Any other information that the owner or operator wishes to include in the report (e.g., an explanation as to why the emissions differ from the preconstruction projection).

(vi) A ''reasonable possibility'' under paragraph (r)(6) of this section occurs when the owner or operator calculates the project to result in either:

(*a*) A projected actual emissions increase of at least 50 percent of the amount that is a ''significant emissions increase,'' as defined under paragraph (b)(40) of this section (without reference to the amount that is a significant net emissions increase), for the regulated NSR pollutant; or

(*b*) A projected actual emissions increase that, added to the amount of emissions excluded under paragraph (b)(41)(ii)(*c*) of this section, sums to at least 50 percent of the amount that is a

"significant emissions increase," as defined under paragraph (b)(40) of this section (without reference to the amount that is a significant net emissions increase), for the regulated NSR pollutant. For a project for which a reasonable possibility occurs only within the meaning of paragraph (r)(6)(vi)(*b*) of this section, and not also within the meaning of paragraph (r)(6)(vi)(*a*) of this section, then provisions (r)(6)(ii) through (v) do not apply to the project.

(7) The owner or operator of the source shall make the information required to be documented and maintained pursuant to paragraph (r)(6) of this section available for review upon a request for inspection by the Administrator or the general public pursuant to the requirements contained in § 70.4(b)(3)(viii) of this chapter.

(s) *Environmental impact statements.* Whenever any proposed source or modification is subject to action by a Federal Agency which might necessitate preparation of an environmental impact statement pursuant to the National Environmental Policy Act (42 U.S.C. 4321), review by the Administrator conducted pursuant to this section shall be coordinated with the broad environmental reviews under that Act and under section 309 of the Clean Air Act to the maximum extent feasible and reasonable.

(t) *Disputed permits or redesignations.* If any State affected by the redesignation of an area by an Indian Governing Body, or any Indian Governing Body of a tribe affected by the redesignation of an area by a State, disagrees with such redesignation, or if a permit is proposed to be issued for any major stationary source or major modification proposed for construction in any State which the Governor of an affected State or Indian Governing Body of an affected tribe determines will cause or contribute to a cumulative change in air quality in excess of that allowed in this part within the affected State or Indian Reservation, the Governor or Indian Governing Body may request the Administrator to enter into negotiations with the parties involved to resolve such dispute. If requested by any State or Indian Governing Body involved, the Administrator shall make a

recommendation to resolve the dispute and protect the air quality related values of the lands involved. If the parties involved do not reach agreement, the Administrator shall resolve the dispute and his determination, or the results of agreements reached through other means, shall become part of the applicable State implementation plan and shall be enforceable as part of such plan. In resolving such disputes relating to area redesignation, the Administrator shall consider the extent to which the lands involved are of sufficient size to allow effective air quality management or have air quality related values of such an area.

(u) *Delegation of authority.* (1) The Administrator shall have the authority to delegate his responsibility for conducting source review pursuant to this section, in accordance with paragraph (u)(2) of this section.

(2) Where the Administrator delegates the responsibility for conducting source review under this section to any agency other than a Regional Office of the Environmental Protection Agency, the following provisions shall apply:

(i) Where the delegate agency is not an air pollution control agency, it shall consult with the appropriate state, tribe, and local air pollution control agency prior to making any determination under this section. Similarly, where the delegate agency does not have continuing responsibility for managing land use, it shall consult with the appropriate state, tribe, and local agency primarily responsible for managing land use prior to making any determination under this section.

(ii) The delegate agency shall send a copy of any public comment notice required under paragraph (r) of this section to the Administrator through the appropriate Regional Office.

(3) In the case of a source or modification which proposes to construct in a class III area, emissions from which would cause or contribute to air quality exceeding the maximum allowable increase applicable if the area were designated a class II area, and where no standard under section 111 of the act has been promulgated for such source

41

# SUBCHAPTER C—AIR PROGRAMS (CONTINUED)

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

### Subpart A—General Provisions

Sec.
52.01  Definitions.
52.02  Introduction.
52.03  Extensions.
52.04  Classification of regions.
52.05  Public availability of emission data.
52.06  Legal authority.
52.07  Control strategies.
52.08  Rules and regulations.
52.09  Compliance schedules.
52.10  Review of new sources and modifications.
52.11  Prevention of air pollution emergency episodes.
52.12  Source surveillance.
52.13  Air quality surveillance; resources; intergovernmental cooperation.
52.14  State ambient air quality standards.
52.15  Public availability of plans.
52.16  Submission to Administrator.
52.17  Severability of provisions.
52.18  Abbreviations.
52.19  Revision of plans by Administrator.
52.20  Attainment dates for national standards.
52.21  Prevention of significant deterioration of air quality.
52.22  Maintenance of national standards.
52.23  Violation and enforcement.
52.24  Statutory restriction on new sources.
52.25  Date for submission of Set II CTG regulations.
52.26  Visibility monitoring strategy.
52.27  Protection of visibility from sources in attainment areas.
52.28  Protection of visibility from sources in nonattainment areas.
52.29  Visibility long-term strategies.

### Subpart B—Alabama

52.50  Identification of plan.
52.51  Classification of regions.
52.52  Extensions.
52.53  Approval status.
52.54  Attainment dates for national standards.
52.56  Review of new sources and modifications.
52.57  Control strategy: Sulfur oxides.
52.58  Control strategy: Lead.
52.59  Maintenance of national standards.
52.60  Significant deterioration of air quality.
52.61  Visibility protection.
52.62  Control strategy: sulfur oxides and particulate matter.

52.63  PM$_{10}$ State Implementation Plan development in group II areas.
52.64  [Reserved]
52.65  Control strategy: Nitrogen Oxides

### Subpart C—Alaska

52.70  Identification of plan.
52.71  Classification of regions.
52.72  Approval status.
52.73  General requirements.
52.74  Legal authority.
52.75  Contents of the approved state-submitted implementation plan.
52.76—52.77  [Reserved]
52.78  Review of new sources and modifications.
52.79  [Reserved]
52.80  Intergovernmental cooperation.
52.81  Attainment dates for national standards.
52.82  Extensions.
52.83  [Reserved]
52.84  Compliance schedules.
52.85—52.94  [Reserved]
52.95  Maintenance of national standards.
52.96  Significant deterioration of air quality.

### Subpart D—Arizona

52.120  Identification of plan.
52.121  Classification of regions.
52.122  Extensions.
52.123  Approval status.
52.124  Part D disapproval.
52.125  Control strategy and regulations: Sulfur oxides.
52.126  Control strategy and regulations: Particulate matter.
52.127—52.128  [Reserved]
52.129  Review of new sources and modifications.
52.130  Source surveillance.
52.131  Attainment dates for national standards.
52.132  [Reserved]
52.133  Rules and regulations.
52.134  Compliance schedules.
52.135  Resources.
52.136—52.137  [Reserved]
52.138  Conformity procedures.
52.139  [Reserved]
52.140  Monitoring transportation trends.
52.141—52.142  [Reserved]
52.143  Maintenance of national standards.
52.144  Significant deterioration of air quality.
52.145  Visibility protection.
52.146  Particulate matter (PM–10) Group II SIP commitments.

### Subpart E—Arkansas

4

[37 FR 19808, Sept. 22, 1972]

## §52.18 Abbreviations.

Abbreviations used in this part shall be those set forth in part 60 of this chapter.

[38 FR 12698, May 14, 1973]

## §52.19 Revision of plans by Administrator.

After notice and opportunity for hearing in each affected State, the Administrator may revise any provision of an applicable plan, including but not limited to provisions specifying compliance schedules, emission limitations, and dates for attainment of national standards; if:

(a) The provision was promulgated by the Administrator, and

(b) The plan, as revised, will be consistent with the act and with the requirements applicable to implementation plans under part 51 of this chapter.

[38 FR 12698, May 14, 1973]

## §52.20 Attainment dates for national standards.

Each subpart contains a section which specifies the latest dates by which national standards are to be attained in each region in the State. An attainment date which only refers to a month and a year (such as July 1975) shall be construed to mean the last day of the month in question. However, the specification of attainment dates for national standards does not relieve any State from the provisions of subpart N of this chapter which require all sources and categories of sources to comply with applicable requirements of the plan—

(a) As expeditiously as practicable where the requirement is part of a control strategy designed to attain a primary standard, and

(b) Within a reasonable time where the requirement is part of a control strategy designed to attain a secondary standard.

[37 FR 19808, Sept. 22, 1972, as amended at 39 FR 34535, Sept. 26, 1974; 51 FR 40676, Nov. 7, 1986]

## §52.21 Prevention of significant deterioration of air quality.

(a) *Plan disapproval.* The provisions of this section are applicable to any State implementation plan which has been disapproved with respect to prevention of significant deterioration of air quality in any portion of any State where the existing air quality is better than the national ambient air quality standards. Specific disapprovals are listed where applicable, in subparts B through DDD of this part. The provisions of this section have been incorporated by reference into the applicable implementation plans for various States, as provided in subparts B through DDD of this part. Where this section is so incorporated, the provisions shall also be applicable to all lands owned by the Federal Goverment and Indian Reservations located in such State. No disapproval with respect to a State's failure to prevent significant deterioration of air quality shall invalidate or otherwise affect the obligations of States, emission sources, or other persons with respect to all portions of plans approved or promulgated under this part.

(b) *Definitions.* For the purposes of this section:

(1)(i) *Major stationary source* means:

(a) Any of the following stationary sources of air pollutants which emits, or has the potential to emit, 100 tons per year or more of any pollutant subject to regulation under the Act: Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input, coal cleaning plants (with thermal dryers), kraft pulp mills, portland cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants, primary copper smelters, municipal incinerators capable of charging more than 250 tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production plants, chemical process plants, fossil fuel boilers (or combinations thereof) totaling more than 250 million British

19

nology, including but not limited to advanced flue gas desulfurization, sorbent injection for sulfur dioxide and nitrogen oxides controls and electrostatic precipitators;

(ii) An activity or project to accommodate switching to a fuel which is less polluting than the fuel in use prior to the activity or project, including, but not limited to natural gas or coal re-burning, or the co-firing of natural gas and other fuels for the purpose of controlling emissions;

(iii) A permanent clean coal technology demonstration project conducted under title II, section 101(d) of the Further Continuing Appropriations Act of 1985 (sec. 5903(d) of title 42 of the United States Code), or subsequent appropriations, up to a total amount of $2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations for the Environmental Protection Agency; or

(iv) A permanent clean coal technology demonstration project that constitutes a repowering project.

(33) *Representative actual annual emissions* means the average rate, in tons per year, at which the source is projected to emit a pollutant for the two-year period after a physical change or change in the method of operation of a unit, (or a different consecutive two-year period within 10 years after that change, where the Administrator determines that such period is more representative of normal source operations), considering the effect any such change will have on increasing or decreasing the hourly emissions rate and on projected capacity utilization. In projecting future emissions the Administrator shall:

(i) Consider all relevant information, including but not limited to, historical operational data, the company's own representations, filings with the State or Federal regulatory authorities, and compliance plans under title IV of the Clean Air Act; and

(ii) Exclude, in calculating any increase in emissions that results from the particular physical change or change in the method of operation at an electric utility steam generating unit, that portion of the unit's emissions following the change that could

have been accommodated during the representative baseline period and is attributable to an increase in projected capacity utilization at the unit that is unrelated to the particular change, including any increased utilization due to the rate of electricity demand growth for the utility system as a whole.

(34) *Clean coal technology* means any technology, including technologies applied at the precombustion, combustion, or post combustion stage, at a new or existing facility which will achieve significant reductions in air emissions of sulfur dioxide or oxides of nitrogen associated with the utilization of coal in the generation of electricity, or process steam which was not in widespread use as of November 15, 1990.

(35) *Clean coal technology demonstration project* means a project using funds appropriated under the heading "Department of Energy-Clean Coal Technology", up to a total amount of $2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations for the Environmental Protection Agency. The Federal contribution for a qualifying project shall be at least 20 percent of the total cost of the demonstration project.

(36) *Temporary clean coal technology demonstration project* means a clean coal technology demonstration project that is operated for a period of 5 years or less, and which complies with the State implementation plans for the State in which the project is located and other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

(37) (i) *Repowering* means replacement of an existing coal-fired boiler with one of the following clean coal technologies: atmospheric or pressurized fluidized bed combustion, integrated gasification combined cycle, magnetohydrodynamics, direct and indirect coal-fired turbines, integrated gasification fuel cells, or as determined by the Administrator, in consultation with the Secretary of Energy, a derivative of one or more of these technologies, and any other technology capable of controlling multiple combus-